# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

SAGECREST II, LLC,

                Plaintiff,

      -against-

IAN S. PECK, ACG CREDIT COMPANY
II, LLC, ACG FINANCE COMPANY, LLC,
FINE ART FINANCE, LLC, ART CAPITAL
GROUP, LLC, ART CAPITAL GROUP,
INC., and ACG CREDIT COMPANY, LLC,

                Defendants.

---

Index No. 600166/09
Part 3 (Bransten, J.)

**AMENDED COMPLAINT**

Plaintiff SageCrest II, LLC ("SageCrest"), by and through its attorneys, Kelley

Drye & Warren LLP, as and for its Amended Complaint against Defendants Ian S. Peck

("Peck"), ACG Credit Company II, LLC ("ACG-II"), ACG Finance Company LLC ("ACG

Finance"), Fine Art Finance, LLC ("Fine Art Finance"), Art Capital Group, LLC ("Art Capital

LLC"), Art Capital Group, Inc. ("Art Capital Inc."), and ACG Credit Company, LLC ("ACG-I"

and, together with ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, and Art Capital

Inc, the "Peck-controlled Entities") (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.    This case is about a continuing fraud perpetrated by Ian S. Peck through the Peck-

controlled Entities. Despite Court orders, signed agreements and commercial obligations

prohibiting such conduct, Peck and the Peck-controlled Entities have brazenly misappropriated

funds, presented false and misleading statements of fact to the Court and SageCrest, and refused

to pay funds to SageCrest when due.

2.      After Peck and some of the Peck-controlled Entities breached their contractual

obligations to pay over $40 million in principal and interest to SageCrest, their failure to provide

required financial and collateral reporting, their tortious actions (such as conveying assets

amongst themselves for no consideration), and their repeated attempts to mislead SageCrest,

SageCrest commenced an action against many of the Defendants herein, captioned *SageCrest II,*

*LLC v. ACG Credit Company, LLC, ACG Credit Company II, LLC, Art Capital Group, LLC, ACG*

*Finance Company, LLC, and Ian Peck*, Index No. 600195/07, in this Court, which action was

originally before the Honorable Karla Moskowitz and was subsequently assigned to the

Honorable Eileen Bransten (the "Prior ACG Litigation"). After SageCrest obtained an *Ex Parte*

Order of Attachment (the "Order of Attachment") and that order was confirmed, SageCrest and

the defendants in the Prior ACG Litigation (the "Prior ACG Litigation Defendants") reached a

settlement that was memorialized in a handwritten document and signed by counsel for

SageCrest and the Prior ACG Litigation Defendants (the "Agreement").

3.      The Agreement was ultimately modified in a Settlement Stipulation and Mutual

Release, dated May 19, 2008, with exhibits, which was signed by SageCrest and all of the

Defendants and was "So Ordered" by Justice Bransten on May 19, 2008 (the "So-Ordered

Settlement Stipulation").

4.      ACG-II, Fine Art Finance and ACG Finance have breached a number of their

obligations contained in the So-Ordered Settlement Stipulation including, but not limited to, their

obligations to: (a) pay over $6.7 million to SageCrest on or before November 19, 2008; (b) pay

interest on the $6.7 million on the first day of every month beginning on December 1, 2008; (c)

refrain from extending the maturity dates of any of the underlying loans past November 18,

2008; (d) make true, correct and accurate representations to SageCrest in the So-Ordered

2

Settlement Stipulation relating to the Assigned Loans (as defined below) and the Assigned

Collateral (as defined below); (e) provide required monthly reports to SageCrest; (f) provide

reports on any material adverse changes to the business and/or finances of the underlying

borrowers on the Assigned Loans (as defined below) or movement of the Assigned Collateral (as

defined below); (g) establish an account in the name of ACG-II at JPMorgan Chase Bank, N.A.

("JPMorgan") or other mutually-agreeable financial institution (the "Blocked Account"), which

is subject to an agreement that permits SageCrest to control the Blocked Account (the "Blocked

Account Agreement"); and (h) provide updates after July 21, 2008 regarding the efforts of ACG-

II, Fine Art Finance and ACG Finance to obtain the Residual Value Insurance policy ("RVI").

These failures constitute material breaches of the So-Ordered Settlement Stipulation, which are

violations of an Order of this Court. Because ACG-II, Fine Art Finance, and ACG Finance are

the alter egos of Peck, Peck is personally liable for the all of the damages that SageCrest has

suffered.

     5.     Defendants have also converted funds and property that belong to SageCrest, just

like the Prior ACG Litigation Defendants did. In particular, Art Capital Inc. — an entity with no

interest in the Assigned Loans (as defined below) or the Assigned Collateral (as defined below)

— has received over $1.2 million from the underlying borrowers on the Assigned Loans (as

defined below) including, most outrageously, $500,000 that Peck and the Peck-controlled

Entities procured from an underlying borrower two days after ACG-II defaulted on its obligation

to pay the $6.7 million and the Additional Interest (as defined below) to SageCrest. Despite

demands from SageCrest, Defendants have refused to turnover to SageCrest over $1.2 million

that belongs to SageCrest.

3

6.     Defendants have also tortiously interfered with SageCrest's contractual relations. After ACG-II failed to pay the over $6.7 million to SageCrest on November 19, 2008 and SageCrest exercised its right to service, manage, and administer the Assigned Loans (as defined below), Peck contacted at least two (2) of the underlying borrowers on the Assigned Loans (as defined below) and told those underlying borrowers not to pay SageCrest because SageCrest is in bankruptcy.

7.     As demonstrated by the previous action and the lawsuit recently brought by Defendants' former attorneys, Hahn & Hessen LLP ("H&H"), against Defendants, the refusal by Peck and the Peck-controlled Entities to comply with their obligations, convert funds and property that belong to SageCrest and commit other tortious acts is "par for the course."

## THE PARTIES

8.     Plaintiff SageCrest is a Delaware limited liability company with its principal place of business located at 3 Pickwick Plaza, Suite 400, Greenwich, Connecticut 06830. On August 17, 2008, SageCrest commenced a reorganization case by filing a voluntary petition for the relief afforded by Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). In accordance with Sections 1107 and 1108 of the Bankruptcy Code, SageCrest was authorized to continue in possession of its properties and operate and manage its businesses as a Debtor-in-Possession.

9.     Upon information and belief, Defendant Peck is a citizen of the State of New York and is domiciled at 181 East 65th Street, Apartment 7B, New York, New York 10065. Peck has admitted that he is the principal of Defendants ACG-II, Fine Art Finance, ACG Finance, Art Capital Inc., Art Capital LLC, and ACG-I. Upon information and belief, Peck is the sole member of Art Capital LLC, which is the sole member of Defendants ACG-II, ACG Finance, Fine Art Finance, and ACG-I. Upon further information and belief, Peck is also the

4

President of Defendants ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, and ACG-I. Upon further information and belief, Peck is sole shareholder and the Chairman or Chief Executive Officer of Art Capital Inc. As such, Peck controls and dominates ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, Art Capital Inc., and ACG-I. Upon further information and belief, Peck has signed all of the checks issued out of the bank accounts for the Peck-controlled Entities. Peck has used the Peck-controlled Entities to perpetrate numerous wrongs and frauds upon SageCrest including, but not limited to, making false statements to this Court both before and after this action was commenced, misappropriating over $1.2 million that belongs to SageCrest, fraudulently inducing SageCrest to enter into the So-Ordered Settlement Stipulation, and breaching the So-Ordered Settlement Stipulation to personally benefit himself. Further, Peck has directed underlying borrowers to make payments to Art Capital Inc. and its bank accounts, an entity that never had any interest in any of the Assigned Loans (as defined below) and the Assigned Collateral (as defined below). Peck further uses the Peck-controlled Entities in a manner demonstrating that they have no separate existence — other than serving Peck's own interests. For example, Peck has used Peck-controlled Entities that had no payment obligations to SageCrest to assign interests to SageCrest in order to secure payment obligations of other Peck-controlled Entities.

10.     Upon information and belief, Defendant ACG-II is a Delaware limited liability company with its principal place of business located at 980 Madison Avenue, New York, New York 10075. Upon information and belief, the sole member of ACG-II is Defendant Art Capital LLC, whose sole member is Defendant Peck. Upon information and belief, ACG-II is a wholly owned subsidiary of Art Capital LLC. Upon information and belief, ACG-II does not have any

5

bank accounts in its own name and uses the bank accounts of other Peck-controlled Entities including, but not limited to, Art Capital Inc. to receive and pay funds.

11.     Upon information and belief, Defendant ACG Finance is a Delaware limited liability company with its principal place of business located at 980 Madison Avenue, New York, New York 10075. Upon information and belief, the sole member of ACG Finance Defendant Art Capital LLC, whose sole member is Defendant Peck. Upon information and belief, ACG Finance is a wholly owned subsidiary of Art Capital LLC. Upon information and belief, ACG Finance does not have any bank accounts in its own name and uses the bank accounts of other Peck-controlled Entities including, but not limited to, Art Capital Inc. to receive and pay funds.

12.     Upon information and belief, Defendant Fine Art Finance is a Delaware limited liability company with its principal place of business located at 980 Madison Avenue, New York, New York 10075. Upon information and belief, the sole member of Fine Art Finance is Defendant Art Capital LLC, whose sole member is Defendant Peck. Upon information and belief, ACG Finance is a wholly owned subsidiary of Art Capital LLC. Upon information and belief, Fine Art Finance does not have any bank accounts in its own name and uses the bank accounts of other Peck-controlled Entities including, but not limited to, Art Capital Inc. to receive and pay funds.

13.     Upon information and belief, Defendant Art Capital LLC is a Delaware limited liability company with its principal place of business located at 980 Madison Avenue, New York, New York 10075. Upon information and belief, the sole member of Art Capital is Defendant Peck. Upon information and belief, Art Capital LLC is the sole member of Defendants ACG-II, ACG Finance, Fine Art Finance, and ACG-I.

6

14.     Upon information and belief, Defendant Art Capital Inc. is a Delaware corporation with its principal place of business located at 980 Madison Avenue, New York, New York 10075.  Upon information and belief, Defendant Peck is sole shareholder and the Chairman or Chief Executive Officer of Art Capital Inc.  Upon information and belief, at least one of the Art Capital Inc. accounts received over $1.2 million on account of or with respect to the Assigned Loans and the Assigned Collateral, despite the fact that Art Capital Inc. did not have any interest in either the Assigned Loans or the Assigned Collateral.  Since Art Capital Inc. has never had any interest in the Assigned Loans or the Assigned Loans and, thus, its receipt of any money relating to either demonstrates that the Peck-controlled Entities are nothing more than Peck's alter ego.  Upon further information and belief, Peck and the Peck-controlled Entities transferred funds in and out of at least one Art Capital Inc. bank account as well as between other bank accounts for Peck and the Peck-controlled Entities.

15.     Upon information and belief, Defendant ACG-I is a Delaware limited liability company with its principal place of business located at 980 Madison Avenue, New York, New York 10075.  Upon information and belief, the sole member of ACG-I is Defendant Art Capital LLC, whose sole member is Defendant Peck.  Upon information and belief, ACG-I is a wholly owned subsidiary of Art Capital LLC.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over Defendants because, *inter alia*, (a) the principal places of business of ACG-II, ACG Finance, Fine Art Finance, Art Capital LLC, Art Capital Inc., and ACG-I are located in New York, and ACG-II, ACG Finance, Fine Art Finance, Art Capital LLC, Art Capital Inc., and ACG-I transact business within New York, and (b) Peck is a citizen and resident of the City, County, and State of New York.  Venue of this action is proper

7

under CPLR §§ 503 and 509 because Art Capital Inc. and Peck are residents of the County of New York and SageCrest is designating the County of New York as the place of trial.

## FACTUAL ALLEGATIONS

### The Prior ACG Litigation

17.     Prior to the entry into the So-Ordered Settlement Stipulation, SageCrest was party to a certain Revolving Credit Agreement by and between ACG-I, as Borrower, and SageCrest, as Lender, dated as of August 20, 2003, and certain written amendments to the Credit Agreement (collectively, the "Credit Agreement"). On or about March 10, 2006, ACG-I sold, conveyed, assigned, transferred and delivered almost all of its assets to ACG-II, and ACG-II assumed many of the obligations and liabilities of ACG-I to SageCrest under the Credit Agreement. Accordingly, the term "ACG" shall refer to both ACG-I and ACG-II.

18.     The Credit Agreement set forth the procedures for how ACG could request a loan from SageCrest, and SageCrest had sole discretion of whether to make the loan. If SageCrest agreed to make a loan to ACG, the proceeds were required to be used to fund "Art Investments," which were asset based loans made to individual and corporate owners of fine art and antique assets, and ACG had to deliver a revolving note to SageCrest for each loan.

19.     In order to induce SageCrest to make any loans to ACG, ACG pledged and granted to SageCrest a security interest in all of ACG's assets including, but not limited to, the notes and security interests that ACG received from the entities and individuals that borrowed money from ACG.

20.     SageCrest perfected its security interests by filing UCC-1 financing statements on all of the assets of ACG-I and ACG-II in 2003 and 2006, respectively.

8

21.     Between August 2003 and January 2006, ACG borrowed well over tens of millions of dollars from SageCrest under the Credit Agreement and delivered revolving notes to SageCrest for each borrowing.

22.     The Credit Agreement and revolving notes matured on their face on December 4, 2006.

23.     ACG did not, however, pay the over $40 million in principal and interest that was owed to SageCrest on that date.

24.     After ACG-I and ACG-II breached their obligations to pay over $40 million in principal and interest to SageCrest, their failure to provide required financial and collateral reporting, the Prior ACG Litigation Defendants' tortious actions (such as converting and dissipating over $13 million of SageCrest's funds and conveying assets amongst themselves for no consideration), and the Prior ACG Litigation Defendants repeated attempts to mislead SageCrest, SageCrest commenced the Prior ACG Litigation by filing a Summons and Complaint on January 19, 2007.

25.     On February 14, 2007, SageCrest filed its Amended Complaint.

26.     The day after SageCrest filed its Amended Complaint, SageCrest served its first request for documents seeking, *inter alia*, bank account records. After many months of effort to obtain the bank account records from the Prior ACG Litigation Defendants, the Prior ACG Litigation Defendants made a production of limited, redacted bank account records on July 16, 2007 pursuant to a July 12, 2007 Compliance Conference Order. On August 17, 2007, the Prior ACG Litigation Defendants produced additional bank account records, which were also limited and redacted. Despite repeated demands from SageCrest to produce unredacted bank account records, the Prior ACG Litigation Defendants refused to do so.

27.    The bank account records show why the Prior ACG Litigation Defendants delayed and refused to produce additional and unredacted bank account records — the records show that the bank accounts of ACG-I and Art Capital Inc. received over $14.5 million on account of or with respect to the Art Investments.  These proceeds were required to be turned over to SageCrest under the Credit Agreement.

