# EXHIBIT 7

B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Sagecrest II, LLC | See Attached. |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| James Berman, Esq.   203-368-4234 Zeisler & Zeisler, P.C. 558 Clinton Ave., Bpt., CT 06605 | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☒ Debtor     ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor   ☐ Other ☐ Trustee | ☐ Debtor     ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor   ☒ Other ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

This is an action on a promissory note brought under 28 U.S.C. Sec. 157(b)(2)(A).

---

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property** ☒ 11-Recovery of money/property - §542 turnover of property ☐ 12-Recovery of money/property - §547 preference ☐ 13-Recovery of money/property - §548 fraudulent transfer ☐ 14-Recovery of money/property - other | **FRBP 7001(6) – Dischargeability (continued)** ☐ 61-Dischargeability - §523(a)(5), domestic support ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury ☐ 63-Dischargeability - §523(a)(8), student loan ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support) ☐ 65-Dischargeability - other |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien** ☐ 21-Validity, priority or extent of lien or other interest in property | **FRBP 7001(7) – Injunctive Relief** ☐ 71-Injunctive relief – imposition of stay ☐ 72-Injunctive relief - other |
| **FRBP 7001(3) – Approval of Sale of Property** ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h) | **FRBP 7001(8) Subordination of Claim or Interest** ☐ 81-Subordination of claim or interest |
| **FRBP 7001(4) – Objection/Revocation of Discharge** ☐ 41-Objection / revocation of discharge - §727(c),(d),(e) | **FRBP 7001(9) Declaratory Judgment** ☐ 91-Declaratory judgment |
| **FRBP 7001(5) – Revocation of Confirmation** ☐ 51-Revocation of confirmation | **FRBP 7001(10) Determination of Removed Action** ☐ 01-Determination of removed claim or cause |
| **FRBP 7001(6) – Dischargeability** ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny (continued next column) | **Other** ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq. ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case) |

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 7,000,000 plus |
| Other Relief Sought | |

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | |
|---|---|
| NAME OF DEBTOR<br>In re: Sagecrest II, LLC, et al | BANKRUPTCY CASE NO.<br>08-50754, 08-50755, 08-50763, 08-50844 |
| DISTRICT IN WHICH CASE IS PENDING<br>Connecticut | DIVISION OFFICE<br>Bridgeport | NAME OF JUDGE<br>Alan H.W. Shiff |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |
|---|---|
| *[signature]* | |
| DATE<br>June 3, 2010 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>James Berman |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## DEFENDANTS

ACG Credit Company II, LLC
ACG Finance Company, LLC
Fine Art Finance, LLC
Art Capital Group, LLC
Art Capital Group, Inc.
ACG Credit Company, LLC
Ian S. Peck

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
### BRIDGEPORT DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| SAGECREST II LLC | CASE NO. 08-50754 (AHWS) |
| SAGECREST FINANCE LLC | CASE NO. 08-50755 (AHWS) |
| SAGECREST HOLDINGS LIMITED | CASE NO. 08-50763 (AHWS) |
| SAGECREST DIXON INC., | CASE NO. 08-50844 (AHWS) |
| DEBTORS. | JOINTLY ADMINISTERED UNDER CASE NO. 08-50754 (AHWS) |
| SAGECREST II, LLC | |
| Plaintiff, | Adv. Proc. No. _____ |
| - against — | **COMPLAINT** |
| ACG CREDIT COMPANY II, LLC, ACG FINANCE COMPANY, LLC, FINE ART FINANCE, LLC, ART CAPITAL GROUP, LLC, ART CAPITAL GROUP, INC., ACG CREDIT COMPANY, LLC, and IAN S. PECK, | |
| Defendants. | |

SageCrest II, LLC ("SageCrest"), debtor and debtor-in-possession in the above-captioned bankruptcy cases (collectively, the "Bankruptcy Case"), by and through its attorneys, Sheppard, Mullin, Richter & Hampton LLP, Neligan Foley LLP, and Zeisler & Zeisler, P.C., as and for its Complaint against Defendants ACG Credit Company II, LLC ("ACG-II"), ACG Finance Company LLC ("ACG Finance"), Fine Art Finance, LLC ("Fine Art Finance"), Art Capital Group, LLC ("Art Capital LLC"), Art Capital Group, Inc. ("Art Capital Inc."), and ACG Credit Company, LLC ("ACG-I" and, together with ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, and Art Capital Inc, the "Peck-controlled Entities"), and Ian S. Peck ("Peck" and, together with the Peck-controlled Entities, "Defendants"), alleges as follows:

## NATURE OF THE ADVERSARY PROCEEDING

1.       This proceeding is brought about by Defendants' failure to pay $4,425,000 due on

May 19, 2010 pursuant to a promissory note (the "2-Year Note"), willful and improper sale of

collateral that is property of SageCrest's estate for far less than the value of that collateral,

improper retention of the proceeds of those sales, and utter disregard for their obligations relating

to the collateral securing the 2-Year Note.

