# EXHIBIT 8

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

| | | |
|---|---|---|
| IN RE:<br><br>SAGECREST II LLC<br>SAGECREST FINANCE LLC<br>SAGECREST HOLDINGS LIMITED<br>SAGECREST DIXON INC.,<br><br>DEBTORS. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CHAPTER 11<br><br>CASE NO. 08-50754 (AHWS)<br>CASE NO. 08-50755 (AHWS)<br>CASE NO. 08-50763 (AHWS)<br>CASE NO. 08-50844 (AHWS) |
| SAGECREST II, LLC,<br><br>Plaintiff,<br><br>-against-<br><br>ACG CREDIT COMPANY II, LLC, ACG FINANCE COMPANY, LLC, FINE ART FINANCE, LLC, ART CAPITAL GROUP, LLC, ART CAPITAL GROUP, INC., and ACG CREDIT COMPANY, LLC, and IAN S. PECK,<br><br>Defendants.<br>------------------------------------------------ | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>X | JOINTLY ADMINISTERED UNDER CASE NO. 08-50754 (AHWS)<br><br>Adv. Proc. No. 10-05042 |
| ACG CREDIT COMPANY II, LLC, ACG FINANCE COMPANY, LLC, FINE ART FINANCE, LLC, ART CAPITAL GROUP, LLC, ART CAPITAL GROUP, INC., and ACG CREDIT COMPANY, LLC,<br><br>Counterclaim-<br>Plaintiffs/Third Party Plaintiffs,<br><br>-against-<br><br>SAGECREST II, LLC and ALAN MILTON,<br><br>Counterclaim-Defendant/<br>Third Party Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |

## ANSWER, COUNTERCLAIMS AND THIRD PARTY CLAIM

Defendants ACG Credit Company II, LLC ("ACG-II"), ACG Finance Company, LLC ("ACG Finance"), Fine Art Finance, LLC ("Fine Art Finance"), Art Capital Group, LLC ("Art Capital LLC"), Art Capital Group, Inc. ("Art Capital Inc."), ACG Credit Company, LLC ("ACG-I"), and Ian S. Peck ("Peck") (collectively, "Defendants"), by and through their undersigned counsel, answers the Complaint in this action as follows:

1. Deny the allegations in paragraph 1.

2. Deny the allegations in paragraph 2, except admit that SageCrest II, LLC ("SageCrest") commenced an action against Defendants in New York State Supreme Court in 2009.

3. Deny the allegations in paragraph 3, except admit that SageCrest commenced an action against certain Defendants in New York State Supreme Court in 2007 regarding a Revolving Credit Agreement by and between ACG-I and SageCrest.

4. Deny the allegations in paragraph 4, except admit that an *Ex Parte* Order of Attachment was issued in the New York State Supreme Court action commenced in 2007, and respectfully refer the Court to that order for a complete recitation of its contents.

5. Deny the allegations in paragraph 5.

6. Deny the allegations in paragraph 6, except admit that a hearing before Justice Freedman occurred on October 15, 2007, and respectfully refer the Court to the transcript of the hearing for context and a complete recitation of the proceedings.

7. Deny the allegations in paragraph 7, except admit that a hearing before Justice Freedman occurred on October 15, 2007, and respectfully refer the Court to the transcript of the hearing for context and a complete recitation of the proceedings.

8.      Deny the allegations in paragraph 8, except admit that certain defendants filed a

motion to reargue, which was decided by Justice Moskowitz, and respectfully refer the Court to

the transcript of that proceeding for context and a complete recitation of the proceedings.

9.      Deny the allegations in the first sentence in paragraph 9, except admit that a

hearing was held on SageCrest's application to replevy collateral, and respectfully refer the

Court to the transcript of this February 2009 hearing for context and complete recitation of the

proceedings.

10.      Deny the allegations in paragraph 10.

11.      Deny the allegations in paragraph 11.

12.      Deny the allegations in paragraph 12.

13.      Admit that SageCrest avers that jurisdiction is proper under the statutory

provisions identified in paragraph 13.

14.      Admit that SageCrest avers that venue is proper under the statutory provisions

identified in paragraph 14.

15.      Deny knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 15.

16.      Deny the allegations in paragraph 16, except admit that Art Capital Group, LLC is

the sole member of ACG Credit Company II, LLC, ACG Finance Company, LLC, Fine Art

Finance, LLC, and ACG Credit Company, LLC and Peck is the President of all of those entities.

17.      Deny the allegations in paragraph 17, except admit the allegations in the first

sentence in paragraph 17, and that the sole member of ACG-II is Art Capital Group, LLC.

3

18.    Deny the allegations in paragraph 18, except admit the allegations in the first sentence of paragraph 18, and that the sole member of ACG Finance Company, LLC is Art Capital Group, LLC.

19.    Deny the allegations in paragraph 19, except admit the allegations in the first sentence in paragraph 19, and that the sole member of Fine Art Finance, LLC is Art Capital Group, LLC.

20.    Deny the allegations in paragraph 20, except admit the allegations in the first and third sentences.

21.    Deny the allegations in paragraph 21, except admit the allegations in the first sentence.

22.    Deny the allegations in paragraph 22, except admit the allegations in the first sentence in paragraph 22, and that the sole member of ACG Credit Company is Art Capital Group LLC.

23.    Admit the allegations in paragraph 23.

24.    Admit the allegations in paragraph 24.

25.    Admit the allegations in paragraph 25.

26.    Deny the allegations in paragraph 26 and respectfully refer the Court to the So-Ordered Settlement Stipulation for its full terms and conditions.

27.    Deny the allegations in paragraph 27 and respectfully refer the Court to the So-Ordered Settlement Stipulation and the 2-Year Note for their full terms and conditions.

28.    Deny the allegations in paragraph 28 and respectfully refer the Court to the So-Ordered Settlement Stipulation and the 2-Year Note for their full terms and conditions.

4

29. Deny the allegations in paragraph 29 and respectfully refer the Court to the So-Ordered Settlement Stipulation and the 2-Year Note for their full terms and conditions.

30. Deny the allegations in paragraph 30 and respectfully refer the Court to the So-Ordered Settlement Stipulation and the IPFP Agreement for their full terms and conditions.

31. Deny the allegations in paragraph 31 and respectfully refer the Court to the So-Ordered Settlement Stipulation and the IPFP Agreement for their full terms and conditions.

32. Deny the allegations in paragraph 32 and respectfully refer the Court to the So-Ordered Settlement Stipulation and the IPFP Agreement for their full terms and conditions.

33. Deny the allegations in paragraph 33 and respectfully refer the Court to the So-Ordered Settlement Stipulation for its full terms and conditions.

34. Deny the allegations in paragraph 34 and respectfully refer the Court to the So-Ordered Settlement Stipulation for its full terms and conditions.

35. Deny the allegations in paragraph 35 and respectfully refer the Court to the So-Ordered Settlement Stipulation for its full terms and conditions.

36. Deny the allegations in paragraph 36 and respectfully refer the Court to the So-Ordered Settlement Stipulation for its full terms and conditions.

37. Deny the allegations in paragraph 37 and respectfully refer the Court to the So-Ordered Settlement Stipulation for its full terms and conditions.

38. Deny the allegations in paragraph 38, except admit that ACG-II did not pay $4,425,000 to SageCrest on May 19, 2010.

39. Deny the allegations in paragraph 39, except admit that SageCrest faxed a Notice of Payment Default in May 2010 to certain Defendants.

40.     Deny the allegations in paragraph 40, except admit that certain Defendants received SageCrest's May 2010 Default Notice.

41.     Deny the allegations in paragraph 41, except admit that certain Defendants filed a Stay OTSC.

42.     Deny the allegations in paragraph 42, except admit that certain Defendants filed a Stay OTSC, and respectfully refer the Court to those motion papers for context and a complete recitation of the issues.

43.     Deny the allegations in paragraph 43.

44.     Deny the allegations in paragraph 44.

45.     Deny the allegations in paragraph 45.

46.     Deny the allegations in paragraph 46.

47.     Deny the allegations in paragraph 47.

48.     Deny the allegations in paragraph 48.

49.     Deny the allegations in paragraph 49.

50.     Deny the allegations in paragraph 50.

51.     Deny the allegations in paragraph 51.

52.     In response to the allegations in paragraph 52, repeat and reallege their responses to paragraphs 1 though 51 of the Complaint as if set forth at length herein.

