# EXHIBIT 10

Page 1

```
                 UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF CONNECTICUT
                       BRIDGEPORT DIVISION
                    JOINTLY ADMINISTERED UNDER
                     CASE NO. 08-50754 (AHWS)
```

IN RE:
SAGECREST II LLC, SAGECREST
FINANCE LLC, SAGECREST                    CASE NOS.
HOLDINGS LIMITED, SAGECREST                08-50754 (AHWS)
DIXON, INC.,                               08-50755 (AHWS)
                                           08-50763 (AHWS)
      Debtors                              08-50844 (AHWS)
-----------------------------------x
SAGECREST II LLC,
      Plaintiff,                           ADV. PROC.
                                           No. 10-05042
      - against -
ACG CREDIT COMPANY II, LLC,
ACG FINANCE COMPANY, LLC, FINE ART
FINANCE, LLC, ART CAPITAL
GROUP LLC, ART CAPITAL GROUP, INC.,
ACG CREDIT COMPANY, LLC, and
IAN S. PECK,

      Defendants.
-----------------------------------x

    VIDEOTAPED 30(b)(6) DEPOSITION OF IAN S. PECK
             New York, New York
            Thursday, April 26, 2012

Reported by
Anita T. Shemin, RPR, CSR
TSG Job # 49077

| Page 74 | Page 76 |
|---|---|
| Peck | Peck |
| A   Mr. Bailey is deceased, so, no. | satisfy the loan obligation, there is still value |
| Q   When did Mr. Bailey pass away? | there, we don't think it will be sufficient |
| A   I was told by one of his family members, | necessarily to pay off his full balance, but there |
| I guess, in 2010. We didn't verify that that was | will be some value in it. |
| accurate, but he was quite elderly. | So the idea would be to now reoffer it |
| Q   Have any efforts been made to collect | at auction as an attributed piece as opposed to a |
| from his estate? | full blown authentic piece. |
| A   No. | Q   And what would -- in your opinion, what |
| Q   Why not? | would be the value that might be received at |
| A   We didn't believe that the estate would | auction from an attributed Stubbs painting? |
| have any -- sufficient resources to be able to | A   I think that based on what I have heard |
| handle a claim like that. | from Christie's and from what I know, I think the |
| Q   And when you say "we," who are you | value could be still somewhere in the 50 to |
| referring to? | $100,000 range potentially. |
| A   ACG Credit Company II. | Q   And has ARC Capital Group or ACG II made |
| Q   And what was Mr. Bailey's balance on his | any efforts to place the piece with either |
| loan? | Christie's or another auction house on an |
| A   $185,000. | attributed basis? |
| Q   Do you know if that is the principal | A   Well, we intend to do that. The sales |
| amount or the entire amount owed? | that it would be appropriate for based upon our |
| A   I think it is just the principal. | research would be in the fall, so we would look to |
| Q   How did ACG II come to the conclusion | place it in auction in the fall. And we were |
| that it didn't believe that Mr. Bailey's estate | discussing whether it would be better to sell it |
| would have assets sufficient to pay at least | in London or here in New York. So the idea is to |

