# EXHIBIT 11

```
 1                     IAN PECK
 2      SUPREME COURT OF THE STATE OF NEW YORK
        COUNTY OF NEW YORK
 3      ---------------------------------------X
        SAGECREST II, LLC,
 4
                     Plaintiff,
 5
                     -against-    No.
 6
        ACG CREDIT COMPANY, LLC, ACG
 7      CREDIT COMPANY II, LLC, ART
        CAPITAL GROUP, LLC, ACG
 8      FINANCE COMPANY, LLC, and IAN
        PECK,
 9
                     Defendants.
10      ---------------------------------------X
        ACG CREDIT COMPANY, LLC,
11      ACG CREDIT COMPANY II, LLC,
12                   Counterclaim Plaintiffs,
13              -against-
14      ALAN MILTON, WINDMILL MANAGEMENT, LLC
        and SAGECREST II, LLC,
15      ---------------------------------------X
16         (Contains Attorneys Eyes Only Portion Bound Separate)
17
18          CONTINUED VIDEOTAPED DEPOSITION OF IAN PECK
19                     New York, New York
20               Thursday, November 11, 2010
21
22      REPORTED BY:  BARBARA R. ZELTMAN
                      Professional Stenographic Reporter
23
24      Job Number:  34710
25
```

Page 131

IAN PECK

Q And then what ultimately happened to the proceeds?
   MR. EPSTEIN: Object to the form.
Q Did any of the Art Capital entities obtain any of proceeds from the sale?
A No. No.
Q No money was ever paid from -- as a result of the sale to Art Capital?
   MR. EPSTEIN: Object to the form.
A The agreement that Mr. Barquet and Art Capital came to was that he had to pay certain fees that included a default commission paid to the arranger for the sale of the collateral and certain back interests and so forth that he hadn't paid to get the loan back to the state of being current. But Sotheby's paid Mr. Barquet the proceeds of that sale directly. We had nothing to do with it.
Q And then you negotiated a payment to one of the Art Capital entities as a result of this sale?

Page 132

IAN PECK

A Not as a result. I spent most of my time with Mr. Barquet going back years chasing him for interest payments, fees and other things. This happened to be a more egregious example of him doing something specifically with selling the collateral without our knowledge and there were monies that were owed as a result of that action.
   And we wanted to get the loan back to a level of being current and secure.
Q Did -- were all the proceeds that Mr. Barquet obtain from the sale paid over to Art Capital?
A No.
Q Why not?
A Because we had a very specific claim to -- specific amount to get him current with his loan, which didn't include the entire amount of what the proceeds were.
Q What happened to the lien that Art Capital had?
   MR. EPSTEIN: Object to the form.
Q The lien on the collateral, the

Page 133

IAN PECK

"Deux Grands Leòpards"?
A I don't know if we maintained the lien or if we removed it.
Q You removed it for a payment that Mr. Barquet made as a result of the sale of the "Deux Grands Leòpards"?
   MR. EPSTEIN: Is that a question or a statement?
   MR. FRIEDMAN: It's a question.
A I don't remember if we removed it or not.
Q Now, at the time, did you inform Mr. Barquet that SageCrest had an interest in the loan as of a certain date in the future?
A I don't know if I did or not.
Q Did you inform SageCrest about the default by Mr. Barquet?
A I don't think I did, no.
Q Did you inform SageCrest about the receipt of proceeds in connection with the loan?
   MR. EPSTEIN: Object to the form.

Page 134

IAN PECK

A I'm not sure if I did or not.
Q Did you inform -- did you inform SageCrest that there were proceeds from the sale of the collateral underlying the signed loans that were not paid to Art Capital?
A I don't recall informing SageCrest or not.
Q Did Mr. Barquet provide additional collateral for the loans as a result of your release of the lien and the "Deux Grands Leòpards"?
   MR. EPSTEIN: Object to the form.
A I don't remember if he did or not.
Q At this point -- you were aware that SageCrest was in bankruptcy, correct?
A Yes.
Q Was Mr. Barquet involved in any way with the sale of any collateral that was from the IPFP collection?
   MR. EPSTEIN: Object to the form.
A Well, from the onset of the settlement agreement with SageCrest,

### Page 135

IAN PECK

Mr. Barquet was in possession of one painting which SageCrest was aware of that was there on consignment.

Q And has that painting been sold?
A I don't know.
Q You still don't know if that painting has been sold?
A I'm not sure, no.
Q Did any of your entities ever receive any proceeds from the sale of that painting?
A I don't recall receiving any proceeds.
Q You don't recall receiving any payment of $75,000 for the Julian Schnabel?
A I recall that there was some sale or some payment for the Schnabel. I don't recall what the amount was, though.
Q Who owned the Schnabel?
A I don't know -- I don't remember who the exact title owner was.
Q Was it one of the Art Capital group of companies?
A I don't know.

### Page 136

IAN PECK

Q Well, that collateral was pledged to SageCrest, correct?
A Yes.
Q As part of the two-year note?
A Correct.
Q So who owned it?
A As I sit here now, I don't know who the actual owner would be, but I can -- I don't know specifically. I'd have to --
Q Was it one of your entities?
MR. EPSTEIN: Object to the form.
A I don't know, I'd have to check.
Q Well, did you have a beneficial ownership in some fashion in the Julian Schnabel that was part of the IPFP component of the two-year note collateral?
MR. EPSTEIN: Object to the form.
A Again, I would have to check.
Q You're not sure?
A I just don't recall right now. I'd have to check.
Q And as of now, it's your testimony

### Page 137

IAN PECK

that you don't know what happened to the Julian Schnabel?
A My recollection was is that Mr. Barquet had the Julian Schnabel from the onset of the settlement agreement. Everyone was aware of that. It was there on consignment. He was trying to sell it and at some point he I guess effectively purchased it from us.
Q When did he purchase it from you?
A I don't remember the date, but there was some consideration for him having it or he sold it. I just don't know what happened. I don't remember the facts.
Q There was some consideration that was given to one of your entities for Mr. Barquet having it?
A I think it was sold to Mr. Barquet.
Q Who sold it?
A I don't remember the entity -- the corporate entity that did.
Q But it was you that sold it, one of your entities?
A Well, I don't agree with your

### Page 138

IAN PECK

statement it was one of my entities, but again I'd have to check and see who the actual seller was.
Q Well, was it the seller that you had represented owned the painting when you provided as collateral to SageCrest and the two-year note?
A I don't know which seller it was.
Q So it may have been a different entity that sold it?
A I just don't know. I'd have to check.
THE WITNESS: Can we take a short break?
MR. EPSTEIN: We've been going about an hour.
MR. FRIEDMAN: Sure.
THE VIDEOGRAPHER: The time is now 2:14 p.m. We're now off the record.
(A brief recess was taken.)
THE VIDEOGRAPHER: This is the start of Tape Number 2. The time is