SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X

SAGECREST II, LLC,

                Plaintiff,

        – against –

ACG CREDIT COMPANY, LLC, ACG CREDIT
COMPANY II, LLC, ART CAPITAL GROUP, LLC,
ACG FINANCE COMPANY, LLC and IAN PECK,

                Defendants.

-----------------------------------------------------------------------X

ACG CREDIT COMPANY, LLC and ACG CREDIT
COMPANY II, LLC,

                Counterclaim Plaintiffs,

        – against –

ALAN MILTON, WINDMILL MANAGEMENT LLC
and SAGECREST II, LLC,

                Counterclaim Defendants.

-----------------------------------------------------------------------X

Index No. 600195-07
(Moskowitz, J.)

**ANSWER, DEFENSES AND**
**COUNTERCLAIMS**

Jury Trial Demanded

       Defendants ACG Credit Company, LLC ("ACG-I"), ACG Credit Company II, LLC

("ACG-II"), Art Capital Group, LLC ("Art Capital"), ACG Finance Company, LLC ("ACG

Finance" and with ACG-I, ACG-II, and Art Capital, "ACG") and Ian Peck ("Peck" and with

ACG, the "Defendants"), by their attorneys, Hahn & Hessen LLP, as and for their answer to the

amended complaint (the "Amended Complaint") of SageCrest II, LLC ("SageCrest") as modified

by the Order of the Court dated December 21, 2007 (the "December Order") and Defendants'

defenses and counterclaims, respond and allege as follows:

## Why SageCrest Is Not Entitled To Relief

1. ACG, a specialty finance company providing, among other financial services, asset-based loans utilizing artwork and other valuable property as collateral, finally has the opportunity to defend itself, and to seek redress for Alan Milton, Windmill, and SageCrest's (the "Milton Parties") duplicitous lending practices and fraudulent conduct. SageCrest, a hedge fund managed by Windmill (which, in turn, is managed by Alan Milton), was ACG's primary source of capital, and was intimately familiar with ACG's business and its portfolio of loans.

2. The Milton Parties violated all bounds of honesty and trust when they, with "eyes wide open," financed Andrew Rose (a fired ACG employee/consultant) and Christopher Krecke (ACG's Chief Financial Officer ("CFO")) to form and operate a competing company for the very purpose, and with the intent, of stealing clients, loans, prospective clients, profits, and the good will of ACG. The financing enabled Rose and Krecke to market and provide financial services substantially similar, if not identical, to those offered by ACG in order to undercut ACG's business and to lead and mislead clients to do business with Rose and Krecke, instead of with ACG.

3. In the end, with the Milton Parties' support and approval, Rose (within three months of being fired) and Krecke (while still ACG's CFO and fiduciary) refinanced approximately $2 million of loans from ACG's portfolio and funded loans in excess of $10 million to ACG's clients (who already signed or received term sheets with ACG). The Milton Parties helped Rose and Krecke keep their competitive efforts concealed, and, in some instances, even permitted them to impair collateral pledged to ACG as security. For example, Rose proceeded to secretly take collateral pledged to ACG (with the consent of the Milton Parties), consign it to Christie's under false pretenses, and bid up the prices of the artwork for his (and the Milton Parties') benefit. This particular aspect of the fraudulent scheme has been widely

2

reported in the press, and formed the basis of at least two lawsuits (*see Christie's, Inc., Counterclaim Plaintiff, v. Art Finance Partners, LLC, et al., Counterclaim Defendants* (NY County Index No. 07-600845) and *Berry-Hill Galleries, Inc. et al. v. Rose et al.* (SDNY Bankr. Case No. 05-03346)).

4.     The damage to ACG and others, and the blizzard of legal actions and investigations would not have occurred absent the Milton Parties' agreement to finance the fraudulent scheme.  Following failed settlement discussions, SageCrest won the race to the courthouse and launched this action. But, as shown below, SageCrest seeks a recovery that (a) is in excess of what it is entitled to receive as it released ACG from all obligations to pay interest or SageCrest's legal fees, (b) does not account for the multi-million dollar credit SageCrest agreed to confer upon ACG, and (c) does not account for the Milton Parties' direct involvement in the scheme to strip ACG of valuable corporate assets. Notably, ACG never disputed the amounts borrowed under the SageCrest loan, and has, on many occasions, made efforts to resolve this matter to no avail. ACG questions SageCrest's motivations in filing this lawsuit given that it continues to transact business with Krecke and Rose notwithstanding the public disclosure, bankruptcies, and lawsuits revealing the details of the fraudulent scheme. Accordingly, by this pleading, ACG seeks a dismissal and a judgment in its favor.

Answer to Amended Complaint

5.     Paragraph "1" of the Amended Complaint contains a narrative and, therefore, does not require a response.  Notwithstanding the foregoing, Defendants deny the allegations contained in paragraph "1" of the Amended Complaint.

6.     Admit the allegations contained in paragraph "2" of the Amended Complaint.

7.     Admit the allegations contained in paragraph "3" of the Amended Complaint.

8.     Admit the allegations of paragraph "4" of the Amended Complaint.

3

9.    Admit the allegations of paragraph "5" of the Amended Complaint.

10.    Admit the allegations of paragraph "6" of the Amended Complaint.

11.    Admit the allegations of paragraph "7" of the Amended Complaint, except deny that Peck is domiciled at the address indicated therein.

12.    The allegations in paragraph "8" of the Amended Complaint contain conclusions of law and, therefore, do not require a response.  Notwithstanding the foregoing, the ACG Companies deny the allegations contained in paragraph "8" of the Amended Complaint.

13.    Admit the allegations contained in paragraph "9" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement for the full meaning and content thereof. Deny the allegations contained in footnote 1 of paragraph "9" of the Amended Complaint, and respectfully refer the Court to paragraphs "50" through "56" below for the responses thereto.

14.    Deny the allegations contained in paragraph "10" of the Amended Complaint, aver that SageCrest agreed, on more than one occasion, to modify the Credit Agreement without the necessity of having a writing subscribed to by all the parties, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

15.    Deny the allegations of paragraph "11" of the Amended Complaint and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

16.    Deny having knowledge or information sufficient to form a belief as to the allegations contained in paragraph "12" of the Amended Complaint.

17.    Admit the allegations contained in paragraph "13" of the Amended Complaint, respectfully refer the Court to the Credit Agreement, and the various amendments and

modifications thereto, for the full content and meaning thereof, and aver that SageCrest's allegations amount to an admission that its borrower was permitted to make loans that were not financed by SageCrest.

18.     Deny the allegations contained in paragraph "14" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

19.     Admit the allegations contained in paragraph "15" of the Amended Complaint, respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof, and aver that SageCrest's allegations amount to an admission that it has no interest in and had no expectation to receive any remuneration from the loan ACG-II made to 360 West 11th LLC and 360 Development Corp. (the "360 Entities") given that, among other reasons, SageCrest did not demand, prepare, or provide a Revolving Note for the 360 West transaction despite being notified of the transaction before it was funded.

20.     Deny the allegations contained in paragraph "16" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

21.     Deny the allegations contained in paragraph "17" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

22.     Deny the allegations contained in paragraph "18" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

23.     Deny the allegations contained in paragraph "19" of the Amended Complaint, respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof, and aver that SageCrest expressly permitted ACG to self-finance transactions and to secure financing from sources other than SageCrest.

24.     Deny the allegations contained in paragraph "20" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

25.     Deny the allegations contained in paragraph "21" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

26.     Deny the allegations contained in paragraph "22" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

27.     Deny the allegations contained in paragraph "23" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

28.     Deny the allegations contained in paragraph "24" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

29.     Deny the allegations contained in paragraph "25" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

30.    Deny the allegations contained in paragraph "26" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

31.    Deny the allegations contained in paragraph "27" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

32.    Deny the allegations contained in paragraph "28" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

33.    Deny the allegations contained in paragraph "29" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

34.    Deny the allegations contained in paragraph "30" of the Amended Complaint, respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof, and aver that ACG is not obligated to pay for SageCrest's legal fees and expenses given its release of ACG in addition to the fact that SageCrest's own actions, bad faith and fraudulent conduct, and active participation in the conspiracy to defraud ACG resulted in such fees and expenses.