28.    Instead of paying SageCrest as required, the accounts that received the approximately $14.5 million had been depleted to almost nothing — the ACG-I account had a balance of $112,869.37 as of July 16, 2007, and the Art Capital Inc. account had a balance of $233,649.39 as of May 2, 2007.

29.    Subsequently, SageCrest sought and Justice Moskowitz entered the Order of Attachment on September 11, 2007.

30.    Pursuant to the CPLR and the Order of Attachment, SageCrest filed the required undertaking and sought to confirm the Order of Attachment.

31.    At the hearings on the motions seeking to confirm the Order of Attachment and the Prior ACG Litigation Defendants' motion to reargue the decision confirming the Order of Attachment, both Justice Freedman and Justice Moskowitz found that the failure of Peck and his companies to remit over $13 million to SageCrest, most of which was missing, demonstrated an intent to defraud SageCrest and dissipate assets.

32.    In particular, at the October 15, 2007 hearing on the motion to confirm the Order of Attachment, SageCrest demonstrated, *inter alia*, that:

- The Prior ACG Litigation Defendants owed over $40 million in principal and interest to SageCrest;

- SageCrest was the senior secured creditor of ACG-II;

- The Prior ACG Litigation Defendants had received approximately $14.5 million in proceeds on account of or with respect to the Art Investments;

10

- The Prior ACG Litigation Defendants failed to remit approximately $13 million of those proceeds to SageCrest, despite the Prior ACG Litigation Defendants' obligations to do so;

- SageCrest could have achieved the same effect as the Order of Attachment under the attorney-in-fact provision of the Credit Agreement;

- The Prior ACG Litigation Defendants had not produced complete, unredacted bank account records that the Court had ordered to be produced by October 12, 2007;

- The Prior ACG Litigation Defendants were using the proceeds to fund the litigation encaptioned *ACG Credit Company, LLC, Art Capital Group, LLC, Art Capital Group, Inc. and Fine Art Finance, LLC v. Andrew C. Rose, Long Valley Farm, Inc., Andrew Rose Fine Art, Art Capital Holdings, Inc., Art Finance Partners, LLC, Art Finance International, LLC, ARCK Credit Company, LLC, and Andrew Rose*, Index No. 601389/05, which is currently pending before Justice Lowe in the Commercial Division (the "*Rose* Litigation"), which is bitter litigation between Peck and certain of the Peck-controlled Entities and his former business partners that has been ongoing since 2005; and

- ACG-II was not a party to the *Rose* Litigation and the entities using the funds had no right to them; and

- If the Order of Attachment was not confirmed, the Prior ACG Litigation Defendants would continue to convert physical assets into cash or receive cash payments (both of which were subject to SageCrest's first priority perfected security interest), and then use that cash so that SageCrest would have nothing to enforce its judgment against.

33.   At the October 15th hearing on the motion to confirm the Order of Attachment,

Justice Freedman also asked the Prior ACG Litigation Defendants' counsel, Zachary G. Newman

of H&H, what happened to the money that was stolen by the Prior ACG Litigation Defendants:

> THE COURT:  In other words, is that $14 million gone? I'm asking you point blank.

> MR. NEWMAN:  We haven't done accounting down to the penny because --

> THE COURT: Not down to the penny.  Is that money there?

> Yes or no.

11

MR. NEWMAN: Some of it, yes.

THE COURT: How much is left?

MR. NEWMAN: Your Honor, I can represent to the Court that with respect to monies received, if you look in Miss Islam's affidavit on Page 4, the monies received with respect to non-Berry-Hill loans are being preserved.

With respect --

THE COURT: You are not answering my question.

MR. NEWMAN: That's approximately $4.6 million.

THE COURT: That's all that's left?

34.     Justice Freedman found that the use of the proceeds in Peck's personal war against his former business partners was a clear dissipation of assets: **"I think your client is dissipating assets and I'm concerned about that."** Accordingly, Justice Freedman confirmed the Order of Attachment. She required an undertaking of $7 million to vacate the Order of Attachment.

35.     The Prior ACG Litigation Defendants sought leave to reargue Justice Freedman's decision. After hearing argument on the application, Justice Moskowitz denied the Prior ACG Litigation Defendants' application to reargue:

> THE COURT: The question is if you look at the statute and see what the statute says, what I have before me I don't think has really changed, that the -- subdivision 3. -- the defendant with intent to defraud his creditors or frustrate the enforcement of the judgment that might be rendered in plaintiff's favor has assigned, disposed of, encumbered or secreted or removed. We don't have removed. Or is about to do any of those acts.
>
> It seems to me, based on the acknowledged receipt of loan proceeds into a bank account and then disbursement and **despite all the paper that the defendants have put in, and that was before Judge Freedman, that's really still what she had before her, didn't show what happened to most of the money that,** I guess, went into ACG I's bank account or ACG-II's.

12

MR. FRIEDMAN:    It went into ACG the LLC. I think some of it went into a parent company and some of it went into ACG 1 and if you combine the two bank accounts, there's about $300,000.

MR. NEWMAN:    Your Honor.

THE COURT: Please. I'm speaking, okay. It seems to me looking at the case law even though it's a very heavy burden on attachment, this not paying, not paying and this missing money is really enough to support the inference that I found when I had the original papers in front of me and that Judge Freedman found on the argument which was an argument to, I guess, the original one she had, was to confirm, right, with a cross motion.

MR. FRIEDMAN:    Yes.

THE COURT: To confirm the attachment and cross motion to vacate it, that this is enough to show an intent to defraud SageCrest II here and frustrate the enforcement of any judgment SageCrest II would get here. I also found and she found that there is a likelihood of success on the merits.

There really is -- there may be some counterclaims or something on some of this, but there's no defense for most of the money that is pursuant to these agreements, that the plaintiff lead to one or the other of the defendants, that the defendants have somehow used but we don't know what and the plaintiff certainly doesn't know what and that that is that the defendant has disposed of these funds.

So-- and despite all the paper that you're correct, you didn't have to put in, it's still admitted that some of the funds were used to fund litigation. The other litigation and the rest of it, there's just no explanation of where it went.

That's some of it, as we say, what is it four million, is somehow accounted for but most of it is not and I, frankly, don't see, even though Judge Freedman took this and didn't have a lot of time to look up everything, she had enough time and I certainly lived with this case and am familiar with it and I don't see any reason, one, to grant the argument because I don't think she mistook anything, all right. So I'm, not granting the argument.

I am granting the application to go to mediation and I am not staying discovery because I did order it to go forward because, as I said originally when I had this motion, and I'm trying to get it out that there's no question that several causes of action will go forward, it's just a question of duplicate causes of action that I

have to analyze.

36.     The Prior ACG Litigation Defendants had previously moved to dismiss the non-contractual causes of action in the Amended Complaint.  On December 21, 2007, Justice Moskowitz rendered her decision on the Prior ACG Litigation Defendants' motion for partial dismissal, denying the motion to dismiss the conversion claims against Peck individually and other of the Peck-controlled Entities as well as the fraudulent conveyance and indemnification claims.  Since the Prior ACG Litigation Defendants did not move to dismiss the nonpayment and contractual claims or the turnover of assets claims, Justice Moskowitz' decision meant that all of the Prior ACG Litigation Defendants were subject to liability and damages on at least one claim including Peck, who was personally liable on the conversion claims.

37.     Pursuant to Justice Moskowitz' order requiring the parties to mediate, representatives of SageCrest and the Prior ACG Litigation Defendants, together with their respective counsel, appeared for mediation on January 17, 2008 and January 25, 2008 before the neutral mediator, Neal H. Klausner, Esq. (the "Mediator").

38.     At the January 25th session, SageCrest and the Prior ACG Litigation Defendants reached a settlement, which was memorialized in the Agreement which, among other things, required ACG-II to make payments to SageCrest totaling $29.925 million, to be paid as follows: $21 million at closing, $4.5 million in six months, and another $4.425 million in two (2) years. The Agreement also provided that the Order of Attachment would not be vacated until SageCrest received the $21 million.

39.     The Agreement set February 8, 2008 as the deadline (the "Deadline") for the parties to sign final documentation of the settlement including, but not limited to, two (2) notes to evidence payments totaling $8.925 million, a $1 million personal guarantee of collection from Peck, the Blocked Account Agreement, the Assigned Collateral Warehouse Waiver Agreement,

14

and certain stipulations that would be filed in the Prior ACG Litigation after SageCrest received the initial payment of $21 million.

40.     Paragraph 3 of the Agreement provides, in pertinent part, that "[t]he terms of settlement, regardless, are binding on the parties, and any party may submit this agreement to the court to be so-ordered after the Deadline absent final documentation."

41.     After SageCrest and the Prior ACG Litigation Defendants entered into the Agreement, SageCrest drafted the final documentation and provided it to the Prior ACG Litigation Defendants' counsel.

42.     Almost from the moment that SageCrest provided the drafts to counsel for the Prior ACG Litigation Defendants until the date the So-Ordered Settlement Stipulation was signed — a period lasting over three (3) months — the Prior ACG Litigation Defendants did their best to try to alter and/or change the terms of the Agreement and delay the payment obligations of ACG-II.

43.     For example, the Prior ACG Litigation Defendants sought to change the terms regarding payment of the $21 million because Peck and the Prior ACG Litigation Defendants claimed that they were unable to come up with $21 million in cash to be paid at closing.

44.     The Prior ACG Litigation Defendants and their counsel argued — in numerous conferences, pleadings, and sessions with the Mediator and the Court — that the $21 million did not have to be paid in cash. They argued that $6.7 million could be paid by assigning certain loans to SageCrest because, according to their sworn statements and representations, those loans were "as good as cash."

45.     For example, at an April 2, 2008 status conference, the Prior ACG Litigation Defendants then-counsel, Zachary Newman of H&H, argued that the assignment of loans with a

principal balance of $6.7 million, together with a blocked account agreement, was a "cash

equivalent":

> MR. NEWMAN: But instead of paying the full amount, we're
> posting --- we're paying cash and financial products. Paper,
> financial paper.
>
> In other words, let's say in six months the 6.7 million and change
> doesn't get paid. Then they are going to take over those loans. It's
> a cash equivalent, is the word I was looking for. They are getting
> the cash equivalent so why should the order of attachment stay in
> place? There has to be an order of finality to the process at that
> point.

*     *     *

> MR. NEWMAN: ... First of all, it's not because they are getting
> the benefit of the bargain, the cash equivalent. And they are
> getting all the protection that is carried with it, meaning payment
> directions and blocked account and control over loans. They are
> getting all that. There is nothing they are not getting.
>
> And I don't mean for this to sound harsh, but my client will
> absolutely not sign on to anything unless, at the time the cash or
> cash equivalents are paid at the closing, that the order of
> attachment is released along with the releases.

*     *     *

> MR. NEWMAN: ... Yes, you are not getting 21 million in cash.
> We explained that to you not just yesterday. Nobody thought Bear
> Stearns would be sold for $2 either. Unfortunately, there is a
> crises. You are getting cash and cash equivalent.

46.     However, the Court recognized that SageCrest was entitled to the payment of $21

million at closing:

> THE COURT: Let me tell you something. **This Court is not
> going to second guess Sagecrest as to what they feel they need
> in order to ensure that they get paid their 21 million. The
> Court is not going to take back the heavy-handed approach,
> which may be very good for you and Mr. Peck but it may not
> be what is in fairness for the bargained deal.**
>
> I suggested, and I still suggest, that if you're saying to me that you

16

need to make up that 1.5 --

MR. NEWMAN: 6.7, your Honor.  It's the $6.7 million number.
That's the delta.

THE COURT: No, there is another sum.

MR. FRIEDMAN: The 1.2.

THE COURT: The 1.2 million.  If you need to have a release to
allow you to liquidate that 1.2 million, we'll start with that and I
think that's eminently fair.  That gives additional security that they
need but, at the same time, it allows you to come up with a certain
amount of money.

MR. NEWMAN: Your Honor, the problem that we have with that
is that with respect to this order of attachment, the Court has
already ruled that upon the posting of the $7 million undertaking or
bond, that the order of attachment automatically dissolves.

So, under our look at the research, if we hand over to Sagecrest a
$6.7 million loan, $1.2 million worth of cash, that that satisfies, or
the Court has the discretion to determine that that satisfies that
requirement to dissolve the order of attachment.

So put aside the settlement.  Let's say the parties never agree to a
settlement and I came into the court and I make a motion and I say,
"Your Honor, we want to dissolve the order of attachment and we
understand that Justice Freedman ruled and Justice Moskowitz
agreed that this $29 million attachment, this very large attachment
could go away with just a $7 million undertaking.  We want to
comply with that now, your Honor.  And what we would like to do
is to pay them $1.2 million in hard cash, cash on the barrelhead,
and provide full assignment of our rights in a $6.7 million loan" --

THE COURT: You are giving them the right to possibly not be
able to collect the 6.7 loan.  That's why you are here to begin with.
You are giving them the right to step into your shoes and try to be
a collection agency.  That's not the bargain that they made.

MR. NEWMAN: The point is, your Honor, is that this loan is not
some unknown loan.  This loan was actually in the Sage portfolio.
This borrower was a borrower that Sagecrest lent through us too.

THE COURT: Through you.  That's the point.

17

47.     Defendants eventually provided due diligence materials to SageCrest so that SageCrest could evaluate the Assigned Loans (as defined below) and the Assigned Collateral (as defined below) in order to allow SageCrest to evaluate whether it would accept those items.

48.     The due diligence materials included, among other things, the underlying loan documents, lists of the underlying collateral and other information regarding that collateral including valuations, and the UCC financing statements for that collateral.

49.     For example, the due diligence materials represented that the value of a piece of the proposed collateral, Diego Rivera's *Nino Ruso con Trineo*, had a value of $500,000 as of April 2008. The materials also represented that the collateral for one of the underlying borrowers, Alastair Crawford and Alastair Crawford, LLC (collectively, "Crawford"), consisted of 98 pieces of silverware.

50.     SageCrest reviewed all of the due diligence materials and relied on those materials when SageCrest agreed to enter into the So–Ordered Settlement Stipulation.

51.     After a number of motions were filed and numerous hearings and sessions with the Mediator and/or the Court, the Prior ACG Litigation Defendants and Fine Art Finance agreed to certain terms and restrictions and to make representations and warranties to SageCrest so that SageCrest could feel secure in deferring the payment of $6.7 million until six months after closing.

52.     All of those terms and restrictions are set forth in the So-Ordered Settlement Stipulation and the exhibits thereto and, in fact, many of those terms and restrictions are ones that have been breached by Defendants.