2.       This is not, however, Defendants' first failure to pay monies due and owing to

SageCrest. As this Court is aware, SageCrest sued Defendants for, among other things, failing to

pay approximately $6.7 million that was due on November 19, 2008, replevin, conversion, and

failure to comply with court-ordered obligations.[1]  That action is currently pending in the

Supreme Court of the State of New York, County of New York, Index No. 600166/2009, before

the Honorable Eileen Bransten (the "Assigned Loan Action").  In December of 2009, SageCrest

moved for an order of contempt based on that payment default and other violations of a

Settlement Stipulation and Mutual Release, dated May 19, 2008, with exhibits, which was signed

by SageCrest and all of the Defendants and was "So Ordered" by Justice Bransten on May 19,

2008 (the "So-Ordered Settlement Stipulation").  That motion, together with Defendants' motion

to dismiss and cross-motion for contempt are currently *sub judice.*

3.       The So-Ordered Settlement Stipulation resolved another action that SageCrest

brought against certain of the defendants herein based on the failure of ACG-II and ACG-I to

pay over $40 million in principal and interest to SageCrest pursuant to a certain Revolving Credit

Agreement by and between ACG-I, as Borrower, and SageCrest, as Lender, dated as of August

20, 2003, and certain written amendments to the Credit Agreement (collectively, the "Credit

---

[1]       As a result, Defendants now owe SageCrest over $11 million.

Agreement"), their failure to provide required financial and collateral reporting, their tortious

actions (such as conveying assets amongst themselves for no consideration), and their repeated

attempts to mislead SageCrest. That action, captioned *SageCrest II, LLC v. ACG Credit*

*Company, LLC, ACG Credit Company II, LLC, Art Capital Group, LLC, ACG Finance Company,*

*LLC, and Ian Peck*, Index No. 600195/07, was brought in the Supreme Court of the State of New

York, County of New York, and was originally before the Honorable Karla Moskowitz (before

she was promoted to the Appellate Division) and was subsequently assigned to the Honorable

Eileen Bransten (the "First Action").

      4.     In the course of the First Action, SageCrest obtained an *Ex Parte* Order of

Attachment for over $29 million (the "Order of Attachment") based on the dissipation of assets

by certain of the defendants herein (the "First Action Defendants"). At the hearings on the

motions seeking to confirm the Order of Attachment and the First Action Defendants' motion to

reargue the decision confirming the Order of Attachment, both Justice Freedman and Justice

Moskowitz found that the failure of Peck and his companies to remit over $13 million to

SageCrest, most of which was missing, demonstrated an intent to defraud SageCrest and

dissipate assets.

      5.     In particular, at the October 15, 2007 hearing on the motion to confirm the Order

of Attachment, SageCrest demonstrated, *inter alia*, that:

- The First Action Defendants owed over $40 million in principal and interest to SageCrest;

- SageCrest was the senior secured creditor of ACG-II;

- The First Action Defendants had received approximately $14.5 million in proceeds on account of or with respect to the underlying assets;

- The First Action Defendants failed to remit approximately $13 million of those proceeds to SageCrest, despite their obligations to do so;

- SageCrest could have achieved the same effect as the Order of Attachment under the attorney-in-fact provision of the Credit Agreement;

- The First Action Defendants had not produced complete, unredacted bank account records that the Court had ordered to be produced by October 12, 2007;

- The First Action Defendants were using the proceeds to fund the litigation encaptioned *ACG Credit Company, LLC, Art Capital Group, LLC, Art Capital Group, Inc. and Fine Art Finance, LLC v. Andrew C. Rose, Long Valley Farm, Inc., Andrew Rose Fine Art, Art Capital Holdings, Inc., Art Finance Partners, LLC, Art Finance International, LLC, ARCK Credit Company, LLC, and Andrew Rose*, Index No. 601389/05, which is currently pending before Justice Lowe in the Commercial Division (the "*Rose* Litigation"), which is a bitter litigation between Peck and certain of the Peck-controlled Entities and his former business partners that has been ongoing since 2005; and

- ACG-II was not a party to the *Rose* Litigation and the entities using the funds had no right to them; and

- If the Order of Attachment was not confirmed, the First Action Defendants would continue to convert physical assets into cash or receive cash payments (both of which were subject to SageCrest's first priority perfected security interest), and then use that cash so that SageCrest would have nothing to enforce its judgment against.

6.     At the October 15th hearing on the motion to confirm the Order of Attachment,

Justice Freedman also asked the First Action Defendants' counsel, Zachary G. Newman of Hahn

& Hessen LLP (which firm has subsequently sued Defendants for failure to pay legal fees and

expenses), what happened to the money that was stolen by the First Action Defendants:

> THE COURT: In other words, is that $14 million gone? I'm asking you point blank.
>
> MR. NEWMAN: We haven't done accounting down to the penny because --
>
> THE COURT: Not down to the penny. Is that money there?
>
> Yes or no.
>
> MR. NEWMAN: Some of it, yes.

THE COURT: How much is left?

MR. NEWMAN: Your Honor, I can represent to the Court that
with respect to monies received, if you look in Miss Islam's
affidavit on Page 4, the monies received with respect to non-Berry-
Hill loans are being preserved.

With respect --

THE COURT: You are not answering my question.

MR. NEWMAN: That's approximately $4.6 million.

THE COURT: That's all that's left?

7.      Justice Freedman found that the use of the proceeds in Peck's personal war

against his former business partners was a clear dissipation of assets: **"I think your client is**

**dissipating assets and I'm concerned about that."** Accordingly, Justice Freedman confirmed

the Order of Attachment. She required an undertaking of $7 million to vacate the Order of

Attachment.