53.     Admit the allegations in paragraph 53.

54.     The allegations in paragraph 54 set forth legal conclusions and require no response. To the extent that a response is required, Defendants deny the allegations in paragraph 54.

55.   Deny the allegations in paragraph 55, except admit that ACG-II did not pay $4,425,000 to SageCrest on May 19, 2010.

56.   Admit the allegations in paragraph 56.

57.   Admit the allegations in paragraph 57.

58.   Deny the allegations in paragraph 58, except admit that ACG-II did not pay $4,425,000 to SageCrest on May 19, 2010.

59.   The allegations in paragraph 59 set forth legal conclusions and require no response. To the extent that a response is required, Defendants deny the allegations in paragraph 59.

60.   Admit the allegations in paragraph 60.

61.   Deny the allegations in paragraph 61.

62.   Admit the allegations in paragraph 62.

63.   Deny the allegations in paragraph 63.

64.   Admit the allegations in paragraph 64.

65.   Admit the allegations in paragraph 65.

66.   Deny the allegations in paragraph 66.

67.   Deny the allegations in paragraph 67.

68.   Deny the allegations in paragraph 68.

69.   Deny the allegations in paragraph 69.

70.   Deny the allegations in paragraph 70, and respectfully refer the Court to the transcript of the February 13, 2009 hearing for a complete recitation of the discussion.

71.   Deny the allegations in paragraph 71.

72.   Deny the allegations in paragraph 72.

73.     Deny the allegations in paragraph 73.

74.     Deny the allegations in paragraph 74.

75.     Deny the allegations in paragraph 75.

76.     Deny the allegations in paragraph 76.

77.     In response to the allegations in paragraph 77, repeat and reallege their responses to paragraphs 1 though 76 of the Complaint as if set forth at length herein.

78.     Deny the allegations in paragraph 78, and respectfully refer the Court to the IPFP Agreement for a full and complete recitation of its terms and conditions.

79.     Deny the allegations in paragraph 79.

80.     Deny the allegations in paragraph 80.

81.     Deny the allegations in paragraph 81.

82.     In response to the allegations in paragraph 81, repeat and reallege their responses to paragraphs 1 though 81 of the Complaint as if set forth at length herein.

83.     Deny the allegations in paragraph 83 and respectfully refer the Court to the So-Ordered Settlement Stipulation for its full terms and conditions.

84.     Deny the allegations in paragraph 84.

85.     Deny the allegations in paragraph 85.

86.     Deny the allegations in paragraph 86.

87.     In response to the allegations in paragraph 87, repeat and reallege their responses to paragraphs 1 though 86 of the Complaint as if set forth at length herein.

88.     Deny the allegations in paragraph 88.

89.     Deny the allegations in paragraph 89.

90.     Deny the allegations in paragraph 90.

91.     Deny the allegations in paragraph 91.

92.     Deny the allegations in paragraph 92.

93.     Deny the allegations in paragraph 93.

94.     Deny the allegations in paragraph 94.

95.     In response to the allegations in paragraph 95, repeat and reallege their responses to paragraphs 1 though 94 of the Complaint as if set forth at length herein.

96.     The allegations in paragraph 96 set forth legal conclusions and require no response.  To the extent that a response is required, Defendants deny the allegations in paragraph 96.

97.     Deny the allegations in paragraph 97.

98.     Deny the allegations in paragraph 98.

99.     Deny the allegations in paragraph 99.

100.    Deny the allegations in paragraph 100.

101.    In response to the allegations in paragraph 101, repeat and reallege their responses to paragraphs 1 though 100 of the Complaint as if set forth at length herein.

102.    Deny the allegations in paragraph 102.

103.    Deny the allegations in paragraph 103.

104.    Deny the allegations in paragraph 104.

105.    Deny the allegations in paragraph 105.

WHEREFORE, Defendants deny all allegations set forth in the Complaint that have not been expressly answered above, deny that Plaintiff is entitled to any relief whatsoever, and respectfully request judgment dismissing Plaintiff's Complaint with prejudice and with such

costs and attorneys' fees as may be allowed by law, and any further legal and equitable relief the Court deems appropriate.

<u>**AFFIRMATIVE DEFENSES**</u>

Defendants assert the following affirmative defenses without assuming the burden of proof or persuasion as to such defenses that would otherwise rest on Plaintiff.

### FIRST AFFIRMATIVE DEFENSE

The Amended Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because of Plaintiff's failure to mitigate its damages, if any.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the equitable doctrines of unclean hands and bad faith.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred and/or Defendants are relieved of any obligation under the So-Ordered Settlement Stipulation on the grounds that Plaintiff breached its own contractual obligations.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the equitable doctrines of waiver, ratification and/or estoppel.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by virtue of the facts, circumstances and conduct alleged in the Counterclaims.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by law of the case doctrine.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of collateral estoppel and *res judicata*.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its failure to satisfy conditions precedent.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its failure to comply with the express requirements of the New York Uniform Commercial Code.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of election of remedies.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred and/or precluded by the express terms of the So-Ordered Settlement Stipulation.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's fraud claims are barred because they are duplicative of the breach of contract claims.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by virtue of a release.

## FIFTEENTH AFFIRMATIVE DEFENSE

Any damages awarded to Plaintiff are offset by the Counterclaims asserted herein.

## DEFENSES RESERVED

The foregoing affirmative defenses are raised by Defendants without waiver of any other defenses that may come to light during the discovery proceedings in this case or otherwise.

Defendants hereby reserve the right to amend or supplement their Answer to assert any other related defenses as they become available.

## COUNTERCLAIMS AND THIRD PARTY CLAIMS

### NATURE OF ADVERSARY PROCEEDING

1.      Since entering into the So-Ordered Settlement Stipulation, SageCrest, in concert with its principal Alan Milton, has, in total disregard of its legal obligations to Defendants and others: (i) repeatedly and knowingly breached the terms of the So-Ordered Settlement Stipulation; (ii) flouted its legal obligations under the Uniform Commercial Code (thereby barring it from asserting many of the claims set forth in the State Court Complaint); (iii) repeatedly breached the Uniform Commercial Code as codified in New York law; (iv) improperly refused to acknowledge Defendant Fine Art Finance's secured right to Arranger's Fees under the terms of the So-Ordered Settlement Stipulation and related agreements; and (v) tortiously interfered with Fine Art Finance's rights to those Arranger's Fees in violation of New York law.

Specifically, as set forth below, SageCrest has:

- **Twice** filed claims against Defendants even though the So-Ordered Settlement Stipulation explicitly prohibited it from doing so, causing Defendants to expend enormous sums of money to defend against those impermissible claims. SageCrest now continues to prosecute those claims in this Court.

- Transferred over 75% of its interest in the Assigned Loans and the 2 Year Note to its offshore affiliates, a transfer clearly barred by the So-Ordered Settlement Stipulation. This transfer stripped Defendants of their bargained for rights and extinguished their ability to control the disposition of those loans.

- Failed to secure, obtain or dispose of the collateral for the Assigned Loans as required by the Uniform Commercial Code, such failure barring SageCrest from asserting claims against Defendants in connection with the Assigned Loans under New York law.

- Violated the New York Uniform Commercial Code by repeatedly refusing to give Defendants notice of SageCrest's sales of Assigned Loan collateral.

- Repeatedly and wrongfully interfered with Defendant Fine Art Finance's efforts to obtain the Arranger's Fees due to it under the terms of the So-Ordered Settlement Stipulation and related agreements by making baseless and improper threats against art auction houses and underlying borrowers.

2.     These actions, undertaken by SageCrest with the full knowledge that they were in violation of the So-Ordered Settlement Stipulation, are consistent with the long history of illegal and fraudulent conduct by SageCrest, its managing member Windmill Management LLC and its principal Alan Milton, that was laid bare in earlier litigation.  Thus, SageCrest:

- Actively and knowingly financed, conspired with, and profited from the fraudulent scheme of Andrew Rose ("Rose"), a fired ACG employee, and Christopher Krecke ("Krecke"), ACG's former Chief Financial Officer, who formed a competing business (ARCK Credit Company) in violation of Krecke's fiduciary duties to ACG, and misappropriated millions of dollars of ACG's business and business opportunities (the "Rose/Krecke Scheme");

- Employed atypical and devious lending procedures and protocols to aid and abet the Rose/Krecke Scheme;

- Concealed its participation in the Rose/Krecke Scheme from Defendants in order to reap the benefits of maintaining its status as Defendants' lender;

- Breached its loan agreements with Defendants;

- Impaired certain collateral securing certain ACG loans in order to profit from the Rose/Krecke Scheme by making multiple loans on the same collateral;

- Knowingly participated in a fraudulent and rigged art auction at Christie's in furtherance of the Rose/Krecke Scheme by orchestrating "strawman" bidding;

- Aided and abetted Krecke's breach of fiduciary duty in furtherance of the Rose/Krecke Scheme; and

- Tortiously interfered with countless of Defendants' business opportunities.