| Page 75 | Page 77 |
|---|---|
| Peck | Peck |
| $185,000? | reoffer it at auction. |
| A   At one point prior to 2000 -- the | Christie's may or may not want to handle |
| Settlement Agreement in 2008, one -- some type of | that, but we may have to find an alternative. |
| relationship to Mr. Bailey, family relation, had | Q   Who are -- with whom have you discussed |
| approached Art Capital and expressed an interest | whether to offer it in New York or London? |
| in purchasing the piece and then subsequently | A   With the auction person at Christie's |
| withdrew any interest based on the fact that they | who has been handling it thus far. |
| had stated that there wasn't -- there really | Q   Who is that? |
| wasn't sufficient moneys to purchase the piece and | A   Again, his first name is James. I am |
| pay off the loan. | forgetting his last name. |
| Q   Do you know if Mr. Bailey owned a home? | Q   And were any efforts made to place it in |
| A   I don't know. | last fall's auctions? |
| Q   Did Art Capital Group II ever inquire | A   No, because we still had to resolve this |
| into whether he owned a home? | issue of authentication and authorship. |
| A   I don't recall if we did or not. | MR. McGRATH: To the extent any |
| Q   Did Art Capital Group II do any asset | documents have been provided by Christie's or |
| searches for Mr. Bailey? | Miss Edgerton regarding the Stubbs painting, |
| A   No. He lived in Canada, so we did not. | we would request those documents. |
| Q   Is there any plan to collect on the | Q   Where is the Stubbs painting right now? |
| balance of the loan, or has that been written off? | A   It is with Christie's. |
| MR. EPSTEIN: Object to the form. | Q   Are -- is ARC Capital Group II or ACG II |
| A   Well, no, the painting that we are | paying any storage fees at Christie's for the |
| having, although now downgraded from what would | painting? |
| have been, you know, a piece worth plenty to | A   There is only a shipping fee that we |

Page 78

Peck

2 were being charged.
3   Q   When you originally shipped it or they
4 picked it up?
5   A   They charged for the pickup, and they
6 will charge for wherever we move it to from
7 Christie's.
8   Q   In regard to the Sokoloff collateral, is
9 that collateral incurring any charges for storage
10 right now?
11   A   I'm not sure, but I don't think so. I
12 will have to check that.
13   Q   Are the Sokoloff pieces of collateral
14 insured?
15   A   Yes.
16   Q   Are those incurring -- is ACG II paying
17 the insurance for that?
18   A   Yes.
19   Q   And how much is ACG II insuring those
20 pieces for?
21   A   I would have to check that, but I think
22 we would be insuring it for the -- up to the loan
23 obligation amount of 90,000.
24   Q   Why would you insure it up to 90,000 if
25 it is only worth 5 to 6,000?

Page 79

Peck

2   A   Well, if there was a loss, we would --
3 we would -- we would have an argument that it is
4 possibly worth more. So the 5 to $6,000 value was
5 something that was an auction estimate, the retail
6 basis might be more.
7       So the differential in expense to ACG
8 Credit Company II to insure from 6,000 to 90,000
9 is miniscule, so we would tend to want to insure
10 the full value of the loan.
11   Q   Do insurers normally allow the insured
12 to tell the value of a piece of artwork?
13       MR. EPSTEIN: Object to the form.
14   A   They don't arbitrarily let you pick the
15 value, but in our case, we have an umbrella
16 policy, as in the case of the Sokoloff trains,
17 which is the collateral that we are talking about.
18 We have an invoice that he provided prior to
19 getting the loan that shows that he paid 50 or
20 $60,000 for the collection of trains.
21   Q   If he paid 50 to 60,000, why would the
22 pieces only fetch 5 to 6,000 at auction now?
23   A   I guess the market came down from when
24 he bought it. Or it is such a specialized market,
25 that there is very little liquidity, which is more

Page 80

Peck

2 to the point.
3       This is not my area of expertise, but my
4 understanding is that this is a very specialized
5 market, and the differential between private
6 dealers who specialize in this area selling these
7 things on a retail basis and what you can get at
8 public auction is dramatically different.
9   Q   Has ACG II made any efforts to approach
10 any private dealers to sell the Sokoloff
11 collateral?
12   A   We haven't found one that we think is
13 able to handle it today.
14   Q   Why aren't they able to handle it, the
15 people you approached?
16       MR. EPSTEIN: Object to the form.
17   A   We haven't approached anyone. We were
18 waiting for Christie's to make a referral to
19 somebody who could handle it, and they haven't
20 done so.
21   Q   Other than waiting on Christie's, what
22 initiative has ACG II made to sell the Sokoloff
23 collateral?
24   A   We have been asked to -- you know, in
25 the industry, who handles such items, and we