35.    Deny the allegations contained in paragraph "31" of the Amended Complaint, respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof, and aver that ACG is not obligated to pay for SageCrest's legal fees and expenses given its release of ACG in addition to

7

the fact that SageCrest's own actions, bad faith and fraudulent conduct, and active participation in the conspiracy to defraud ACG resulted in such fees and expenses.

36.     Deny the allegations contained in paragraph "32" of the Amended Complaint, respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof, and aver that ACG is not obligated to any indemnity protection given SageCrest's own actions, bad faith and fraudulent conduct, and active participation in the conspiracy to defraud ACG.

37.     Admit the allegations contained in paragraph "33" and aver that SageCrest later interfered with the loan to Berry-Hill Galleries Inc. ("BH") by, among other things, financing ACG-I's CFO and former managing director to secretly lend BH $8.5 million that violated the BH loan agreement and resulted in, among other things, BH's collateral being converted and ultimately impaired.

38.     Deny the allegations contained in paragraph "34" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

39.     Admit the allegations contained in paragraph "35" of the Amended Complaint.

40.     Admit the allegations contained in paragraph "36" of the Amended Complaint.

41.     Deny the allegations contained in paragraph "37" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

42.     Deny the allegations contained in paragraph "38" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

43.     Admit the allegations contained in paragraph "39" of the Amended Complaint.

44.     Deny the allegations contained in paragraph "40" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

45.     Deny the allegations contained in paragraph "41" of the Amended Complaint, respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof, and aver that SageCrest's suspension of interest payments with respect to the BH loan amounts to an admission by SageCrest that it interfered with the BH loan and actively and knowingly participated in the conspiracy to defraud ACG.

46.     Admit the allegations contained in paragraph "42" of the Amended Complaint.

47.     Deny the allegations contained in paragraph "43" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

48.     Admit the allegations contained in paragraph "44" of the Amended Complaint, respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof, and aver that SageCrest's allegations amount to an admission that it has no interest in and had no expectation to receive any remuneration from the loan ACG-II made to 360 West given that, among other reasons, SageCrest did not demand, prepare, or provide a Revolving Note for the 360 West transaction despite receiving ample notice before the transaction was funded.

49.     Admit the allegations contained in paragraph "45" of the Amended Complaint, and aver that (a) SageCrest agreed to lend an additional $5 million to ACG-I as a concession and

9

as partial remuneration for having interfered with the BH loan and for conspiring with ACG-I's CFO and former managing director to defraud ACG, (b) SageCrest expressly lent the $5 million to ACG-II so that it or its affiliates could satisfy the new lender's requirement of a $5 million equity pledge to fund the loan, (c) SageCrest benefited from this transaction as its indebtedness was significantly paid down as a result of the new financing, (d) specific and discreet artwork owned indirectly by Peck was pledged as collateral for the $5 million loan, and (e) SageCrest was fully apprised of the intended and actual use of the $5 million (contrary to its allegations in the Amended Complaint but confirmed by e-mails sent directly to and from Alan Milton, SageCrest's founder and manager).

50. Admit the allegations contained in paragraph "46" of the Amended Complaint, and aver that (a) SageCrest lent an additional $5 million to ACG-I as a concession and as partial remuneration for having interfered with the BH loan and for conspiring with ACG's CFO and former managing director to defraud ACG, (b) SageCrest lent the $5 million to ACG-II so that it or its affiliates could satisfy the new lender's requirement of a $5 million equity pledge to fund the loan, (c) SageCrest benefited from this transaction as its indebtedness was significantly paid down as a result of the new financing, (d) specific and discreet artwork owned indirectly by Peck was pledged as collateral for the $5 million loan, and (e) SageCrest was fully apprised of the intended and actual use of the $5 million (contrary to its allegations in the Amended Complaint but confirmed by e-mails sent directly to and from Alan Milton, SageCrest's founder and manager).

51. Deny the allegations contained in paragraph "47" of the Amended Complaint, respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof, and aver that (a) SageCrest

10

agreed to lend an additional $5 million to ACG-I as a concession and as partial remuneration for having interfered with the BH loan and for conspiring with ACG's CFO and former managing director to defraud ACG, (b) SageCrest expressly lent the $5 million to ACG-II so that it or its affiliates could satisfy the new lender's requirement of a $5 million equity pledge to fund the loan, (c) SageCrest benefited from this transaction as its indebtedness was significantly paid down as a result of the new financing, (d) specific and discreet artwork owned indirectly by Peck was pledged as collateral for the $5 million loan, and (e) SageCrest was fully apprised of the intended and actual use of the $5 million (contrary to its allegations in the Amended Complaint but confirmed by e-mails sent directly to and from Alan Milton).

52.     Deny the allegations contained in paragraph "48" of the Amended Complaint and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

53.     Deny the allegations contained in paragraph "49" of the Amended Complaint, respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof, and aver that SageCrest's allegations amount to an admission that it has no interest in and had no expectation to receive any remuneration from the loan ACG-II made to 360 West given that, among other things, SageCrest did not demand, prepare, or provide a Revolving Note for the 360 West transaction despite being notified of the transaction before it was funded.

54.     Deny the allegations contained in paragraph "50" of the Amended Complaint and aver that Alan Milton, SageCrest's fraudulent and bad faith conduct compelled ACG-I to seek alternative and replacement financing.

11

55.    Deny the allegations contained in paragraph "51" of the Amended Complaint, aver that SageCrest agreed and encouraged ACG-I to form ACG-II to take assignment of and assume all of the obligations and liabilities of ACG-I to SageCrest, and further aver that SageCrest's allegations contained in paragraph "51" of the Amended Complaint constitute an admission that ACG-I has no further obligations or liabilities under the Credit Agreement.

56.    Deny the allegations contained in paragraph "52" of the Amended Complaint, aver that SageCrest agreed and encouraged ACG-I to form ACG-II to take assignment of and assume all of the obligations and liabilities of ACG-I to SageCrest, and further aver that SageCrest's allegations contained in paragraph "51" of the Amended Complaint constitute an admission that ACG-I has no further obligations or liabilities under the Credit Agreement.

57.    Deny having knowledge or information sufficient to form a belief as to the allegations contained in paragraph "53" of the Amended Complaint.

58.    Admit the allegations contained in paragraph "54" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

59.    Deny the allegations contained in paragraph "55" of the Amended Complaint, aver that SageCrest agreed and encouraged ACG-I to form ACG-II to take assignment of and assume all of the obligations and liabilities of ACG-I to SageCrest, and further aver that SageCrest's allegations contained in paragraph "51" of the Amended Complaint constitute an admission that ACG-I has no further obligations or liabilities under the Credit Agreement.

60.    Deny having knowledge or information sufficient to form a belief as to the allegations contained in paragraph "56" of the Amended Complaint.

12

61.     Deny the allegations contained in paragraph "57" of the Amended Complaint, aver that SageCrest was fully apprised and did not object that a replacement lender (the "New Lender") required ACG to form ACG Finance to act as its borrower, which also helped segregate the loans that the New Lender and SageCrest financed.

62.     Deny the allegations contained in paragraph "58" of the Amended Complaint, and aver that SageCrest not only knew that the $5 million was to be used in connection with the New Lender refinancing but expressly lent the money for that purpose and with knowledge thereof.

63.     Deny the allegations contained in paragraph "59" of the Amended Complaint, and respectfully refer all questions of law and fact to the Court (and a jury) for consideration thereof.

64.     Deny the allegations contained in paragraph "60" of the Amended Complaint, and aver that SageCrest was fully apprised of the loan being made to the 360 Entities, declined to participate in the funding, did not require a Revolving Note for the loan made to the 360 Entities, and did not – until it commenced this action – ever claim to have any interest whatsoever in the loan made to the 360 Entities.

65.     Admit the allegations contained in paragraph "61" of the Amended Complaint.

66.     Deny the allegations contained in paragraph "62" of the Amended Complaint.

67.     Deny the allegations contained in paragraph "63" of the Amended Complaint, and aver that SageCrest was fully apprised that the loan to the 360 Entities was not included or intended to be included in SageCrest's collateral package, and that its claim – made for the first time in this action – is overreaching and contradicted by the parties' agreement.