**The So-Ordered Settlement Stipulation**

53.    On May 19, 2008, the So-Ordered Settlement Stipulation was executed by, among others, SageCrest, Peck, ACG-I, ACG-II, ACG Finance, Art Capital LLC, and Fine Art Finance, and was subsequently "so ordered" by the Justice Bransten.

54.    Peck executed the So-Ordered Settlement Stipulation both individually and as President of ACG-I, ACG-II, ACG Finance, Art Capital LLC, and Fine Art Finance.

55.    The So-Ordered Settlement Stipulation was entered by the Clerk of the Court on or about May 19, 2008.

56.    The So-Ordered Settlement Stipulation obligates Defendants to, *inter alia*, make payments totaling $29,925,000 (the "Settlement Amount") plus any applicable interest to SageCrest, establish the Blocked Account and make it subject to the Blocked Account Agreement, direct the underlying borrowers to make payments to the Blocked Account, provide monthly reporting, report to SageCrest if there are any materially adverse changes to the financial condition of the underlying borrowers or any movement of the collateral, refrain from extending any maturity dates for the Assigned Loans past November 18, 2008, and fully cooperate with SageCrest.

57.    The So-Ordered Settlement Stipulation requires that the Settlement Amount plus any additional interest be paid to SageCrest as follows:

(a)    $21,000,000.00 (the "Initial Consideration") on or before May 19, 2008 (the "Closing Date") in the form of a Cash Payment (as defined below) and an Assignment (as defined below);

(i)    The "Cash Payment" consisted of wire transfers in immediately available funds of $14,300,000 to be paid through a number of different transactions including (A) the release of over $12,519,686.41 from escrow being held by the Prior ACG Litigation

Defendants' counsel, H&H, which represented the payoff by Berry-Hill Galleries to SageCrest, (B) the payment to SageCrest by one of ACG-II's underlying borrower of $419,963.08, (C) the payment of $750,000 by ACG-II to SageCrest on the Closing Date, and (D) the payment by ACG-II to SageCrest of the difference between $14,300,000 and the amounts specified in subparagraphs (A) through (C) above (which particular amount was later reduced by $200,000 pursuant to Amendment No. 1 to the So-Ordered Settlement Stipulation because ACG-II prepaid the 6-Month Note (as defined below)); and

(ii)     The Assignment consisted of an assignment (the "Assignment") by Fine Art Finance and ACG Finance to SageCrest of, among other things, Fine Art Finance's and/or ACG Finance's rights to receive all monthly principal and interest payments and/or any sale proceeds generated by five (5) unencumbered loans purportedly having an outstanding principal balance of at least $6.7 million as set forth in Exhibit K to the So-Ordered Settlement Stipulation (individually, an "Assigned Loan" and collectively, the "Assigned Loans") which Assigned Loans are supposed to be secured by collateral consisting of 35 pieces of artwork with an appraised value of approximately $14 million (the "Assigned Collateral") to secure the payment of $6.7 million (the "Balance") plus any interest due thereon (the "Additional Interest") by ACG-II to SageCrest, which payment is required to made by wire transfer in immediately available funds within six (6) months of the Closing Date (the "Grace Period"). The Assignment was made by execution of the Collateral Assignment of Promissory Notes and Security Interests by Fine Art Finance, ACG Finance and SageCrest (the "Collateral Assignment") and by providing the underlying original notes, allonges and collateral documents for the Assigned Loans to SageCrest.

20

(b)     $4,500,000 on or before November 19, 2008 pursuant to a note (the "6-Month Note"), which note was secured by a first perfected security interest in and lien on and the proceeds of the one art loan and the collateral securing that loan, a $1 million limited personal guarantee of collection issued by Peck to SageCrest (the "Limited Personal Guarantee"), and the Blocked Account.

(c)     $4,425,000 on or before May 19, 2010 pursuant to a note (the "2-Year Note"), which payment is secured by: (i) a first perfected security interest in and lien on and the proceeds of a certain judgment (the "American Furniture Judgment") and a certain lot of furniture owned by an underlying borrower that is being held by a trustee the (the "Gill Furniture Lot"); (ii) ACG-II's rights and interest in the three other loans (the "Other Art Loans") and the collateral securing those loans (the "Other Art Loan Collateral"), (iii) eight paintings that are identified in Exhibit I to the So-Ordered Settlement Stipulation (the "IPFP Collateral"); (iv) a care and custody agreement between SageCrest and ACG-II for the IPFP Collateral, which is attached to the So-Ordered Settlement Stipulation as Exhibit P; (v) the Limited Personal Guarantee; and (vi) and the Blocked Account.

58.     In the So-Ordered Settlement Stipulation, Defendants made numerous representations and warranties to SageCrest.

59.     In regard to the Assigned Loans and the Assigned Collateral, Section 4(a) of the So-Ordered Settlement Stipulation includes the following:

> Fine Art Finance and ACG Finance each warrants and represents that as of April 30, 2008 (i) the balance due and owing under each of the Assigned Loans, as set forth in Exhibit K, is true and accurate, (ii) there is not, nor has been, any declaration of default under the Assigned Loans, (iii) neither Fine Art Finance nor ACG Finance is aware of any default under the Assigned Loan, (iv) no outstanding interest payments are due and owing under the Assigned Loans and (v) the Assigned Loans are secured by

21

collateral consisting of 35 pieces of artwork with an appraised value of approximately $14 million (the "Assigned Collateral") and Fine Art Finance and/or ACG Finance has a first priority perfected security interest in the Assigned Collateral.

60.     Exhibit K to the So-Ordered Settlement Stipulation contains the following

representations regarding the Assigned Loans and the Assigned Collateral:

| | INITIAL LOAN DATE | LOAN TYPE | OUTSTANDING PRINCIPAL BALANCE | MATURITY DATE | COLLATERAL TYPE |
|---|---|---|---|---|---|
| Alastair Crawford | 5/21/07 | $1mm Credit Facility | 179,289 | 5/21/08 | Decorative Art |
| Lawrence J. Daitch | 7/1/04 | $15,000 Term Loan | 15,000 | 6/30/08 | Fine Art |
| Evan Tawil | 8/11/06 | $350,000 Credit Facility | 220,000 | 10/17/08 | Fine Art |
| Enrico Navarra d/b/a Enrico Navarra New York | 5/27/04 | $5mm Credit Facility | 310,000 | 5/22/09 | Fine Art |
| Galleria Ramis Barquet, N.Y. Ltd. | 9/28/04 | $6mm Credit Facility | 6,000,000 | 10/31/08 | Fine Art |
| | | | $    6,724,289 | | |

61.     The Collateral Assignment, which is Exhibit L to the So-Ordered Settlement

Stipulation, was signed by Fine Art Finance, ACG Finance and ACG-II — all by Peck as

President of those entities — and by SageCrest.

62.     In the Collateral Assignment, Fine Art Finance and ACG Finance (collectively,

the "Assignor") assigned all of their rights in the Assigned Loans except for certain fees,

expenses and commissions.  The Collateral Assignment provides, in pertinent part:

> FOR VALUE RECEIVED, and as collateral security for all debts, liabilities and obligations of ACG Credit Company II, LLC ("Borrower") to [SageCrest], now existing or hereafter arising under the [So-Ordered] Settlement Stipulation in connection with the payment of the $6.7 million Balance due under the Initial

22

Payment, Assignor hereby assigns, transfers and sets over unto [SageCrest], its successors and assigns, all of its rights, but not its obligations, under (i) each of the promissory notes set forth and described on Schedule A hereto (the "Assigned Loans"), with each of the borrowers listed on said Schedule A (such borrowers, the "Underlying Borrowers"), (ii) all collateral documents and guarantees relating to the Assigned Loans or any collateral security provided therefor, (iii) all filings made to preserve or perfect any security interest granted pursuant to any of the foregoing documents, and (iv) all payments, products and proceeds of any of the foregoing (the items described in clauses (i) through (iv), collectively, the "Collateral"; the collateral documents described in clauses (ii) and (iii), collectively, the "Collateral Documents"); except, Assignor expressly carves out of such assignment and retains for its own use and benefit, any and all rights to receive any commissions, fees or expenses, including an Arranger's Fee, due under the Assigned Loans.

63.     On May 19, 2008, SageCrest received the allonges, a general loan document assignment, and original loan documents for the Assigned Loans. On May 20, 2008, UCC financing statements were filed assigning the security interests in the Assigned Loans and Assigned Collateral from Fine Art Finance and/or ACG Finance to SageCrest pursuant to the Collateral Assignment. As a result, SageCrest has a first priority perfected security interest in the Assigned Loans and the Assigned Collateral.

64.     As part of the security for the 6-Month Note, the 2-Year Note and the payment of the Balance plus any Additional Interest, the parties agreed that the Blocked Account would be established. In particular, Section 13(a) of the So-Ordered Settlement Stipulation provides, in pertinent part:

Simultaneously with the execution of this So-Ordered Settlement Stipulation and in order to secure the ACG-II Notes and the Collateral Assignment, SageCrest and ACG-II shall present the [B]locked [A]ccount [A]greement annexed hereto as Exhibit R (the "Blocked Account Agreement" and, together with the 6-Month Note, 2-Year Note, the Limited Personal Guarantee, the Collateral Assignment, the IPFP Care and Custody Agreement, the Assignment, the Assigned Collateral Warehouse Agreement, and the Assigned Loan Guarantee, collectively the "Additional

23

Agreements") to a mutually acceptable financial institution,
preferably JPMorgan Chase Bank, N.A., which account is
currently or shall be in the name of ACG-II.... The Blocked
Account Agreement shall terminate when SageCrest is paid the
Settlement Amount plus any Additional Interest and any collection
and/or enforcement costs, if applicable.

65.    On or prior to the Closing Date, ACG-II, by Peck as President, and SageCrest

executed the Blocked Account Agreement.

66.    The Blocked Account Agreement allows SageCrest to control the Blocked

Account. Paragraph 2 of the Blocked Agreement provides, in pertinent part:

The [bank] shall honor all withdrawal, payment, transfer or other
fund disposition instructions (collectively, "instructions") received
from [SageCrest] concerning the Account and all funds on deposit
therein without [ACG-II's] consent or the consent of any other
person or entity. Neither [ACG-II] nor any other person or entity
other than [SageCrest] shall have the right or ability to access or
withdraw or transfer funds from the Account.

67.    All payments relating to the Assigned Loans or the Assigned Collateral are

required to be made into the Blocked Account.

68.    In particular, Section 4(b) of the So-Ordered Settlement Stipulation requires that

"[a]ny payments on account of or with respect to the Assigned Loans or the Assigned Collateral

and/or sale proceeds generated by the Assigned Loans or the Assigned Collateral shall be paid

directly into the Blocked Account ... for the benefit of SageCrest and in reduction of the

Balance. Fine Art Finance and ACG Finance each covenants and agrees that they will direct

each of the underlying borrowers on each Assigned Loan to make payments in the manner

specified above...."

69.    Section 4(f) of the So-Ordered Settlement Stipulation further provides that "Any

and all proceeds generated by or from the Assigned Collateral shall be deposited into the

Blocked Account ..."

24

70.     If any underlying borrowers remitted any payments to ACG-II, Fine Art Finance or ACG Finance and not into the Blocked Account, Section 13(b) of the So-Ordered Settlement Stipulation requires ACG-II, Fine Art Finance or ACG Finance to remit such payment into the Blocked Account within ten (10) days of receipt of any such payment.

71.     The Prior ACG Litigation Defendants and Fine Art Finance also agreed to provide certain credit enhancements to SageCrest in order to induce SageCrest to defer the receipt of the $6.7 million until November 19, 2008.

72.     In particular, Fine Art Finance, ACG Finance and ACG-II agreed to "use their best efforts to request, on or before the Closing Date, [the RVI] for the benefit of SageCrest, providing coverage during the Grace Period (and for 6 months afterwards or until the Balance and any Additional Interest (as defined below) is paid whichever is earlier) for no more than $3.5 million, representing approximately twenty-five (25%) percent of the total Assigned Collateral value."

73.     However, if Fine Art Finance, ACG Finance and ACG-II could not procure the RVI, then the Balance accrues simple interest from the Closing Date at a rate of the posted yield for the 6-month U.S. Treasury Bill ... plus 2% per annum during the Grace Period (the "Additional Interest").  The Additional Interest must be paid to SageCrest in a lump sum on the last day of the Grace Period by wire transfer.

74.     In the event that ACG-II failed to pay the Balance plus any Additional Interest on or before November 19, 2008, any unpaid amounts continue to accrue interest at the same rate as the Additional Interest and such interest must be paid into the Blocked Account on the 1st day of each month until the balance thereof is paid in full with all interest thereon.

25

75.     Peck executed and delivered to SageCrest a guarantee of collection (the "Assigned Loan Guarantee"), which is annexed as Exhibit N to the So-Ordered Settlement Stipulation. The Assigned Loan Guarantee provides for payment of collection of an amount equal to the lesser of (a) the difference between $6.7 million and any remaining balance after application of any payment(s) under the RVI, if procured, and (b) $3 million. Accordingly, if the RVI was not procured, then the Assigned Loan Guarantee from Peck is for $3 million.

76.     During the Grace Period and assuming that Defendants did not breach certain of the provisions of the So-Ordered Settlement Stipulation, Defendants had a fiduciary duty to SageCrest because SageCrest agreed that it would not interfere with the servicing, managing, and administration of the Assigned Loans.

77.     However, Section 4(e) of the So-Ordered Settlement Stipulation and paragraph 5 of the Collateral Assignment provide that neither Fine Art Finance nor ACG Finance were permitted to amend or modify the loan documents for the Assigned Loans or any provision of the Assigned Loans in a manner that would have a material adverse impact upon the lien or rights of SageCrest under the Collateral Assignment or the loan documents for the Assigned Loans except that Fine Art Finance or ACG Finance were permitted to extend or renew the Assigned Loans on the exact same terms that existed as of the Closing Date provided that the extended or maturity date was November 18, 2008 or earlier.

78.     The reason why the maturity dates could not be extended past November 18, 2008 was that the $6.7 million plus any Additional Interest was due on November 19, 2008.

79.     The So-Ordered Settlement Stipulation also requires ACG-II, Fine Art Finance and ACG Finance to provide certain reports and information to SageCrest.

80.     Section 14(c) of the So-Ordered Settlement Stipulation mandates that:

"ACG-II, Fine Art Finance and ACG Finance shall provide a monthly written report to SageCrest setting forth (i) any collection and/or enforcement efforts made by ACG-II, Fine Art Finance and ACG Finance and (ii) the amount(s), if any, expended in connection with such collection and/or enforcement efforts, and attaching copies of the invoices for any such collection and/or enforcement efforts incurred during the previous month (redacted to exclude information protected by the attorney-client privilege and/or the attorney work product doctrine)."