8.      The First Action Defendants sought leave to reargue Justice Freedman's decision.

After hearing argument on the application, Justice Moskowitz denied it:

> THE COURT: The question is if you look at the statute and see
> what the statute says, what I have before me I don't think has
> really changed, that the -- subdivision 3. -- the defendant with
> intent to defraud his creditors or frustrate the enforcement of the
> judgment that might be rendered in plaintiff's favor has assigned,
> disposed of, encumbered or secreted or removed. We don't have
> removed. Or is about to do any of those acts.
>
> It seems to me, based on the acknowledged receipt of loan
> proceeds into a bank account and then disbursement and **despite**
> **all the paper that the defendants have put in, and that was**
> **before Judge Freedman, that's really still what she had before**
> **her, didn't show what happened to most of the money that, I**
> **guess, went into ACG I's bank account or ACG-II's.**
>
> MR. FRIEDMAN:    It went into ACG the LLC. I think some of it
> went into a parent company and some of it went into ACG 1 and if
> you combine the two bank accounts, there's about $300,000.

> MR. NEWMAN:      Your Honor.
>
> THE COURT: Please. I'm speaking, okay. It seems to me looking
> at the case law even though it's a very heavy burden on
> attachment, this not paying, **not paying and this missing money
> is really enough to support the inference that I found when I
> had the original papers in front of me and that Judge
> Freedman found on the argument which was an argument to, I
> guess, the original one she had, was to confirm, right, with a
> cross motion.**
>
> MR. FRIEDMAN:      Yes.
>
> THE COURT: **To confirm the attachment and cross motion to
> vacate it, that this is enough to show an intent to defraud
> SageCrest II here and frustrate the enforcement of any
> judgment SageCrest II would get here. I also found and she
> found that there is a likelihood of success on the merits.**

9.      In the Assigned Loan Action, Defendants refused to turn over collateral securing

the payment of approximately $6.7 million that was due on November 19, 2008.  After

SageCrest brought an application to replevy the collateral, the court held hearings on that

application.  Following the second day of evidentiary hearings, Justice Bransten ordered a

restraint on one of Defendants' accounts, explaining:

> And it goes on and on. But the point is that I gather from this --
> this testimony is that Peck basically said that these monies
> represented... How did -- how was it put? "That were proceeds
> from the assigned loans and due SageCrest into your own ACG."
> He said "I don't remember," but then he goes on later on to say
> yes, he did order it.
>
>      *And the point that I'm making is that I believe that __Peck__
> __who wasn't exactly the most forthcoming witness we've ever met__
> __in this courtroom__, I believe that Peck basically implied that these
> monies were basically due SageCrest.*
>
> So you point out where I'm wrong, where there's contradiction on that.

(2/17/2009 Tr. at 506-07 (emphases added).)

10.    Defendants have repeatedly sought to stay the Assigned Loan Action including, but not limited to, objecting to SageCrest's application in this Court to retain Sheppard, Mullin, Richter & Hampton LLP, filing a stay motion in the Bankruptcy Case, and seeking a stay from the Appellate Division, First Department.  Moreover, Defendants have tried to multiply the proceedings in this Bankruptcy Case by, among other things, seeking Rule 2004 examinations and opposing applications of SageCrest and the other debtors for relief.  Ultimately, all of the courts have seen Defendants' actions for what they really are — meritless and frivolous attempts to delay and avoid their obligations.

11.    Defendants' recent actions in the Assigned Loan Action are consistent.  After ACG-II failed to pay $4,425,000 to SageCrest on May 19, 2010 and SageCrest sent a notice of the payment default that gave ACG-II five (5) business days to cure that default, Defendants filed an order to show cause seeking a stay of SageCrest's rights under the 2-Year Note, the So-Ordered Settlement Stipulation, and law (the "Stay OTSC").  The purported reason for the stay is because "SageCrest's bankruptcy is a disaster."  However, Defendants' actions are really an effort by Peck forestall a very simple, straightforward commercial obligation to pay SageCrest what is owed on the note.  In addition, Peck's actions are aimed at avoiding a $1 million personal guarantee.  By filing the Stay OTSC, Peck is seeking to avoid the sale of the certain collateral owned by ACG-II (the "IPFP Collateral"), which is the last condition prior to the enforcement of the guarantee based on the admissions contained in the Stay OTSC.

12.    Because Peck is the alter ego of each of the Peck-controlled Entities, and each of those entities are the alter egos of one another, Peck and the Peck-controlled Entities are jointly and severally liable to SageCrest for the $4.425 million plus all other amounts that SageCrest is entitled to recover in this action.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1334.  This is

a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O).

14.     Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

15.     SageCrest is a Delaware limited liability company with its principal place of

business located at 3 Pickwick Plaza, Suite 400, Greenwich, Connecticut 06830.  On August 17,

2008, SageCrest commenced a reorganization case by filing a voluntary petition for the relief

afforded by Chapter 11 of title 11 of the United States Code, U.S.C. §§ 101-1352, as amended

(the "Bankruptcy Code").  Under Section 301 of the Bankruptcy Code, the filing of the

petition constituted an order for relief under chapter 11 and, since that filing, in accordance

with Sections 1107 and 1108, SageCrest has continued in possession and control of its assets

and properties and has continued to operate its business and manage its affairs as a debtor-in-

possession.

16.     Upon information and belief, Defendant Peck is a citizen of the State of New

York and is domiciled at 181 East 65th Street, Apartment 7B, New York, New York 10065.