3. While SageCrest devotes over 40 paragraphs of both Complaints to an inaccurate, self-serving and highly misleading "history" of the original state court litigation between the parties (*SageCrest II, LLC v. ACG Credit Company, LLC*, et al., Index. No. 600195/07) (the "First State Court Action"), it deliberately omits the fact that it agreed to settle the First State Court Action within weeks of the defendants filing counterclaims: (i) based on the facts set forth above regarding the Rose/Krecke Scheme, and (ii) alleging claims against Milton and Windmill for their participation in that scheme, including claims for conspiracy, fraud, tortious interference with business and prospective business, aiding and abetting Rose and Krecke's fraud, and aiding and abetting Rose and Krecke's acts of unfair competition. SageCrest and Milton were apparently so concerned about the counterclaims they moved quickly to ensure that they would never have to respond to them in any court proceeding.

4. Even before SageCrest's bankruptcy filing, Alan Milton's investment practices caused at least one hedge fund publication to characterize the SageCrest funds as nothing more than a classic Ponzi scheme. *HFM Week*, M. Corey Goldman, June 5-11, 2008 ("After all, paying Paul 18% interest to pay back Peter, charging a management fee to do it and keeping the money tied up is something Charles Ponzi would be proud of.").

5. Such unflattering press portrayals were hardly surprising, given the dishonest and unethical manner in which Milton conducted SageCrest's business. On one occasion, while SageCrest was still serving as Defendants' lender, Milton demanded that [ACG] sign a form "confirming" for SageCrest's accountants (and thus its benighted investors as well) that SageCrest was earning a 16% rate of return from its loans to ACG-I when in fact that rate of return was only 12%. Milton later admitted – in writing – that the information he was providing to SageCrest's auditors was false.

6.      Upon information and belief, Milton's fraudulent "partnership" with Rose and Krecke continues to this day.   Part of SageCrest's art loan portfolio consists of its loans to Rose/Krecke's entities ARCK Credit Company and/or Art Finance Partners ("ARCK").   Upon information and belief, while ARCK has been receiving regular payments of interest and principal from its borrowers on these loans, it has not made any payments to SageCrest in 2009 or 2010.  Despite that fact, SageCrest has not taken any action to foreclose on ARCK's collateral or otherwise collect from ARCK.

7.      Upon information and belief, during the pendency of SageCrest's chapter 11 case, Milton and Rose and Krecke have conspired to "transfer" SageCrest's loans to ARCK to another entity, not owned or controlled by the debtors, in acts which constitute a fraud upon SageCrest, its bankruptcy estate, and SageCrest's creditors.

### JURISDICTION AND VENUE

8.      This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O).

9.      Venue is proper under 28 U.S.C. §§ 1408 and 1409.

### THE PARTIES

10.      Counterclaim/Third Party Plaintiff ACG Credit Company II, LLC ("ACG-II") is a Delaware limited liability company with its principal place of business located in New York, New York.

11.      Counterclaim/Third Party Plaintiff ACG Finance Company, LLC ("ACG Finance") is a Delaware limited liability company with its principal place of business located in New York, New York.

12.     Counterclaim/Third Party Plaintiff Fine Art Finance, LLC ("Fine Art Finance") is a Delaware limited liability company with its principal place of business located in New York, New York.

13.     Counterclaim/Third Party Plaintiff Art Capital Group, LLC ("Art Capital LLC") is a Delaware limited liability company with its principal place of business located in New York, New York.

14.     Counterclaim/Third Party Plaintiff Art Capital Group, Inc. ("Art Capital Inc.) is a Delaware corporation with its principal place of business located in New York, New York.

15.     Counterclaim/Third Party Plaintiff ACG Credit Company, LLC ("ACG-I") is a Delaware limited liability company with its principal place of business located in New York, New York.

16.     Upon information and belief, Counterclaim Defendant SageCrest II, LLC ("SageCrest") is a Delaware limited liability company with its principal place of business located in Greenwich, Connecticut.

17.     Upon information and belief, Third Party Defendant Alan Milton ("Milton") is a resident of the State of New York.

## RELEVANT FACTS

### The Settlement Stipulation

18.     On or about May 19, 2008, the parties entered into the So-Ordered Settlement Stipulation to resolve the litigation then before the State Court entitled *SageCrest II, LLC v. ACG Credit Company LLC, et al*, Index No. 600195/08.

19.     The Settlement Stipulation, *inter alia*, provided that:

- ACG-II agreed to pay SageCrest $29,925,500.00, which included an "Initial Consideration" of $21,000,000.00; a six-month note in the

16

amount of $4,500,000.00; and a two-year interest-free note in the amount of $4,425,000.00 (the "Two Year Note").

- The Initial Consideration consisted of a $14,300,000.00 cash payment to be made at the time of closing and an assignment of certain rights with respect to loans and collateral securing the obligation of $6,700,000.00, which was to be paid by ACG-II six months from the Closing Date (November 19, 2008).

- Pursuant to the terms of the Assignment, Fine Art Finance and ACG Finance assigned SageCrest certain rights to receive all select monthly principal and interest payments and/or sales proceeds generated by five (5) unencumbered loans having an outstanding combined balance of at least $6.7 million ("Assigned Loans").

- The Assigned Loans were themselves secured by collateral consisting of 35 pieces of artwork owned by certain underlying borrowers (the "Assigned Loan Borrowers").

- The So-Ordered Settlement Stipulation provided that during the period from May 19, 2008 through November 18, 2008, SageCrest "shall not interfere with the servicing, managing and administration of the Assigned Loans by Fine Art Finance and ACG Finance" (which entities had the absolute right to service manage and administer the Assigned Loans).

- However, in the event that ACG-II failed to pay the Balance and any Additional Interest by November 19, 2008 and following 5 days written notice to ACG-II to cure the failure, then SageCrest had the absolute right to service, manage and administer the Assigned Loans as per the terms of the Collateral Assignment.

- Pursuant to Section 33 of the So-Ordered Settlement Stipulation, the Assigned Loans were "not to be assigned, transferred or pledged [by SageCrest] absent the written consent of ... ACG-II, ACG Finance, Fine Art Finance and Ian Peck (which consent may be withheld for any reason whatsoever and ACG-II, ACG Finance and Ian Peck shall not be required to disclose or justify their reason)..."

- Pursuant to Section 2(c) of the So-Ordered Settlement Stipulation, ACG-II agreed to execute and deliver the Two Year Note.

- The Two Year Note was secured by, *inter alia*, (i) proceeds of the American Furniture Judgment, (ii) ACG-II's interest in the Gill Furniture Lot, (iii) ACG-II's interest in the Other Art Loans, (iv) the Other Art Loan Collateral, (v) the IPFP Collateral, and (vi) a Limited

17

Personal Guarantee (as those terms are defined in the So-Ordered Settlement Stipulation).

- SageCrest expressly released (in Section 20 of the So-Ordered Settlement Stipulation) Defendants or its affiliates from *any* claims arising or accruing before or including May 19, 2008. In that provision, SageCrest "remise[d], covenant[ed] not to sue, and release[d]" Defendants from "any and all actions, causes of actions … fraudulent inducement claims, acts and/or omissions … and all other claims of every kind, nature and description, whatsoever …" that it had against Defendants "accruing or arising from the beginning of time to and through the day of this Settlement Stipulation."

- In Section 21 of the So-Ordered Settlement Stipulation, SageCrest agreed to hold Defendants harmless "and will forever forbear from pursuing, and do hereby waive any right to make any demand or claim against [Defendants] concerning any act, conduct, commission, omission or claim arising out of or related to the facts or occurrences underlying [the prior litigation] or with respect to any and all events, occurrences, and circumstances through the Closing Date (including, without limitation, fraudulent conveyance, conversion, and *fraudulent inducement claims* other than for breach of this Settlement Stipulation … ." (Emphasis added.)