Page 81

Peck

2 haven't gotten a satisfactory answer to date.
3   Q   Have you done any independent research?
4   A   I have not, no.
5   Q   Has ACG II done any independent
6 research?
7   A   I would have to confirm what research
8 has been done, but generally, I know that I have
9 asked people, and other people have asked people
10 about who would be the right person to handle such
11 a sale.
12   Q   Who would you have to confer with at
13 ACG?
14       MR. EPSTEIN: Object to the form.
15   A   Well, I would confer with any person
16 that had been handling the matter. So in this
17 case, it would have been Loristan Roach, perhaps.
18   Q   Who is currently handling the Sokoloff
19 matter?
20   A   Well, I guess I am at this point.
21   Q   Are you handling all of the collateral
22 that secures ACG II's obligations to Sagecrest?
23   A   Well, define handling.
24   Q   Are you the responsible day-to-day for
25 the Hearst, Sokoloff, Bailey, American Furniture

## Page 82

Peck

1 and remaining pieces of IPFP collateral?
2 A  I would make the decisions regarding
3 that collateral, yes.
4 Q  Is anyone else involved in handling or
5 managing those loans or collateral?
6 A  Not really, no.
7 Q  When you say "not really," what do you
8 mean?
9 A  Well, there are attorneys that are
10 handling some of these matters.
11 Q  Are any attorneys handling the Sokoloff
12 matter?
13 A  Hahn & Hessen was handling Sokoloff.
14 Q  Are they handling it now?
15 A  No.
16 Q  When was the last time Hahn & Hessen did
17 any work on behalf of any of the Art Capital Group
18 of companies?
19 A  July 2008.
20 Q  And is any attorney handling the Bailey
21 loan?
22 A  No.
23 Q  Was anyone handling it prior to -- or
24 prior to today?

## Page 83

Peck

1 A  Was any attorney handling it?
2 Q  Yes.
3 A  No. Other than Hahn & Hessen up until
4 July of 2008.
5 Q  And what is the status of the Melanie
6 Gill and American Furniture collateral?
7 A  The collateral was auctioned in New
8 Hampshire in November and December of 2011. I am
9 sorry November, December 2011, and then again
10 subsequently in 2012.
11 Q  When in 2012?
12 A  I think January, there were a few items
13 that -- there were many items that had failed to
14 sell previously, and they reoffered them.
15 Q  And what were the gross proceeds from
16 the auction?
17     MR. EPSTEIN: Object to the form.
18 A  I don't recall the specific number.
19 Q  Do you recall approximately?
20 A  It was approximately $90,000.
21 Q  Do you know who acquired the items?
22 A  No.
23 Q  Did you personally acquire any of the
24 Gill or American Furniture collateral?

## Page 84

Peck

1 A  No.
2 Q  Did any company associated with you or
3 affiliated with you acquire any of the pieces?
4 A  No.
5 Q  Where are the funds from the auction --
6 auctions of the Gill furniture?
7 A  The funds were transmitted to Art
8 Capital Group and are being held pending the
9 outcome of this case.
10 Q  When you say they were transmitted to
11 Art Capital Group, which entity?
12 A  I would have to check. I mean, I don't
13 recall the specific entity.
14 Q  Would that transfer be reflected in bank
15 account records?
16 A  We should be able to identify the bank
17 record that would show the deposit.
18 Q  Do you know whether it was transmitted
19 via wire or check?
20 A  I believe it was a check.
21     MR. McGRATH: We would request all
22 documents regarding the auction of the Gill
23 furniture, including copies of the bank
24 account records showing receipt of the funds.