68.     Deny the allegations contained in paragraph "64" of the Amended Complaint, and aver that SageCrest was fully apprised that the loan to the 360 Entities was not included or

intended to be included in SageCrest's collateral package, and that its claim – made for the first time in this action – is overreaching and contradicted by the parties' agreement.

69.     Deny the allegations contained in paragraph "65" of the Amended Complaint.

70.     Deny the allegations contained in paragraph "66" of the Amended Complaint, except admit that ACG Finance did have an equity requirement in its agreement with the New Lender, a requirement that SageCrest (a) was fully aware of having received a copy of the agreement before it was executed and (b) agreed to satisfy by lending ACG-I the $5 million supplemental loan.

71.     Deny the allegations contained in paragraph "67" of the Amended Complaint.

72.     Deny the allegations contained in paragraph "68" of the Amended Complaint.

73.     Deny the allegations contained in paragraph "69" of the Amended Complaint.

74.     Deny the allegations contained in paragraph "70" of the Amended Complaint.

75.     Deny the allegations contained in paragraph "71" of the Amended Complaint, and aver that SageCrest only called a default after the United States Bankruptcy Court overseeing the BH bankruptcy case remarked it would not recognize any claim by SageCrest to monies being repaid by BH to ACG-II unless it had declared a default, and further aver that SageCrest's declaration of default thereafter was unfounded and evidence of SageCrest's intentional interference with ACG-II's business.

76.     Deny the allegations contained in paragraph "72" of the Amended Complaint.

77.     Deny the allegations contained in paragraph "73" of the Amended Complaint, and aver that ACG paid $5 million to SageCrest and would have paid additional monies to SageCrest if it would have consummated a settlement with ACG and provided ACG with the agreed upon credit for SageCrest's bad acts, which SageCrest agreed to do but later repudiated.

14

78.     Deny the allegations contained in paragraph "74" of the Amended Complaint.

79.     Deny the allegations contained in paragraph "75" of the Amended Complaint.

80.     Admit the allegations contained in paragraph "76" of the Amended Complaint, and aver that the restatement of the BH Loan (as defined in the Amended Complaint) included a settlement payment BH, its affiliate Coram Capital LLC ("Coram"), and their principals, James and Frederick Hill (the "Hills") agreed to pay ACG-II for their role in the conspiracy to defraud ACG, a conspiracy which SageCrest financed with "open eyes."

81.     Deny the allegations contained in paragraph "77" of the Amended Complaint, and aver that SageCrest – having participated in and financed the conspiracy to defraud ACG – has no interest in or right to receive any portion of the settlement payments made by BH, Coram, and the Hills to ACG.

82.     Deny the allegations contained in paragraph "78" of the Amended Complaint.

83.     Deny the allegations contained in paragraph "79" of the Amended Complaint.

84.     Deny the allegations contained in paragraph "80" of the Amended Complaint.

85.     Deny the allegations contained in paragraph "81" of the Amended Complaint, and respectfully refer the Court to the documents filed in the BH and Coram bankruptcy cases for the full content and meaning thereof.

86.     Deny the allegations contained in paragraph "82" of the Amended Complaint, and aver that it is SageCrest, not ACG-II, which has breached its contractual obligations and engaged in fraudulent activity precluding it from recovering certain of the loan obligations and exposing it to sizeable offsets and claims.

87.     Deny the allegations contained in paragraph "83" of the Amended Complaint, and aver that SageCrest's attempt to secure control of the BH payoff failed, resulting in a court imposed escrow account, which is now the subject of this action.

88.     Deny the allegations contained in paragraph "84" of the Amended Complaint.

89.     Deny the allegations contained in paragraph "85" of the Amended Complaint.

90.     Deny the allegations contained in paragraph "86" of the Amended Complaint.

First Cause Of Action
(Nonpayment of Revolving Notes – Against ACG-II)

91.     Paragraph "87" of the Amended Complaint need not be responded to, and, to the extent it does, ACG incorporates and repeats its responses to paragraphs "1" through "86."

92.     Admit the allegations contained in paragraph "88" of the Amended Complaint.

93.     Deny the allegations contained in paragraph "89" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

94.     Deny the allegations contained in paragraph "90" of the Amended Complaint.

95.     Deny the allegations contained in paragraph "91" of the Amended Complaint, and aver that it was SageCrest that breached the Credit Agreement, and the amendments and modifications thereto, thereby relieving ACG-II's obligations thereunder.

96.     Deny the allegations contained in paragraph "92" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

97.     Deny the allegations contained in paragraph "93" of the Amended Complaint, and aver that it was SageCrest that breached the Credit Agreement, and the amendments and modifications thereto, thereby relieving ACG-II's obligations thereunder.

98.     Deny the allegations contained in paragraph "94" of the Amended Complaint.

Second Cause Of Action
(Breach of Contract – Against ACG- II)

99.     Paragraph "95" of the Amended Complaint need not be responded to, and, to the extent it does, ACG incorporates and repeats its responses to paragraphs "1" through "94."

100.    Deny the allegations contained in paragraph "96" of the Amended Complaint, and respectfully refer all questions of law and fact to the Court (and the jury).

101.    Admit the allegations contained in paragraph "97" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

102.    Deny the allegations contained in paragraph "98" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

103.    Deny the allegations contained in paragraph "99" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

104.    Deny the allegations contained in paragraph "100" the Amended Complaint, and respectfully refer all questions of law and fact to the Court (and the jury).

105.    Deny the allegations contained in paragraph "101" of the Amended Complaint.

106.    Deny the allegations contained in paragraph "102" of the Amended Complaint.

107.    Deny the allegations contained in paragraph "103" of the Amended Complaint.

108.    Deny the allegations contained in paragraph "104" of the Amended Complaint.

Third Cause Of Action
(Turnover of Assets (UCC 9-609) – Against ACG-I and ACG-II)

109.    Paragraph "105" of the Amended Complaint need not be responded to, and, to the extent it does, ACG incorporates and repeats its responses to paragraphs "1" through "104."

110.    Deny the allegations contained in paragraph "106" of the Amended Complaint.

111.    Deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "107" of the Amended Complaint.

112.    Deny the allegations contained in paragraph "108" of the Amended Complaint, and respectfully refer all questions of law and fact to the Court (and the jury).

113.    Deny the allegations contained in paragraph "109" of the Amended Complaint, and respectfully refer all questions of law to the Court.

114.    Deny the allegations contained in paragraph "110" of the Amended Complaint, and respectfully refer all questions of fact and law to the Court (and the jury).

115.    Deny the allegations contained in paragraph "111" of the Amended Complaint, and respectfully refer all questions of law to the Court.

116.    Deny the allegations contained in paragraph "112" of the Amended Complaint, and respectfully refer all questions of law to the Court.

Fourth Cause Of Action
(Declaratory Judgment – Against ACG-I and ACG-II)

117.    Paragraph "113" of the Amended Complaint need not be responded to, and, to the extent it does, ACG incorporates and repeats its responses to paragraphs "1" through "112."

118.    No response is required to paragraphs "114" through "117" of the Amended Complaint because the Fourth Cause of Action was dismissed pursuant to the December Order.

Fifth Cause Of Action
(Declaratory Judgment (Indemnification) – Against ACG-I and ACG-II)

119.    Paragraph "118" of the Amended Complaint need not be responded to, and, to the extent it does, ACG incorporates and repeats its responses to paragraphs "1" through "117."

120.    No response is required to paragraphs "119" through "120" of the Amended Complaint in that SageCrest withdrew the Fifth Cause of Action.

Sixth Cause Of Action
(Indemnification – Against ACG-I and ACG-II)

121.    Paragraph "121" of the Amended Complaint need not be responded to, and, to the extent it does, ACG incorporates and repeats its responses to paragraphs "1" through "120."

122.    Deny the allegations contained in paragraph "122" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

123.    Deny having knowledge or information sufficient to form a belief as to the allegations contained in paragraph "123" of the Amended Complaint.

124.    Deny having knowledge or information sufficient to form a belief as to the allegations contained in paragraph "124" of the Amended Complaint.

125.    Deny the allegations contained in paragraph "125" of the Amended Complaint, and respectfully refer all questions of fact and law to the Court (and the jury).