81.    Section 14(d) of the So-Ordered Settlement Stipulation provides:

In addition to any restrictions contained in this So-Ordered Settlement Stipulation or the Additional Agreement regarding the IPFP Collateral and the Assigned Loan Collateral, ACG-II, Fine Art Finance, and/or ACG Finance shall provide written notice to SageCrest of any movement of any piece of the Lealma/Malca Collateral, the Other Art Loan Collateral, the IPFP Collateral, the Gill Furniture Lot and the Assigned Loan Collateral. ACG-II, Fine Art Finance, and/or ACG Finance shall also inform SageCrest of any material adverse changes to the business and/or finances of the underlying borrowers on the Lealma/Malca Art Loan, the Other Art Loans, and/or the Assigned Loans.

82.    SageCrest agreed that it would not have any contact or communications with the underlying borrowers unless (a) ACG-II failed to pay the Settlement Amount when due or (b) ACG-II, Fine Art Finance and/or ACG Finance failed to fulfill the reporting requirements in Section 14(d).

83.    The Prior ACG Litigation Defendants and Fine Art Finance are obligated to fully cooperate with SageCrest in their performance of each and every one of their obligations under the So-Ordered Settlement Stipulation and the Additional Agreements. The Prior ACG Litigation Defendants also must "execute such additional agreements, documents or instruments, if any, as may reasonably be required to carry out the intent of th[e So-Ordered] Settlement Stipulation and the Additional Agreements."

27

84.     If ACG-II failed to pay the Balance and all of the Additional Interest by November 19, 2008, then SageCrest was required to send a cure notice to ACG-II, Fine Art Finance and ACG Finance.

85.     In the event that ACG-II did not cure the payment default within five (5) business days of the notice (the "Cure Period"), then SageCrest was vested with a number of additional rights and interests and ACG-II, Fine Art Finance and ACG Finance lose a number of rights.

86.     In particular, if ACG-II failed to cure the payment default within the Cure Period, then SageCrest was entitled to assign all of its rights and obligations relating to the Balance and the Additional Interest to any persons or entities other than certain persons and entities identified in Section 25 of the So-Ordered Settlement Stipulation.

87.     Further, if ACG-II failed to pay the Balance and any Additional Interest by the end of the Cure Period, then SageCrest had the absolute right to service, manage, and administer the Assigned Loans.  Moreover, neither Fine Art Finance nor ACG Finance were permitted to interfere with the servicing, managing, and administration of the Assigned Loans.

88.     If ACG-II failed to pay the Balance and the Additional Interest by the end of the Cure Period, then Fine Art Finance and ACG Finance lose any and all interests that they might have in the Assigned Loans unless and until SageCrest receives payment of the Balance, all Additional Interest, and any collection costs that SageCrest is entitled to recover.

**Peck's Scheme Come to Light**

89.     On November 19, 2008, ACG-II did not pay the Balance and the Additional Interest to SageCrest.

90.     In accordance with the terms of the So-Ordered Settlement Stipulation, on November 19, 2008, SageCrest sent a Notice of Default (the "Default Notice") by facsimile to

ACG-II, Fine Art Finance and ACG Finance and their counsel, which Default Notice gave ACG-II five (5) business days to cure the payment default.

91.     ACG-II, Fine Art Finance and ACG Finance received the Default Notice on November 19, 2008, but ACG-II did not cure the payment default within the Cure Period.

92.     In accordance with the terms of the So-Ordered Settlement Stipulation, SageCrest exercised its rights to service, administer, and manage the Assigned Loans on November 26, 2008.

93.     On November 26, 2008, SageCrest sent notices to the underlying borrowers on the Assigned Loans advising those borrowers that SageCrest was servicing, administering and managing their respective loans and provided each of the underlying borrowers with a copy of the Collateral Assignment. As part of that notice, SageCrest directed the underlying borrowers to make payments directly to SageCrest.

94.     At the same time that SageCrest sent the notices to the underlying borrowers, SageCrest also sent a notice to ACG-II, Fine Art Finance, ACG Finance and their counsel, Susan F. Balaschak ("Balaschak"), then a partner at Dreier LLP ("Dreier") and subsequently at Traub, Bonacquist & Fox, LLP ("TBF") and now at Akerman Senterfitt. The November 26, 2008 notice informed Defendants that SageCrest was exercising its contractual rights to service, administer and manage the Assigned Loans and that Defendants should not interfere with those loans. In particular, the letter states:

> On November 19, 2008, we sent you a Notice of Default (the "Default Notice"). Pursuant to the terms of the Settlement Stipulation and Additional Agreements, ACG II was required to wire transfer the amount set forth in the Default Notice plus any and all accrued Additional Interest by no later than today. ACG II has not done so. Accordingly, the Balance continues to accrue Additional Interest at the rate of the posted yield for the 6-month U.S. Treasury Bill plus 2% per annum until the Balance and all

29

Additional Interest is paid in full and such amounts must be paid to SageCrest, all in accordance with the terms of the Settlement Stipulation and the Additional Agreements.

Pursuant to the terms of the Settlement Stipulation and the Additional Agreements, **SageCrest is hereby exercising its absolute right to, without limitation, (i) hold the Assigned Loans as its property, (i) dispose of the Assigned Loans and/or the Assigned Collateral, (iii) service, manage, and administer the Assigned Loans, and (iv) contact and communicate with the underlying borrowers on the Assigned Loans,** all of which rights and remedies SageCrest may exercise at any time and from time to time hereafter as it determines in its sole discretion. Please be advised that SageCrest is contacting the underlying borrowers on the Assigned Loans to begin the process of servicing, managing and administering the Assigned Loans. **Neither Fine Art Finance nor ACG shall interfere with SageCrest's right to service, manage and administer the Assigned Loans. Any attempt by Fine Art Finance or ACG Finance or any of their agents to interfere with SageCrest's rights regarding the Assigned Loans or the Assigned Collateral will be in violation of the Settlement Stipulation and/or one or more of the Additional Agreements and will be, among other things, tortious conduct.**

(Emphasis added.)

95.     Since SageCrest took over the servicing, managing, and administering of the Assigned Loans, SageCrest has learned of numerous facts that demonstrate that Peck and the Peck-controlled Entities have continued their pattern and practice of defrauding SageCrest and stealing millions of dollars that belong to SageCrest.

96.     Despite SageCrest's warning to Defendants and their counsel that they should not interfere with SageCrest's rights regarding the Assigned Loans and entirely consistent with Defendants past conduct, Peck contacted Crawford by e-mail and told that underlying borrower not to pay SageCrest because SageCrest is in bankruptcy.

97.     Crawford has since not made any payments to SageCrest in breach of his loan agreement with SageCrest. Peck also contacted the principal, Ramis Barquet ("Barquet"), of another underlying borrower, Barquet Group, Inc. f/k/a Galleria Ramis Barquet, N.Y. Ltd.

30

("Barquet Group"), and told Barquet not to pay SageCrest because SageCrest is in bankruptcy

and that Peck was going to purchase the Assigned Loans from SageCrest in its bankruptcy for

cents on the dollar. Peck told Barquet that if Barquet Group did not pay SageCrest and Peck

acquired the underlying borrower's loan in the bankruptcy, then Peck would reduce the principal

balance of that loan by well over $1 million.

98.     Upon information and belief, Peck continues to contact these underlying

borrowers.

99.     These repeated communications have adversely affected SageCrest's relationships

with the underlying borrowers and SageCrest's ability to collect.

100.    After the So-Ordered Settlement Stipulation was signed, SageCrest contacted

Defendants' then-counsel, H&H, to inquire about the payments due on the Assigned Loans.

H&H stated that the underlying borrowers on the Assigned Loans were holding monthly interest

payments and that Defendants would instruct them to remit those payments into the Blocked

Account once it was set up.

101.    Contrary to the representation by H&H on behalf of Defendants that the

underlying borrowers would hold payments until the Blocked Account was established,

SageCrest learned on April 23, 2009 that Art Capital Inc., one of the Peck-controlled Entities and

an entity with no interest in the Assigned Loans or the Assigned Collateral, received over

$913,000 from the underlying borrowers after May 19, 2008. In particular, Art Capital Inc.

received the following payments from the underlying borrowers:

| Underlying Borrower | Date of Payment | Amount of Payment ($) |
|---|---|---|
| Crawford | May 30, 2008 | 3,478.00 |
| Crawford | June 26, 2008 | 8,648.44 |

| Crawford | July 24, 2008 | 6,949.20 |
|---|---|---|
| Crawford | September 2, 2008 | 3,622.00 |
| Crawford | October 6, 2008 | 6,019.15 |
| Crawford | December 1, 2008 | 2,157.36 |
| | | |
| Lawrence J. Daitch ("Daitch") | June 30, 2008 | 15,750.00 |
| Daitch | July 2, 2008 | 234.00 |
| | | |
| Evan Tawil ("Tawil") | July 11, 2008 | 2,047.00 |
| Tawil | July 17, 2008 | 596.00 |
| Tawil | August 11, 2008 | 2,650.50 |
| Tawil | August 19, 2008 | 2,650.50 |
| | | |
| Enrico Navarra d/b/a Enrico Navarra New York ("Navarra") | May 29, 2008 | 3,159.00 |
| Navarra | June 26, 2008 | 3,058.00 |
| Navarra | July 28, 2008 | 3,159.00 |
| Navarra | August 29, 2008 | 3,159.00 |
| Navarra | October 9, 2008 | 3,058.00 |
| Navarra | November 6, 2008 | 3,159.00 |
| Navarra | November 26, 2008 | 3,058.00 |
| **Underlying Borrower** | **Date of Payment** | **Amount of Payment ($)** |
| Barquet Group | July 10, 2008 | 49,836.00 |
| Barquet Group | July 28, 2008 | 60,265.00 |

| Barquet Group | August 13, 2008 | 52,765.00 |
| Barquet Group | October 22, 2008 | 51,063.00 |
| Barquet Group | November 4, 2008 | 52,765.00 |
| Barquet Group | November 7, 2008 | 22,313.00 |
| Barquet Group | November 17, 2008 | 47,856.25 |
| Barquet Group | November 21, 2008[1] | 500,000.00 |
| | **TOTAL** | **$913,475.40** |

102.    The So-Ordered Settlement Stipulation requires those funds to be deposited into the Blocked Account but the funds were not because, as alleged below, Defendants failed to open the Blocked Account.

103.    Since Defendants failed to open the Blocked Account, Defendants were entrusted with funds that belong to SageCrest and those funds should have been immediately wire transferred to SageCrest because SageCrest is the owner of the Assigned Loans until SageCrest receives the Balance, all Additional Interest, and any collection costs it is entitled to recover.

104.    SageCrest repeatedly demanded that Defendants wire all of the above-described funds that they have received from the underlying borrowers, but Defendants have not done so and, thus, Defendants have improperly and illegally exercised dominion over SageCrest's property.

105.    Peck, the Peck-controlled Entities, and their counsel did their best to hide these payments and facts from SageCrest and, as alleged below, went to far as to (a) make false and misleading statements to SageCrest both before and after this action was commenced, (b) sign and file in this action an affidavit, under oath, containing false statements, (c) proffer false

---

[1]     The facts and circumstances surrounding this payment are addressed more fully below in Paragraphs 125 through 127 and 161 through 162.

33

testimony during hearings held in this action on February 11 and 13, 2009, (d) violate an Order

of this Court that prohibited Defendants from removing any funds from an account, and (e) make

two motions to stay this action to attempt to prevent SageCrest from discovering these facts.

106.    On October 29, 2008, Defendants, through their counsel Balaschak (at that time a

partner at Dreier), responded to a letter from SageCrest's counsel inquiring about a number of

issues and demanding compliance with the So-Ordered Settlement Stipulation.  In Balaschak's

October 29, 2008 letter, Defendants represented that:

- "the Assigned Collateral is in secured locations, either in the possession of the ACG II or the applicable Borrower, as provided for in the Settlement Agreement";

- "none of the Assigned Collateral … has been moved by ACG II";

- "any and all payments received by [ACG-I, ACG-II, Art Capital LLC, ACG Finance, Fine Art Finance, and Peck], on the Assigned Loans are in a segregated account";

- the outstanding principal balance of each of the Assigned Loans was the exact same amount as was identified in Exhibit K to the So-Ordered Settlement Stipulation; and

- "a number of the Assigned Loans are in default and continue to lose value."

107.    Defendants knew and Defendants' counsel knew or should have known that the

above-identified statements were false or misleading because:  (a) pieces of the Assigned

Collateral had been moved from locations; (b) the Assigned Collateral that was supposed to be

moved from Defendants' offices to Cirker's was not moved in violation of the So-Ordered

Settlement Stipulation; (c) pieces of the Assigned Collateral had been sold including, but not

limited to, pieces of the Assigned Collateral for the Crawford Assigned Loan; (d) all of the

payments that were received were initially received by Art Capital Inc.; (e) none of the received

payments were in a segregated account; (f) the principal balances some or all of the Assigned

34

Loans were less than the amounts identified in Exhibit K to the So-Ordered Settlement

Stipulation including, but not limited to, the principal balances of the loans to Crawford, Daitch,

and Barquet Group; and (g) no more than one of the Assigned Loans was in default as of October

29, 2008.

      108.   On November 11, 2008, Defendants again made numerous false and misleading

statements in a letter from Balaschak to SageCrest's counsel. In particular, Defendants

represented that:

- a List of Collateral "provide[d] the ... location of the collateral";

- "the [attached] Note Balance Report that identifies (as of November 8, 2008) each borrower, the applicable note balance and the amounts and dates of payments received"; and

- "[a]ll payments received are in a segregated account at J.P. Morgan Chase."

      109.   Each of those representations is false and misleading.

      110.   First, the "List of Collateral" represents that Rembrandt Buggati's *Deux Grands*

*Leopards* was located at the Barquet Group's offices when, as alleged below, Defendants knew

that the piece was sold at an auction at Sotheby's on November 3, 2008. The List of Collateral

also shows that the number of pieces of collateral for the Crawford Assigned Loan had been

reduced from 98 pieces to 23 pieces. However, SageCrest was never informed of any sales and,

to date, has never been provided with any details regarding those sales.

      111.   Second, the "Note Balance Report" shows that Defendants had purportedly

received $270,455.79 in principal and interest payments from the underlying borrowers on the

Assigned Loans. However, the total amount and the individual amounts for a number of the

payments are false.