Peck has admitted that he is the principal of Defendants ACG-II, Fine Art Finance, ACG

Finance, Art Capital Inc., Art Capital LLC, and ACG-I.  Upon information and belief, Peck is the

sole member of Defendant Art Capital LLC, which is the sole member of Defendants ACG-II,

ACG Finance, Fine Art Finance, and ACG-I.  Upon further information and belief, Peck is also

the President of Defendants ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, and

ACG-I.  Upon further information and belief, Peck is sole shareholder and the Chairman or Chief

Executive Officer of Art Capital Inc.  As such, Peck controls and dominates ACG-II, Fine Art

Finance, ACG Finance, Art Capital LLC, Art Capital Inc., and ACG-I.  Upon further information

and belief, Peck has signed all of the checks issued out of the bank accounts for the Peck-controlled Entities. Peck has used the Peck-controlled Entities to perpetrate numerous wrongs upon SageCrest including, but not limited to, making false statements to courts, failing to pay millions of dollars due and owing to SageCrest, and misappropriating funds that belong to SageCrest, and seeking to prevent SageCrest from enforcing its rights, all of which have been done to personally benefit Peck. Further, upon information and belief, the funds that Peck and the Peck-controlled Entities have received were paid or deposited into an account in the name of Art Capital Inc., an entity that never had any interest in any of the loans or collateral securing the 2-Year Note. Peck further uses the Peck-controlled Entities in a manner demonstrating that they have no separate existence — other than serving Peck's own interests.

17.     Upon information and belief, Defendant ACG-II is a Delaware limited liability company with its principal place of business located at 980 Madison Avenue, New York, New York 10075. Upon information and belief, the sole member of ACG-II is Defendant Art Capital LLC, whose sole member is Defendant Peck. Upon information and belief, ACG-II is a wholly owned subsidiary of Art Capital LLC. Upon information and belief, ACG-II does not have any bank accounts in its own name and uses the bank accounts of other Peck-controlled Entities including, but not limited to, Art Capital Inc. to receive and pay funds.

18.     Upon information and belief, Defendant ACG Finance is a Delaware limited liability company with its principal place of business located at 980 Madison Avenue, New York, New York 10075. Upon information and belief, the sole member of ACG Finance Defendant Art Capital LLC, whose sole member is Defendant Peck. Upon information and belief, ACG Finance is a wholly owned subsidiary of Art Capital LLC. Upon information and belief, ACG Finance does not have any bank accounts in its own name and uses the bank

accounts of other Peck-controlled Entities including, but not limited to, Art Capital Inc. to receive and pay funds.

19.     Upon information and belief, Defendant Fine Art Finance is a Delaware limited liability company with its principal place of business located at 980 Madison Avenue, New York, New York 10075. Upon information and belief, the sole member of Fine Art Finance is Defendant Art Capital LLC, whose sole member is Defendant Peck. Upon information and belief, ACG Finance is a wholly owned subsidiary of Art Capital LLC. Upon information and belief, Fine Art Finance does not have any bank accounts in its own name and uses the bank accounts of other Peck-controlled Entities including, but not limited to, Art Capital Inc. to receive and pay funds.

20.     Upon information and belief, Defendant Art Capital LLC is a Delaware limited liability company with its principal place of business located at 980 Madison Avenue, New York, New York 10075. Upon information and belief, the sole member of Art Capital is Defendant Peck. Upon information and belief, Art Capital LLC is the sole member of Defendants ACG-II, ACG Finance, Fine Art Finance, and ACG-I.

21.     Upon information and belief, Defendant Art Capital Inc. is a Delaware corporation with its principal place of business located at 980 Madison Avenue, New York, New York 10075. Upon information and belief, Defendant Peck is sole shareholder and the Chairman or Chief Executive Officer of Art Capital Inc. Upon information and belief, at least one of the Art Capital Inc. accounts received over $1.2 million on account of or with respect to the Assigned Loans and the Assigned Collateral, despite the fact that Art Capital Inc. did not have any interest in either the Assigned Loans or the Assigned Collateral. Since Art Capital Inc. has never had any interest in the Assigned Loans or the Assigned Loans and, thus, its receipt of any

money relating to either demonstrates that the Peck-controlled Entities are nothing more than Peck's alter ego. Upon further information and belief, Peck and the Peck-controlled Entities transferred funds in and out of at least one Art Capital Inc. bank account as well as between other bank accounts for Peck and the Peck-controlled Entities.

22.    Upon information and belief, Defendant ACG-I is a Delaware limited liability company with its principal place of business located at 980 Madison Avenue, New York, New York 10075. Upon information and belief, the sole member of ACG-I is Defendant Art Capital LLC, whose sole member is Defendant Peck. Upon information and belief, ACG-I is a wholly owned subsidiary of Art Capital LLC.

## FACTUAL ALLEGATIONS

23.    On May 19, 2008, the So-Ordered Settlement Stipulation was executed by, among others, SageCrest, Peck, ACG-I, ACG-II, ACG Finance, Art Capital LLC, and Fine Art Finance, and was subsequently "so ordered" by the Justice Bransten.

24.    Peck executed the So-Ordered Settlement Stipulation both individually and as President of ACG-I, ACG-II, ACG Finance, Art Capital LLC, and Fine Art Finance.

25.    The So-Ordered Settlement Stipulation was entered by the Clerk of the Court on or about May 19, 2008.

26.    The So-Ordered Settlement Stipulation required ACG-II to make payments totaling $29,925,000 (the "Settlement Amount") plus any applicable interest to SageCrest at three separate times. The only payment that is the subject of this proceeding is the $4,425,000 that was required to be paid by no later than May 19, 2010. That payment obligation is evidenced by the 2-Year Note.