- To deter SageCrest from asserting such claims, the So-Ordered Settlement Stipulation goes so far as to provide that they "will be liable to Defendants for *all* damages, fees and expenses incurred by [Defendants] to enforce this Section." (Emphasis added.)

- In Section 36 of the So-Ordered Settlement Stipulation, SageCrest, certified that it fully read and understood all of its terms and conditions.

**SageCrest's Blatant and Bad Faith Breaches of the So-Ordered Settlement Stipulation**

20.     SageCrest breached the So-Ordered Settlement Stipulation in three separate – but equally egregious – ways.

21.     First, SageCrest breached and is in contempt of the So-Ordered Settlement Stipulation because: (i) in Section 20 of the So-Ordered Settlement Stipulation, SageCrest released all claims against Defendants for events that occurred prior to or including May 19,

2008 other than for breach of the So-Ordered Settlement Stipulation; (ii) Section 21 of the So-Ordered Settlement Stipulation explicitly prohibited SageCrest from ever filing or pursuing any claim against Defendants based on events that took place prior to May 19, 2008, (iii) SageCrest's original state court complaint, filed January 20, 2009 (the "Complaint"), asserted a fraud claim against all Defendants other than Art Capital, Inc., which claim was clearly based on purported "fraudulent misrepresentations" which SageCrest alleges were made by Defendants Fine Art Finance and ACG Finance LLC before May 19, 2008; (iv) SageCrest's Amended Complaint, filed on or about May 19, 2009 asserts a claim against Defendants Fine Art Finance and Art Capital Inc. for fraudulent inducement, which claim is clearly based on purported "fraudulent misrepresentations" which SageCrest alleges were made by Fine Art Finance and Art Capital Inc. before May 19, 2008; (v) despite being fully aware that it was barred from asserting these claims by the So-Ordered Settlement Stipulation; and (vi) Defendants have been (and continue to be) prejudiced by SageCrest's knowing and deliberate violations of Sections 20 and 21 of the So-Ordered Settlement Stipulation by being forced to expend tens of thousands of dollars in legal fees and other costs that would not have been necessary had SageCrest not engaged in the contumacious action of asserting prohibited fraud and fraudulent inducement claims in its Complaint and Amended Complaint.

22. Section 20 of the So-Ordered Settlement Stipulation provides that:

> SageCrest, Windmill, and Mr. Milton, individually, and on behalf of their respective successors and assigns …hereby remise and covenant not to sue, and release ACG-I, ACG-II, Art Capital, ACG Finance and Ian Peck and their respective (a) successors and assigns, (b) affiliates, (c) executors, (d) predecessors, (e) heirs, and (f) present and former directors, officers, shareholders, managers, members, partners, employees, representatives, agents, and attorneys (collectively the "ACG Release Parties") from any and all manner of actions, causes of action, suits, proceedings … fraudulent inducement claims, acts and/or omissions … and all

other claims of any kind, nature and description, whatsoever, liquidated and unliquidated ... known and unknown ... whether based on statutory law, common law, federal law, state law, local law or otherwise, that they may have, or could have against the ACG Release Parties, accruing or arising from the beginning of time to and through the day of this Settlement Stipulation.

23.   Section 21 of the So-Ordered Settlement Stipulation provides that:

SageCrest, Windmill and Mr. Milton, individually and collectively, do hereby covenant and agree that SageCrest, Windmill and Mr. Milton will hold the ACG Release Parties harmless and will forever forbear from pursuing, and do hereby waive any right to make, any demand or claim against the ACG Release Parties concerning any act, conduct, commission, omission or claim arising out of or related to the facts or occurrences underlying the above-captioned litigation or with respect to any and all events, occurrences, and circumstances through the Closing Date (including, without limitation, fraudulent conveyance, conversion and fraudulent inducement claims) other than for breach of this Settlement Stipulation or the Additional Agreements.

24.   The Tenth Cause of Action of SageCrest's Complaint asserted a claim for fraud against "all Defendants except Art Capital, Inc." based on "representations and warranties" which "SageCrest relied on in signing the So-Ordered Settlement Stipulation and releasing the Order of Attachment." Compl., at ¶ 252. SageCrest admitted that "[t]hose representations and warranties are essentially the same as those that were made to induce SageCrest into accepting less than $21 million in cash at closing..." In other words, SageCrest was alleging that Defendants had made representations **before May 19, 2008** – the "Closing Date" on which the parties entered into the So-Ordered Settlement Stipulation -- which purportedly induced it into entering into that agreement. But Section 21 (and Section 20) of the So-Ordered Settlement Stipulation explicitly prohibited SageCrest from asserting this fraud claim, because it was clearly a "claim against the ACG Release Parties concerning an[] act, conduct, commission, omission or claim ... with respect to any and all events, occurrences, and circumstances through the Closing

Date (including, without limitation, fraudulent conveyance, conversion and fraudulent inducement claims)..."

25.     The Eleventh Cause of Action in SageCrest's Amended Complaint – which remains the operative complaint in this action – alleges a claim for fraudulent inducement against Defendants Fine Art Finance and Art Capital Inc. In this claim, SC alleges that Fine Art Finance and Art Capital Inc. (clearly included among the "ACG Release Parties" as they are affiliates of the other corporate Defendants) – **before the parties entered into the So-Ordered Settlement Stipulation on May 19, 2008** – provided "due diligence materials" and made "representations and warranties" which "SageCrest reasonably relied on ... in determining whether or not to enter into the So-Ordered Settlement Stipulation."

26.     Here, too, Sections 20 and 21 of the So-Ordered Settlement Stipulation explicitly prohibited SageCrest from asserting this claim – even going so far as specifically enumerating "fraudulent inducement claims" as being those which were expressly barred.

27.     SageCrest was indisputably aware of the So-Ordered Settlement Stipulation's explicit prohibition of these claims. SageCrest was a signatory to the So-Ordered Settlement Stipulation and pursuant to Section 36 thereof certified that it had "read this Settlement Stipulation, have conferred with counsel, and fully understand[s] all the terms, and ... acknowledge and represent that [it] enter[s] into this Settlement Stipulation of their own free will, and not from any representation, commitment, promise, pressure or duress from any other Party."

28.     Thus, SageCrest cannot legitimately claim that (i) it did not understand the terms of the So-Ordered Settlement Stipulation, (ii) it was barred from asserting the fraud claim in its original Complaint, or (iii) it was barred from asserting the fraudulent inducement claim in its

Amended Complaint. And yet SageCrest filed these claims anyway, and thereby violated the clear and explicit terms of Sections 20 and 21 of the So-Ordered Settlement Stipulation.

29.    It is equally clear that Defendants have been prejudiced by SageCrest's contumacious conduct. Defendants have incurred (and continue to incur) considerable costs defending against the fraud and fraudulent inducement claims, as well as the allegations in respect of the Prior ACG Litigation. SageCrest caused those claims and allegations to be filed knowing full well that they were expressly barred from doing so by the So-Ordered Settlemetn Stipulation. Accordingly, they should be held to be in civil contempt, compelled to withdraw the claims and allegations with prejudice, and to reimburse all of Defendants' legal fees that were incurred in connection with those claims.

30.    Second, SageCrest knowingly and deliberately violated Section 33 of the So-Ordered Settlement Stipulation, which provided that the Assigned Loans were "not to be assigned, transferred or pledged absent the written consent of ... ACG-II, ACG Finance, Fine Art Finance and Ian Peck (which consent may be withheld for any reason whatsoever and ACG-II, ACG Finance and Ian Peck shall not be required to disclose or justify their reason...)" SageCrest's bankruptcy filings reveal that it holds only a 23% interest in the Assigned Loans. According to SageCrest, the remaining 77% interests have been "participated out" (*i.e.*, sold or assigned) to "offshore entities."

31.    At some point between May 19, 2008 (the date of execution of the So-Ordered Settlement Stipulation) and October 14, 2008 (the date that SageCrest appears to have first disclosed this information to this Court and *before* any purported breach by Defendants), SageCrest sold a majority share of its interest in the Assigned Loans to the ["offshore entities."]

32.     SageCrest's sale of its interests in the Assigned Loans was a clear breach of Section 33 of the So-Ordered Settlement Stipulation, which prohibits any such transfer without ACG's express written consent. No such consent was ever sought or received.