## Page 85

Peck

1 Q  Are any actions being taken to collect
2 any other balances due from American Furniture or
3 Melanie Gill?
4 A  No.
5 Q  Why not?
6 A  Well, there is no collateral left. We
7 still have a judgment that is unsatisfied, or not
8 fully satisfied, and we -- we probably will have
9 to look at selling that judgment to a company that
10 would continue to pursue those efforts.
11 Q  Have you done anything to identify any
12 companies that might purchase that judgment?
13 A  I have asked my attorney to look into
14 what companies would be appropriate for that type
15 of transaction.
16 Q  When you say "my attorney," to whom are
17 you referring to?
18 A  A firm called Schiff Hardin that
19 represents me in some other matters.
20 Q  When you say they represent you, are
21 they representing you personally?
22 A  No, they are representing -- I am sorry,
23 ACG Credit Company II.
24 Q  ACG II?

Page 178

```
1                  Peck
2      A   In a simultaneous back to back
3  transaction showing the chain of where -- of where
4  it would flow. ACG Galleries is a flow through
5  entity, so it was acting as the seller on behalf
6  of two entities, ACG II and Fine Art Finance as
7  arranger.
8      Q   And are there documents -- is there any
9  documentation showing the sale from ACG II to ACG
10 Galleries?
11     A   I don't know if there is or not.
12     Q   Well, presumably you would have to pass
13 title, correct?
14     A   Well, the answer is, I don't know. I
15 know that is how it would flow, but I don't know
16 what documentation exists between those entities
17 internally.
18     Q   Well, you are the president of both
19 entities, correct?
20     A   Yes.
21     Q   What is your business policy for sales
22 of collateral from one entity to another?
23     A   There would have to be a transfer
24 document internally or memo to show that it was
25 transferred from one entity to the other.
```

Page 179

```
1                  Peck
2      Q   And what form would that transfer
3  document or memo take?
4      A   It could be an email or a -- or some
5  kind of invoice, standard invoice.
6          MR. McGRATH: No such documents have
7      been produced, so we request that those
8      documents be produced, if they exist.
9      Q   In regard to the sale from ACG II to ACG
10 Galleries, why didn't the entities negotiate the
11 price?
12         MR. EPSTEIN: Object to the form.
13     A   Why didn't ACG II and ACG Galleries
14 negotiate the price between them?
15     Q   Yes.
16     A   That would be counterintuitive. The
17 price was set by the buyer and ACG Galleries.
18     Q   So ACG II just accepted the price that
19 the ACG Galleries purportedly negotiated?
20         MR. EPSTEIN: Object to the form.
21     A   Well, ACG Galleries was, in essence,
22 working as an agent for ACG Credit Company II and
23 the arranger, which is charged with obtaining
24 those advantageous prices, which is Art Finance.
25     Q   Was the agency agreement or agency
```

Page 180

```
1                  Peck
2  relationship you just discussed disclosed to
3  anybody?
4          MR. EPSTEIN: Object to the form.
5      A   Who would we have disclosed it to?
6      Q   The purchaser.
7      A   No.
8      Q   The Hearst was valued or purportedly
9  valued in excess of $4 million, correct?
10         MR. EPSTEIN: Object to the form.
11     A   Yes.
12     Q   And it was sold for 500,000?
13     A   Yes.
14     Q   Correct?
15     A   (No response).
16     Q   What was the reason for the diminution
17 in value?
18     A   The reason was that once we were able to
19 take possession of the collateral and had several
20 experts do some research on the collateral, many
21 of the pieces were -- became downgraded from
22 authentic to attributed. These are all old master
23 paintings, they were all 300 years or more old,
24 and some of the scholarship -- over the last five
25 years or the five years between making the loan
```

Page 181

```
1                  Peck
2  and liquidating the collateral from the loan, some
3  of the scholarship on these particular paintings
4  had changed, and we had to -- you know, the market
5  changed its view of value. The value went down.
6      Q   And when were those studies done, or
7  when did the scholarship on the old masters
8  change?
9      A   Well, we don't know specifically. All
10 we know is based on comments that other old master
11 dealers and old master experts said when we came
12 in was just that -- that some of the scholarship
13 had changed on certain of these artists, and the
14 market didn't believe that some of these were
15 fully authentic.
16     Q   Which experts looked at the old masters'
17 paintings?
18     A   We had a group from Bonhams London look
19 at the pieces. We had several old master or
20 prominent old master painting dealers come in and
21 take a look at the works.
22     Q   Who were those dealers?
23     A   I remember two specifically, one named
24 Richard Finnegan, one named Bob Habolt.
25     Q   How do you spell Bob's last name?
```