Seventh Cause Of Action
(Conversion – Against ACG-I, ACG-II, Art Capital, and Peck)

126.    Paragraph "126" of the Amended Complaint need not be responded to, and, to the extent it does, ACG incorporates and repeats its responses to paragraphs "1" through "125."

19

127. Deny the allegations contained in paragraph "127" of the Amended Complaint, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

128. Admit the allegations contained in paragraph "128" of the Amended Complaint.

129. Deny the allegations contained in paragraph "129" of the Amended Complaint.

130. Deny the allegations contained in paragraph "130" of the Amended Complaint, and aver that it was SageCrest which breached the Credit Agreement, and the amendments and modifications thereto, thereby relieving ACG-II's obligations thereunder.

131. Deny the allegations contained in paragraph "131" of the Amended Complaint, and respectfully refer all questions of law to the Court.

132. Deny the allegations contained in paragraph "132" of the Amended Complaint.

133. Deny the allegations contained in paragraph "133" of the Amended Complaint, respectfully refer all questions of law to the Court, and aver that it was SageCrest that breached the Credit Agreement, and the amendments and modifications thereto, thereby relieving ACG-II's obligations thereunder.

134. Deny the allegations contained in paragraph "134" of the Amended Complaint, respectfully refer all questions of law to the Court, and aver that it was SageCrest that breached the Credit Agreement, and the amendments and modifications thereto, thereby relieving ACG-II's obligations thereunder.

135. Deny the allegations contained in paragraph "135" of the Amended Complaint.

136. Deny the allegations contained in paragraph "136" of the Amended Complaint.

20

Eighth Cause Of Action
(Conversion – Against ACG-I, ACG-II, Art Capital, ACG Finance and Peck)

137.   Paragraph "137" of the Amended Complaint need not be responded to, and, to the extent it does, ACG incorporates and repeats its responses to paragraphs "1" through "136."

138.   Admit the allegations contained in paragraph "138" of the Amended Complaint.

139.   Deny the allegations contained in paragraph "139" of the Amended Complaint.

140.   Deny the allegations contained in paragraph "140" of the Amended Complaint and respectfully refer all questions of law to the Court.

141.   Deny the allegations contained in paragraph "141" of the Amended Complaint, respectfully refer all questions of law to the Court, and respectfully refer the Court to the Credit Agreement, and the various amendments and modifications thereto, for the full content and meaning thereof.

142.   Deny the allegations contained in paragraph "142" of the Amended Complaint, and respectfully refer all questions of law to the Court.

143.   Deny the allegations contained in paragraph "143" of the Amended Complaint, and respectfully refer all questions of law to the Court.

144.   Deny the allegations contained in paragraph "144" of the Amended Complaint, and respectfully refer all questions of law to the Court.

145.   Deny the allegations contained in paragraph "145" of the Amended Complaint, and respectfully refer all questions of law to the Court.

146.   Deny the allegations contained in paragraph "146" of the Amended Complaint, and respectfully refer all questions of law to the Court.

147.   Deny the allegations contained in paragraph "147" of the Amended Complaint, and respectfully refer all questions of law to the Court.

148.    Admit the allegations contained in paragraph "148" of the Amended Complaint, and aver that SageCrest is not entitled to turnover of the funds used to finance the loan to the 360 Entities.

149.    Deny the allegations contained in paragraph "149" of the Amended Complaint.

150.    Deny the allegations contained in paragraph "150" of the Amended Complaint.

### Ninth Cause Of Action
### (Fraudulent Conveyance – Against ACG-II, Art Capital and ACG Finance)

151.    Paragraph "151" of the Amended Complaint need not be responded to, and, to the extent it does, ACG incorporates and repeats its responses to paragraphs "1" through "150."

152.    Admit the allegations contained in paragraph "152" of the Amended Complaint.

153.    Deny the allegations contained in paragraph "153" of the Amended Complaint.

154.    Deny the allegations contained in paragraph "154" of the Amended Complaint.

155.    Deny the allegations contained in paragraph "155" of the Amended Complaint, and respectfully refer all questions of law to the Court.

156.    Deny the allegations contained in paragraph "156" of the Amended Complaint, and respectfully refer all questions of fact and law to the Court (and the jury).

157.    Deny the allegations contained in paragraph "157" of the Amended Complaint, and respectfully refer all questions of fact and law to the Court (and the jury).

158.    Deny the allegations contained in paragraph "158" of the Amended Complaint, and respectfully refer all questions of fact and law to the Court (and the jury).

159.    Deny the allegations contained in paragraph "159" of the Amended Complaint, and respectfully refer all questions of fact and law to the Court (and the jury).

160.    Paragraph "160" of the Amended Complaint need not be responded to, and, to the extent it does, Defendants deny the allegations contained therein.

### Tenth Cause Of Action
(Accounting – Against ACG-I, ACG-II and Art Capital)

161.    Paragraph "161" of the Amended Complaint need not be responded to, and, to the extent it does, ACG incorporates and repeats its responses to paragraphs "1" through "160."

162.    No response is required to paragraphs "162" through "168" of the Amended Complaint because the Tenth Cause of Action was dismissed pursuant to the December Order.

163.    Defendants deny generally and specifically each and every material allegation not responded to in the herein paragraphs, and further deny SageCrest is entitled to any relief.

### DEFENSES AND COUNTERCLAIMS
The Parties and Related Entities

164.    Counterclaim Plaintiff ACG-I is a limited liability company organized under the laws of the State of Delaware, is authorized to transact business in New York, and maintains its principal place of business at 980 Madison Avenue, New York, New York.

165.    Counterclaim Plaintiff ACG-II is a limited liability company organized under the laws of the State of Delaware, is authorized to transact business in New York, and maintains its principal place of business at 980 Madison Avenue, New York, New York.

166.    Defendant ACG Finance is a limited liability company organized under the laws of the State of Delaware and maintains its principal place of business at 980 Madison Avenue, New York, New York.

167.    Defendant Art Capital is a limited liability company organized under the laws of the State of Delaware, and maintains its principal place of business at 980 Madison Avenue, New York, New York.

168.    ACG is known in the art community as offering loans to individuals and/or companies using fine art or other valuable property as collateral.

169.    Defendant Peck is the founder and President of each of the ACG companies.

170.    Upon information and belief, counterclaim defendant SageCrest is a limited liability company organized under the laws of the State of Delaware with a principal place of business at 3 Pickwick Plaza, Suite 400, Greenwich Connecticut 06830.

171.    Sagecrest, upon information and belief, is one of the few hedge funds that regularly purchases participations in art receivables.  These types of loans are particularly attractive to funds like SageCrest due to their high yields and ability to convert accounts receivable to cash within a relatively short period.

172.    Upon information and belief, counterclaim defendant Windmill Management LLC ("Windmill") is a limited liability company organized under the laws of the State of Connecticut with a principal place of business in Connecticut.  Windmill, upon information and belief, manages a number of hedge funds and is the sole manager of SageCrest.

173.    Upon information and belief, counterclaim defendant Alan Milton is an individual and a resident of the State of New York and regularly conducts business in New York as a manager and principal of Windmill.

Jurisdiction and Venue

174.    The causes of action alleged herein arise out of business transacted by the Milton Parties in the State of New York.  Additionally, SageCrest expressly consented in the Credit Agreement to the jurisdiction of New York state and federal courts in Manhattan for any actions relating to the Credit Agreement or the transactions contemplated thereby.  SageCrest has submitted to the jurisdiction of this Court by filing the Amended Complaint herein.

175.    This action properly lies in this Court pursuant to sections 501 and 503 of the New York CPLR.

24

Factual Background

A.      The SageCrest Credit Facility

176.    In August 2003, ACG-I entered into a revolving credit facility (as amended and modified, the "Credit Agreement") with SageCrest. Pursuant to the Credit Agreement, ACG-I submitted loan requests to SageCrest for individual art investments (*i.e.*, loans) to third parties and SageCrest exercised its discretion whether to make such loans. If SageCrest made a loan, it was evidenced by a separate promissory note (collectively, the "Revolving Notes") and secured by the collateral pledged to ACG-I in connection with the loan. If SageCrest chose not to fund a transaction, the Credit Agreement expressly permitted ACG-I or its affiliates to self-finance the transaction or to secure financing from another lending source, which it did with regularity. In such cases, the other lender, and not SageCrest, would have rights in the pledged collateral.