112.   In particular, Defendants represented that the payments received were as follows as of November 8, 2008:

| Underlying Borrower | Date of Payment | Amount of Payment ($) |
|---|---|---|
| Crawford | May 30, 2008 | 3,478.00 |
| Crawford | June 26, 2008 | 7,328.94 |
| Crawford | July 24, 2008 | 5,741.70 |
| Crawford | September 2, 2008 | 3,622.00 |
| Crawford | October 6, 2008 | 5,319.15 |
| | | |
| Daitch | June 30, 2008 | 15,000.00 |
| | | |
| Tawil | July 11, 2008 | 2,047.00 |
| Tawil | July 17, 2008 | 596.00 |
| Tawil | August 11, 2008 | 2,650.50 |
| Tawil | August 19, 2008 | 2,650.50 |
| | | |
| Navarra | May 29, 2008 | 3,159.00 |
| Underlying Borrower | Date of Payment | Amount of Payment ($) |
| Navarra | June 26, 2008 | 3,058.00 |
| Navarra | July 28, 2008 | 3,159.00 |
| Navarra | August 29, 2008 | 3,159.00 |
| Navarra | October 9, 2008 | 3,058.00 |
| | | |
| Barquet Group | July 10, 2008 | 49,836.00 |

| Barquet Group | July 28, 2008 | 52,765.00 |
| Barquet Group | August 13, 2008 | 52,765.00 |
| Barquet Group | October 22, 2008 | 51,063.00 |

113.    However, as demonstrated in Paragraph 101 above, Defendants both understated the amounts of a number of payments and omitted a number of payments in their November 11th representations:

- the June 26, 2008 payment from Crawford was $1,319.50 less than the amount actually received;

- the July 24, 2008 payment from Crawford was $1,207.50 less than the amount actually received;

- the October 6, 2008 payment from Crawford was $700 less than the amount actually received;

- the June 30, 2008 payment from Daitch was $750 less than the amount actually received;

- Defendants failed to identify a payment of $234 that they received on July 2, 2008 from Daitch;

- Defendants failed to identify a payment of $3,159 that they received on November 6, 2008 from Navarra;

- the July 28, 2008 payment from Barquet Group was $7,500 less than the amount actually received;

- Defendants failed to identify a payment of $52,765 that they received on November 4, 2008 from Barquet Group; and

- Defendants failed to identify a payment of $22,313 that they received on November 7, 2008 from Barquet Group.

Thus, the "Note Balance Report" understated the amount received from the underlying borrowers on the Assigned Loans by not less than $89,948.

114.    Third, none of the payments were in a segregated account; rather, they were initially paid into an Art Capital Inc. account and were, upon information and belief, transferred

to other accounts and/or used to pay for other expenditures including, but not limited to, the *Rose Litigation* and other expenses and items that have no relation to SageCrest, the Assigned Loans or the Assigned Collateral.

115.    On November 24, 2008, Defendants reiterated their representation regarding the segregated account. In particular, Defendants represented through counsel that: "We had previously made it clear (in our October 29 and November 11 letters to your firm that ... ACG had placed all payments on the Assigned Loans in a segregated account." For the same reasons alleged above in Paragraphs 107 and 114, that representation was false.

116.    Defendants continued to falsely represent that the funds that were received were in a segregated account. On December 24, 2008, Balaschak (who was then at TBF) sent an email containing certain reports. In the email, Defendants represented that "[t]he payments identified in the Payment Report remain in a segregated account." The Payment Report indicated the receipt of additional payments since November 11, 2008 but did not correct any of the false statements identified in Paragraph 109 above except that Defendants finally identified the November 6th payment from Navarra. Thus, the "Payment Report" underreported the amount received on the Assigned Loans by at least $87,195. The December 24, 2008 email also states: "The List of the Collateral previously forwarded to you by letter dated November 11, 2008 that identified the borrower and the description and the location of the Assigned Collateral has not changed. The Collateral remains at the location identified therein." However, that was false for the same reasons previously identified in Paragraph 109 above.

117.    Unbeknownst to SageCrest until after November 26, 2008, the due diligence materials provided by Defendants (including, but not limited to, Fine Art Finance and Art Capital

Inc.) contained false information, and the representations and warranties provided by Fine Art Finance were false.

118.    Upon information and belief, Art Capital Inc. or Art Capital LLC released the lien on and security interest on one piece of the Assigned Collateral, Diego Rivera's *Nino Ruso con Trineo*, on or about April 9, 2008.

119.    At the hearings on SageCrest's motion for a preliminary injunction and for replevin (the "Replevin Motion") on February 11, 2009, Peck was originally asked whether any of the Assigned Collateral was transferred to an underlying borrower, Peck answered: "I wouldn't remember exactly, but I don't think so." (2/11/09 Tr. at 50:2-5.) Peck also testified that he believed that all of the pieces that were listed as being at Defendants' offices at 980 Madison Avenue were all there. (2/11/09 Tr. at 50:22-23.) Moments later, Peck was asked whether Diego Rivera's *Nino Ruso con Trineo* was at Defendants' offices, he testified to the contrary: "No, I believe that piece is with the borrower." (2/11/09 Tr. at 51:2-5.) Peck then testified that he thought the Diego Rivera's *Nino Ruso con Trineo* was picked up prior to the entry into the So-Ordered Settlement Stipulation. (2/11/09 Tr. at 51:15.) In fact, a document on "Art Capital Group" letterhead, which was marked as an exhibit at the February 13, 2009 hearing, shows that Defendants released the Diego Rivera's *Nino Ruso con Trineo* on April 9, 2008. (2/13/09 Tr. at 90:12 – 91:2.) Peck, the principal of both Art Capital Inc. and Art Capital LLC, could not identify whether the "Art Capital Group" letterhead was for Art Capital Inc. or Art Capital LLC. (2/13/09 Tr. at 91:14-17.) Peck then admitted that the representation contained in the Assigned Collateral Warehouse Waiver Agreement that the Diego Rivera's *Nino Ruso con Trineo* was located at Defendants' offices was "inaccurate." (2/13/09 Tr. at 99:11-23.)

120.    In connection with the release of Diego Rivera's *Non Ruso con Trineo*, Art
Capital Inc., an entity with no interest in the Barquet Group loan, received $300,000 from
Barquet Group on or about April 21, 2008.

121.    At the February 13, 2009 hearing on Replevin Motion, Peck claimed that he did
not know whether that payment was a principal or interest payment. (2/13/09 Tr. at 111:22-25.)
However, as demonstrated at the hearing, Peck's testimony is contradicted by invoices sent by
ACG Finance to Barquet Group showing that the $300,00 was a principal payment. Those
invoices also directed Barquet Group to make payments to Art Capital Inc., despite the fact that,
at the time, ACG Finance was the lender to Barquet Group. Accordingly, the principal balance
of all the Assigned Loans was less than $6.7 million as of April 30, 2008, and the principal
balance of the loan to Barquet Group was $5.7 million, not $6 million, as of April 30, 2008.

122.    Thus, the representation and warranty made by Fine Art Finance and ACG
Finance, for which Peck signed as President, regarding the number of pieces of Assigned
Collateral, the value of the Assigned Collateral and the principal balance on the Assigned Loans
was materially false.

123.    Defendants knew that the representations and warranties were false, but never
informed SageCrest that Diego Rivera's *Nino Ruso con Trineo* was released from the security
interest for the loan to Barquet Group and was not part of the Assigned Collateral or that the
principal balance on the Assigned Loans was less than $6.7 million.

124.    In fact, on November 18, 2008, Peck and the Defendants, though their counsel,
Balaschak (then at Dreier), represented to SageCrest and its counsel that Diego Rivera's *Nino
Ruso con Trineo* was still part of the Assigned Collateral when, in fact, Defendants knew that
Diego Rivera's *Nino Ruso con Trineo* had been released from the security interest.

40

125.    Defendants' tortious actions are made worse by the fact that on November 21,
2008 — two days after SageCrest sent the Default Notice — Art Capital Inc. received $500,000
from Barquet Group in connection with the sale of a piece of the Assigned Collateral, namely,
Rembrandt Bugatti's *Deux Grands Leopards*.

126.    In a letter agreement, dated November 21, 2008, between ACG-I and Galeria
Ramis Barquet, on ACG-I letterhead c/o Art Capital LLC, Defendants represented to Galeria
Ramis Barquet that they would release and terminate security interests in the *Deux Grands
Leopards* in exchange for a principal paydown of $500,000 to Art Capital Inc. Peck signed that
agreement as President of ACG-I.

127.    However, the loan to Galeria Ramis Barquet was not owned by ACG-I, but rather
ACG Finance. Further, Defendants knew they had no security interests in any of the pieces of
Assigned Collateral, let alone the *Deux Grands Leopards*, because all of the security interests
and liens were assigned to SageCrest in the So-Ordered Settlement Stipulation and the Collateral
Assignment.

128.    Peck, together with Fine Art Finance and/or ACG Finance, also have tried to
defraud SageCrest by improperly extending the maturity dates past November 18, 2008 for two
of the underlying Assigned Loans.

129.    In particular, the "Loan Status Report" that is attached to the November 11th
letter from Balaschak states that Peck extended the Crawford loan from May 21, 2008 until May
21, 2009 and the Barquet Group loan through April 30, 2009, which extensions constitute
breaches of the So-Ordered Settlement Stipulation and the Collateral Assignment.

130.    The improper extension of the maturity dates was done by Peck and the Peck-
controlled Entities in order to attempt to reduce Peck's personal exposure on the Assigned Loan

41

Guarantee and to ensure that SageCrest would not receive the $6.7 million and Additional Interest on November 19, 2008.

131.    The Assigned Loan Guarantee contains a provision whereby that guarantee expires 18 months after November 19, 2008, and also contains certain pre-requisites to enforcement.

132.    Since Peck, through Fine Art Finance and ACG Finance, improperly extended the maturity dates of at least two of the Assigned Loans to personally benefit Peck, the expiration date on the Assigned Loan Guarantee must·be eliminated or, at a minimum, extended for at least six (6) additional months.

**Defendants Repeatedly Breach the So-Ordered Settlement Stipulation**

133.    In addition to the tortious conduct identified above, Peck and the Peck-controlled Entities have also breached the So-Ordered Settlement Stipulation a number of different times.

134.    Following the execution of the So-Ordered Settlement Stipulation and its filing under seal, SageCrest's counsel contacted H&H, Defendants' prior attorneys, on numerous ·occasions to inquire as to, among other things:  the status of the Blocked Account; the status of the Blocked Account Agreement; whether any of the underlying borrowers had made any payments and, if not, what the underlying borrowers were doing with the funds; and the status of the RVI. ·

135.    During those conversations, H&H repeatedly stated that the Blocked Account was in the process of being opened, and that ACG-II, Fine Art Finance and ACG Finance were still requesting the RVI.

136.    For example, on June 18, 2008, H&H advised SageCrest's counsel that they had spoken with Peck on June 17th regarding the Blocked Account.  H&H stated that Peck said that the Blocked Account number was expected later that week.

137.    Subsequently, on July 21, 2008, H&H informed SageCrest's counsel that the Blocked Account should have been opened on Friday, July 18, 2008, and that it would be set up in a number of days.

138.    Upon information and belief, shortly thereafter, H&H withdrew from representing Defendants because Defendants and other Peck-controlled Entities failed to pay H&H for services that were purportedly rendered.

139.    On October 29, 2008, H&H commenced an action in this Court by filing a summons and verified complaint. The action is encaptioned *Hahn & Hessen LLP v. Ian Peck, Individually and as Executor of the Estate of Joan Peck, Art Capital Group, LLC, Art Capital Group, Inc., Fine Art Finance, LLC, ACG Credit Company, LLC, ACG Credit Company II, LLC, and ACG Finance Company, LLC,* Index No. 603122/08, and asserts four (4) causes of action against the defendants therein, seeking at least $877,630.15 for the services that were purportedly rendered by H&H.

140.    Defendants retained new counsel, Wollmuth Maher & Deutsch LLP ("WMD"), to replace H&H.

141.    SageCrest contacted WMD on numerous occasions to find out, among other things, whether the Blocked Account had been set up and the status of the RVI. WMD never provided any updates to SageCrest regarding those inquiries.

142.    Beginning in August and continuing to the present date, ACG-II, Fine Art Finance and ACG Finance have failed to provide SageCrest with the reporting required by Sections 13(e) and 14(c) of the So-Ordered Settlement Stipulation.

143.    SageCrest contacted WMD regarding the status of that required reporting, but never received a response.

43

144.    Upon information and belief, on or about October 23, 2008, the Prior ACG
Litigation Defendants retained a new law firm, Dreier, to represent them.

145.    On October 23, 2008, over five (5) months after the So-Ordered Settlement
Stipulation was signed, "so ordered," and entered by the Clerk, SageCrest learned for the first
time that, contrary to explicit terms of the So-Ordered Settlement Stipulation and the Additional
Agreements, the Assigned Collateral that was located at Defendants' offices was not delivered to
Cirkers Hayes.

146.    After Dreier was retained, SageCrest also learned that Defendants breached
numerous other provisions of the So-Ordered Settlement Stipulation and that Defendants have
committed tortious acts.

147.    Dreier informed SageCrest that JPMorgan refused to sign the Blocked Account
Agreement. To date, however, neither Defendants nor Dreier nor TBF has ever provided any
proof that the Blocked Account was set up or any reason why JPMorgan refused to sign the
Blocked Account Agreement.

148.    Had Defendants advised SageCrest that the Blocked Account had not been set up
or that JPMorgan had not signed the Blocked Account Agreement, SageCrest would have taken
appropriate action including, but not limited to, speaking with JPMorgan about the Blocked
Account Agreement and/or finding another financial institution to hold the Blocked Account
because the So-Ordered Settlement Stipulation explicitly provides that the Blocked Account can
be held in a mutually agreeable financial institution.

149.    Defendants also failed to deliver the first appraisal of the Assigned Collateral that
is required by the Assigned Loan Guarantee, which was required to be delivered to SageCrest no
later than August 24, 2008.

44

150.     Defendants' failure to deliver that first appraisal by August 24, 2008 excuses

SageCrest from complying with the conditions precedent to enforce the Assigned Loan

Guarantee including, but not limited to, the prior obligation to obtain a minimum price for the

Assigned Collateral in the event that an underlying borrower defaults on an Assigned Loan.

151.     Defendants also failed to advise SageCrest that one or more of the underlying

borrowers on the Assigned Loans had suffered a material adverse change in their businesses or

that one or more of the underlying borrowers on the Assigned Loans had improperly moved

collateral.  Those breaches are material and prevented SageCrest from exercising rights under the

So-Ordered Settlement Stipulation including, but not limited to, contacting and communicating

with the underlying borrowers for the particular Assigned Loans.

**Defendants False Statements in this Action and Their Efforts to Delay this Action**

152.     This action was commenced on January 20, 2009.  At the same time this action

was commenced, SageCrest filed the Replevin Motion.

153.     Defendants opposed the relief requested in the Replevin Motion.

154.     As alleged above, Defendants and their counsel claimed, prior to the

commencement of this action, that Rembrandt Bugatti's *Deux Grands Leopards* was located at

Barquet Group's offices when, in fact, Defendants knew that the piece was sold at Sotheby's on

November 3, 2008.