27.    The 2-Year Note is a secured promissory note which was executed on or about May 19, 2008 by ACG-II, by Peck as President. Pursuant to the terms of the 2-Year Note, ACG-

II "unconditionally promise[d] to pay" SageCrest the sum of $4,425,000 in immediately available funds on or before May 19, 2010.

28.     The 2-Year Note is secured by a first priority, perfected security interest in and lien on and the proceeds of:  (a) a certain judgment (the "American Furniture Judgment") and a certain lot of furniture owned by an underlying borrower (the "Gill Furniture Lot"); (b) three loans and the documentation relating to those loans including, without limitation, the promissory notes made in favor of ACG-II by (i) Veronica Hearst (the "2004 Hearst Loan"), (ii) Peter Socolof (the "Socolof Loan"), and (iii) Vernon Bailey (the "Bailey Loan" and, together with the 2004 Hearst Loan and the Socolof Loan, the "Other Art Loans"); (c) the collateral securing the Other Art Loans (the "Other Art Loan Collateral"), (d) eight paintings that are owned by ACG-II and that are identified in Exhibit I to the So-Ordered Settlement Stipulation (the "IPFP Collateral"); (e) a care and custody agreement between SageCrest and ACG-II for the IPFP Collateral (the "IPFP Agreement"), which is attached to the So-Ordered Settlement Stipulation as Exhibit P; (f) a $1 million personal guarantee executed by Peck and delivered to SageCrest on or about May 19, 2008 (the "Peck Personal Guarantee"), which is attached to the So-Ordered Settlement Stipulation as Exhibit Q; and (g) an account in the name of ACG-II at JPMorgan Chase Bank, N.A. ("JPMorgan") or other mutually-agreeable financial institution (the "Blocked Account"), which is subject to an agreement that permits SageCrest to control the Blocked Account (the "Blocked Account Agreement").

29.     If ACG-II failed to pay the full amount owed under the 2-Year Note on or before May 19, 2010 and SageCrest sent notice providing five (5) business days to cure that default (the "Cure Period"), then the 2-Year Note provides that SageCrest "may pursue any and all remedies available to [SageCrest]."

30.    In the IPFP Agreement, ACG-II "agree[d] not to allow the removal of the [IPFP Collateral] from [its] premises unless at least two (2) business days prior written notice of such release or removal is provided to SageCrest or SageCrest provides its written consent to the release or removal of one or more pieces of the [IPFP Collateral]."

31.    ACG-II also agree to refrain from taking "any action purporting to encumber or transfer any interest in the [IPFP Collateral]."

32.    ACG-II further acknowledged that SageCrest was relying on the IPFP Agreement in connection with SageCrest's decision to permit ACG-II to pay the Settlement Amount over time and enter into the So-Ordered Settlement Stipulation.

33.    Section 13(b) of the So-Ordered Settlement Stipulation provides that "any interest and/or principal payment or proceeds generated by or from . . . the Other Art Loans, the Other Art Loan Collateral, the American Furniture Judgment, the Gill Furniture Lot, [and] the IPFP Collateral, . . . shall be deposited into the Blocked Account.  If an underlying borrower remits any payment due and owing under the ACG-II Notes or the Collateral Assignment to ACG-II, Fine Art Finance or ACG Finance and not into the Blocked Account, ACG-II, Fine Art Finance or ACG Finance shall, within ten (10) days of receipt of such payment, remit such payment into the Blocked Account."

34.    Section 13(e) of the So-Ordered Settlement Stipulation provided an opportunity for ACG-II to be reimbursed for Collection Costs (as defined in the So-Ordered Settlement Stipulation) and Administrative Costs (as defined in the So-Ordered Settlement Stipulation) for the 2004 Hearst Loan and the collateral for that loan (the "Hearst Collateral"), enforcement of the American Furniture Judgment, and the sale of the Gill Furniture Lot (including, but not limited to, defending any claims made in New Hampshire), but did not provide an opportunity

for the recovery of any of those costs for the Other Art Loans, the Other Art Loan Collateral or

the IPFP Collateral.  Further, the recovery of any such costs had to be pursuant to the terms,

conditions and procedure set forth in Sections 13 and 14 of the So-Ordered Settlement

Stipulation including, but not limited to, providing monthly reports and copies of all invoices or

bills.

35.    ACG-II, Fine Art Finance, and ACG Finance are required to "provide written

notice to SageCrest of any movement of any piece" of the Other Art Loan Collateral, the IPFP

Collateral or the Gill Furniture Lot.  Further, ACG-II, Fine Art Finance, and ACG Finance are

obligated to inform SageCrest of any material adverse changes to the business and/or finances of

the underlying borrowers on the Other Art Loans.

36.    Section 15 of the So-Ordered Settlement Stipulation sets forth SageCrest's rights

regarding the take over of the collection, enforcement or execution on the Other Art Loans and

the American Furniture Judgment.  After a default on the 2-Year Note, SageCrest is permitted to

take over those loans without having to provide any credits to ACG-II or abide by any of the

restrictions contained in Section 15(a) regarding the take over of the Other Art Loans or the

American Furniture Judgment.  Upon such take over, ACG-II appointed SageCrest "attorney-in-

fact to act with full power and authority in the name of, and for and on behalf of, ACG-II."