33.     SageCrest's knowing and deliberate violation of Section 33 of the So-Ordered Settlement Stipulation prejudiced Defendants, particularly Defendants ACG-II and Fine Art Finance (which assigned the relevant rights under the Assigned Loans to SageCrest). The prohibition on assignments or transfers contained in Section 33 of the So-Ordered Settlement Stipulation was a specific, bargained for benefit for Defendants, intended to guard against the risk that:

> (i)  the Assigned Loans could be transferred by SageCrest to Defendants' competitors in the art lending marketplace. Once Defendants' competitors were servicing the Assigned Loans and building business relationships with the borrowers on those loans, Defendants could lose valuable market share to those competitors.
>
> (ii) Defendants would not get the Assigned Loans back once SageCrest had collected the full principal amount of those loans.

34.     Because SageCrest violated Section 33 of the So-Ordered Settlement Stipulation, and assigned a majority interest in the Assigned Loans to offshore entities, Defendants lost the benefit of this bargain. There is now no way for Defendants to control any further transfers or assignments of these loans, which – now in the hands of Bermuda based entities that are not under SageCrest's control – could end up in the portfolios of Defendants' competitors.

35.     Third, upon information and belief, SageCrest and Milton have violated the So-Ordered Settlement Stipulation (and are attempting to defraud SageCrest's creditors and the bankruptcy estate) by transferring (or attempting to transfer) some or all of the Assigned Loans to ARCK and/or principals of ARCK, all of whom are impermissible transferees and/or assignees under Section 33 of the So-Ordered Settlement Stipulation.

36.    These furtive transfers are, *inter alia*, depriving Fine Art Finance and ACG Finance of its rights to collect Arranger's Fees.

**SageCrest Has Failed To Comply With Its Obligations under UCC Article 9**

37.    SageCrest has failed to comply with its legal obligations under the UCC. The Assigned Loans, and their underlying collateral (the "Assigned Collateral"), were SageCrest's collateral for a $6.7 million secured obligation. After ACG-II's purported default in November 2008 in paying the $6.7 million, SageCrest "foreclosed" on the Assigned Loans by electing manage, administer and service them under the terms of the So-Ordered Settlement Stipulation (which gave SageCrest to right to elect to assume the "absolute right to service, manage and administer the Assigned Loans as per the terms of the Collateral Assignment...").

38.    SageCrest's rights with respect to the Assigned Loans are governed by the UCC. Through the execution of the So-Ordered Settlement Stipulation and the Collateral Assignment, SageCrest created a security interest in the Assigned Loans and the Assigned Collateral under UCC Article 9. Moreover, to attempt to ensure that its security interest took precedence over any potential competing creditors, SageCrest sought to perfect its security interest in the Assigned Loans by obtaining the original notes and in the Assigned Collateral by filing UCC financing statements.

39.    Accordingly, SageCrest became subject to the "good faith" requirements of Article 9 of the N.Y. UCC, which provides, at  9-207(c)(2) that "a secured party having possession of collateral or control [over it] ... shall apply money or funds received from the collateral to reduce the secured obligation..."). Thus, SageCrest must first attempt to reduce the amount of the $6.7 million by disposing of, or collecting upon the Assigned Loans and the Assigned Collateral *before* seeking to recover any deficiency against ACG-II. But after

24

SageCrest took over the right to service, administer and collect upon the Assigned Loans in November 2008, it:  (i) failed to use commercially reasonably methods in servicing and/or enforcing its rights under those loans, and (ii) did not sell or otherwise dispose of the collateral it has in its possession in compliance with the UCC, and (iii) as a result, there are <u>no</u> amounts due and owing to SageCrest from Defendants.

40.     However, SageCrest has repeatedly and emphatically disputed that it has any obligations under the UCC with respect to the Assigned Loans, thus giving rise to a controversy between the parties regarding the existence and extent of those obligations.

41.     On February 19, 2009, ACG-II gave SageCrest all 10 items of Assigned Loan Collateral that it had in its possession, pursuant to a stipulation between the parties that was later so-ordered by the State Court.. Upon information and belief, on that date the remaining items of Assigned Loan Collateral were in the possession of Assigned Loan borrowers Galleria Ramis Barquet, N.Y. Ltd. ("Barquet"), Alistair Crawford, Lawrence J. Daitch, Evan Tawil and Enrico Navarra (the "Assigned Loan Borrowers").

42.     SageCrest's "efforts" to assemble the Assigned Loan Collateral and collect on the Assigned Loans have been characterized by inattention, incompetence and gross negligence. The largest Assigned Loan, to Barquet, has been in default for well over 18 months, yet SageCrest has inexplicably failed to call a default on that loan or bring an action to recover the balance.

43.     Upon information and belief, since taking over the Assigned Loans in November 2008, SageCrest principal Alan Milton and SageCrest employee Shida Yeung have been in frequent contact with Barquet, repeatedly speaking with Barquet's principal Ramis Barquet in person (during frequent visits to the Barquet gallery) and over the phone.

44.     Despite that fact, SageCrest has never sought to enforce the terms of the Barquet loan by suing Barquet to: (i) recover the unpaid loan balance, or (ii) obtain possession numerous items of fine art which are collateral for the Barquet loan and which, upon information and belief, remain in Barquet's possession or have been sold by Barquet since November 2008.

45.     Instead, upon information and belief, since November 2008, SageCrest has obtained possession of only three (3) items of the Assigned Loan collateral for the Barquet loan – three paintings which Barquet agreed to sell at auction in May 2010.   The remaining items of Barquet collateral remain unaccounted for.

46.     Upon information and belief, rather than seeking to enforce SageCrest's rights under the Assigned Loans, and recover the principal balance due thereunder, SageCrest principal Alan Milton has devoted significant time and effort to an attempt to convince Barquet to agree to transfer its loan from SageCrest's loan portfolio to the loan portfolio of a non-debtor entity in which Milton holds a personal interest, in violation of Milton's duties to SageCrest, its bankruptcy estate and the estate's constituencies.

47.     Those constituencies are well aware of SageCrest's failure to enforce its rights under the Assigned Loans (although apparently not yet aware of Milton's blatant attempts at bankruptcy fraud).  SageCrest's senior secured creditor Deutsche Bank AG, as agent for DB Structured Products, Inc. ("DB"), has made it clear, in moving for the appointment of a trustee in this chapter 11 case, that SageCrest and its current management have "no strategy … as to when and how to sell anything," and has stated that "no material asset sales have occurred during the pendency of these cases."

48.     At an April 7, hearing before the bankruptcy court, SageCrest's other creditors made it clear that SageCrest (and its "manager," Windmill) could not be counted upon to dispose

of its assets (including any collateral obtained from ACG II) in a commercially reasonable manner.  Counsel for the Official Committee of SageCrest's Equity Security Holders told the bankruptcy court that:

> **[W]e have lost complete confidence in Windmill.**  And by Windmill, Your Honor, we are really primarily focusing on the principals of Windmill and the people at the top of the Windmill chain who are – who are in charge of making leadership decisions that are needed to move this case forward and that's Alan and Philip Milton.  **We don't believe and our clients don't believe, for that matter, that Mr. Alan Milton and Mr. Philip Milton have the necessary skill set to be able to deal with what is now a portfolio of fairly distressed assets.  So we are – we are in this position, Your Honor, of having our assets managed by someone who we don't want to manage our assets and who should not be in charge of those assets.** (Emphasis supplied)

49.     Under New York law, "[e]very aspect of a disposition of collateral, including the method, manner, time, and place, and other terms must be commercially reasonable."  NY UCC 9-610(b).  SageCrest has the burden of establishing its compliance with Article 9.  *See* NY UCC 9-626(a)(2), ("If the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part.").  SageCrest acquired all necessary legal and equitable rights relating to those Assigned Loans in November 2008, but has failed to service, administer and collect upon those loans in the commercially reasonable fashion required by the UCC.  Unless and until SageCrest can satisfy its burden of showing that it has done so, this Court should declare that it has no right to payment of <u>any</u> amounts from ACG-II with respect to the Assigned Loans.

**SageCrest Violated the UCC by Failing to Notify Defendants of the Sale of Other
<u>Collateral Securing the Assigned Loans</u>**

50.     Since taking over the Assigned Loans in November 2008, SageCrest has sold, or attempted to sell, only a handful of items of the Assigned Loan Collateral.