Page 182

Peck
1
2  A  I don't know.
3  Q  H-A-B-O-L-T?
4  A  H-A-B.
5  Q  And when did they come in and look at
6  the paintings?
7  A  This would have been in 2010, I guess.
8  Q  When was the Hearst collateral sold by
9  ACG Galleries?
10  A  My recollection was that it was sold in
11  April.
12      MR. EPSTEIN: You are referring to the
13      paintings, right? There is more than that.
14      MR. McGRATH: Right, the old masters'
15      paintings, it is.
16  A  I would have to check that date. My
17  recollection was it was sometime in 2010. It
18  could have been sooner, earlier than that.
19  Q  Does April 2009 sound more familiar?
20  A  Yes, I think it was April.
21  Q  If they were sold in April 2009, would
22  the experts have come in before that sale or after
23  that sale? Because you had said 2010.
24  A  They would have come in before that.
25  Q  Do you know, did they come in in 2008 or

Page 183

Peck
1
2  2009?
3  A  I think it would have been the spring
4  of -- January, February, March of 2009.
5  Q  Did they have any written opinions as to
6  the change to attribution?
7  A  No.
8  Q  How was that communicated?
9  A  Verbally.
10  Q  To whom was it communicated?
11  A  Myself.
12  Q  Anyone else?
13  A  Not that I am aware of, no.
14  Q  Who was involved in the sale of the old
15  masters' paintings?
16      MR. EPSTEIN: Object to the form.
17  A  I was and Baird Ryan.
18  Q  What was Mr. Ryan's involvement?
19  A  Well, he was offering the collection to
20  clients that he knew, or had been referred to him
21  or had approached us with an interest of
22  purchasing the collection.
23  Q  Did anybody ever offer to purchase the
24  Hearst collateral prior to the agreement to sell
25  that collateral to the ultimate purchaser, Fifth

Page 184

Peck
1
2  Avenue?
3  A  We had one offer for the collection that
4  we pursued, and unfortunately, that offer was
5  withdrawn.
6  Q  What was the -- the offer that was
7  withdrawn?
8  A  My recollection was that it was for
9  about $1.2 million.
10  Q  Who made the offer?
11  A  It was coming through a group of
12  investors from California. I don't remember their
13  names. I don't remember the organization that
14  they had.
15  Q  Do you know why they withdrew the offer?
16  A  Because they spoke -- yes. They spoke
17  to somebody in the art world who told them that
18  they didn't think that these pictures were
19  authentic.
20  Q  And to whom was that -- their withdrawal
21  of the offer communicated to?
22  A  I believe it was communicated to
23  Mr. Ryan.
24      MR. McGRATH: We would request any
25      documents or information regarding this

Page 185

Peck
1
2  $1.2 million offer that was withdrawn.
3  Q  When was that offer made?
4  A  The offer for 1.2?
5  Q  Yes.
6  A  It would have been made six weeks before
7  the ultimate sale of $500,000.
8  Q  So if the sale was on April 20th, this
9  is approximately early March?
10  A  Thereabouts.
11  Q  And the offer essentially went from 1.2
12  to 500,000?
13  A  Different buyer.
14  Q  Right. But I am trying to understand.
15  A  Someone made an offer for $1.2 million,
16  we said we would accept it, and then they withdrew
17  it.
18  Q  Did you ever get to drafting contracts
19  of sale or bills of sale with the 1.2 million?
20  A  No.
21  Q  How soon after the offer was the offer
22  withdrawn?
23  A  Within days.
24  Q  Had the purchasing group done any due
25  diligence prior to making the offer?