177.    The parties conducted business in this manner, maintaining a good business relationship, for over eighteen months. Their business relationship proved to be very profitable for SageCrest, yielding interest repayments at rates between about 13% and 18% and other fees, low asset management requirements, and rapid repayments.

178.    Everything changed between the parties in February 2005 when, upon information and belief, the Milton Parties saw an opportunity to make a quick and substantial profit by financing the scheme by ACG's then CFO (Krecke) and recently fired managing director (Rose) to divert corporate assets and opportunities to a competing business venture.

25

B.   With "Eyes Wide Open," The Milton Parties Substantially
Facilitated And Financed The Krecke/Rose Conspiracy To
Defraud and Unfairly Compete With The ACG Companies

179.   Since 2003, Krecke and Rose were employed by or worked for Art Capital Group,

Inc. and ACG companies.[1]   Krecke was ACG's CFO, charged with, among other things,

administering the loans for each of ACG's lending clients, and managing and developing key

banking and credit relationships.   Krecke would regularly communicate with SageCrest, ACG-

II's lender, about financial, reporting, and collateral issues.   Krecke's position placed him in a

fiduciary relationship with ACG, and SageCrest knew, at all times relevant hereto, that Krecke

was ACG's CFO and was a fiduciary to ACG.

180.   In or about April 2003, Rose joined ACG and was responsible for developing

banking relations, acquisitions and sales of private art, and strengthening ACG's loan portfolio.

Several months later, Rose requested that, for tax purposes, his status be changed to a full-time

consultant, to which ACG agreed.   By the close of 2004, however, ACG had become

increasingly dissatisfied with Rose's performance and lack of commitment.   In addition, ACG

discovered that not only was Rose self-dealing but he also was charging unauthorized and

improper business expenses.   Based on these discoveries and his poor performance, on

December 28, 2004, Rose's employment was terminated for cause and he was relieved as of his

responsibilities as ACG-I's managing director.

181.   Unbeknownst to ACG, Rose already had set in motion his secret plan to

appropriate ACG-I's corporate loans and business opportunities for himself and Krecke.   Before

he was fired, upon information and belief, Rose formed a company called Art Capital Holdings,

Inc. to provide financial consulting services and established e-mail accounts with

---

[1]   Specifically, Krecke was an employee of Art Capital Group, Inc. and served as its chief financial
officer as well as the chief financial officer of ACG-I.   Rose was employed by and a consultant
for Art Capital Group, Inc. and served as the managing director of ACG-I.

"artcapitalgroup.com" domain names without ACG's consent. Upon information and belief, right after he was fired, Rose formed ARCK Credit Company, LLC ("ARCK") and Art Finance Partners, LLC in order to emulate ACG's corporate structure.

182. Krecke remained employed by ACG so he could (a) successfully assist Rose in appropriating the business and good will of ACG and (b) secure his $75,000 bonus from ACG.

183. To finance the conspiracy, Krecke and Rose turned to the Milton Parties. Upon information and belief, after Rose was fired, he and Krecke (while still an employee of and owing fiduciary duties to ACG) approached Alan Milton seeking millions of dollars of financing to lure away ACG-II's clients and prospective clients. Upon information and belief, Alan Milton agreed to do so without following his standard and well accepted industry lending guidelines and protocols.

184. Upon information and belief, Alan Milton knew Krecke was going to quit as soon as the competitive business was off the ground and running. This understanding is reflected by, among other things, his agreement to amend the new multi-million dollar credit facility with ARCK to permit the transfer of fifty percent of ARCK to Krecke without it constituting an event of default. Indeed, the relationship between Rose, Krecke, and Milton was such that Rose told Milton in an e-mail that "Chris [Krecke] and [he] will be totally cooperative and assist SageCrest in any way possible! As you know, we view you as our partner, not just our banker."

185. Krecke and Rose could not have accomplished the objectives of their conspiracy – the successful launch of their competitive business – without the financial backing and security provided by the Milton Parties. SageCrest's own documents show that Alan Milton was an active and knowing participant in the conspiracy. These documents (all of which were transmitted and/or prepared while Krecke was working for and owed fiduciary duties to ACG)

27

show that the Milton Parties transacted business with Krecke in two capacities at the same time: One as the CFO of ACG and the other as a direct competitor of ACG. Alan Milton intentionally concealed the scheme from Ian Peck, ACG's president and owner, and instead, and despite meeting and speaking with Ian Peck in the first quarter of 2005 about ACG's business, discreetly and expeditiously financed the conspiracy to misappropriate and embezzle ACG-II's asset-based loans.

C.    The BH Debacle And The Christie's Auction

186.    In December 2003, BH received a $20 million loan from ACG-I, and pledged all of its assets to ACG-I as security. The loan agreement with ACG-I prohibited BH from incurring additional indebtedness for financing without the express permission of ACG-I. It also provided ACG-I with a blanket security interest in and lien on all of BH's artwork and assets.

187.    On December 1, 2005, BH purchased a painting by George Bellows called *The Kids* at a Sotheby's auction. Upon information and belief, BH lacked the cash or ability to pay for the painting without receiving additional financing. At BH's request, ACG-I provided a term sheet setting forth the terms upon which ACG-I was willing to lend BH the money to pay Sotheby's for *The Kids*. Rose was fired thereafter and, upon information and belief, seamlessly picked up the communications with BH on ARCK's behalf to provide BH with the financing for *The Kids*. Rose previously and falsely told BH that ACG was discontinuing its lending operations and that Rose would be handling their finance needs. Upon information and belief, Rose and Krecke (while still employed and a fiduciary of ACG) proceeded to simultaneously document an $8.5 million loan transaction with BH and to negotiate the terms with Alan Milton to secure the money to make the loan.

188.    Rose and Krecke, with Alan Milton's assistance, concealed the financing arrangement from ACG-I as well as the public at large. They accomplished this in a number of

28

ways. First, BH formed a shell company called Coram to receive the loan. Coram was a shell company with no employees, no operations, and no office. Second, since Coram had no collateral to securitize the loan, BH transferred 44 paintings worth over $16 million from BH to Coram in violation of the ACG-I loan agreement. This transfer was void as to ACG-I since the consideration was almost entirely a note issued by Coram to BH. The artwork never changed hands, Coram never paid for insurance or any other incidentals of the transaction, and was not even part of various sale agreements that were later entered into concerning the artwork. BH remained the true and beneficial owner of the artwork. Third, the parties ensured that the paper trail leading back to BH was as minimal as possible. References to BH's address were removed from loan documents. Fourth, Coram pledged the fraudulently conveyed artwork to Rose's company as security for the $8.5 million ARCK/BH loan (even though the artwork had already been pledged to ACG-I). Fifth, Rose consigned the 43 paintings to Christie's and misrepresented the collection as being owned by a divorcing couple. Christie's relied on Rose and placed all 43 paintings (plus one additional painting from BH) into the May 19, 2005 auction identifying them as "property from a private collection."

189.    Upon information and belief, Rose, who told BH he would handle all the negotiations with Christie's for the May 19, 2005 auction, knew Christie's had a firm policy that consignors were not permitted to bid on their own paintings except in very limited situations like when a divorcing couple sells marital property and the spouses want to bid for certain lots. Rose and BH understood that if they were able to bid on the lots they could sell the artwork at inflated prices, pay back the $8.5 million loan, and secure additional cash while, at the same time, depleting the collateral pool available to ACG. Rose and BH (on the claim it represented the other spouse) sought and received permission from Christie's to bid on the paintings.

29

190.    Upon information and belief, at the auction on May 19, 2005, Rose and BH bid against each other on many of the consigned paintings, which had the effect of creating interest in the artwork and setting an artificially higher value for the artwork. Rose benefited from this scheme in a number of ways. First, Rose was seeking to do additional financing, presumably with Alan Milton's support and cash. Second, Rose stood to receive commissions from the sale of the paintings at the auction and afterwards (in which SageCrest, upon information and belief, would share). Some of the paintings were purchased at the auction by unsuspecting third parties. Other paintings were bought back secretly by BH and sold to non-parties after the auction at inflated prices. Third, Rose used the situation to promote himself, having been quoted in publications touting the sale and reflecting his views on the booming art market.