155.     Defendants and their counsel continued to make false representations regarding

Rembrandt Bugatti's *Deux Grands Leopards* until those representations were exposed as false

during the hearings on the Replevin Motion.  For example, on January 21, 2009, Defendants'

counsel stated: "We, in November, and I think earlier, sent a list of each and every painting and

piece of art to Mr. Friedman and Mr. McGrath, and we said what the paintings were and exactly

where they were..." (1/21/09 Tr. at 24:22-25.)

156.   Defendants' opposition papers also contain a number of false and misleading statements and the affidavit submitted by Peck contains false testimony under oath.

157.   For example, in the Affidavit of Ian S. Peck in Opposition to Plaintiff's Motion for an Order of Replevin and a Preliminary Injunction, sworn to under penalties of perjury in February 2009 (the "February Peck Affidavit"), Peck repeatedly stated that the funds that were received from the underlying borrowers were in a segregated account. In particular, Peck stated the following:

> 4.   "Immediately after the Settlement Stipulation was executed, Defendants Fine Art Finance and ACG Finance began to service the Assigned Loans by collecting principal and interest and placing the payments into a segregated account."

> \*     \*     \*

> 20.   "... First, we informed SageCrest that (i) all payments made on account of the Assigned Loans were in a segregated account..."

> \*     \*     \*

> 40.   "Moreover, as set forth above, Fine Art Finance and ACG Finance had a segregated account where they deposited all of the Underlying Loans' proceeds for SageCrest's benefits...."

The memorandum of law that Defendants served and filed in opposition to the Replevin Motion also stated that "Defendants have maintained all payment made on account of the Assigned Loans in a segregated account" and that "Defendants informed SageCrest that (i) all payments made on account of the Assigned Loans were in a segregated account...."

158.   However, each and every one of those statements by Peck and Defendants is false because all of the payments from the underlying borrowers were made payable to Art Capital Inc. or wired to Art Capital Inc.'s account, which Peck admitted in the Affidavit of Ian S. Peck,

sworn to on April 23, 2009 (the "April Peck Affidavit"), when he stated that "the money was not so segregated."

159.   The February Peck Affidavit also false states that "[w]e also informed SageCrest that the Assigned Collateral had not been moved ...." However, as alleged above, that was false because Diego Rivera's *Nino Ruso con Trineo* has both been moved and released from the Assigned Collateral and Rembrandt Bugatti's *Deux Grands Leopards* was sold on November 3, 2008.

160.   Peck also stated that "neither I nor my agents ever extended the maturity date for an Assigned Loan after the execution of the Settlement Stipulation." However, as alleged above in paragraph 129, the Loan Status Report that was attached to the November 11th letter from Balaschak states that both the Crawford and Barquet Group Assigned Loans were extended.

161.   At the hearings on the Replevin Motion, Peck made numerous admissions that demonstrate Defendants' breaches of the So-Ordered Settlement Stipulation as well as tortious conduct. In particular, Peck admitted that:

- he knows that the So-Ordered Settlement Stipulation was ordered by the Court (2/11.09 Tr. at 22:19 – 23:07);

- the $6.7 million was not paid to SageCrest on November 19, 2009, (2/1//09 Tr. at 23:24 – 24:2), and he had no factual basis to contest that the failure to make that payment was a default under the So-Ordered Settlement Stipulation (2/11/09 Tr. at 26:21 – 27:2);

- the Peck-controlled entities received principal and interest on the Assigned Loans and did not pay that money to SageCrest (2/11/09 Tr. at 36:10-16);

- the Blocked Account was not set up in breach of the So-Ordered Settlement Stipulation (2/11/09 Tr. at 37:8-10);

- the proceeds received on account of or with respect to the Assigned Loans and the Assigned Loans were not deposited into the Blocked Account (2/11/09 Tr. at 37:18-20);

- the Assigned Collateral was not placed into the warehouse in accordance with the terms of the So-Ordered Settlement Stipulation (2/11/09 Tr. at 38: 21-25);

- there was nothing in the underlying loan agreements that prohibited Defendants from placing the Assigned Collateral that was located in their offices into a warehouse (2/11/09 Tr. at 39:16-24);

- The Assigned Collateral Warehouse Waiver Agreement, which is Exhibit M to the So-Ordered Settlement Stipulation, contains a false representation by Fine Art Finance and ACG Finance, for which Peck signed as President of both entities, because Diego Rivera's *Nino Ruso con Trineo* had been released to Barquet Group prior to May 19, 2008 (2/11/09 Tr. at 54:3 – 56:6, 51:2-17; 2/13/09 Tr. at 88:2 – 90:14, 96:2-9, 98:4 – 99:23);

- he could not identify whether the "Art Capital Group" letterhead on the April 9, 2008 document releasing Diego Rivera's *Nino Ruso con Trineo* was for Art Capital Group, Inc. or Art Capital Group, LLC (2/13/09 Tr. at 91:14-17);

- the due diligence materials that were furnished to SageCrest prior to entry into the So-Ordered Settlement Stipulation were false because Diego Rivera's *Nino Ruso con Trineo* was assigned a value of $500,000 and, at the hearing on the Replevin Motion, Peck stated that the value of the piece was approximately $100,000 to $200,000 as of April 9, 2008 (2/13/09 Tr. at 92:10-14);

- Peck received the Default Notice via facsimile on or about November 19, 2008 (2/13/09 Tr. at 116:6-25)

- Defendants learned that Rembrandt Buggati's *Deux Grands Leopards* was auctioned in early November and Defendants never informed SageCrest of the sale (2/13/09 Tr. at 120:19-23, 121:11-17);

- Peck was unaware of any provision in the So-Ordered Settlement Agreement that provides that any of the Peck-controlled Entities retained a lien in any of the Assigned Loans (2/13/09 Tr. at 130:11-23);

- the November 11th letter and December 24th emails from Balaschak contained false information because they listed Rembrandt Buggati's *Deux Grands Leopards* as being at Barquet Group (2/13/09 Tr. at 143:6-24, 146:16 – 147:6, 149:15 – 150:11) ;

162.    In addition to the numerous admissions, Peck's testimony regarding a number of

facts was false.  In particular, Peck testified that Defendants did not receive payment for the

48

release of Rembrandt Buggati's *Deux Grands Leopards*. (2/13/09 Tr. at 119:16-21.) He also

falsely testified that his recollection was that Defendants received only a payment of $450,000 as

opposed to a payment of $500,000. (2/13/09 Tr. at 119:22 – 120:12, 122:12-19, 131:7-9, 133:4-

15, 135:19 – 136:2.) Peck also testified that the funds that were received from the underlying

borrowers on the Assigned Loans were moved into a separate account so that Defendants were

"accounting for all the monies related to Sagecrest and to the settlement accurately and

separately. (2/13/09 Tr. at 157:13-18, 158:12-16.)

163.    At the end of the hearings on February 13, 2009, the parties entered into an

agreement whereby the Assigned Collateral located at Defendants' offices would be turned over

to SageCrest and $250,000 would be placed into escrow.

164.    Then, this Court issued the following Order:

> Well, the account that has the 800,000-plus sum of money in it is
> hereby, under my order, blocked. It is not to be -- no funds are to
> go out of it. If monies go in, that's fine, but money is not to go out
> of it without my personal signature on a court order, and I want
> that communicated to the account -- obviously, today is Friday, so
> it's not going to happen today, but it can happen at approximately
> 9:15 on Tuesday morning.
>
> That's what I'm thinking is going to happen. I want that money
> secured. I don't want anybody using it, and I don't want anything
> taken out of it, and that includes this weekend. Nothing is to
> happen to that money, and it will stay there until further order of
> this court.
>
> Is everybody clear on that? No problems? Right?
>
> MR. EPSTEIN: Understood, your Honor.
>
> THE COURT: Mr. Peck, is that understood?
>
> MR. PECK: Yeah.
>
> MR. FRIEDMAN: No commingling with other funds.
>
> THE COURT: There will be no commingling of any funds in that

account with any other funds.  That is to remain inviolate by itself,
and that way you can deal with it later on.

(2/13/09 Tr. at 203:23 – 204:23.)

165.    This Court then directed SageCrest's counsel to prepare a stipulation to be "so

ordered" and provide it to Defendants' counsel.  If the parties could not agree on the language of

the stipulation, the parties were ordered to show up on Tuesday, February 17, 2009 to address

those problems.  (2/13/2009 Tr. at 209:16 – 210:22.)

166.    SageCrest's counsel prepared the proposed Stipulation and Order and sent it to

Defendants' counsel.  Defendants' counsel objected to the proposed Stipulation and Order

because it contained language regarding the restraint on the account at JPMorgan.  Accordingly,

counsel for SageCrest and Defendants appeared before this Court on February 17th to discuss the

proposed Stipulation and Order.

167.    During that February 17, 2009 hearing, Defendants' counsel began explaining his

objection to including the language about the restrained account.  This Court then began to

explain why it ordered the account to be restrained:

THE COURT:  All right, look, the 800 plus -- the 825 plus sum of
money was really described by Peck when he said that monies that
-- that had resulted from really sales of the asset -- am I right on
that?

MR. EPSTEIN:  Your Honor, I don't think he testified to that
number, and I don't mean to cut Mr. McGrath off, but that was the
number Mr. Friedman used in the questioning.  But what the
numbers are about are funds that were collected from the
underlying borrowers on the assigned loans.  That's what it's -- you
know, the category.

THE COURT:  If you analyze it -- and the reason why I came up
with this idea, if you analyze it, my understanding -- and, again, if
I'm wrong, I'm wrong, but my understanding was that for whatever
reason there have been sales that -- we know of one sale
definitively, but there are some others that we weren't terribly sure
of that were actually sold, but somehow it materialized in money

that Peck himself stated -- in fact we asked him where was the
money, it was at JP Morgan bank. And he described that earlier in
the testimony. He described it as monies that were totally
segregated, apart from any other funds that he had, and monies that
he -- that were in the sense the, I thought the result of... Were the
result of -- of sales.

(2/17/2009 Tr. at 502-03.)

168.     This Court then continues explains why it ordered the restraint on the account:

And it goes on and on. But the point is that I gather from
this -- this testimony is that Peck basically said that these monies
represented... How did -- how was it put? "That were proceeds
from the assigned loans and due SageCrest into your own ACG."
He said "I don't remember," but then he goes on later on to say yes,
he did order it.

And the point that I'm making is that I believe that Peck
who wasn't exactly the most forthcoming witness we've ever met
in this courtroom, I believe that Peck basically implied that these
monies were basically due SageCrest.

So you point out where I'm wrong, where there's
contradiction on that.

(2/17/2009 Tr. at 506-07.)

169.     After Defendants' counsel argued there was some type of uncertainty over the

application of the alleged funds, this Court ordered a further hearing to address the location and

application of the at least $826,280.40 that Defendants admitted that they had received.

Following up the prior inquiry of Peck, the Court also directed production of bank account

records.

170.     This Court also ordered that the account holding the funds from the underlying

borrowers "be kept inviolate until we meet again" at the subsequent hearing date. (2/17/09 Tr. at

510.)

171.     Following the February 17, 2009 hearing, the parties eventually signed a

Stipulation that was submitted to this Court to be "so ordered."

51

172.    Counsel for SageCrest also contacted Defendants' counsel on a number of occasions to schedule the hearing that this Court ordered and set a deadline for production of the bank account records. Eventually, the parties agreed to hold the hearing on March 27, 2009 and scheduled that date with the Court. SageCrest continued to seek the production of the bank account records.

173.    Shortly after the parties agreed to the hearing date, Defendants filed a motion in SageCrest's bankruptcy proceedings pending in the United States Bankruptcy Court for the District of Connecticut to stay this action. SageCrest (and other parties) opposed Defendants' motion. At the hearing on that motion on March 17, 2009, the Bankruptcy Court denied Defendants' motion:

> The motion is denied. There is no basis whatsoever. The Court is
> not persuaded one bit that this litigation should be stayed. It is
> already in progress and the next hearing date is March 27th. This
> court isn't going to interfere with that court's schedule.

174.    Before the hearing on the motion that Defendants filed in SageCrest's bankruptcy proceeding, counsel for SageCrest and Defendants spoke about the production of the bank account records. During a call on March 13, 2009, Defendants' counsel stated that he would produce the bank account records shortly after the March 17th hearing if Defendants' motion was denied. After the March 17th hearing, SageCrest's counsel contacted Defendants' counsel to inquire as to when the bank account records were going to be produced.

175.    On March 19, 2009, over a month after the February 17th hearing, Defendants advised SageCrest that they were going to seek a stay pending appeal of this Court's February 17th Order.

176.    Defendants moved for a stay pending appeal after this Court entered an Order on March 19, 2009, which "so ordered" the transcripts of the arguments and orders at hearings on the Replevin Motion.

177.    The Appellate Division, First Department granted Defendants an interim stay while the parties briefed the motion, and then subsequently denied the stay and vacated the interim stay.

178.    After the First Department denied the stay, this Court ordered the Defendants to produce the bank account records and the parties scheduled the continued hearing for May 1, 2009.

179.    On April 23, 2009, the date that the parties agreed Defendants would produce the first batch of bank account records, Defendants sent SageCrest the April Peck Affidavit.

180.    In the April Peck Affidavit, Peck contradicts his prior sworn statements and testimony regarding both the amount of money received from the underlying borrowers on the Assigned Loans and the fact that money was not held in a segregated account. In particular, Peck admitted that Art Capital Inc. received at least $913,475.40 from the underlying borrowers after May 19, 2008 — not the $826,280.40 that he testified to on February 13, 2009. Further, the funds were never transferred to a segregated account, nor were the payments received by either Fine Art Finance or ACG Finance.

181.    Upon information and belief, Peck and the Peck-controlled Entities have continued to move money out of the Art Capital Inc. account that received the funds from the underlying borrowers after the Court restrained that account, which actions are a direct violation of this Court's orders.

53

### FIRST CAUSE OF ACTION

(Breach of the So-Ordered Settlement Stipulation --
Against ACG-II, Fine Art Finance, ACG Finance, and Peck)

182.    SageCrest repeats and realleges paragraphs 1 through 181 as if fully set forth herein.

183.    Peck has admitted that he is the principal of each of the Peck-controlled Entities.

184.    Upon information and belief, Art Capital LLC is the sole member of ACG-II, Fine Art Finance, ACG Finance, and ACG-I.

185.    Upon information and belief, Peck is the sole member of Art Capital LLC.

186.    Peck is the President of ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, and ACG-I.

187.    Upon information and belief, Art Capital Inc. is owned by Peck and Peck is the Chairman or Chief Executive Officer of Art Capital Inc.

188.    Upon information and belief, the offices of ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, Art Capital Inc., and ACG-I are all located on the third floor at 980 Madison Avenue, New York, New York.

189.    ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, Art Capital Inc., and ACG-I all share the same telephone number and facsimile number.