37.    Sections 28 and 39 of the So-Ordered Settlement Stipulation require the parties to

fully cooperate with each other and execute any additional documents that are needed to fulfill

the intent of the So-Ordered Settlement Stipulation.

38.    On May 19, 2010, ACG-II did not pay the $4,425,000 that was due and owing to

SageCrest.

39.     On May 20, 2010, SageCrest sent a Notice of Payment Default (the "Default Notice") by facsimile to ACG-II, Fine Art Finance and ACG Finance and their counsel, which Default Notice gave ACG-II five (5) business days to cure the payment default.

40.     ACG-II, Fine Art Finance and ACG Finance received the Default Notice on May 20, 2010, but ACG-II did not cure the payment default within the Cure Period.

41.     Rather than cure the payment default, Peck and the Peck-controlled Entities filed the Stay OTSC seeking to prevent SageCrest from exercising its rights under the documents and law including, but not limited to, the Bankruptcy Code.

42.     The Stay OTSC is based on the repeated assertion that "SageCrest's bankruptcy is a disaster." According to Defendants, a stay should be entered that prevents SageCrest from exercising its rights.

43.     However, the Stay OTSC reveals numerous breaches of the 2-Year Note, the IPFP Agreement, and the So-Ordered Settlement Stipulation. In particular, Defendants reveal that they:

- "sold through a private sale the collateral securing the Hearst Art Loan for $500,000";

- "sold one painting contained within the IPFP Collateral for $75,000"; and

- "unsuccessfully attempted to sell the collateral securing the Socolof and Bailey Art Loans."

44.     These admissions demonstrate that Defendants: (a) moved the Other Art Loan Collateral and at least one piece of the IPFP Collateral without providing any notice to SageCrest; (b) sold collateral and did not deposit the funds in the Blocked Account or turn over the proceeds to SageCrest and retained the funds for Defendants' own benefit and, thus, converted the funds; (c) sold at least one piece of the IPFP Collateral for less than the minimum price that ACG-II was obligated to obtain for the sale of any piece of the IPFP Collateral (the

lowest such price was $100,000); and (d) did not notify SageCrest of any defaults by Socolof or Bailey.

45.     Defendants do not, however, identify the collateral that was sold, the dates of the sales, the purchasers, the location of the sale, the terms of the sales, or where the funds are located, all of which further demonstrates Defendants' disingenuous motivations.

46.     Defendants also make numerous arguments or claims that are directly contradicted by the 2-year Note, the IPFP Agreement and/or the So-Ordered Settlement Stipulation." For example, Defendants claim (or at least imply) that they are entitled to an arranger's fee upon the sale of any piece of the IPFP Collateral. However, Defendants have no such right as the IPFP Collateral is owned by ACG-II and there is no arranger's agreement relating to such collateral. Thus, the very premise of Defendants' Stay OTSC is flawed. Further, Defendants claim that they are entitled to "an Arranger's Fee as a result of the sale of the Hearst Collateral" when they are, at best, entitled to 50% of any such fee.

47.     The real motivation behind the Stay OTSC is three-fold.

48.     First, Peck and his entities simply do not wish to pay $4.425 that is owed to the estate.

49.     Second, Peck is seeking to stay SageCrest from exercising its legal and contractual rights in an effort to avoid his guarantee. The Stay OTSC demonstrates Peck's efforts to avoid paying SageCrest at all costs and his utilization of the Peck-controlled Entities to attempt to personally benefit by attempting to avoid his obligations under the Peck Personal Guarantee.

50.     Third, the Stay OTSC makes clear that Defendants are seeking to avoid turning over collateral that is property of SageCrest's estate. Defendants' rationale that if they have a

claim in the Bankruptcy Case, Defendants will "never be able to recover those fees [and because they have] virtually no legal recourse against SageCrest."

51.     Defendants' motivations and rationales fly in the face of the Bankruptcy Code, law and their contractual obligations.   Even if Defendants were somehow correct, neither Defendants nor the court handling the Assigned Loan Action have any right to determine whether Defendants can be paid for any valid claim before any other creditors.  This Court is the only court that can make any such determination and Defendants' efforts to avoid this Court and maintain collateral and cash are violations of the automatic stay and, thus, are punishable by contempt.

## FIRST CAUSE OF ACTION

### (Nonpayment of the 2-Year Note – Against All Defendants)

52.     SageCrest repeats and realleges paragraphs 1 through 51 as if fully set forth herein.

53.     The 2-Year Note was executed by ACG-II, by Peck as President, on or about May 19, 2008, and was delivered to SageCrest on May 19, 2008.

54.     The 2-Year Note is a is a binding and enforceable promissory note and ACG-II was obligated to pay $4,425,000 in immediately available funds to SageCrest on May 19, 2010.

55.     ACG-II failed to pay $4,425,000 to SageCrest.

56.     On May 20, 2010, SageCrest send the Default Notice to ACG-II, Fine Art Finance, and ACG Finance.

57.     Upon information and belief, ACG-II, Fine Art Finance, and ACG Finance received the Default Notice.

58.     To date, ACG-II has not paid the $4,425,000 that is due and owing to SageCrest.

59.     Peck has admitted that he is the principal of each of the Peck-controlled Entities.

60.    Upon information and belief, Art Capital LLC is the sole member of ACG-II, Fine Art Finance, ACG Finance, and ACG-I.

61.    Upon information and belief, Peck is the sole member of Art Capital LLC.

62.    Peck is the President of ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, and ACG-I.

63.    Upon information and belief, Art Capital Inc. is owned by Peck and Peck is the Chairman or Chief Executive Officer of Art Capital Inc.