51.     Upon information and belief, SageCrest arranged for the sale of 3 paintings which formed part of the collateral for Assigned Loan borrower Evan Tawil in late 2009, and two paintings which formed part of the Barquet loan collateral in May 2010.

52.     In a blatant attempt to evade its express obligations to pay Fine Art Finance its Arranger's Fee from the proceeds of those sales, SageCrest failed to provide notice to ACG II and Fine Art Finance as it must under Section 9-611 of the New York Uniform Commercial Code, and by so doing, violated New York law and damaged defendants ACG II and Fine Art Finance.

**The Arranger's Fees Due to Defendant Fine Art Finance**

53.     Defendants provide various types of secured financing to individuals and businesses. Because of Defendants' specialized knowledge of the art market, most, if not all, of the financing provided by Defendants is secured by fine art.

54.     In connection with the Assigned Loans and the loans securing the 2 Year Note, each underlying borrower executed an arranger agreement with Fine Art Finance (the "Arranger Agreement").

55.     Pursuant to the Arranger Agreement, Fine Art Finance, as the Arranger, performs a variety of functions with respect to each loan, including servicing the loan, collecting upon the loan, safeguarding collateral and selling collateral in the event of a default. In connection with those responsibilities, the Arranger charges each borrower certain fees and commissions including fees and triggered by the borrower's default (the "Arranger's Fees"). The relevant loan agreements provide that these fees and commissions are secured by each borrower's

collateral and are paid <u>first</u> – they come "off the top" of the proceeds from any collateral sale

*before* such proceeds are applied to the balance of any outstanding loan.

- The Arranger's Fees are secured obligations under the relevant loan documents.

- The Arranger Agreements for the Assigned Loans provide that "[a]ll proceeds from Collateral sales ... shall be applied *first, towards the payment of the* [Arranger's Fee]; second towards the repayment of the Obligations [under the loan agreement]; and third, any excess to [the underlying borrower]." (Emphasis added).

- The Arranger Agreements for the loans that form the collateral for the Two Year Note have similar language to those of the Assigned Loans.

- As a result, the Arranger's Fees come "off the top" of the gross sale price.

- Accordingly, Fine Art Finance has the right to be paid the Default Sale Fee *before* SageCrest receives *any* proceeds from any sale.

- The Collateral Assignment provided that Fine Art Finance expressly retained "**any and all rights to receive any commissions, fees, or expenses including an Arranger's fee, due under the Assigned Loans**." (Emphasis added.) Thus, Fine Art Finance maintained and may now enforce its secured right to recover the Arranger's Fees in connection with any sale of any item of the Assigned Loan Collateral.

- The Two Year Note expressly excluded "any commission, fees, or expenses due any Arranger, Borrower affiliate, or related company based on a contractual commission already existing in the Loan Documents..." Thus, Fine Art Finance maintained and may now enforce its secured right to recover the Arranger's Fees in connection with any sale of any item of the Two Year Note Collateral.

### SageCrest's Refusal to Pay Fine Art Finance Its Arranger's Fees

56.     While the dispute with respect to Fine Art Finance's Arranger's Fees emerged early in this action, the issue ripened in or about early November 2009, when Fine Art Finance learned that art auction house Phillips de Pury & Co. ("Phillips"), was going to sell at public auction certain artwork securing a $220,000 loan from ACG II to Evan Tawil ("Tawil") (the "Tawil Artwork").  Tawil is a borrower who had defaulted on his loan in 2008.  As a result of that default (among other things), Fine Art Finance was entitled under its loan agreements with Tawil (as well as the So-Ordered Settlement Stipulation) to recover certain fees from Tawil as a result of any public sale (the "Default Sale Fee").

57.     Once Fine Art Finance learned that the Tawil Artwork had been sold by Phillips under a consignment arrangement with Tawil, it immediately notified SageCrest that it was entitled to its fees on a "first out" basis and demanded payment thereof.  Thus, by letter dated November 23, 2009, Fine Art Finance informed SageCrest as follows:

> Be advised that Evan Tawil ("Tawil") owes in excess of one hundred thousand dollars to Fine Art Finance LLC ("Fine Art Finance") as the result of his breaches of the Arranger Agreement, dated August 11, 2006 (the "Arranger Agreement") and the Loan and Security Agreement, dated August 11, 2006 (as amended) (the "Loan Agreement").  Fine Art Finance's rights to recover fees from Tawil under those Agreements were specifically carved out of the Collateral Assignment.
>
> It has come to our attention that two pieces of Tawil Collateral were sold recently by Philips DePury & Company ("Phillips") at auction for $218,500.00 (the "Sale").  Pursuant to the Arranger Agreement, Fine Art Finance is required to be paid its Default Sale Fee (25% of the Sale amount) *before* the proceeds of the Sale are applied to principal and interest of the Tawil Assigned Loan. *See* Arranger Agreement at § 4.  Accordingly, we demand that SageCrest provide Fine Art Finance with a cashier's check in the amount of $54,625.00 at the time the funds from the Sale are disbursed.
>
> ***

In light of the foregoing and because Tawil still owes Fine Art
Finance thousands of dollars in Default Sale Fees from prior sales
of Collateral, we hereby demand that SageCrest (i) cease from
transferring to Tawil any of the proceeds in excess of principal,
interest and other costs due under Tawil's Assigned Loan, and (ii)
immediately transfer the excess proceeds and the remaining Tawil
Collateral (Hirst's *Bisphenol A*) to Fine Art Finance.

We demand written confirmation that you will comply with the
foregoing by no later than the close of business on November 30,
2009. If we do not receive adequate assurances, we will be forced
to conclude that SageCrest intends to convey at least some of the
proceeds of the sale to Tawil or to release the Collateral to him,
and will pursue all available remedies including, but not limited to,
seeking to have all proceeds from the Sale turned over to Fine Art
Finance, and filing claims against SageCrest for tortious
interference with Fine Art Finance's rights under the Arranger
Agreement.

Defendants reserve all rights and remedies under the Settlement
Stipulation and all Loan Agreements.

58.     Notwithstanding the fact that Defendants made their position clear, SageCrest
(consistent with its past practices) ignored the November 23 letter, and has since repeatedly and
emphatically disputed Fine Art Finance's right to recover Arranger's Fees on a secured, "first
out" basis from the proceeds of any sales of Assigned Loan Collateral or Two Year Note
Collateral.

59.     In or about May 2010, SageCrest, without providing any notice to any
Counterclaim Plaintiff, sold certain collateral securing the Assigned Loans.   Specifically,
SageCrest sold three paintings which formed part of the collateral securing the loan of Galleria
Ramis Barquet NY, Ltd.  Defendants turned over those paintings to SageCrest pursuant to a
Stipulation, dated February 19, 2009. Pursuant to the relevant loan documents, Fine Art Finance
is indisputably entitled to an Arranger's Fee resulting from any such sale, again on a first out
basis. However, in a blatant attempt to evade its express obligations to pay Fine Art Finance its

31

Arranger's Fee from the proceeds of that sale, SageCrest failed to provide notice to ACG II and Fine Art Finance as it must, *inter alia*, under Section 9-611 of the New York Uniform Commercial Code.

**FIRST COUNTERCLAIM FOR RELIEF**
**(Breach of the So-Ordered Settlement Stipulation)**

60.     Counterclaim-Plaintiffs repeat and reallege paragraphs 1 through 59 as if fully set forth herein.

61.     Counterclaim-Plaintiffs and SageCrest are parties to the So-Ordered Settlement Stipulation.

62.     Pursuant to Section 20 of the So-Ordered Settlement Stipulation, SageCrest released all claims against Counterclaim-Plaintiffs for events that occurred prior to or including May 19, 2008, other than for breach of the So-Ordered Settlement Stipulation.

63.     Pursuant to Section 21 of the So-Ordered Settlement Stipulation, SageCrest was explicitly prohibited from ever filing or pursuing any claim against Counterclaim-Plaintiffs based on events that took place prior to May 19, 2008.

64.     Despite this prohibition, SageCrest has twice filed such claims. The first such claim was SageCrest's original state court complaint, filed January 20, 2009 (the "Complaint"). This prohibited action asserted a fraud claim against all Defendants other than Art Capital, Inc., which claim was clearly based on purported "fraudulent misrepresentations" which SageCrest alleges was made by Defendants Fine Art Finance and ACG Finance LLC before May 19, 2008. The second such claim was SageCrest's Amended Complaint, filed on or about May 19, 2009, which asserted a claim against Defendants Fine Art Finance and Art Capital Inc. for fraudulent inducement, which claim is clearly based on purported "fraudulent misrepresentations" which SageCrest alleges were made by Fine Art Finance and Art Capital Inc. before May 19, 2008.