191.    Upon information and belief, Christie's president, Marc Porter, launched an investigation and retained outside investigators given the observed bidding activity of Rose and others, and the complaints received from auction participants. Ultimately, Christie's offered to cancel all of the affected sales, withheld BH's artwork, and withheld money paid by Rose in connection with the bid-rigging scheme. As the due date on the ACG-I loan approached later in the year, BH and Coram had no ability to pay and, thus, no choice but to file for bankruptcy protection.

192.    Upon information and belief, Alan Milton knew BH was going to be auctioning off the artwork while the loan documents were being prepared, and Rose enticed him by telling him there was "upside" in the deal. Alan Milton expected to share in Rose's commissions for the sale of the artwork.

193.    The end result is that Alan Milton made a conscious choice to lend twice against the same collateral, and to join Rose and Krecke's conspiracy to surreptitiously strip ACG of

valuable corporate assets. The Milton Parties' participation and funding of this conspiracy caused ACG to incur significant reputational damage, legal and other fees, and substantial financial loss, and enabled the manipulation of the Christie's auction.

194.   Upon information and belief, notwithstanding the public disclosures involving Rose, neither Windmill nor SageCrest called a default under the loans to Rose's company, and it is believed, based on public UCC filings, that SageCrest continue to do business with and to lend monies to Krecke and Rose's companies.

D.   SageCrest Admits Its Wrongdoing And Provides
ACG With Significant Financial And Other Concessions

195.   Upon discovering SageCrest's role in the conspiracy and its continued financing of Krecke and Rose's competing business, ACG-I told SageCrest it no longer wanted to conduct business with it. SageCrest recognized its role in the conspiracy and offered several financial concessions to ACG-I in an attempt to stabilize the relationship and to mitigate the damages. As discussed below, SageCrest later reneged upon these concessions.

196.   One concession was the execution of a Release and Indemnification dated as of January 24, 2006 (the "Release") which was to be held in escrow pending the parties' mutual agreement to release same from escrow. SageCrest contends the Release is effective and binding. There are a number of points to make concerning the Release. First, the Release given by ACG to SageCrest in no way bars any claims against Alan Milton or Windmill, as they are not defined within the "Released Parties." Second, the Release relieved ACG from all obligations to SageCrest except for four components, one of which was to repay only principal amounts borrowed (including sales commissions with respect thereto). Third, the Release confirms SageCrest has no right to recover its legal fees incurred in this proceeding. Thus, SageCrest has no right, as it seeks by this lawsuit, to recover simple and default interest on any

31

monies owed under the Credit Agreement or to recover its legal expenses. Fourth, ACG's claims against SageCrest under the September 13, 2005 Letter Agreement (the BH credit discussed below) were expressly carved out of the released claims since it was premature to determine the full extent of ACG's damages.

197.    Another concession relating to the BH loan arose out of the cash collateral order (the "Cash Collateral Order") negotiated in the BH bankruptcy. BH and ACG agreed to restate ACG-I's loan to BH in the new restated amount of $22 million (the "Restated Loan Balance"), with a restatement fee of $880,000. At the time of the Cash Collateral Order, the amount of SageCrest's loan to ACG-I with respect to BH was approximately $19.7 million (the "SageCrest BH Debt"). SageCrest understood and agreed it had no repayment claim to the difference (approximately $2.5 million) between the SageCrest/BH Debt and the Restated Loan Balance or to the $880,000 restatement fee (which was reduced to $440,000 since BH met its payment milestone dates). Those amounts were paid by BH to ACG-I for, among other things, consideration for ACG-I's release of claims against BH, Coram, and their principals for their pre-petition conduct.

198.    Another concession was SageCrest's agreement to pay a portion of ACG-I's losses with respect to obligations incurred under the BH loan. By letter agreement dated September 13, 2005 (the "September 13, 2005 Letter Agreement"), SageCrest agreed to "make ACG-I whole" by paying ACG-I's losses with respect to the BH loan, which losses include, without limitation, all fees and expenses incurred by ACG-I in any litigation, dispute, or proceeding involving any of BH's collateral (which includes, for example, the BH and Coram bankruptcy cases, fees and expenses in the lawsuit against Rose and Krecke for misappropriating collateral and business relating to BH and its collateral, the lawsuit commenced by James

32

McGlothin in federal court in Virginia concerning BH artwork, and adversary proceedings commenced in the BH and Coram bankruptcy cases) in addition to commissions that BH was obligated to pay ACG-I in connection with its staged liquidation. SageCrest agreed to provide a multi-million dollar credit to ACG-I if, following a liquidation, the BH collateral was insufficient to satisfy BH's obligations. It also engaged in a pre-petition, staged liquidation of its assets through the purported sale of artwork to Coram, sales of artwork to BH clients, and the sale of the newly acquired Bellows *The Kids.* Ultimately, BH was unable to meet its obligations, which is why it filed for bankruptcy protection. Through the bankruptcy cases, ACG-I secured as much of a recovery as possible from BH, and sought the balance from SageCrest under the contractually agreed-to credit.

199.    SageCrest has since reneged on its agreements and now refuses to abide by any of these concessions.

E.    The Formation of ACG-II and ACG Finance

200.    ACG-I told SageCrest it would seek a new lender and SageCrest agreed to assist its efforts to do so. SageCrest amended the Credit Agreement to remove the prohibition against refinancing the SageCrest indebtedness, and agreed to extend an additional $5 million loan to ACG-I (the "Supplemental Loan") to enable ACG-I to secure the replacement financing. Specifically, the New Lender required ACG to make a $5 million equity pledge as a precondition to the loan. SageCrest agreed to make the $5 million loan to ACG-I to satisfy this funding requirement. SageCrest requested, and received, a copy of the credit facility with the New Lender and requested in the Supplemental Loan agreement that if the New Lender's agreement did not close, ACG-I would have to return the $5 million. Furthermore, ACG-I pledged specific artwork beneficially owned by a company of Ian Peck as collateral for the loan. SageCrest's

33

agreement in this regard is confirmed by numerous e-mails sent from Alan Milton on SageCrest's behalf. SageCrest now claims, contrary to its own documents and e-mails, that ACG-I's use of the $5 million for the equity component of the New Lender's loan was a fraudulent conveyance and constituted an unauthorized transfer of proceeds.

201. On notice to SageCrest, ACG established separate borrowers for SageCrest and the New Lender. ACG Finance was the ACG entity selected to be the New Lender's borrower. The money received from the New Lender was used to refinance a number of SageCrest loans, thereby significantly reducing the balance of the ACG-I/SageCrest loan. ACG-II was then chosen to be the dedicated borrower to SageCrest for the remaining loans. SageCrest agreed it would limit its recourse only to the remaining loans and only to ACG-II's assets. SageCrest acknowledged this and filed UCC financing statements changing its borrower from ACG-I to ACG-II.

202. In connection with the refinancing, the parties negotiated and entered into a Bill of Sale pursuant to which ACG-I sold, conveyed, assigned, transferred and delivered to ACG-II all of ACG-I's obligations under the Credit Agreement, as well as ACG-I's right, title and interest in certain assets listed in Exhibit A to the Bill of Sale. The Bill of Sale also contained a written release from SageCrest whereby SageCrest "irrevocably release[ed] Seller [ACG-I], now and forever, from any and all liabilities or obligations under the Credit Agreement and the Supplemental Loan Letter Agreement."

DEFENSES

203. Defendants set forth below their defenses, and, by doing so, do not assume the burden of proving any fact, issue or element where such burden properly belongs to SageCrest.

FIRST DEFENSE

204.    The Amended Complaint fails to state a cause of action against the Defendants upon which relief can be granted.

SECOND DEFENSE

205.    SageCrest materially breached the Credit Agreement, as amended, modified, and supplemented, thereby relieving ACG-I and/or ACG-II of any obligations to SageCrest thereunder.