190.    ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, Art Capital Inc., and ACG-I all use the same website, www.artcapitalgroup.com, to advertise and promote their business.

191.    Upon information and belief, the aforementioned website is registered to Art Capital Inc.

54

192.    Upon information and belief, all of the employees of Art Capital Inc. also work on behalf of ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, and ACG-I.

193.    Upon information and belief, ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, Art Capital Inc., and ACG-I were never adequately capitalized.

194.    The So-Ordered Settlement Stipulation is a binding and enforceable agreement that was signed by, among others, SageCrest and all of the Defendants except Art Capital Inc., and Peck signed the So-Ordered Settlement Stipulation as President of all of the Peck-controlled Entities that signed the So-Ordered Settlement Stipulation.

195.    In connection with the settlement of the Prior ACG Litigation, ACG-II agreed to pay the Settlement Amount to SageCrest.

196.    Despite the fact that the Settlement Amount was supposed to be paid by ACG-II, Fine Art Finance and ACG Finance assigned their interests in the Assigned Loans and the Assigned Collateral to SageCrest.

197.    Peck provided two guarantees for the payment obligations of ACG-II: the Assigned Loan Guarantee and another $1 million guarantee for the 2-Year Note.

198.    ACG-II was obligated to pay to SageCrest the Balance and all Additional Interest on or before November 19, 2008.

199.    ACG-II failed to do so.

200.    On November 19, 2008, SageCrest sent the Default Notice via facsimile to ACG-II, Fine Art Finance and ACG Finance, which gave ACG-II the required five (5) business days' notice to cure the payment default.

201.    Peck, ACG-II, Fine Art Finance and ACG Finance received the Default Notice on or November 19, 2008, but ACG-II failed to cure the payment default within the Cure Period.

202.    The So-Ordered Settlement Stipulation explicitly prohibits Fine Art Finance and ACG Finance from extending any of the maturity dates for any of the Assigned Loans past November 18, 2008.

203.    The reason for that explicit prohibition was to ensure that SageCrest was paid the Balance on or before November 19, 2008 and, equally as important, to allow SageCrest, in the event that ACG-II failed to pay the Balance by that date, to collect on the Assigned Loans and, if necessary, have Peck honor the Assigned Loan Guarantee.

204.    In direct contravention to the So-Ordered Settlement Stipulation, Peck and the Peck-controlled Entities improperly and illegally extended the maturity dates of the Crawford and Barquet Group Assigned Loans to dates in May and April of 2009, respectively.

205.    The actions by Peck and the Peck-controlled Entities were done in part to frustrate SageCrest's rights and benefit Peck individually because the Assigned Loan Guarantee was supposed to expire eighteen (18) months after November 19, 2008.

206.    By extending the maturity dates for two of the Assigned Loans by more than six (6) months, Peck and his entities have breached the So-Ordered Settlement Stipulation and caused damage to SageCrest by preventing the payment in full of the $6.7 million plus the Additional Interest on or before November 19, 2008.

207.    Also, by extending the maturity dates, Peck and the Peck-controlled Entities have unilaterally reduced the time SageCrest is supposed to have to liquidate any Assigned Collateral by the amount of time the loans were extended.

208.    That reduction in time has damaged SageCrest in that SageCrest could be forced to liquidate any Assigned Collateral that relates to the particular defaulted Assigned Loans in less

56

than a year as opposed to the eighteen months that SageCrest negotiated for in the So-Ordered

Settlement Stipulation and the Assigned Loan Guarantee.

209.     As a result of the foregoing, Peck, ACG-II, Fine Art Finance, and ACG Finance

have damaged SageCrest in an amount to be determined at trial, but in no event less than $6.8

million, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the

Additional Interest rate.

210.     Further, as a result of the foregoing, SageCrest is entitled to a declaration that the

termination provision in the Assigned Loan Guarantee is stricken or, alternatively, that such

provision is modified to give SageCrest at least eighteen months from the latest maturity date for

the Assigned Loans to liquidate any Assigned Collateral before having to commence any action

against Peck on the Assigned Loan Guarantee.

## SECOND CAUSE OF ACTION

(Breach of the So-Ordered Settlement Stipulation –
Against Fine Art Finance, ACG Finance, and Peck)

211.     SageCrest repeats and realleges paragraphs 1 through 210 as if fully set forth

herein.

212.     Fine Art Finance and ACG Finance represented and warranted that the

outstanding principal balance of the Assigned Loans was over $6.7 million as of April 30, 2008

and that the Assigned Collateral consisted of 35 pieces of collateral with a value of

approximately $14 million.

213.     Those representations and warranties were false because the outstanding principal

balance of the Assigned Loans was less than $6.7 million dollars and the Assigned Collateral

consisted of less pieces of collateral and was worth less than $14 million because (a) Diego

Rivera's *Nino Ruso con Trineo* was released from the security interests on April 9, 2008 and the

number of pieces of collateral for the Crawford Assigned Loan was less than the 98 pieces of silverware.

214.    Since Peck is the principal and alter ego of all of the Peck-controlled Entities and Peck knew that Art Capital Inc. had received a principal paydown of $300,000 before April 30, 2008, Peck's knowledge can be imputed to both Fine Art Finance and ACG Finance.

215.    The false representations and warranties caused SageCrest to be damaged because the principal balance of the Assigned Loans was less than the amount that ACG-II agreed to pay SageCrest on November 19, 2008 and the Assigned Collateral was less than the amount SageCrest bargained for in the So-Ordered Settlement Stipulation

216.    As a result of the foregoing, Peck, Fine Art Finance, and ACG Finance have damaged SageCrest in an amount to be determined at trial, but in no event less than $300,000, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory rate.

### THIRD CAUSE OF ACTION

(Breach of the So-Ordered Settlement Stipulation –
Against All Defendants except Art Capital Inc.)

217.    SageCrest repeats and realleges paragraphs 1 through 216 as if fully set forth herein.

218.    The So-Ordered Settlement Stipulation expressly provides that Defendants are not to interfere with the servicing, managing, and administering of the Assigned Loans after SageCrest exercises its rights to do so.

219.    Peck and the Peck-controlled Entities have breached their duty to refrain from interfering by repeatedly contacting the underlying borrowers on the Assigned Loans and telling

them, among other things, not to deal with SageCrest and not to pay SageCrest because SageCrest is in bankruptcy.

220.    The actions of Peck and the Peck-controlled Entities have caused SageCrest to be damaged in a number of different ways including, without limitation, negatively impacting SageCrest's relationships with the underlying borrowers on the Assigned Loans and making it more difficult to collect from the underlying borrowers.

221.    As a result of the foregoing, Defendants have damaged SageCrest in an amount to be determined at trial, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate.

## FOURTH CAUSE OF ACTION

(Specific Performance of the So-Ordered Settlement Stipulation – Against ACG-II)

222.    SageCrest repeats and realleges paragraphs 1 through 221 as if fully set forth herein.

223.    The So-Ordered Settlement Stipulation requires ACG-II to establish the Blocked Account at JPMorgan or another mutually agreeable financial institution and cause all payments on account of or with respect to the Assigned Loans or the Assigned Collateral to be deposited into the Blocked Account.

224.    The Blocked Account Agreement explicitly provides that any funds in the Blocked Account be wired to SageCrest.

225.    Upon information and belief, ACG-II did not establish the Blocked Account and cause it to be subject to the Blocked Account Agreement.

226.    Further, ACG-II did not inform SageCrest until over five (5) months after the So-Ordered Settlement Stipulation was signed and "so ordered" that JPMorgan did not sign the Blocked Account Agreement.

227.    ACG-II's failure to establish the Blocked Account and cause such account to be subject to the Blocked Account Agreement has caused SageCrest to be damaged because SageCrest has not received what it bargained for in the So-Ordered Settlement Stipulation, namely, an account in which SageCrest has control over and the ability to monitor any payments from any underlying borrowers or the receipt of any proceeds from the disposition of any collateral that secures the 2-Year Note or the Assigned Loans.

228.    Defendants' failure to take action and keep SageCrest informed of the status of the Blocked Account and the Blocked Account Agreement also constitutes a breach of (a) their duty to fully cooperate with SageCrest and (b) the covenant of good faith and fair dealing that is implied in the So-Ordered Settlement Stipulation.

229.    As a result of the foregoing breaches, SageCrest is entitled to specific performance of the obligations in the So-Ordered Settlement Stipulation and the Blocked Account Agreement including, but not limited to, the establishment of the Blocked Account at JPMorgan (or another mutually agreeable financial institution) subject to the Blocked Account Agreement.

## FIFTH CAUSE OF ACTION

(Specific Performance of the So-Ordered Settlement Stipulation –
Against ACG-II, Fine Art Finance, and ACG Finance)

230.    SageCrest repeats and realleges paragraphs 1 through 229 as if fully set forth herein.

231.    The So-Ordered Settlement Stipulation requires that ACG-II, Fine Art Finance and ACG Finance provide monthly reports to SageCrest.

232.    ACG-II, Fine Art Finance and ACG Finance have failed to provide the required monthly reporting in accordance with the terms of the So-Ordered Settlement Stipulation to

60

SageCrest since the report that was submitted on July 21, 2008, which covered expenses through June of 2008.

233.   SageCrest has demanded that ACG-II, Fine Art Finance and ACG Finance comply with their contractual reporting obligations, but they have not complied with SageCrest's demands.

234.   The failure of ACG-II, Fine Art Finance and ACG Finance to comply with their reporting requirements has caused SageCrest to be damaged because SageCrest has been deprived of what it bargained for and has not been kept apprised of the status of its property.

235.   SageCrest has further been damaged as a result of the failure to provide the required monthly reporting because SageCrest is entitled to object to any purported costs or expenses incurred with the Other Art Loans or the Assigned Loans.

236.   Since ACG-II, Fine Art Finance and ACG Finance failed to provide the required monthly reporting, SageCrest has not been able to object to any purported costs or expenses.

237.   As a result of the foregoing, SageCrest is entitled to specific performance of the reporting requirements contained in the So-Ordered Settlement Stipulation, and a declaration that ACG-II, Fine Art Finance and ACG Finance are not entitled to any reimbursement for any costs or expenses incurred after June 30, 2008.

## SIXTH CAUSE OF ACTION

### (Conversion – Against All Defendants)

238.   SageCrest repeats and realleges paragraphs 1 through 237 as if fully set forth herein.

239.   All payments made by the underlying borrowers on the Assigned Loans were required to be made into the Blocked Account and, to the extent that ACG-II received any payments, ACG-II was required to wire transfer such payments to the Blocked Account.

61

240.    Art Capital Inc., an entity with no interest in the Assigned Loans or the Assigned Collateral, received at least $913,475.40 from the underlying borrowers on the Assigned Loans between May 19, 2008 and the present.

241.    Since ACG-II failed to establish the Blocked Account and cause that account to be subject to the Blocked Account Agreement, Defendants were entrusted with funds that belonged to SageCrest and should have been immediately wire transferred to SageCrest.

242.    ACG-II, Fine Art Finance, ACG Finance and/or Art Capital Inc., at Peck's direction, have failed to remit to SageCrest funds that they were entrusted with on behalf of SageCrest, which funds are believed to total at least $913,175.40.

243.    SageCrest has repeatedly demanded that Defendants remit those funds to SageCrest, but they have refused.

244.    SageCrest has a superior right of possession to all funds received from the underlying borrowers including, but not limited to, the: (a) $31,144.15 that Defendants received from Crawford; (b) $15,984 that Defendants received from Daitch; (c) $7,944 that Defendants received from Tawil; (d) $21,810 that Defendants received from Navarra; and (e) $836,863.25 that Defendants received from Barquet Group.

245.    By failing to pay the funds to SageCrest, Defendants have exercised dominion over at least $913,475.40 without SageCrest's authorization, which is in defiance of SageCrest's rights.

246.    The failure of Defendants to pay the at least $913,475.40 to SageCrest was done with the malicious intent to deprive SageCrest of its assets.

247.    As a result of the conversion by Defendants of at least $913,475.40, Defendants have damaged SageCrest in an amount to be determined at trial, but in no event less than

$913,475.40, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate.

## SEVENTH CAUSE OF ACTION

(Turnover of Assets Pursuant to Article 9 of the Uniform
Commercial Code – Against Fine Art Finance, ACG Finance, and Art Capital Inc.)

248.    SageCrest repeats and realleges paragraphs 1 through 247 as if fully set forth herein.

249.    Fine Art Finance and ACG Finance assigned their interests in the Assigned Loans and Assigned Collateral to SageCrest.

250.    On or before May 20, 2008, SageCrest perfected its security interests in the (a) Assigned Loans by receiving allonges, the original notes for the Assigned Loans, and a general loan document assignment and (b) the Assigned Collateral by filing UCC financing statements that assigned the Fine Art Finance's and ACG Finance's security interests in the Assigned Collateral to SageCrest.

251.    As a result, SageCrest has a first priority perfected security interest in the Assigned Loans and the Assigned Collateral including, without limitation, any and all proceeds relating to the Assigned Loans and the Assigned Collateral.

252.    When ACG-II failed to cure the payment default within the Cure Period, Fine Art Finance and ACG Finance lost any interest they have in the Assigned Loans and the Assigned Collateral unless and until SageCrest receives the Balance, all Additional Interest, and any collection costs that SageCrest is entitled to under the loan documents for the Assigned Loans.

253.    Art Capital Inc. — an entity with not interest in the Assigned Loans or the Assigned Collateral — has received over $1.2 million on account of or with respect to the

63

Assigned Loans and the Assigned Collateral, which funds should have been deposited into the

Blocked Account and then transferred to SageCrest.

254.    Since the Blocked Account was not established, SageCrest has demanded that

Defendants wire transfer the over $1.2 million to SageCrest, but Defendants have refused.

255.    Therefore, SageCrest requests that Fine Art Finance, ACG Finance, and Art

Capital Inc. turnover any and all funds that they have received from the underlying borrowers

including, but not limited to, the over $1,213,475.40, plus SageCrest's attorneys' fees, costs, and

both pre- and post-judgment interest at the statutory interest rate.

## EIGHTH CAUSE OF ACTION

### (Civil Contempt – Against All Defendants Except Art Capital Inc.)

256.    SageCrest repeats and realleges Paragraphs 1 through 255 as if fully set forth

herein.

257.    The So-Ordered Settlement Stipulation is an Order of this Court.

258.    As alleged above, all of the Defendants (except Art Capital Inc.) have failed to

comply with a number of the provisions of the So-Ordered Settlement Stipulation including, but

not limited to, the payment of the $6.7 million plus the Additional Interest.

259.    As a result of Defendants' failure to comply with an Order of this Court,

Defendants are in contempt.

260.    Accordingly, SageCrest is entitled to the entry of an Order of Contempt directing

Defendants to immediately wire transfer to SageCrest $6.7 million, the accrued Additional

Interest, and all of SageCrest's fees and costs including, but not limited to, attorneys' fees, and

all other remedies under the law.