64.    Upon information and belief, the offices of ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, Art Capital Inc., and ACG-I are all located on the third floor at 980 Madison Avenue, New York, New York.

65.    ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, Art Capital Inc., and ACG-I all share the same telephone number and facsimile number.

66.    ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, Art Capital Inc., and ACG-I all use the same website, www.artcapitalgroup.com, to advertise and promote their business.

67.    Upon information and belief, the aforementioned website is registered to Art Capital Inc.

68.    Upon information and belief, all of the employees of Art Capital Inc. also work on behalf of ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, and ACG-I.

69.    Upon information and belief, ACG-II, Fine Art Finance, ACG Finance, Art Capital LLC, Art Capital Inc., and ACG-I were never adequately capitalized.

70. At a hearing in the Assigned Loan Action on February 13, 2009, when Peck was questioned about "Art Capital" letterhead, he was unable to distinguish whether that was Art Capital Inc. and Art Capital LLC letterhead.

71. Entities that had no interest in any loans received payments from and issued invoices to underlying borrowers.

72. Many of the Peck-controlled Entities do not have bank accounts. Rather, funds relating to those entities are routinely routed through Art Capital Inc.'s bank accounts.

73. Peck signs all checks issued out of any of the Peck-controlled Entities bank accounts.

74. Peck uses the Peck-controlled Entities to defraud persons and commit tortious acts including, but not limited to, SageCrest. For example, Defendants' admission that they have sold collateral underlying the 2-Year Note and retained the proceeds is entirely consistent with their past acts of improperly selling collateral and retaining the proceeds.

75. Accordingly, Peck is the alter ego of the Peck-controlled Entities and each of those entities are the alter egos of one another.

76. As a result of the foregoing, Defendants have damaged SageCrest in an amount to be determined at trial, but in no event less than $4,425,000, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest.

## SECOND CAUSE OF ACTION

### (Breach of the IPFP Agreement – Against All Defendants)

77. SageCrest repeats and realleges paragraphs 1 through 76 as if fully set forth herein.

78. The IPFP Agreement prohibits the movement of any piece of the IPFP Collateral without either (a) two (2) business days prior notice to SageCrest or (b) SageCrest's consent.

79.     As evidenced by Defendants' admissions in the Stay OTSC, Defendants sold at least one (1) piece of the IPFP Collateral and, thus, moved at least one piece of the IPFP Collateral.

80.     Defendants never provided any notice of such movement, nor did SageCrest consent to any movement of any IPFP Collateral.

81.     As a result of the foregoing and since Peck is the alter ego of the Peck-controlled Entities and each of those entities are alter egos of the others, Defendants have damaged SageCrest in an amount to be determined at trial, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest.

### THIRD CAUSE OF ACTION

(Breach of the So-Ordered Settlement Stipulation – Against All Defendants)

82.     SageCrest repeats and realleges paragraphs 1 through 81 as if fully set forth herein.

83.     The So-Ordered Settlement Stipulation required Defendants to notify SageCrest of any movement of any piece of the Other Art Loan Collateral or the Gill Furniture Lot.

84.     Defendants did not notify SageCrest of the sales or attempted sales of the Other Art Loan Collateral which, upon information and belief, involved the movement of one or more pieces of the Other Art Loan Collateral.

85.     Defendants failed to notify SageCrest of any materially adverse change in the financial condition of the underlying borrowers on the Socolof Loan or the Bailey Loan.

86.     As a result of the foregoing and since Peck is the alter ego of the Peck-controlled Entities and each of those entities are alter egos of the others, Defendants have damaged SageCrest in an amount to be determined at trial, but in no event less than $2 million, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest.

## FOURTH CAUSE OF ACTION

### (Conversion – Against All Defendants)

87.     SageCrest repeats and realleges paragraphs 1 through 86 as if fully set forth herein.

88.     Since ACG-II failed to establish the Blocked Account and cause that account to be subject to the Blocked Account Agreement, Defendants were entrusted with funds that belonged to SageCrest and should have been immediately wire transferred to SageCrest.

89.     The Peck-controlled Entities, at Peck's direction, have failed to remit to SageCrest funds that they were entrusted with on behalf of SageCrest, which funds are believed to total at least $450,000.

90.     SageCrest has demanded that Defendants remit those funds to SageCrest, but they have refused.

91.     SageCrest has a superior right of possession to these funds.

92.     By failing to pay the funds to SageCrest, Defendants have exercised dominion over at least $450,000 without SageCrest's authorization, which is in defiance of SageCrest's rights.

93.     The failure of Defendants to pay the at least $450,000 to SageCrest was done with the malicious intent to deprive SageCrest and SageCrest's estate of its assets.

94.     As a result of the conversion by Defendants of at least $450,000 and Defendants repeated prior conversions of SageCrest's funds, Defendants have damaged SageCrest in an amount to be determined at trial, but in no event less than $450,000, plus punitive damages, SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest.

## FIFTH CAUSE OF ACTION

(Turnover of Assets Pursuant to Section 542 of the
Bankruptcy Code and the UCC – Against All Defendants)

95.    SageCrest repeats and realleges paragraphs 1 through 94 as if fully set forth herein.

96.    SageCrest has a first priority perfected security interests in the Other Art Loan Collateral, the Gill Furniture Lot, and the IPFP Collateral.