32

65.     Accordingly, SageCrest has materially breached its obligations under the So-Ordered Settlement Stipulation.

66.     Counterclaim-Plaintiffs have been (and continue to be) damaged and prejudiced by SageCrest's knowing and deliberate violations of Sections 20 and 21 of the So-Ordered Settlement Stipulation by being forced to expend tens of thousands of dollars in legal fees and other costs that would not have been necessary had SageCrest not engaged in the contumacious action of asserting prohibited fraud and fraudulent inducement claims in its Complaint and Amended Complaint.

67.     By reason of SageCrest's breach of contract, Counterclaim-Plaintiffs have sustained damages in an amount to be determined at trial.

### SECOND COUNTERCLAIM FOR RELIEF
**(Breach of the So-Ordered Settlement Stipulation)**

68.     Counterclaim-Plaintiffs repeat and reallege paragraphs 1 through 67 as if fully set forth herein.

69.     Counterclaim-Plaintiffs and SageCrest are parties to the So-Ordered Settlement Stipulation.

70.     Section 33 of the So-Ordered Settlement Stipulation provides that the Assigned Loans were "not to be assigned, transferred or pledged absent the written consent of ... ACG-II, ACG Finance, Fine Art Finance and Ian Peck (which consent may be withheld for any reason whatsoever and ACG-II, ACG Finance and Ian Peck shall not be required to disclose or justify their reason...)."

71.     SageCrest's bankruptcy filings in this Court reveal that it holds only a 23% interest in the Assigned Loans. According to SageCrest, the remaining 77% interests have been "participated out" (*i.e.*, sold or assigned) to "offshore entities."

33

72.     Neither ACG-II, ACG Finance, Fine Art Finance, nor Ian Peck provided written consent to the assignment by SageCrest of its interests.

73.     Accordingly, SageCrest has materially breached its obligations under the So-Ordered Settlement Stipulation.

74.     SageCrest's knowing and deliberate breach of Section 33 of the So-Ordered Settlement Stipulation has damaged and prejudiced Counterclaim-Plaintiffs, particularly Counterclaim-Plaintiffs ACG-II and Fine Art Finance (which assigned the relevant rights under the Assigned Loans to SageCrest).

75.     The prohibition on assignments or transfers contained in Section 33 of the So-Ordered Settlement Stipulation was a specific, bargained for benefit for Counterclaim-Plaintiffs, intended to guard against certain risk noted earlier.  However, because SageCrest violated Section 33 of the So-Ordered Settlement Stipulation, and assigned a majority interest in the Assigned Loans to "offshore entities," Counterclaim-Plaintiffs have now lost the benefit of this bargain.  There is now no way for Counterclaim-Plaintiffs to control any further transfers or assignments of these loans, which -- now in the hands of Bermuda-based entities that are not under SageCrest's control -- could end up in the portfolios of Counterclaim-Plaintiffs' competitors.

76.     By reason of SageCrest's breach of contract, Counterclaim-Plaintiffs have sustained damages in an amount to be determined at trial.

### THIRD COUNTERCLAIM FOR RELIEF AND THIRD PARTY CLAIM
### (Breach of the So-Ordered Settlement Stipulation)

77.     Counterclaim-Plaintiffs repeat and reallege paragraphs 1 through 76 as if fully set forth herein.

78.    Counterclaim-Plaintiffs, SageCrest and Milton are parties to the So-Ordered Settlement Stipulation.

79.    Sections 33 and 25 prohibits SageCrest and Milton from assigning or transferring any rights under the Settlement Stipulation to certain individual entities or people, including, but not limited to, Andrew C. Rose, Christopher Krecke, ARCK and/or any entities owned, operated and/or controlled by Rose and/or Krecke.

80.    Upon information and belief, SageCrest has violated the So-Ordered Settlement Stipulation by transferring and/or assigning certain rights and/or agreements created thereunder to prohibited persons or entities

81.    By reason of SageCrest's breach of contract, Counterclaim-Plaintiffs have sustained damages in an amount to be determined at trial.

## FOURTH COUNTERCLAIM FOR RELIEF
### (Civil Contempt)

82.    Counterclaim-Plaintiffs repeat and reallege paragraphs 1 through 81 as if fully set forth herein.

83.    The So-Ordered Settlement Stipulation is an order of the New York State Supreme Court, entered in the action captioned, *SageCrest II, LLC v. ACG Credit Company LLC, et al.*, Index No. 600195/08.

84.    As alleged above, SageCrest has failed to comply with a number of the provisions of the So-Ordered Settlement Stipulation including, but not limited to, the provision (i) prohibiting it from filing or pursuing any claim against Counterclaim-Plaintiffs based on events that took place prior to May 19, 2008, and (ii) providing that the Assigned Loans were "not to be assigned, transferred or pledged absent the written consent of . . . ACG-II, ACG Finance, Fine Art Finance, and Ian Peck."

35

85. As a result of SageCrest's clear and unequivocal failure to comply with a court order, Counterclaim-Plaintiffs have been prejudiced. SageCrest is therefore in contempt.

86. Accordingly, Counterclaim-Plaintiffs are entitled to the entry of an Order of Contempt directing SageCrest to pay, *inter alia*, all of Counterclaim-Plaintiffs' fees and costs including, but not limited to, attorneys' fees, and all other remedies under the law.

87. In the event that SageCrest fails to comply with the Order of Contempt, this Court should direct the U.S. Marshal's Service to seize all of its assets, and imprison each member of SageCrest, and its officers and directors until such time as Counterclaim-Plaintiffs receive all of the monies it is entitled to under the So-Ordered Settlement Stipulation and SageCrest complies with the requirements of the So-Ordered Settlement Stipulation.

## FIFTH COUNTERCLAIM FOR RELIEF
### (Declaratory Judgment)

88. Counterclaim –Plaintiffs repeat and reallege paragraphs 1 through 87 as if fully set forth herein.

89. SageCrest's rights with respect to the Assigned Loans are governed by the NY UCC.

90. Through the execution of the So-Ordered Settlement Stipulation and the Collateral Assignment, SageCrest created a security interest in the Assigned Loans and the Assigned Collateral under UCC Article 9.

91. Moreover, to attempt to ensure that its security interest took precedence over any potential competing creditors, SageCrest sought to perfect its security interest in the Assigned Loans by obtaining the original notes and in the Assigned Collateral by filing U.C.C. financing statements.

92.     Accordingly, SageCrest became subject to the "good faith" requirements of Article 9 of the N.Y. U.C.C., which provides, at 9-207(c)(2) that "a secured party having possession of collateral or control [over it] … shall apply money or funds received from the collateral to reduce the secured obligation…."

93.     Thus, SageCrest must first attempt to reduce the amount of the $6.7 million by disposing of, or collecting upon the Assigned Loans and the Assigned Collateral *before* seeking to recover any deficiency against ACG-II.  But after SageCrest took over the right to service, administer and collect upon the Assigned Loans in November 2008, it:  (i) failed to use commercially reasonably methods in servicing and/or enforcing its rights under those loans, and (ii) did not sell or otherwise dispose of the collateral it has in its possession in compliance with the UCC, and (iii) as a result, there are <u>no</u> amounts due and owing to SageCrest from Counterclaim-Plaintiffs.

94.     Moreover, "[e]very aspect of a disposition of collateral, including the method, manner, time, and place, and other terms must be commercially reasonable." N.Y.U.C.C. 9-610(b).

95.     SageCrest acquired all necessary legal and equitable rights relating to those Assigned Loans in November 2008, but has failed to service, administer and collect upon those loans in the commercially reasonable fashion as required by the UCC.

96.     SageCrest has repeatedly and emphatically disputed that it has any obligations under the UCC with respect to the Assigned Loans.  As a result, a substantial controversy exists between the parties who have adverse legal interests, regarding the existence and extent of those UCC obligations.