206.    For example, in or about mid-2005, before the New Lender entered the picture, a borrower approached ACG requesting an $8 million loan so he could finance the development of luxury residential apartments at 360 West 11th Street in New York (the "360 Loan"). ACG notified SageCrest of the loan and offered it the opportunity to finance the transaction. SageCrest declined to finance the transaction. Because SageCrest did not want to fund the loan, ACG proceeded with the financing, which it was permitted to do under the Credit Agreement. ACG-II was used as the borrower so as to not confuse the 360 Loan with those loans ACG-I was holding as SageCrest's collateral. Once the Bill of Sale was negotiated with SageCrest, ACG-II transferred the 360 Loan out of ACG-II (since SageCrest declined to finance it) and into ACG Finance (since the New Lender agreed to accept the loan). For this very reason, the 360 Loan was not specified or referenced in the Bill of Sale, and ACG-II publicly filed documents transferring the 360 Loan. SageCrest now claims the transfer of the 360 Loan was a fraudulent conveyance, even though it was told about the loan, declined to finance the loan, and the loan was never pledged to SageCrest as collateral. SageCrest's claim amounts to a breach of contract.

## THIRD DEFENSE

207.    SageCrest has alleged, in its Amended Complaint and numerous other court filings, that ACG-II improperly transferred the 360 Loan and has breached the Supplemental Loan by utilizing the loan proceeds for the equity component of the New Lender's refinancing.

208.    Such allegations are false and SageCrest knew and understood them to be false when made.

209.    Accordingly, not only does SageCrest's knowledge and approval of the transactions negate any claim by SageCrest, but it has materially breached the Supplemental Loan and related documents like the Release, thereby exposing SageCrest to the very same counterclaims against Alan Milton set forth below.  For this reason, Counterclaim Plaintiffs assert all counterclaims set forth below against SageCrest as well.

## FOURTH DEFENSE

210.    SageCrest released any and all claims it had, or may have had, against ACG-I pursuant to the terms of the Release and the Bill of Sale (which at paragraph 5 expressly provides that SageCrest "irrevocably releases Seller [ACG-I], now and forever, from any and all liabilities or obligations under the Credit Agreement and the Supplemental Loan Letter Agreement").

## FIFTH DEFENSE

211.    Pursuant to the express terms of the Release between SageCrest and ACG, SageCrest released and discharged ACG from any and all further obligations to SageCrest under the Credit Agreement, as amended and modified, except for, among other non-monetary obligations, the obligation to repay only the principal amount borrowed by ACG-I (including sales commissions with respect thereto).

212.    SageCrest has made no claim or allegations for sales commissions.

213. SageCrest's claims for (a) simple and default interest, (b) legal fees and expenses, and (c) any conduct or activity prior to the date of the Release are barred in whole or in part by the terms of the Release and Bill of Sale.

## SIXTH DEFENSE

214. SageCrest is barred from recovery of its legal fees and expenses by the doctrine of unclean hands given that SageCrest's own actions, bad faith fraudulent conduct, and active participation in the conspiracy to defraud ACG resulted in such fees and expenses.

## SEVENTH DEFENSE

215. SageCrest is barred from recovery of any right to receive any portion of the settlement payments made by BH and Coram to ACG based on its own agreement, actions, bad faith, and fraudulent conduct, and active participation in the conspiracy to defraud ACG.

## EIGHTH DEFENSE

216. Any damages suffered by SageCrest were a direct result of its own culpable conduct and "unclean hands."

## NINTH DEFENSE

217. SageCrest is barred from recovery by the equitable doctrines of waiver and estoppel.

## TENTH DEFENSE

218. Pursuant to the September 13, 2005 Letter Agreement, SageCrest agreed that if the liquidation of the BH collateral did not generate sufficient proceeds to satisfy all of BH's obligations to ACG-I, SageCrest would credit ACG-I's obligations in an amount equal to the unpaid obligations.

219. Accordingly, SageCrest's damages, if any, are subject to reduction by reason of this setoff or credit.

37

ELEVENTH DEFENSE

220.    SageCrest is barred from recovery for breaching its obligation to act fairly and in good faith.

221.    SageCrest had an implied obligation to deal fairly and in good faith and with honesty with ACG-II under the Bill of Sale and related agreements and with ACG-I under the Bill of Sale and related agreements, including, but not limited to, the September 13, 2005 Letter Agreement.

222.    Notwithstanding its obligation to deal in good faith and with honesty, SageCrest dealt in bad faith and with dishonesty with ACG-I and ACG-II by, among other things, (a) failing to acknowledge the substantial credit due and owing to ACG-I to satisfy all of ACG-I's losses with respect to the BH loan, (b) commencing this action against ACG-I and its affiliates seeking to recover sums SageCrest knowingly and willingly contractually agreed to forego, and (c) asserting a fraudulent conveyance claim for a transaction transferred between ACG companies that SageCrest was notified of and declined to finance.

TWELFTH DEFENSE

223.    SageCrest is barred from recovery based upon the Counterclaims set forth below.

FIRST COUNTERCLAIM
(Aiding and Abetting Krecke's Breach of Fiduciary Duty
And Duty of Loyalty Against Alan Milton and Windmill)

224.    Counterclaim Plaintiffs incorporate herein by reference all of the allegations set forth herein, and the allegations set forth in the Amended Complaint in the action titled *Art Capital Group, LLC et al. v. Andrew C. Rose et al.* (NY County Index No. 05-601389), the Christie's claims against Rose, and the Berry-Hill claims against Rose.

225.   Based on his employment and his position as CFO of ACG, Krecke stood in a fiduciary capacity, and owed a fiduciary duty and a duty of loyalty to ACG, and was obliged to deal with ACG honestly and in good faith.

226.   Krecke breached those fiduciary duties by concealing material information from ACG, misleading them, usurping business opportunities for himself and Rose, misrepresenting to Ian Peck that borrowers were electively pre-paying loans when in fact he and Rose were provided replacement financing, and acting for his own benefit to the detriment of ACG.

227.   Alan Milton and Windmill had knowledge of Krecke's fiduciary relationship to ACG and of his wrongful conduct constituting breaches of his fiduciary duties and duties of loyalty.

228.   With full and complete knowledge that SageCrest's loan to ARCK would aid in Krecke's fraudulent scheme and breach of his duties, Alan Milton and Windmill, on behalf of SageCrest, approved and funded the loan without, upon information and belief, performing reasonable and industry acceptable due diligence or following SageCrest's or industry accepted lending protocols.

229.   There was an inherent conflict of interest in SageCrest providing financing for the competitive activities, and it was encouraged and incentivized by Krecke (and Rose) to finance loans that were prejudicial to ACG-I.   SageCrest's loan provided substantial assistance to Krecke's fraudulent conspiracy because without the financing, Krecke would not have been able to appropriate the loans or ACG-I's good will for his and Rose's benefit.

230.   Alan Milton, Windmill, and SageCrest profited and intended to profit financially by their conduct and participation in the conspiracy.

231. By reason of the foregoing, Alan Milton and Windmill knowingly and willingly aided and abetted Krecke's breaches of fiduciary duties.

232. Counterclaim Plaintiffs were harmed by the conduct of Alan Milton and Windmill.

233. As a direct and proximate result of the aforesaid wrongful acts of Alan Milton and Windmill, Counterclaim Plaintiffs have suffered damages in an amount not reasonably known but believed to be in excess of $100 million, plus interest thereon.

SECOND COUNTERCLAIM
(Aiding and Abetting Fraud Claim Against Alan Milton and Windmill)

234. Counterclaim Plaintiffs incorporate herein by reference all the allegations set forth herein.

235. As alleged herein, Rose and Krecke had a common plan, scheme, design, and conspiracy to form and operate the competing companies with the purpose and intent of stealing, luring, and/or misappropriating Counterclaim Plaintiffs' loan clients, prospective clients, profits, good will, and destroying Counterclaim Plaintiffs as a competitor. This plan, scheme, design, and conspiracy amounted to a fraud on the Counterclaim Plaintiffs.

236. Alan Milton and Windmill knew of the existence of the aforementioned plan, scheme, design, conspiracy, and fraud, and that the intended targets thereof were the Counterclaim Plaintiffs.