261.    In the event that Defendants fail to comply with the Order of Contempt, this Court

should direct the Sheriff to imprison Peck, each of members of ACG-II, ACG Finance, Fine Art

Finance, Art Capital LLC, and ACG-I, and each of the officers and directors of the

aforementioned entities until such time as SageCrest receives all of the monies it is entitled to

under the So-Ordered Settlement Stipulation and compliance with the requirements of the So-

Ordered Settlement Stipulation.

## NINTH CAUSE OF ACTION

### (Civil Contempt – Against All Defendants)

262.    SageCrest repeats and realleges Paragraphs 1 through 261 as if fully set forth

herein.

263.    This Court's February 13, 2009, February 17, 2009, and March 19, 2009 Orders

prohibited Defendants from removing any funds from the account that Peck testified was

segregated and holding $826,280.40.

264.    The account that received the funds from the underlying borrowers on the

Assigned Loans was an account in the name of Art Capital Inc., and it received at least

$913,475.40 from the underlying borrowers after May 19, 2008.

265.    Upon information and belief and in direct violation of this Court's Orders,

Defendants withdrew funds from the Art Capital Inc. account, paid bills from that account, used

the funds for other purposes, and transferred funds to other accounts in the name of one or more

of the Defendants.

266.    As a result of Defendants' failure to comply with the Orders of this Court,

Defendants are in contempt.

267.    Accordingly, SageCrest is entitled to the entry of an Order of Contempt directing

Defendants to immediately wire transfer to SageCrest an amount equal to all amounts

withdrawn, paid out of, or transferred out of the Art Capital Inc. account after February 13, 2009,

plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate, and all other remedies under the law.

268.    In the event that Defendants fail to comply with the Order of Contempt, this Court should direct the Sheriff to imprison Peck, each of members of ACG-II, ACG Finance, Fine Art Finance, Art Capital Inc., Art Capital LLC, and ACG-I, and each of the officers and directors of the aforementioned entities until such time as SageCrest receives all of the monies it is entitled to under the So-Ordered Settlement Stipulation and compliance with the requirements of the So-Ordered Settlement Stipulation.

### TENTH CAUSE OF ACTION

#### (Tortious Interference – Against All Defendants)

269.    SageCrest repeats and realleges paragraphs 1 through 268 as if fully set forth herein.

270.    Fine Art Finance and ACG Finance assigned the Assigned Loans and the security interests in the Assigned Collateral on May 19, 2008 and, thus, SageCrest is the owner of the Assigned Loans and the security interests in the Assigned Collateral.

271.    Since all of the Peck-controlled Entities are owned and controlled by Peck, Defendants knew of SageCrest's ownership of the Assigned Loans and the security interests in the Assigned Collateral.

272.    When ACG-II failed to pay the Balance and the Additional Interest to SageCrest on November 19, 2008 and failed to cure that breach of the So-Ordered Settlement Stipulation within five (5) business days of the Default Notice, SageCrest obtained the exclusive right to service, manage, and administer the Assigned Loans.

273.    On November 26, 2008, SageCrest sent notices to the underlying borrowers on the Assigned Loans advising those borrowers that SageCrest was exercising that right and

66

provided each of the underlying borrowers with a copy of the Collateral Assignment. As part of that notice, SageCrest directed the underlying borrowers to make payments directly to SageCrest.

274.    At the same time that SageCrest sent the notices to the underlying borrowers, SageCrest sent a letter to ACG-II, Fine Art Finance, ACG Finance and their counsel at the time, Dreier. The letter informed Defendants that SageCrest was exercising its contractual rights to service, administer and manage the Assigned Loans and that Defendants should not interfere with those loans. In particular, the letter states:

> Neither Fine Art Finance nor ACG shall interfere with SageCrest's right to service, manage and administer the Assigned Loans. Any attempt by Fine Art Finance or ACG Finance or any of their agents to interfere with SageCrest's rights regarding the Assigned Loans or the Assigned Collateral will be in violation of the Settlement Stipulation and/or one or more of the Additional Agreements and will be, among other things, tortious conduct.

275.    Despite SageCrest's warning to Defendants and their counsel that they should not interfere with SageCrest's rights regarding the Assigned Loans and, entirely consistent with Defendants' past conduct, Peck contacted at least two of the underlying borrowers on the Assigned Loans.

276.    In particular, Peck contacted Crawford by e-mail and told that underlying borrower not to pay SageCrest because SageCrest is in bankruptcy.

277.    That underlying borrower has since not made any payments to SageCrest.

278.    As a result, SageCrest has not been able to service, manage or administer the Crawford Assigned Loan and, therefore, SageCrest has suffered damages including, but not limited, to the receipt of principal and interest payments and other fees and expenses that SageCrest is entitled to under the underlying loan documents.

279.   Further, by reason of Defendants' tortious acts, SageCrest may be forced to commence litigation against Crawford to enforce its rights, which suit will cause SageCrest to incur attorneys' fees, costs and expenses.

280.   Peck has contacted Barquet on numerous occasions, both by email and telephone, and those contacts continue to the present day.

281.   Peck has told Barquet that he should not deal with SageCrest because SageCrest is in bankruptcy.

282.   Peck has also told Barquet Group not to pay SageCrest.

283.   Peck has asked Barquet to "coordinate" what they would say to SageCrest.

284.   Both in December of 2008 and early January of 2008, Peck also requested on that Barquet Group resubmit its December interest payment on the loan to Art Capital Inc.

285.   As a result, these repeated communications have adversely affected SageCrest relationships with the underlying borrowers and SageCrest's ability to collect.

286.   As a result of the tortious interference, Peck and Defendants have damaged SageCrest in an amount to be determined at trial, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate.

## ELEVENTH CAUSE OF ACTION

### (Fraudulent Inducement – Against Fine Art Finance and Art Capital Inc.)

287.   SageCrest repeats and realleges paragraphs 1 through 286 as if fully set forth herein.

288.   Prior to entry into the So-Ordered Settlement Stipulation, SageCrest had insisted that ACG-II pay the $21 million required by the Agreement in cash at closing.  In fact, SageCrest filed motion papers seeking to have the Agreement "so ordered" without being modified.

68

289.    Defendants, in an effort to pay less than $21 million in cash at closing, made numerous offers to SageCrest.

290.    Many of those offers were unacceptable to SageCrest for numerous reasons.

291.    After Defendants made an offer to assign certain loans and security interest, a personal guarantee from Peck, and certain other enhancements, SageCrest requested due diligence materials to evaluate whether or not it would accept Defendants' offer.

292.    Defendants made numerous due diligence materials available to SageCrest including, but not limited to, the underlying loan documents, lists of the collateral for those loans, valuations of the collateral, and UCC financing statements.

293.    However, a number of the disclosures made to SageCrest to induce SageCrest to accept less than a $21 million cash payment on the Closing Date regarding the Assigned Loans and the Assigned Collateral were false.

294.    In the So-Ordered Settlement Stipulation, Fine Art Finance made a number of representations and warranties regarding the Assigned Loans and the Assigned Collateral. Those representations and warranties are essentially the same as those that were made to induce SageCrest into accepting less than $21 million in cash at closing, namely, that the principal balance of the Assigned Loans was in excess of $6.7 million and that the Assigned Collateral consisted of 35 pieces of artwork with an appraised value of approximately $14 million.

295.    Art Capital Inc. received $300,000 from Barquet Group on April 21, 2008, which was a principal paydown and reduced the balance of the Barquet Group Assigned Loans to $5.7 million and, thus, the principal balance of the Assigned Loans was less than $6.7 million.

296.    Fine Art Finance and Art Capital Inc. knew that the due diligence materials and representations were false because they knew that Diego Rivera's *Nino Ruso con Trineo* had

69

been released from the security interests on or about April 9, 2008 and that the outstanding

principal balance due on the loan to Barquet Group was $5.7 million because Art Capital Inc.

had received a principal paydown of $300,000 on or about April 21, 2008 as indicated on the

invoices marked as exhibits at the February 13, 2009 hearing.

297.    Fine Art Finance and Art Capital Inc. also knew that the number of pieces of

collateral for the Crawford Assigned Loan was less than the 98 pieces that was represented to

SageCrest.

298.    SageCrest did not know that the due diligence materials, representations and

warranties were false and SageCrest reasonably relied on those disclosures and representations in

determining whether or not to enter into the So-Ordered Settlement Stipulation.

299.    Fine Art Finance and Art Capital Inc. were motivated to make fraudulent

misrepresentations to SageCrest because if SageCrest did not accept the assignment of the

Assigned Loans and the security interests in the Assigned Collateral, then ACG-II claimed it

would not be able to pay the amount it agreed to pay in the Agreement, which would have

resulted in a judgment against ACG-II, the continuation of the Order of Attachment, and another

action for fraudulent inducement.

300.    But for SageCrest's entry into the So-Ordered Settlement Stipulation, the Order of

Attachment would be in place for all of the assets of ACG-II and ACG-I up to approximately

$30 million and, thus, those entities would not have been able to transfer, sell, encumber or

otherwise move the assets.

301.    SageCrest also had to pay $50,000 in poundage to the Sheriff of the City of New

York to release the Order of Attachment.

302.   All of these actions have caused SageCrest to be damaged in an amount to be determined at trial, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate.

## TWELFTH CAUSE OF ACTION

### (Fraud – Against All Defendants)

303.   SageCrest repeats and realleges paragraphs 1 through 302 as if fully set forth herein.

304.   As alleged above, after the So-Ordered Settlement Stipulation was executed, "so ordered" by this Court, and entered by the Clerk of the Court, Defendants made numerous false and misleading statements and representations, Peck submitted an affidavit containing false testimony under oath, and Peck's testimony at the hearings on the Replevin Motion was rife with false and misleading statements.

305.   Those false and misleading statements and representations were intentionally made by Defendants in order to defraud or mislead SageCrest as to the amount(s) of funds received from the underlying borrowers on the Assigned Loans and the locations of the Assigned Collateral.

306.   SageCrest relied on those representations in its attempts to service, manage, and administer the Assigned Loans and the Assigned Collateral, which has caused SageCrest to expend time, money and effort to uncover the true facts regarding both the Assigned Loans and the Assigned Collateral.

307.   SageCrest also relied on the representations and statements in bringing this action and filing the Replevin Motion.

308.   SageCrest's reliance was reasonable because (a) Defendants were under an obligation to present truthful and accurate information to SageCrest and (b) Defendants were in a

71

special position of knowledge as the servicer, manager, and administrator of the Assigned Loans prior to November 26, 2008.

309.    All of these actions have caused SageCrest to be damaged in an amount to be determined at trial, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate.

## PRAYER FOR RELIEF

WHEREFORE, SageCrest respectfully demands judgment on its Complaint as follows:

A.    On the First Cause of Action, an amount to be determined at trial, but in no event less than $6.8 million, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the Additional Interest rate, and a declaration that the termination provision in the Assigned Loan Guarantee is stricken or, alternatively, that such provision is modified to give SageCrest at least eighteen months from the latest maturity date for the Assigned Loans to liquidate any Assigned Collateral;

B.    On the Second Cause of Action, an amount to be determined at trial, but in no event less than $300,000, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory rate.;

C.    On the Third Cause of Action, an amount to be determined at trial, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate

D.    On the Fourth Cause of Action, specific performance of the obligations in the So-Ordered Settlement Stipulation and the Blocked Account Agreement including, but not limited to, the establishment of the Blocked Account at JPMorgan (or another mutually agreeable financial institution) subject to the Blocked Account Agreement;

72

E.    On the Fifth Cause of Action, specific performance of the reporting requirements contained in the So-Ordered Settlement Stipulation, and a declaration that ACG-II, Fine Art Finance and ACG Finance are not entitled to any reimbursement for any costs or expenses incurred after June 30, 2008an amount to be determined at trial, but in no event less than $1,070,455.79, plus punitive damages, SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate;

F.    On the Sixth Cause of Action, an amount to be determined at trial, but in no event less than $913,475.40, SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate;

G.    On the Seventh Cause of Action, turnover any and all funds that they have received from the underlying borrowers including, but not limited to, the over $1,213,475.40, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate;

H.    On the Eighth Cause of Action, an Order of Contempt directing Defendants to immediately wire transfer to SageCrest $6.7 million, the accrued Additional Interest, all of SageCrest's fees and costs including, but not limited to, attorneys' fees, and all other remedies under the law, and, in the event that Defendants fail to comply with the Order of Contempt, an Order directing the Sheriff to imprison Peck, each of members of ACG-II, ACG Finance, Fine Art Finance, and Art Capital LLC, and each of the officers and directors of the aforementioned entities until such time as SageCrest receives all of the monies it is entitled to under the So-Ordered Settlement Stipulation;

I.    On the Ninth Cause of Action, an Order of Contempt directing Defendants to immediately wire transfer to SageCrest an amount equal to all amounts withdrawn, paid out

73

of, or transferred out of the Art Capital Inc. account after February 13, 2009, plus SageCrest's

attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate, and

all other remedies under the law, and, in the event that Defendants fail to comply with the Order

of Contempt, an Order directing the Sheriff to imprison Peck, each of members of ACG-II, ACG

Finance, Fine Art Finance, and Art Capital LLC, and each of the officers and directors of the

aforementioned entities until such time as SageCrest receives all of the monies it is entitled to

under the So-Ordered Settlement Stipulation

       J.     On the Tenth Cause of Action, an amount to be determined at trial, plus

SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory

interest rate;

       K.    On the Eleventh Cause of Action, an amount to be determined at trial, plus

SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory

interest rate;

       L.     On the Twelfth Cause of Action, an amount to be determined at trial, plus

SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory

interest rate;

       M.   Awarding SageCrest its costs, expenses and attorneys' fees; and

74

N.    Granting SageCrest such other and further relief as may be just and

proper.

Dated: May 19, 2009                  Respectfully submitted,

                                     KELLEY DRYE & WARREN LLP

                                     By: _____
                                           Robert S. Friedman
                                           Mark E. McGrath
                                     101 Park Avenue
                                     New York, New York 10178
                                     Telephone:  (212) 808-7800

                                     *Attorneys for Plaintiff SageCrest II, LLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
INDEX NO.: 600166/09

SAGECREST II, LLC,

Plaintiff,

-against-

IAN S. PECK, ACG CREDIT COMPANY II, LLC, ACG
FINANCE COMPANY, LLC, FINE ART FINANCE,
LLC, ART CAPITAL GROUP, LLC, ART CAPITAL
GROUP, INC., and ACG CREDIT COMPANY, LLC,

Defendants.

**AMENDED COMPLAINT**

**KELLEY DRYE & WARREN LLP**

101 PARK AVENUE
NEW YORK, NY 10178

(212) 808-7800