97.    When ACG-II failed to pay the $4,425,000 and cure the payment default, SageCrest obtained the right to the collateral including, but not limited to, the IPFP Collateral and the proceeds of the sales of any collateral securing the 2-Year Note.

98.    Therefore, SageCrest demands that Defendants turn over the IPFP Collateral and any and all funds relating to the Other Art Loans, the Other Art Loan Collateral, the IPFP Collateral, the American Furniture Judgment and the Gill Furniture Lot, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate.

99.    SageCrest further demands that Defendants turn over all records relating to the Other Art Loans, the Other Art Loan Collateral, the IPFP Collateral, the American Furniture Judgment and the Gill Furniture Lot.

100.    Further, Section 542 of the Bankruptcy Code obligates Defendants to provide an accounting relating to the Other Art Loans, the Other Art Loan Collateral, the IPFP Collateral, the American Furniture Judgment and the Gill Furniture Lot and, therefore, SageCrest demands that Defendants immediately provide such.

## SIXTH CAUSE OF ACTION

### (Enforcement of the Peck Personal Guarantee – Against Peck)

101.    SageCrest repeats and realleges Paragraphs 1 through 100 as if fully set forth herein.

102.    In the Stay OTSC, Defendants admit that they have either sold or attempted to sell all of the collateral securing the 2-Year Note with the possible exception of seven (7) pieces of the IPFP Collateral.

103.    Since Defendants admit that they have been unable to sell the Other Art Loan Collateral (except for what has been sold) and are silent regarding the Gill Furniture Lot, SageCrest is entitled to enforce the Peck Personal Guarantee at this time because Defendants have only recovered $450,000 of over $2 million.

104.    Upon information and belief, even if the remaining pieces of the IPFP Collateral were sold, there will be a deficiency on the collateral securing the 2-Year Note of more than $1 million and, thus, all of the conditions to enforcing the Peck Personal Guarantee have been satisfied.

105.    Accordingly, Peck is liable to SageCrest for $1 million, plus all of SageCrest's fees and costs including, but not limited to, attorneys' fees, and pre- and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, SageCrest respectfully demands judgment on its Complaint as follows:

A.    On the First Cause of Action, an amount to be determined at trial, but in no event less than $4,425,000, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest;

W02-EAST:7MEM1\200311897.2                              -23-

B.      On the Second Cause of Action, an amount to be determined at trial, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest;

C.      On the Third Cause of Action, an amount to be determined at trial, but in no event less than $2 million, plus SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest;

D.      On the Fourth Cause of Action, an amount to be determined at trial, but in no event less than $450,000, plus punitive damages, SageCrest's attorneys' fees, costs, and both pre- and post-judgment interest;

E.      On the Fifth Cause of Action, turnover of (i) the IPFP Collateral, (ii) any and all funds relating to the Other Art Loans, the Other Art Loan Collateral, the IPFP Collateral, the American Furniture Judgment and the Gill Furniture Lot, and (iii) all records relating to the Other Art Loans, the Other Art Loan Collateral, the IPFP Collateral, the American Furniture Judgment and the Gill Furniture Lot, as well as an accounting relating to the Other Art Loans, the Other Art Loan Collateral, the IPFP Collateral, the American Furniture Judgment and the Gill Furniture Lot, plus SageCrest's attorneys' fees and costs, and pre- and post-judgment interest;

F.      On the Sixth Cause of Action, an amount to be determined at trial, but in no event less than $1 million, plus all of SageCrest's fees and costs including, but not limited to, attorneys' fees, and pre- and post-judgment interest;

G.      Awarding SageCrest its costs, expenses and attorneys' fees; and

H.    Granting SageCrest such other and further relief as may be just and

proper.

Dated: June 3, 2010                    THE PLAINTIFF
                                       SAGECREST II, LLC


                        By:    /s/ James Berman
                               James Berman, Esq. (ct06027)
                               ZEISLER & ZEISLER, P.C.
                               558 Clinton Avenue
                               Bridgeport, CT  06605
                               Telephone: 203-368-4234
                               Facsimile: 203-367-9678
                               Email: jberman@zeislaw.com

                                    -   And   -

                               Robert S. Friedman, Esq.
                               SHEPPARD MULLIN RICHTER &
                                   HAMPTON, LLP
                               30 Rockefeller Plaza
                               New York, NY  10112
                               Telephone:  212-653-8600
                               Facsimile:  212-653-8701


                               Mark E. McGrath, Esq.
                               SHEPPARD MULLIN RICHTER &
                                   HAMPTON, LLP
                               30 Rockefeller Plaza
                               New York, NY  10112
                               Telephone:  212-653-8600
                               Facsimile:  212-653-8701


                               Douglas J. Buncher, Esq.
                               NELIGAN FOLEY, LLP
                               325 N. St. Paul, Suite 3600
                               Dallas, TX  75201
                               Telephone:  214-840-5300
                               Facsimile:  214-840-5301

Patrick J. Neligan, Jr., Esq.
NELIGAN FOLEY, LLP
325 N. St. Paul, Suite 3600
Dallas, TX 75201
Telephone: 214-840-5300
Facsimile: 214-840-5301


Seymour Roberts, Jr., Esq.
NELIGAN FOLEY, LLP
325 N. St. Paul, Suite 3600
Dallas, TX 75201
Telephone: 214-840-5300
Facsimile: 214-840-5301

W02-EAST:7MEM1\200311897.2                                -26-