97.     Accordingly, ACG-II, Fine Art Finance and ACG Finance seek a declaratory judgment that: (i) SageCrest's efforts to collect on the Assigned Loans and the Two-Year Note are subject to the UCC; and (ii) with respect to SageCrest's efforts to collect on the Assigned Loans, that SageCrest has failed to comply with its UCC obligation to obtain and dispose of the collateral in a commercially reasonable manner.

### SIXTH COUNTERCLAIM FOR RELIEF
### (Breach of the NY UCC)

98.     Counterclaim-Plaintiffs repeat and reallege paragraphs 1 through 97 as if fully set forth herein.

99.     SageCrest has violated the NY UCC by failing to notify Counterclaim-Plaintiffs of the sale of collateral securing the Assigned Loans.

100.    Since taking over the Assigned Loans in November 2008, SageCrest has sold, or attempted to sell, only a handful of items of the Assigned Loan Collateral.

101.    Upon information and belief, SageCrest arranged for the sale of 3 paintings which formed part of the collateral for Assigned Loan borrower Evan Tawil in late 2009, and two paintings which formed part of the Barquet loan collateral in May 2010.

102.    In a blatant attempt to evade its express obligations to pay Fine Art Finance its Arranger's Fee from the proceeds of those sales, SageCrest failed to provide notice to ACG-II and Fine Art Finance as it must under Section 9-611 of the New York Uniform Commercial Code, and by so doing, violated New York law and damaged defendants ACG-II and Fine Art Finance.

103.    As a direct and proximate result of the aforesaid wrongful acts of SageCrest, Counterclaim-Plaintiffs have suffered damages in an amount to be determined at trial.

## SEVENTH COUNTERCLAIM FOR RELIEF
### (Accounting)

104. Counterclaim-Plaintiffs repeat and reallege paragraphs 1 through 103 as if fully set forth herein.

105. SageCrest has obligations under Section 14(b) and (c) of the So-Ordered Settlement Stipulation to provide monthly written reports to ACG-II, Fine Art Finance and ACG Finance detailing, *inter alia,* (i) the balance of the Balance and the ACG-II Notes, (ii) the amounts, if any that were obtained during the previous month and a reconciliation and source for such amounts, and (iii) its collection and enforcement efforts to service the loans.

106. SageCrest has failed to provide sufficiently detailed monthly reports to ACG-II, Fine Art Finance and ACG Finance as required under the So-Ordered Settlement Stipulation .

107. As a result, ACG-II, Fine Art Finance and ACG Finance have been unable to, among other things, determine what efforts, if any, SageCrest has taken to collect on the Assigned Loans or to sell the collateral securing the Assigned Loans.

108. Accordingly, Counterclaim-Plaintiffs seek an accounting of all funds received in connection with and/or on account of the Assigned Loans.

## EIGHTH COUNTERCLAIM FOR RELIEF
### (Declaratory Judgment)

109. Counterclaim-Plaintiffs repeat and reallege paragraphs 1 through 108 as if fully set forth herein.

110. Despite knowledge of Fine Art Finance and ACG Finance's position, SageCrest has consistently ignored their warnings, and repeatedly and emphatically disputed their right to recover Arranger's Fees on a secured, "first out" basis for any sales of Assigned Loan Collateral or Two-Year Note Collateral.

111.   As described above, SageCrest's conduct in this regard was exemplified in the sale of certain artwork to Evan Tawil.

112.   Thus, a substantial controversy exists between the parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

113.   Such a judgment would serve a useful purpose in clarifying the legal issues involved and offer relief from uncertainty in that the issue of the fees and commissions due to the Arranger under the Arranger Agreement will be settled.

114.   Accordingly, Counterclaim-Plaintiffs seek a declaratory judgment that Counterclaim-Plaintiffs have a secured, "first out" right to Arranger's Fees from SageCrest and/or any underlying borrower for any sales of Assigned Loan Collateral or Two-Year Note Collateral.

## NINTH COUNTERCLAIM FOR RELIEF
### (Tortious Interference)

115.   Counterclaim-Plaintiffs repeat and reallege paragraphs 1 through 114 as if fully set forth herein.

116.   By engaging in the conduct complained herein, SageCrest has intentionally and tortiously interfered with current and/or prospective contractual and economically advantageous relationships between Counterclaim-Plaintiffs and others.

117.   Counterclaim-Plaintiffs had business relations with, among others, Evan Tawil.

118.   Despite SageCrest's knowledge of Counterclaim-Plaintiffs' business relations with Evan Tawil and others, SageCrest interfered with those business relations without justification by, among other things, disputing Fine Art Finance's right to recover Arranger's Fees on a secured, "first out" basis from the proceeds of any sales of Assigned Loan Collateral or Two-Year Note Collateral.

119.    As a direct and proximate result of the aforesaid wrongful acts of SageCrest, Counterclaim-Plaintiffs have suffered damages in an amount to be determined at trial.

**WHEREFORE**, Counterclaim-Plaintiffs respectfully that the Court enter judgment for ACG Credit Company II, LLC, ACG Finance Company, LLC, Fine Art Finance, LLC, Art Capital Group, LLC, Art Capital Group, Inc., and ACG Credit Company, LLC and against Counterclaim-Defendant on each of the counterclaims and grant relief as follows:

1.    On the first, second, third, fourth, sixth, and ninth counterclaims and the third party claim, compensatory and punitive damages in an amount to be determined at trial;

2.    On the fifth counterclaim, a declaration that: (i) SageCrest's efforts to collect on the Assigned Loans and the Two-Year Note are subject to the UCC; and (ii) with respect to SageCrest's efforts to collect on the Assigned Loans, that SageCrest has failed to comply with its UCC obligation to obtain and dispose of the collateral in a commercially reasonable manner,

3.    On the seventh counterclaim, an accounting of all funds received and actions taken in connection with and/or on account of the Assigned Loans;

4.    On the eighth counterclaim, a declaration that Fine Art Finance and/or ACG Finance have a secured, "first out" right to Arranger's Fees from SageCrest and/or any other underlying borrower for any sales of Assigned Loan Collateral or Two-Year Note Collateral;

5.    Attorneys' fees and costs;

6.    Pre- and post-judgment interest; and

7.    Such other relief as the Court deems just and proper.

Dated:  July 13, 2010

Respectfully Submitted,

/s/ Elizabeth J. Austin
Elizabeth J. Austin (ct04384)
Jessica Grossarth (ct23975)
PULLMAN & COMLEY, LLC
850 Main Street   P.O. Box 7006
Bridgeport, CT   06601-7006
Phone: (203) 330-2243
Fax: (203) 576-8888
Email: eaustin@pullcom.com
          jgrossarth@pullcom.com

SORIN ROYER COOPER LLC
Joshua H. Epstein
1230 Avenue of the Americas, 7th Floor
New York, New York  10020
(212) 618-6324

-and-

Christopher R. Donoho, III, Esq.
Hogan Lovells US LLP
875 Third Avenue
New York, NY  10022
(212) 909-0600
*Attorneys for the ACG Parties*

Attorneys for Defendants-
          Counterclaim Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on July 13, 2010, a true and correct copy

of the ***Defendants' Answer, Counterclaims and Third Party Claim*** was served by electronic

transmission on the parties identified on attached Schedule A.


                    /s/ Elizabeth J. Austin
                    Elizabeth J. Austin (ct04384)

## SCHEDULE A

**Via Pacer/ECF Service:**

| | | |
|---|---|---|
| **James Berman** | representing | **SageCrest II LLC** |
| Zeisler and Zeisler | | Three Pickwick Plaza |
| 558 Clinton Avenue | | Suite 400 |
| P.O. Box 3186 | | Greenwich, CT 06830 |
| Bridgeport, CT 06605 | | *(Plaintiff)* |
| (203) 368-4234 | | |
| jberman@zeislaw.com | | |

**Via Email Transmission:**

**Douglas J Buncher**
Neligan Foley LLP
325 N. St. Paul
Suite 3600
Dallas, TX 75201
(214) 840-5300
(214) 840-5301 (fax)
dbuncher@neliganlaw.com

**Mark E McGrath**
Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza, Suite 2400
New York, NY 10112
212-653-8700
212-653-8701 (fax)
mmcgrath@sheppardmillin.com

**Robert S. Friedman**
Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza, Suite 2400
New York, NY 10112
(212) 653-8700
(212) 653-8701 (fax)
rfriedman@sheppardmullin.com

ACTIVE/73355.1/JXG/2197179v1
ACTIVE/73355.1/JXG/2197188v1