237. Upon information and belief, Alan Milton and Windmill employed atypical lending procedures and protocols to aid and abet Rose and Krecke's refinancing of ACG-I loans. Alan Milton and Windmill had known Rose and Krecke since December 2003, and had intimate knowledge of each of the loans that ultimately were appropriated by Rose and Krecke, through ARCK. Alan Milton and Windmill had substantial familiarity with the business activities of

40

ACG-I having (a) reviewed and approved the loans made to its lending clients, (b) reviewed ACG-I's financials and collateral reports, and (c) discussed operations on a frequent basis with Krecke and others at ACG-I.

238.    Alan Milton and Windmill provided substantial assistance in the perpetration of the aforementioned plan, scheme, design, conspiracy, and fraud, by, among other things, facilitating the aforementioned conspiracy, financing Rose and Krecke's competitive efforts, and double lending against the same collateral pledged to ACG-I in the context of the BH loan. Alan Milton and Windmill affirmatively assisted Rose and Krecke, helped conceal their activities and conduct from the Counterclaim Plaintiffs, and enabled Rose and Krecke to perpetuate the fraud. Alan Milton and Windmill exhibited reckless disregard for, and were deliberately indifferent, to the contract and other rights and property of ACG-I.

239.    Alan Milton and Windmill knowingly participated in and helped structure transactions that enabled Rose and Krecke to conceal from ACG-I that SageCrest and ARCK were financing artwork purchased by BH that was pledged to ACG-I as collateral. Alan Milton, Windmill and SageCrest played an indispensable role in facilitating the corporate fraud.

## THIRD COUNTERCLAIM
### (Aiding and Abetting Unfair Competition Claim Against Alan Milton and Windmill)

240.    Counterclaim Plaintiffs incorporate herein by reference all the allegations set forth herein.

241.    In or about September 2004, the parties were negotiating an amendment to the Credit Agreement. The parties ultimately executed Amendment Number 2 to the Credit Agreement on or about September 21, 2004. In the negotiation of that amendment, ACG-I, and specifically, Ian Peck, requested SageCrest to agree not to extend financing to any of ACG-I's

41

former employees or associates.  Ian Peck was considering Rose's long term employment
horizon and discussed with Alan Milton that Rose's future with the firm was uncertain.

242.    Alan Milton and Windmill requested that the Amendment not contain language
concerning the restriction, and told Ian Peck, during a telephone conversation in or about
September 2004, in sum or substance that under no circumstances would he (Alan Milton) ever
lend to any former employees, especially Rose.  Alan Milton told Ian Peck in sum or substance
that you have my word and explained that it would not make good business sense for him to do
that.  During that telephone call, Alan Milton said that he and his firm were honorable and would
never do that.

243.    Counterclaim Plaintiffs relied on Alan Milton's statements to their detriment.

244.    As a direct and proximate result of the aforesaid wrongful acts of Alan Milton and
Windmill, Counterclaim Plaintiffs have suffered damages in an amount not reasonably known
but believed to be in excess of $100 million, plus interest thereon.

FOURTH COUNTERCLAIM
(Tortious Interference with Business and
Prospective Business Against Alan Milton and Windmill)

245.    Counterclaim Plaintiffs incorporate herein by reference all the allegations set forth
herein.

246.    By engaging in the conduct complained herein, Alan Milton and Windmill have
intentionally and tortiously interfered with current and/or prospective contractual and
economically advantageous relationship between Counterclaim Plaintiffs and others.

247.    Counterclaim Plaintiffs had business relations with, among others, BH, the Hills,
Michael Antonello and his family members, George Newman and his family members, Brian
Nemeth, Holcombe Green and companies in which he was involved and/or had an interest, John

42

Schaeffer and companies in which he was involved and/or had an interest, M&T Bank, Eli Wilner and companies in which he was involved and/or had an interest.

248. Alan Milton and Windmill interfered with those business relations by, among other things, facilitating the aforementioned conspiracy, financing Rose and Krecke's competitive efforts, and double lending against the same collateral pledged to ACG-I in the context of the BH loan.

249. As a direct and proximate result of the aforesaid wrongful acts of Alan Milton and Windmill, Counterclaim Plaintiffs have suffered damages in an amount not reasonably known but believed to be in excess of $100 million, plus interest thereon.

FIFTH COUNTERCLAIM
(Civil Conspiracy And Fraud Against Alan Milton and Windmill)

250. Counterclaim Plaintiffs incorporate herein by reference all of the allegations set forth herein.

251. Rose and Krecke, conspired together to and did unlawfully, and knowingly, wrongfully, maliciously and intentionally interfere with ACG-I's lending relationship with BH, other borrowers, including, but not limited to Antonello, Nemeth and Newman, and a number of potential borrowers.

252. Alan Milton and Windmill joined with Rose and Krecke and became a party to the fraud and conspiracy, ratified the same, and participated therein in concert with Rose and Krecke for their mutual profit, benefit, and advantage.

253. As a direct and proximate result of the herein mentioned fraud and conspiracy, Counterclaim Plaintiffs have been damaged in an amount not reasonable known but believed to be in excess of $100 million, plus interest thereon.

43

## SIXTH COUNTERCLAIM
### (Breach of the September 13, 2005 Letter Agreement Against SageCrest)

254.    Counterclaim Plaintiffs incorporate herein by reference all of the allegations set forth herein.

255.    Pursuant to the terms of the September 13, 2005 Letter Agreement, SageCrest was required to satisfy all of ACG-I's losses with respect to the BH loan under the terms thereof.

256.    Despite due demand, SageCrest has failed to make payment to ACG or to provide a credit to ACG for any obligations owed under the Credit Agreement.

257.    Accordingly, SageCrest has materially breached its obligations under the September 13, 2005 Letter Agreement.

258.    By reason of SageCrest's breach of contract, Counterclaim Plaintiffs have sustained damages in an amount to be determined but believed to be in excess of $100 million, plus interest thereon.

## SEVENTH COUNTERCLAIM
### (Declaratory Judgment Against SageCrest)

259.    Counterclaim Plaintiffs incorporate herein by reference all of the allegations set forth herein.

260.    By reason of the foregoing Counterclaim Plaintiffs seek a declaratory judgment that the 360 Loan and the proceeds derived therefrom are not, and never were, subject to SageCrest's security interest and lien.

**WHEREFORE**, Defendants and Counterclaim Plaintiffs demand judgment against Sagecrest, Alan Milton and Windmill follows:

A.    On the Defenses;

B.    Dismissing the Amended Complaint;

44

C.   On the first through sixth counterclaims, for judgment against Alan Milton and Windmill (and SageCrest), in an amount to be determined but believed to be in excess of $100 million, plus fees and interest thereon;

D.   On the seventh counterclaim, a declaration that the 360 West loan and the proceeds derived therefrom are not, and never were, subject to SageCrest's security interest and lien; and

E.   For costs, disbursements and such other relief as the court deems just and proper.

Dated: New York, New York
January 15, 2008

HAHN & HESSEN LLP
Counsel for Defendants and
Counterclaim Plaintiffs

By:_____
Zachary G. Newman
488 Madison Avenue
New York, New York 10022
(212) 478-7200

Of Counsel:

Maria Arnott, Esq.
Julie Lazarus, Esq.

45

## VERIFICATION

STATE OF NEW YORK      )
                                ) ss.:
COUNTY OF NEW YORK    )

        **IAN PECK,** being duly sworn, states:

        1.    I am a defendant herein and an officer of the remaining defendants and counterclaim plaintiffs.  This verification is made by me because the defendants are corporations and I am an officer thereof.

        2.    I have read the foregoing Answer, Defenses and Counterclaims and know the contents thereof.  The Answer, Defenses and Counterclaims are true to the best of my knowledge, unless matters are alleged to be made on information and belief, and as to those matters, I believe them to be true.

        3.    The sources of my information and grounds of my belief as to all matters in the foregoing Answer, Defenses and Counterclaims not stated to be made upon my knowledge are as follows: the books and records maintained by defendants, court documents, documents produced thus far in the course of discovery, and various other documents.

                                **IAN PECK**

Sworn to before me this
____ day of January 2008

_____
Notary Public

ZACHARY G. NEWMAN
Notary Public, State of New York
No. 02NE5054960
Qualified in Nassau County
Commission Expires March 6, 20 _10_