# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAGECREST II, LLC<br><br>    Plaintiff,<br><br>  - against -<br><br>ACG CREDIT COMPANY II, LLC,<br>ACG FINANCE COMPANY, LLC,<br>FINE ART FINANCE, LLC, ART CAPITAL<br>GROUP, LLC, ART CAPITAL GROUP,<br>INC., ACG CREDIT<br>COMPANY, LLC, and IAN S. PECK,<br><br>    Defendants. | 3:13-cv-973-SRU |
| SAGECREST II, LLC<br><br>    Plaintiff,<br><br>  - against -<br><br>IAN S. PECK, ACG CREDIT COMPANY II<br>LLC, ACG FINANCE COMPANY, LLC,<br>FINE ART FINANCE LLC, ART CAPITAL<br>GROUP, LLC, ART CAPITAL GROUP INC.,<br>and ACG CREDIT COMPANY, LLC,<br><br>    Defendants. | 3:13-cv-974-SRU<br><br><br><br><br>June 11, 2014 |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## PROPOSED FINDINGS OF FACT[1]

1.      Plaintiff commenced these actions because the defendants failed to pay $11,125,000 out of the $29,925,000 that they were ordered to pay pursuant to a court order.  The $11,125,000 is comprised of two payments obligations — $6.7 million that was due on November 19, 2008 and $4.425 million that was due on May 19, 2010.  As discussed below, Plaintiff was not obligated to do anything other than sue, but through his prodigious efforts at great expense, Plaintiff reduced the total amounts owed to approximately $6 million plus his claim for attorneys' fees and costs.

## I.      The Parties

2.      SageCrest II, LLC ("SageCrest") was a Delaware limited liability company with its principal place of business located at 3 Pickwick Plaza, Suite 400, Greenwich, Connecticut 06830.  On August 17, 2008, SageCrest commenced a reorganization case by filing a voluntary petition for the relief afforded by Chapter 11 of Title 11 of the United States Code.

3.      John D. Huber is a resident of the State of Illinois.  Mr. Huber is the Trustee of the SageCrest Liquidating Trust, which is the successor-in-interest to SageCrest because all of the assets of SageCrest (and other entities) were assigned to the SageCrest Liquidating Trust pursuant to the terms of a Plan of Reorganization that was confirmed by the United States Bankruptcy Court for the District of Connecticut on December 13, 2011.[2]  (*See* PX 658.)

---

[1]      These Proposed Findings of Fact and Conclusions of Law do not include all the evidence that Plaintiff intends to or may introduce at trial, nor do they include the testimony that Plaintiff expects to elicit at trial.  That evidence is expected to further support the factual findings and legal conclusions contained herein.

[2]      The term "Plaintiff" refers to both SageCrest and Mr. Huber, as Trustee of the SageCrest Liquidating Trust.

4.      Defendants ACG Credit Company, LLC ("ACG-I"), ACG Credit Company II ("ACG-II"), ACG Finance Company, LLC ("ACG Finance"), Fine Art Finance, LLC ("Fine Art Finance"), and Art Capital Group, LLC ("Art Capital LLC") are Delaware limited liability companies.  The sole member of ACG-I, ACG-II, ACG Finance, and Fine Art Finance is Art Capital LLC.  Defendant Ian S. Peck ("Peck") is the President of ACG-I, ACG-II, ACG Finance, Fine Art Finance, and Art Capital LLC. There are no officers of ACG-I, ACG-II, ACG Finance, Fine Art Finance, and Art Capital LLC other than Peck.  ACG-I, ACG-II, ACG Finance, Fine Art Finance, and Art Capital LLC have no employees.

5.      Defendant Art Capital Group, Inc. ("Art Capital Inc.") is a Delaware corporation. Peck owns over 80% of Art Capital Inc. and is the Chairman, Chief Executive Officer, and President of Art Capital Inc.

6.      Peck is a resident of the State of New York.  Peck is the principal of ACG-I, ACG-II, ACG Finance, Fine Art Finance, Art Capital LLC, and Art Capital Inc.

7.      Judges have repeatedly questioned Peck's veracity, truthfulness, and business conduct.  For example, after two days of an evidentiary hearing, Justice Eileen Bransten stated:

> And it goes on and on.  But the point is that I gather from this -- this testimony is that Peck basically said that these monies represented... How did -- how was it put?  "That were proceeds from the assigned loans and due SageCrest into your own ACG." He said "I don't remember," but then he goes on later on to say yes, he did order it.
>
> And the point that I'm making is that I believe that Peck who wasn't exactly the most forthcoming witness we've ever met in this courtroom, I believe that Peck basically implied that these monies were basically due SageCrest.
>
> So you point out where I'm wrong, where there's contradiction on that.

(PX 575 at 506-07.)

8.    The Honorable Katherine Forrest, after a two-day bench trial, made the following

findings regarding Peck's credibility:

> The Court found Peck to be a sophisticated businessman who was
> at times less than forthcoming in his testimony. He answered
> carefully those questions directly posed but at times obviously
> skirted the question to avoid an awkward answer. The Court
> cannot point to a purposeful lie but nor was he forthcoming. There
> were certainly times when his testimony was not credible.
>
> Peck's testimony confirmed that even he could not distinguish
> between what one entity did and what another did at various
> times. He was less than clear as to how to draw lines within
> what he referred to generically as "Art Capital Group" (which
> could be an "LLC" of which he is the sole member or [Art
> Capital Group, Inc.], which had outside shareholders). He
> agreed the name "Art Capital Group" was used "generally" to
> refer to a variety of his businesses. (Tr. at 292, 317, 319.) The
> Court found that Peck was not credible when he avoided clarity
> on questions of financial divisions between the companies and
> the financial position of [Art Capital Group, Inc.], including the
> information on [Art Capital Group, Inc.]'s tax returns (which
> show substantial activities and revenues even in recent years).

(PX 468 at 7-8.)

9.    In prior litigation between SageCrest and Defendants, two judges found that Peck

and his companies were dissipating assets in order to divert the assets from SageCrest. (*See, e.g.,*

PX 442 (granting an *Ex Parte* Order of Attachment); PX 446 at p. 64:24-26 (Justice Helen

Freedman stating, "I think your client is dissipating assets and I'm concerned about that."); PX

447 at 27-30 (Justice Karla Moskowitz stating: "It seems to me looking at the case law even

though it's a very heavy burden on attachment, this not paying, not paying and this missing

money is really enough to support the inference that I found when I had the original papers in

front of me and that Judge Freedman found … that this is enough to show an intent to defraud

SageCrest II here and frustrate the enforcement of any judgment SageCrest II would get here.")

10.     In these actions, the Honorable Alan Shiff entered an order granting a prejudgment remedy based upon, *inter alia,* his finding that Defendants dissipated assets and violated the automatic stay.  Judge Shiff held:  "Here, the plaintiff has demonstrated that the defendants have dissipated assets, to wit, the sale of the so-called Schnabel painting that the defendants do not deny was sold post-petition and in violation of the automatic stay."  (PX 467 at 7.)  That holding also contained a footnote, which stated "The plaintiff made additional proffers of evidence at the December 7th hearing that persuasively demonstrate dissipation of assets. See Hr'g Tr. Dec. 7, 2010 (doc. #191)."

11.     When Defendants sought reassignment of the case based on the granting of the PJR, the Honorable Janet C. Hall held:

> The Corporate Defendants argue that Judge Shiff's decision to grant the Motion for Prejudgment Remedy demonstrates bias. To the contrary, the prejudgment remedy reflects the Bankruptcy Court's legitimate concern that the Corporate Defendants' delays could prejudice Sagecrest's ability to obtain payment for a judgment in its favor, particularly given evidence of prior dissipation of assets by the Corporate Defendants.  Indeed, this court explicitly contemplated the possibility of Prejudgment Remedy proceedings in response to its grant of leave to appeal. Hearing Tr., Dec. 2, 2010, at 17. On these facts, the mere granting of a prejudgment remedy cannot be interpreted as evidence of bias.

12.     At the time the complaints in these actions were filed, the offices of ACG-I, ACG-II, ACG Finance, Fine Art Finance, Art Capital LLC, and Art Capital Inc. were located in the same space on the third floor at 980 Madison Avenue, New York, New York.  (*See* PX 587 at 5-7.)

13.     Currently, the offices ACG-I, ACG-II, ACG Finance, Fine Art Finance, Art Capital LLC, and Art Capital Inc. are located in the same space at 850 Third Avenue, New York, New York.

14.     ACG-I, ACG-II, ACG Finance, Fine Art Finance, Art Capital LLC, and Art Capital Inc. all share the same telephone number and facsimile number.

15.     ACG-I, ACG-II, ACG Finance, Fine Art Finance, Art Capital LLC, and Art Capital Inc. all use the same website, www.artcapitalgroup.com (the "Website"), to market their businesses and services.  *See* PX 511.  Art Capital Inc. is the registered owner of the Website.  *See* PX 571.  Art Capital Inc. is the registered owner of the trademark "Art Capital Group."

16.     ACG-I, ACG-II, ACG Finance, Fine Art Finance, Art Capital LLC all use the "Art Capital Group" mark and do not pay any royalties to Art Capital Inc. for the use of the mark.  (*See* PX 709 at ¶¶ 102-21.)

## II.     The Prior ACG Litigation

17.     In 2003, SageCrest and ACG-I entered into a Revolving Credit Agreement by and between ACG-I, as Borrower, and SageCrest, as Lender, dated as of August 20, 2003, and subsequently entered into certain written amendments to the Credit Agreement (collectively, the "Credit Agreement").  (*See, e.g.,* PX 587, 959.)

18.     On or about March 10, 2006, ACG-I sold, conveyed, assigned, transferred and delivered almost all of its assets to ACG-II, and ACG-II assumed many of the obligations and liabilities of ACG-I to SageCrest under the Credit Agreement.  (*See* PX 562, 587.)

19.     The Credit Agreement set forth the procedures for how ACG could request a loan from SageCrest, and SageCrest had sole discretion of whether to make the loan.  If SageCrest agreed to make a loan to ACG, the proceeds were required to be used to fund "Art Investments," which were asset based loans made to individual and corporate owners of fine art and antique assets, and ACG had to deliver a revolving note to SageCrest for each loan.  (*See* PX 587, 959.)

20.     In order to induce SageCrest to make any loans to ACG, ACG pledged and granted to SageCrest a security interest in all of ACG's assets including, but not limited to, the

notes and security interests that ACG received from the entities and individuals that borrowed money from ACG.  (*See* PX 587, 959.)

21.     SageCrest perfected its security interests by filing UCC-1 financing statements on all of the assets of ACG-I and ACG-II in 2003 and 2006, respectively.  (*See* PX 587.)

22.     Between August 2003 and January 2006, ACG borrowed tens of millions of dollars from SageCrest under the Credit Agreement and delivered revolving notes to SageCrest for each borrowing.  (*See* PX 960-985.)

23.     The Credit Agreement and revolving notes matured on their face on December 4, 2006.  (*See* PX 587, PX 959-985.)

24.     ACG did not, however, pay the over $32 million in principal and $8 million in interest that was owed to SageCrest on that date.  (*See* PX 587.)

25.     SageCrest commenced an action (the "2007 Action") against ACG-I, ACG II, Art Capital LLC, ACG Finance, and Peck (collectively, the "2007 Action Defendants") by filing a Summons and Complaint on January 19, 2007 in the Supreme Court of the State of New York, County of New York (the "NY Supreme Court"), Index No. 600195/2007 .  (*See* PX 587.)

26.     On February 14, 2007, SageCrest filed its Amended Complaint.  (*See* PX 587.)

27.     The day after SageCrest filed its Amended Complaint, SageCrest served its first request for documents seeking, *inter alia*, bank account records.  After many months of effort to obtain the bank account records from the 2007 Action Defendants, the 2007 Action Defendants made a production of limited, redacted bank account records on July 16, 2007 pursuant to a July 12, 2007 Compliance Conference Order.  On August 17, 2007, the 2007 Action Defendants produced additional bank account records, which were also limited and redacted.  Despite

repeated demands from SageCrest to produce unredacted bank account records, the 2007 Action Defendants refused to do so.  (*See* PX 587.)

28.     The bank account records show why the 2007 Action Defendants delayed and refused to produce additional and unredacted bank account records — the records show that the bank accounts of ACG-I and Art Capital Inc. received over $14.5 million on account of or with respect to the Art Investments.  These proceeds were required to be turned over to SageCrest under the Credit Agreement.  (*See* PX 587.)

29.     Instead of paying SageCrest as required, the accounts that received the approximately $14.5 million had been depleted to almost nothing — the ACG-I account had a balance of $112,869.37 as of July 16, 2007, and the Art Capital Inc. account had a balance of $233,649.39 as of May 2, 2007.  (*See* PX 587.)

30.     SageCrest sought and Justice Moskowitz of the Supreme Court of the State of New York entered an *Ex Parte* Order of Attachment (the "Order of Attachment") on September 11, 2007.  (*See* PX 442.)

31.     SageCrest filed the required undertaking and sought to confirm the Order of Attachment.  (*See* PX 446-47.)

32.     At the hearings on the motions seeking to confirm the Order of Attachment and the 2007 Action Defendants' motion to reargue the decision confirming the Order of Attachment, both Justice Freedman and Justice Moskowitz found that the failure of Peck and his companies to remit over $13 million to SageCrest, most of which was missing, demonstrated an intent to defraud SageCrest and dissipate assets.  (*See* PX 446-47.)

33.     At the October 15th hearing on the motion to confirm the Order of Attachment,

Justice Freedman also asked the 2007 Action Defendants' counsel, Zachary G. Newman of

H&H, what happened to the money that was stolen by the 2007 Action Defendants:

> THE COURT:  In other words, is that $14 million gone? I'm
> asking you point blank.
>
> MR. NEWMAN:  We haven't done accounting down to the penny
> because --
>
> THE COURT: Not down to the penny.  Is that money there?
>
> Yes or no.
>
> MR. NEWMAN: Some of it, yes.
>
> THE COURT: How much is left?
>
> MR. NEWMAN: Your Honor, I can represent to the Court that
> with respect to monies received, if you look in Miss Islam's
> affidavit on Page 4, the monies received with respect to non-Berry-
> Hill loans are being preserved.
>
> With respect --
>
> THE COURT: You are not answering my question.
>
> MR. NEWMAN: That's approximately $4.6 million.
>
> THE COURT: That's all that's left?

(*See* PX 446.)

34.     Justice Freedman found that the use of the proceeds in Peck's personal war

against his former business partners was a clear dissipation of assets:  "I think your client is

dissipating assets and I'm concerned about that."  Accordingly, Justice Freedman confirmed the

Order of Attachment.  She required an undertaking of $7 million to vacate the Order of

Attachment.  (*See* PX 446.)

35.     The 2007 Action Defendants sought leave to reargue Justice Freedman's decision.

After hearing argument on the application, Justice Moskowitz denied the application:

THE COURT: Please. I'm speaking, okay. It seems to me looking at the case law even though it's a very heavy burden on attachment, this not paying, not paying and this missing money is really enough to support the inference that I found when I had the original papers in front of me and that Judge Freedman found on the argument which was an argument to, I guess, the original one she had, was to confirm, right, with a cross motion.

MR. FRIEDMAN:    Yes.

THE COURT: To confirm the attachment and cross motion to vacate it, that <u>this is enough to show an intent to defraud SageCrest II here and frustrate the enforcement of any judgment SageCrest II would get here. I also found and she found that there is a likelihood of success on the merits.</u>

(*See* PX 447 at 28-29 (emphasis added).)

36.     The 2007 Action Defendants had previously moved to dismiss the non-contractual causes of action in the Amended Complaint.  On December 21, 2007, Justice Moskowitz rendered her decision on the 2007 Action Defendants' motion for partial dismissal, denying the motion to dismiss the conversion claims against Peck individually and other of the Peck-controlled Entities as well as the fraudulent conveyance and indemnification claims.  Because the 2007 Action Defendants did not move to dismiss the nonpayment and contractual claims or the turnover of assets claims, Justice Moskowitz' decision meant that all of the 2007 Action Defendants were subject to liability and damages on at least one claim including Peck, who was personally liable on the conversion claims.

37.     Defendants then requested that Justice Moskowitz order the parties to attend mediation, which she did.  Pursuant to Justice Moskowitz' order, representatives of SageCrest and the Prior ACG Litigation Defendants, together with their respective counsel, appeared for mediation on January 17, 2008 and January 25, 2008 before the neutral mediator, Neal H. Klausner, Esq.

38.     At the January 25th session, SageCrest and the 2007 Action Defendants reached a settlement, which was memorialized in the Agreement which, among other things, required ACG-II to make payments to SageCrest totaling $29.925 million, to be paid as follows: $21 million at closing, $4.5 million in six months, and another $4.425 million in two (2) years.  The Agreement also provided that the Order of Attachment would not be vacated until SageCrest received the $21 million.  (*See* PX 444.)

39.     The Agreement set February 8, 2008 as the deadline (the "Deadline") for the parties to sign final documentation of the settlement including, but not limited to, two (2) notes to evidence payments totaling $8.925 million, a $1 million personal guarantee of collection from Peck, the Blocked Account Agreement, the Assigned Collateral Warehouse Waiver Agreement, and certain stipulations that would be filed in the 2007 Action after SageCrest received the initial payment of $21 million.  (*See* PX 444.)

40.     Paragraph 3 of the Agreement provides, in pertinent part, that "[t]he terms of settlement, regardless, are binding on the parties, and any party may submit this agreement to the court to be so-ordered after the Deadline absent final documentation."  (*See* PX 444.)

41.     After SageCrest and the 2007 Action Defendants entered into the Agreement, SageCrest drafted the final documentation and provided it to the 2007 Action Defendants' counsel.

42.     Almost from the moment that SageCrest provided the drafts until the date the So-Ordered Settlement Stipulation was signed — a period lasting over three (3) months — the 2007 Action Defendants did their best to try to alter and/or change the terms of the Agreement and delay the payment obligations of ACG-II.

43.     For example, the 2007 Action Defendants sought to change the terms regarding payment of the $21 million because Peck and the 2007 Action Defendants claimed that they were unable to come up with $21 million in cash to be paid at closing.

44.     The 2007 Action Defendants and their counsel argued — in numerous conferences, pleadings, and sessions with the Mediator and the Court — that the $21 million did not have to be paid in cash.  They argued that $6.7 million could be paid by assigning certain loans to SageCrest because, according to their sworn statements and representations, those loans were "as good as cash."

45.     For example, at an April 2, 2008 status conference, the 2007 Action Defendants' then-counsel, Zachary Newman of H&H, argued that the assignment of loans with a principal balance of $6.7 million, together with a blocked account agreement, was a "cash equivalent":

> MR. NEWMAN: But instead of paying the full amount, we're posting --- we're paying cash and financial products.  Paper, financial paper.
>
> In other words, let's say in six months the 6.7 million and change doesn't get paid.  Then they are going to take over those loans.  It's a cash equivalent, is the word I was looking for.  They are getting the cash equivalent so why should the order of attachment stay in place?  There has to be an order of finality to the process at that point.

46.     However, the Court recognized that SageCrest was entitled to the payment of $21 million at closing:

> THE COURT: Let me tell you something.  This Court is not going to second guess Sagecrest as to what they feel they need in order to ensure that they get paid their 21 million.  The Court is not going to take back the heavy-handed approach, which may be very good for you and Mr. Peck but it may not be what is in fairness for the bargained deal.
>
> I suggested, and I still suggest, that if you're saying to me that you need to make up that 1.5 –

MR. NEWMAN: 6.7, your Honor.  It's the $6.7 million number.
That's the delta.

THE COURT: No, there is another sum.

MR. FRIEDMAN: The 1.2.

THE COURT: The 1.2 million.  If you need to have a release to
allow you to liquidate that 1.2 million, we'll start with that and I
think that's eminently fair.  That gives additional security that they
need but, at the same time, it allows you to come up with a certain
amount of money.

MR. NEWMAN: Your Honor, the problem that we have with that
is that with respect to this order of attachment, the Court has
already ruled that upon the posting of the $7 million undertaking or
bond, that the order of attachment automatically dissolves.

So, under our look at the research, if we hand over to Sagecrest a
$6.7 million loan, $1.2 million worth of cash, that that satisfies, or
the Court has the discretion to determine that that satisfies that
requirement to dissolve the order of attachment.

                    *          *          *

THE COURT: You are giving them the right to possibly not be
able to collect the 6.7 loan.  That's why you are here to begin with.
You are giving them the right to step into your shoes and try to be
a collection agency.  That's not the bargain that they made.

47.    Defendants eventually provided due diligence materials to SageCrest.  (*See, e.g.,*
PX 4, 25, 100, 114-15, 118, 121, 825-896.)  The due diligence materials included, among other
things, the underlying loan documents, lists of the underlying collateral and other information
regarding that collateral including valuations, and the UCC financing statements for that
collateral.  (*See* PX 4, 25, 100, 114-15, 118, 121, 825-896.)

48.    For example, the due diligence materials represented that the value of a piece of
the proposed collateral, Diego Rivera's *Nino Ruso con Trineo*, had a value of $500,000 as of
April 2008.  The materials also represented that the collateral for one of the underlying

borrowers, Alastair Crawford and Alastair Crawford, LLC (collectively, "Crawford"), consisted of 98 pieces of silverware.

49.    SageCrest reviewed all of the due diligence materials and relied on those materials when SageCrest agreed to enter into the So–Ordered Settlement Stipulation.

50.    After a number of motions were filed and numerous hearings and sessions with the Mediator and/or the Court, the 2007 Action Defendants and Fine Art Finance agreed to certain terms and restrictions and to make representations and warranties to SageCrest so that SageCrest could feel secure in deferring the payment of $6.7 million until six months after closing.  (*See* PX 1.)

III.    **The So-Ordered Settlement Stipulation**

51.    On May 19, 2008 (the "Closing Date"), the Settlement Stipulation and Mutual Release (the "So-Ordered Settlement Stipulation") was executed by, among others, SageCrest, Peck, ACG-I, ACG-II, ACG Finance, Art Capital LLC, and Fine Art Finance, and was subsequently "so ordered" by the Honorable Eileen Bransten of the NY Supreme Court.  (PX 1 at pp. 34-36.)

52.    Peck executed the So-Ordered Settlement Stipulation both individually and as President of ACG-I, ACG-II, ACG Finance, Art Capital LLC, and Fine Art Finance.  (*See* PX 1 at pp. 34-36.)

53.    The So-Ordered Settlement Stipulation was entered by the Clerk of the NY Supreme Court on or about May 19, 2008.  (PX 1.)

54.    Peck, ACG-I, ACG-II, ACG Finance, Art Capital LLC, and Fine Art Finance all had knowledge of the terms, conditions and restrictions contained in the So-Ordered Settlement Stipulation because they executed the So-Ordered Settlement Stipulation.  (PX 1 at pp. 35-36.)

Section 36 of the So-Ordered Settlement Stipulation, titled "Terms Read and Understood, "

provides:

> The signatories to this Settlement Stipulation certify that they have
> read this Settlement Stipulation, have conferred with counsel, and
> fully understand all the terms, and the Parties acknowledge and
> represent that they enter into this Settlement Stipulation of their
> own free will, and not from any representation, commitment,
> promise, pressure or duress from any other Party.

(PX 1 at § 36.)

55.    Peck was actively involved in the negotiations and review of the So-Ordered

Settlement Stipulation. (*See, e.g.,* PX 21, PX 439-41.)  In a litigation between Defendants and

one of their former attorneys, Hahn & Hessen, LLP ("H&H"), H&H sued for nonpayment of

legal fees.  Defendants counterclaimed based on alleged malpractice relating to Defendants'

claim that Plaintiff's sole recourse in this action is to the Assigned Loans and that H&H failed to

protect the alleged rights to arranger's fees.[3]  As a result of those claims, H&H filed emails

demonstrating Peck's involvement in the process.

56.    H&H told Peck that the settlement "is not going to leave the launch pad without

you hitting the launch button."  (PX 21 at Ex. 9 thereto.)

57.    When H&H inquired when Peck could close, Peck stated that he could close at a

certain time "[a]ssuming that I have had enough time to review all documents in their final form

and comment if necessary."  Peck also stated that he would "reserve the right to request more

time to review documents if [he] need[ed] it."   (PX 21 at Ex. 10 thereto.)

---

[3]    As discussed below, the court granted summary judgment to H&H and entered judgment,
holding that Plaintiff rejected the sole recourse language and that Defendants are not
entitled to arranger's fees.  (PX 598-99.)

58.     Two nights before the closing, Peck wrote: "As you well know Zach I will not agree to close a deal until I am fully comfortable no matter what any idiot judge or anyone else thinks….moreover I think there may be room for some last minute horse trading. …"  (PX 21 at Ex. 15 thereto.)

59.     H&H made clear their disagreement with any efforts to horse trade or refuse to close because, as they told Peck, "this is the deal you negotiated, and we have spent way too much time and effort to get this deal in the form you are comfortable with."  (PX 21 at Ex. 16 thereto.)

60.     Numerous drafts of the So-Ordered Settlement Stipulation were provided to Peck. (*See, e.g.,* PX 21, 439-41.)  Most tellingly, a blackline showing the deletion of the "sole recourse" provision was provided by H&H to Peck on May 9, 2008 — ten days before the closing would occur.  Thus, Peck was well aware of the removal of that provision.

A.      ACG-II's Payment Obligations

61.     The So-Ordered Settlement Stipulation obligates Defendants to, *inter alia*, make payments totaling $29,925,000 (the "Settlement Amount") plus any applicable interest to SageCrest.  (PX 1 at § 2.)

62.     Of the Settlement Amount, $21 million (the "Initial Consideration") was required to be paid by ACG-II to SageCrest as follows:  (a) $14,300,000 immediately,[4] (PX 1 at § 3), and (b) a payment of $6,700,000.00 (the "Balance") plus any additional interest due thereon (the "Additional Interest") on or before November 19, 2008, which was six months after May 19, 2008 (the "Closing Date").  (PX 1 at § 4(d).)

---

[4]     This particular amount was later reduced by $200,000 pursuant to Amendment No. 1 to the So-Ordered Settlement Stipulation because ACG-II prepaid one of the notes using funds received from the underlying borrower.  (PX 756.)

63.     In particular, Section 4(d) provides: "The Collateral Assignment shall remain as a placeholder for a period of six (6) months from the Closing Date … at which time ACG-II is required to wire transfer the Balance and any Additional Interest … in immediately available funds to SageCrest."

64.     If ACG-II failed to pay the Balance and all of the Additional Interest by November 19, 2008, then SageCrest was required to send a cure notice to ACG-II, Fine Art Finance and ACG Finance.  (PX Ex. 1, at § 19 & Ex. L.)

65.     ACG-II had five (5) business days to cure (the "Cure Period") and, if ACG-II did not cure, then SageCrest was vested with a number of additional rights and interests and ACG-II, Fine Art Finance and ACG Finance lose a number of rights.  (PX 1, at §§ 4(e), 14(f), and Ex. L.) In particular, SageCrest had the absolute right to service, manage, and administer the Assigned Loans.  Moreover, Fine Art Finance and ACG Finance were prohibited from interfering with SageCrest's servicing, managing, and administration of the Assigned Loans.  (PX 1, at § 4(e).) Defendants also lost any and all interests that they might have in the Assigned Loans unless and until SageCrest receives payment of the Balance, all Additional Interest, and any collection costs that SageCrest is entitled to recover.  (PX 1, at Ex. L thereto.)

66.     The So-Ordered Settlement Stipulation also required ACG-II to pay to Plaintiff the sum of $4,425,000 on or before May 19, 2010.  That obligation is also contained in a promissory note executed by Peck as President of ACG-II and delivered to Plaintiff (the "2-Year Note").  (PX 1 at § 2(c) & Ex. H.)  Section 2(c) provides:  "ACG-II agrees to execute and deliver the [2-Year Note] …, which note provides, inter alia, that ACG-II will pay SageCrest the sum of $4,425,000.00 on [May 19, 2010]."  The 2-Year Note similarly provides:

> FOR VALUE RECEIVED, ACG CREDIT COMPANY II, LLC
> … hereby **unconditionally promises** to pay to the order of

> SageCrest II, LLC … the principal sum of Four Million Four
> Hundred Twenty-Five Thousand Dollars ($4,425,000.00), or less
> as a result of a pre-payment, the principal amount outstanding …
> on May 19, 2010."

(PX 1 at Ex. H, at 1 (emphasis added).)

B.    ACG Finance and Fine Art Finance Assign Five Loans to SageCrest

     67.    On May 19, 2008, Peck, as President of Fine Art Finance, ACG Finance and

ACG-II, executed the Collateral Assignment, which is Exhibit L to the So-Ordered Settlement

Stipulation, and delivered it to SageCrest.  (*See* PX 1, at Ex. L.)

     68.    The Collateral Assignment, together with the Allonges and the General Loan

Document Assignment, assigned five loans to SageCrest (individually, an "Assigned Loan" and

collectively, the "Assigned Loans").  In particular, Fine Art Finance assigned its rights to loans

to Evan Tawil ("Tawil"), Alastair Crawford ("Crawford"), and Lawrence Jay Daitch ("Daitch"),

and ACG Finance assigned its rights to loans to Barquet Group, Inc. f/k/a/ Galleria Ramis

Barquet, N.Y. Ltd. ("Barquet Group") and Enrico Navarra ("Navarra").  (*See* PX at §§ 2-4 &

Exs. K-L, PX 43; PX 49.)

     69.    The Collateral Assignment provides, in pertinent part:

>      FOR VALUE RECEIVED, and as collateral security for all
> debts, liabilities and obligations of ACG Credit Company II, LLC
> ("Borrower") to [SageCrest], now existing or hereafter arising
> under the [So-Ordered] Settlement Stipulation in connection with
> **the payment of the $6.7 million Balance due** under the Initial
> Payment, Assignor hereby assigns, transfers and sets over unto
> [SageCrest], its successors and assigns, all of its rights, but not its
> obligations, under (i) each of the promissory notes set forth and
> described on <u>Schedule A</u> hereto (the "<u>Assigned Loans</u>"), with each
> of the borrowers listed on said <u>Schedule A</u> (such borrowers, the
> "<u>Underlying Borrowers</u>"), (ii) all collateral documents and
> guarantees relating to the Assigned Loans or any collateral security
> provided therefor, (iii) all filings made to preserve or perfect any
> security interest granted pursuant to any of the foregoing
> documents, and (iv) all payments, products and proceeds of any of
> the foregoing (the items described in clauses (i) through (iv),

> collectively, the "Collateral"; the collateral documents described in
> clauses (ii) and (iii), collectively, the "Collateral Documents");
> except, Assignor expressly carves out of such assignment and
> retains for its own use and benefit, any and all rights to receive any
> commissions, fees or expenses, including an Arranger's Fee, due
> under the Assigned Loans.

(*See* PX 1, at Ex. L (emphasis added).)  The Collateral Assignment also permits the recovery of

Plaintiff's reasonable collection costs (the "Assigned Loans Costs") .

70.     If ACG-II failed to pay the Balance and the Additional Interest to SageCrest by

November 19, 2008 and failed to cure any such breach, then ACG Finance and Fine Art Finance

lost any and all rights in the Assigned Loans and Assigned Collateral until Plaintiff recovers all

amounts owed.  (*See* PX 1 at Ex. L ("[If] Assignee does not receive the Balance plus any

Additional Interest and any Assigned Loans Costs in available funds on or before [November 19,

2008] and after five (5) business days written notice to [ACG-II, ACG Finance, and Fine Art

Finance], then [ACG Finance and Fine Art Finance] shall have no interest in the Assigned Loans

unless and until such amounts are paid to Assignee.").)

71.     Peck executed the General Loan Document Assignment and the Allonges on

behalf of ACG Finance and Fine Art Finance as President of both entities.  Fine Art Finance and

ACG Finance delivered the General Loan Document Assignment and the Allonges to SageCrest.

72.     The General Loan Document Assignment (PX 43), assigned all of the documents

associated with the Assigned Loans to SageCrest, including any arranger's agreements.  The

Allonges (PX 49), transferred ownership of the promissory notes to SageCrest.

73.     Section 4(a) of the So-Ordered Settlement Stipulation includes the following

representations and warranties:

> Fine Art Finance and ACG Finance each warrants and represents
> that as of April 30, 2008 (i) the balance due and owing under each
> of the Assigned Loans, as set forth in Exhibit K, is true and
> accurate, (ii) there is not, nor has been, any declaration of default

under the Assigned Loans, (iii) neither Fine Art Finance nor ACG Finance is aware of any default under the Assigned Loan, (iv) no outstanding interest payments are due and owing under the Assigned Loans and (v) the Assigned Loans are secured by collateral consisting of 35 pieces of artwork with an appraised value of approximately $14 million (the "Assigned Collateral") and Fine Art Finance and/or ACG Finance has a first priority perfected security interest in the Assigned Collateral.

(*See* PX 1.)

74. Exhibit K to the So-Ordered Settlement Stipulation contains the following representations regarding the Assigned Loans and the Assigned Collateral:

| | INITIAL LOAN DATE | LOAN TYPE | OUTSTANDING PRINCIPAL BALANCE | MATURITY DATE | COLLATERAL TYPE |
|---|---|---|---|---|---|
| Alastair Crawford | 5/21/07 | $1mm Credit Facility | 179,289 | 5/21/08 | Decorative Art |
| Lawrence J. Daitch | 7/1/04 | $15,000 Term Loan | 15,000 | 6/30/08 | Fine Art |
| Evan Tawil | 8/11/06 | $350,000 Credit Facility | 220,000 | 10/17/08 | Fine Art |
| Enrico Navarra d/b/a Enrico Navarra New York | 5/27/04 | $5mm Credit Facility | 310,000 | 5/22/09 | Fine Art |
| Galleria Ramis Barquet, N.Y. Ltd. | 9/28/04 | $6mm Credit Facility | 6,000,000 | 10/31/08 | Fine Art |
| | | | $  6,724,289 | | |

(*See* PX 1, at Ex. K.)

75. On May 20, 2008, SageCrest filed UCC financing statements assigning the security interests in the Assigned Loans and Assigned Collateral from Fine Art Finance and/or ACG Finance to SageCrest. (*See* PX 448.)

C.   The 2-Year Note Is Secured By Loans, A Judgment, and Collateral

76. The 2-Year Note is secured by, among other things:

(a)   a first priority, perfected security interest in and lien on the proceeds of loans from ACG-II to three borrowers — a loan with a principal balance of $2 million to Veronica Hearst (the "Hearst Art Loan"), a loan with a principal balance of $185,000 to Vernon Bailey (the "Bailey Art Loan"), and a loan with a principal balance of $96,500 to Peter Socolof (the "Socolof Art Loan" and, together with the Hearst Art Loan, and the Socolof Art Loan, the "Other Art Loans");

(b)   the collateral for the Hearst Art Loan (the "Hearst Collateral"), the Bailey Art Loan (the "Bailey Collateral"), and the Socolof Art Loan (the "Socolof Collateral" and, together with the Hearst Collateral and the Socolof Collateral, the "Other Art Loan Collateral");

(c)   an outstanding judgment against American Furniture and Melanie Gill in the amount of $466,246.56 (the "American Furniture Judgment");

(d)   certain furniture owned by Melanie Gill (the "Gill Furniture Lot");

(e)   eight paintings that were purportedly sold from Ian Peck Fine Paintings, Ltd. ("IPFP") to ACG-II, (the "IPFP Collateral"); and

(f)   a $1 million personal guarantee by Peck.

(PX 1 at §§ 1(b)-(e)), 2(c), 12.)

D.   <u>Plaintiff Has No Obligation To Collect On The Underlying Obligations</u>

77.   The So-Ordered Settlement Stipulation does not require that Plaintiff pursue the collateral before or in lieu of seeking to collect directly from Defendants.  In fact, the Collateral Assignment states that:

> It is expressly understood and agreed, however, that [Plaintiff] shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any other action to collect or enforce the payment of any amount which may have been assigned to [Plaintiff] or to which [Plaintiff] may be entitled hereunder at any time or times.

(PX 1 at Ex. L.)

78.   The 2-Year Note similarly provides that Plaintiff "may pursue any and all remedies available to [Plaintiff] under the Settlement Stipulation, at law, in equity, by contract or otherwise against the Collateral as defined [t]herein."  (PX 1 at Ex. H, at 2.)

79.     While Plaintiff had the option to takeover the collection and enforcement of the collateral underlying the 2 Year Note, pursuant to Section 15(b)(ii) of the So-Ordered Settlement Stipulation, he was not required to do so.  (PX 1 at § 15(b)(ii) ("Following a Default under the 2-Year Note, [Plaintiff] may takeover the collection, enforcement, or execution…".).)

E.     ACG-I, ACG-II, ACG Finance, Fine Art Finance, and Art Capital LLC's
       Other Obligations Under The So-Ordered Settlement Stipulation

80.     In addition to the obligations to pay the Balance, Additional Interest, and the 2-Year Note, the So-Ordered Settlement Agreement imposed numerous obligations and restrictions on ACG-II, Fine Art Finance, ACG Finance, and the other Defendants that are signatories to that agreement.  In particular, they had to:

(a)     establish a bank account in the name of ACG-II that Plaintiff had control over (the "Blocked Account") pursuant to an agreement (the "Blocked Account Agreement") (PX 1 at § 13(a) & Ex. R);

(b)     ensure that all payments relating to the Assigned Loans and Assigned Collateral were paid into the Blocked Account, including directing the underlying borrowers to make payments to the Blocked Account (PX 1 at §§ 4(b), 4(f), 13(b));

(c)     provide monthly reporting setting forth (i) any collection and/or enforcement efforts made by ACG-II, Fine Art Finance and ACG Finance and (ii) the amount(s), if any, expended in connection with such collection and/or enforcement efforts, and attach copies of the invoices for any such collection and/or enforcement efforts incurred during the previous month (PX 1 at § 14(c));

(d)     report to SageCrest if there are any materially adverse changes to the financial condition of the underlying borrowers or any movement of the collateral, refrain from extending any maturity dates for the Assigned Loans past November 18, 2008, and refrain from amending the Assigned Loans in a manner that would have a material adverse impact of SageCrest's liens and rights (PX 1 at § 14(d), 4(e) & Ex. L.);

(e)     refrain from interfering with the servicing of the Assigned Loans if Plaintiff took over that role (PX 1 at § 4(e)); and

(f)     cooperate fully with Plaintiff.  (PX 1 at § 28.)

81.     On or prior to the Closing Date, ACG-II, by Peck as President, and SageCrest executed the Blocked Account Agreement.  (*See* PX 1, at Ex. R.)

82.     The Prior ACG Litigation Defendants and Fine Art Finance also agreed to provide certain credit enhancements to SageCrest in order to induce SageCrest to defer the receipt of the $6.7 million until November 19, 2008.  (*See* PX 1, at § 6.)  In particular, Fine Art Finance, ACG Finance and ACG-II agreed to "use their best efforts to request, on or before the Closing Date, [the RVI] for the benefit of SageCrest, providing coverage during the Grace Period (and for 6 months afterwards or until the Balance and any Additional Interest (as defined below) is paid whichever is earlier) for no more than $3.5 million, representing approximately twenty-five (25%) percent of the total Assigned Collateral value."  (*See* PX 1, at § 6(a).)  If Fine Art Finance, ACG Finance and ACG-II could not procure the RVI, then the Balance accrues simple interest from the Closing Date at a rate of the posted yield for the 6-month U.S. Treasury Bill … plus 2% per annum during the Grace Period (the "Additional Interest").  The Additional Interest must be paid to SageCrest in a lump sum on the last day of the Grace Period by wire transfer.  (*See* PX 1, at § 6(a).)

83.     Peck executed and delivered to SageCrest a guarantee of collection (the "Assigned Loan Guarantee"), which is annexed as Exhibit N to the So-Ordered Settlement Stipulation.  The Assigned Loan Guarantee provides for payment of collection of an amount equal to the lesser of (a) the difference between $6.7 million and any remaining balance after application of any payment(s) under the RVI, if procured, and (b) $3 million.  Accordingly, if the RVI was not procured, then the Assigned Loan Guarantee from Peck is for $3 million.  (*See* PX 1, at Ex. N.)

## IV.     Defendants Breach And Are In Contempt Of The So-Ordered Settlement Stipulation

A.     Defendants Fail to Pay the Balance, Additional Interest, and 2-Year Note

84.     On November 19, 2008, ACG-II did not pay the Balance and the Additional Interest to SageCrest as required by Section 4(d) of the Settlement Stipulation.  (PX 587, at 89; 588, at ¶ 89.)

85.     On November 19, 2008, SageCrest sent a Notice of Default (the "Default Notice") by facsimile to ACG-II, Fine Art Finance and ACG Finance and their counsel, which Default Notice was received by ACG-II, Fine Art Finance and ACG Finance.  (PX 44-45; 587-88 at ¶¶ 90-91.)

86.     ACG-II did not cure the payment default within the Cure Period.  (PX 44-45.)

87.     In accordance with the terms of the So-Ordered Settlement Stipulation, SageCrest exercised its rights to service, administer, and manage the Assigned Loans on November 26, 2008.  (See PX 239; 587 at ¶ 92; 588 at ¶ 92.)

88.     On May 19, 2010, ACG-II did not pay to SageCrest the $4,425,000 that was required to be paid pursuant to the 2-Year Note and the So-Ordered Settlement Stipulation.  (See PX 244; 465.)

89.     On May 20, 2010, SageCrest sent a Notice of Payment Default (the "Default Notice") by facsimile to ACG-II, Fine Art Finance and ACG Finance and their counsel, which Default Notice gave ACG-II five (5) business days to cure the payment default.  (See PX 244.)

90.     ACG-II, Fine Art Finance and ACG Finance received the Default Notice on May 20, 2010, but ACG-II did not cure the payment default within the Cure Period.  (See PX 244; 465.)

91.     At the time, Plaintiff did not exercise his option to service the Other Art Loans or collect on the Other Art Loan Collateral, the American Furniture Judgment, the Gill Furniture Lot, or the IPFP Collateral because, prior to bringing an adversary proceeding, Plaintiff learned

that Defendants sold purportedly sold the Hearst Collateral for $500,000 (which was supposed to be worth in excess of $3 million) and the most valuable piece of the IPFP Collateral for $75,000. Plaintiff also learned that Defendants purportedly had been unable to sell the Socolof Collateral, the Bailey Collateral, and the Gill Furniture Lot.[5]

92.     While Plaintiff had no obligation to collect on the Assigned Loans or Liquidate the Assigned Collateral, Plaintiff has been able to reduce the Balance and the Additional Interest, after payment of the Assigned Loans Costs from the recovery efforts, to $2,683,407.10 as of March 31, 2014.  (*See* PX 631.)

93.     Plaintiff was able to collect all of the funds owed by Navarra, including all of the Assigned Loans Costs associated with that loan.  (*See* PX 631.)

94.     Tawil's collateral was liquidated, and Plaintiff commenced an adversary proceeding against Tawil to collect a deficiency of $24,954.21, inclusive of attorneys' fees.  (*See* PX 665.)  That case was tried to Judge Shiff in June 2013 and the parties are awaiting a decision.

95.     Crawford never paid a dollar to Plaintiff.  After Crawford testified in these actions that he sold all of the collateral for his loans, Plaintiff commenced an adversary proceeding, obtained a default judgment, placed a judgment lien on Crawford's home, and Crawford's mortgage holder is currently foreclosing on that home.  (*See* PX 660-62).

96.     Plaintiff has collected $4,614.964.85 from Barquet Group and Barquet.  (*See* PX 631.)  These collections came from interest payments, sales of the collateral, and payments from the bankruptcy estates of Barquet Group and Barquet.  After Plaintiff attempted to collect from

---

[5]     Plaintiff reached what he believed was an agreement to resolve the 2-Year Note case in 2011.  After Plaintiff drafted the settlement papers, Defendants refused to sign.  As part of those negotiations, Defendants turned over five (5) pieces of the IPFP Collateral plus an additional piece of art.  Plaintiff sold four of those pieces, but was unable to sell the remaining two despite numerous efforts to do so.

Barquet Group and learned that it had sold over $2.7 million of collateral prior to the entry into the So-Ordered Settlement Stipulation and while Defendants were servicing the loan, Plaintiff commenced an adversary proceeding against Barquet Group, Barquet, and his wife, Helena. After Barquet Group, Barquet, and Helena failed to comply with court-ordered obligations, Plaintiff filed a motion for contempt.  On the eve of that hearing, Barquet Group and Barquet filed for bankruptcy protection.  Plaintiff was the largest creditor in the Barquet Group bankruptcy and Barquet's bankruptcy.  Because Plaintiff also had a claim against Helena Barquet (who was not a party to the Barquet Group loan), Plaintiff was able to negotiate a settlement that resulted in Plaintiff receiving approximately $4 million from the sales of two rental apartment owned by Barquet and Barquet's and Helena's residence — the overwhelming amount of proceeds from those sales.  These payments resulted in the recovery of all of the Assigned Loan Costs associated with the Barquet Group loan as well as a reduction in the Balance.  (*See* PX 631; 680-91.)

97.     All of the Barquet collateral assigned under the So-Ordered Settlement Stipulation has been liquidated.

98.     Plaintiff also had no obligation to sell any of the IPFP Collateral that he received as part of the settlement that Defendants abrogated.  Plaintiff was able to sell four pieces of the IPFP Collateral for $130,496.71 and the additional piece of art for $8,067.70, resulting in a total reduction of $138,564.41 of the 2-Year Note balance.  (*See* PX 521-23.)

B.     Defendants' Other Breaches of the So-Ordered Settlement Stipulation

99.     Defendants opened an account in the name of ACG-II at JPMorgan Chase Bank, N.A. ("JPMC") but Defendants apparently did not make it subject to the Blocked Account Agreement.  The evidence shows that Defendants belatedly submitted the Blocked Account

Agreement to JPMC at the same time Defendants requested that the bank open a new account. (*See* PX 35.) Defendants took weeks to submit the required account opening documents to JPMC. (*See* PX 36.) JPMC opened an account named "ACG Credit Company II Blocked Account" but Defendants did not deposit any proceeds relating to the Assigned Loans, the Assigned Loan Collateral, the Other Art Loans, the Other Art Loan Collateral, the Gill Furniture Loan, and the IPFP Collateral into that account.

100.    Instead, Art Capital Inc. and CM Russell, another entity owned and controlled by Peck, received all of the proceeds relating to the Assigned Loans, the Assigned Loan Collateral, the Other Art Loans, the Other Art Loan Collateral, the Gill Furniture Loan, and the IPFP Collateral.[6] (*See* PX 3; 417; 436; 517-20.)

101.    Because ACG-II never complied with its obligations regarding the Blocked Account, ACG-II also failed to instruct the underlying borrowers on the Assigned Loans and the Other Art Loans to make payments into the Blocked Account and Defendants never transferred the proceeds to the Blocked Account.

102.    ACG-II also failed to place the Assigned Loan Collateral in a warehouse and make that collateral subject to the required agreement. (*See* PX 173.) As a result, Barquet Group and Crawford were able to sell much of the collateral for their loans (*see* PX 660; 680), which caused Plaintiff to suffer damages.

103.    After providing two reports that complied with the reporting requirements contained in Section 14(c) of the So-Ordered Settlement Stipulation (*see* PX 40), ACG-II, Fine Art Finance, and ACG Finance stopped providing any reporting that complied with those

---

[6]    Defendants were ordered to produced account records but never produced additional documents showing bank account activity, despite the court order and repeated demands,

obligations and breached their obligations under the So-Ordered Settlement Stipulation.  (PX 1 at
§ 14(c).)

106. In addition to failing to provide the required reporting, ACG-II, Fine Art Finance,
and ACG Finance never reported any material adverse changes to the financial conditions of the
underlying borrowers or any movements of the collateral as required by Sections 14(d).  For
example, ACG Galleries, LLC, another entity owned and controlled by Peck, apparently sold the
Hearst Collateral for $500,000 in April 2009.  (*See* PX 22; 68; 95; 453.)  Defendants did not
advise Plaintiff of that sale until months after it occurred when they filed a motion seeking a stay
to prevent Plaintiff from exercising its rights under the So-Ordered Settlement Stipulation.  (*See*
PX 406.)  After that sale, Defendants continued to market and attempt to sell the Hearst
Collateral (*see* PX 390), and continued to file continuations of UCC financing statements.

105. It was only at a deposition that Plaintiff learned that the Gill Furniture Lot was
apparently sold at auction for an undisclosed amount.   Despite having an obligation to remit
those funds to Plaintiff, Defendants claim that they have escrowed those funds but have not
provided any proof of the sales or the receipt of the proceeds.  Plaintiff also learned that ACG-II
settled its suit with Hearst from court filings.  Defendants never advised Plaintiff of the
settlement discussion, nor have Defendants remitted the approximately $220,000 that they
received to settle a $3 million claim.

106. Defendants did not inform Plaintiff that the Barquet Group had made a $300,000
principal payment in April 2008 in exchange for the release of a piece of art by Diego Rivera
(the "Rivera").  Not only was the Rivera part of the Assigned Loan Collateral, but the principal
balance was reduced to not more than $5,7000,000.  Thus, the representations and warranties by
ACG Finance that the Barquet Group principal balance was false.  (*See* PX 16.)  Plaintiff later

learned that Barquet Group had sold millions of dollars of Assigned Loan Collateral, both before the So-Ordered Settlement Stipulation was entered into as well as prior to the time that Plaintiff took over the servicing of that loan.  (*See* PX 680.)  Finally, on the eve of ACG-II's $6.7 million payment obligation to Plaintiff, Defendants permitted Barquet Group to conclude a sale of a piece of collateral for $1,150,000 and Defendants allowed Barquet Group to retain all but $500,000 of the proceeds.  Defendants never informed Plaintiff of this sale and secret agreement with Barquet.  Plaintiff found out from Barquet.

107.   Defendants also failed to report that Barquet Group was routinely in breach of its loan agreement with ACG Finance.  (*See, e.g.,* PX 286; 287; 289-96.)  Barquet was frequently in arrears.  (*See, e.g.,* PX 286-87; 289-92; 294-96; 298.)  The Barquet Group collateral was not in warehouse as Defendants' claimed it was required to be and Defendants failed to inspect the collateral.  (*See, e.g.,* PX 286-87; 291-92; 295.)

108.   There are numerous examples of Defendants' failure to report information, including that Bailey passed away.  Defendants did not reveal that information until a deposition in 2012.  The Bailey Collateral was subsequently moved, but Defendants have failed to identify its location.  The Socolof Collateral was picked-up from Christie's London in March 2009, but Defendants did not reveal that until they produced documents indicating that they had done so. (*See* PX 23; 366.)  Peck has subsequently testified that the Socolof Collateral is at Christie's in London.

109.   Defendants also extended the maturity dates for the loans to Barquet Group in violation of Section 4(e) of the So-Ordered Settlement Stipulation.

110.   The So-Ordered Settlement Stipulation also required Defendants to refrain from interfering with the servicing of the Assigned Loans after Plaintiff took over such role on

November 26, 2008 and to fully cooperate with Plaintiff.  Rather than comply, Defendants told

borrowers not to deal with SageCrest because it was in bankruptcy (*see* PX 29), told Crawford to

ignore calls from SageCrest (*see* PX 10), interfered with efforts to collect on the Tawil and

Barquet loans and collateral (*see* PX 263; 695; 697), and refused to turnover funds and collateral

to Plaintiff.

**V.      Defendants' Tortiously Interfere With The Assigned Loans, Convert Plaintiff's**
**Assets, Fraudulently Induce Plaintiff to Enter Into The So-Ordered Settlement**
**Stipulation, and Make Fraudulent Statements During These Actions**

111.    On November 26, 2008, SageCrest sent notices to the underlying borrowers on

the Assigned Loans advising those borrowers that SageCrest was servicing, administering and

managing their respective loans and provided each of the underlying borrowers with a copy of

the Collateral Assignment.  As part of that notice, SageCrest directed the underlying borrowers

to make payments directly to SageCrest.  (*See, e.g.,* PX 87.)

112.    At the same time that SageCrest sent the notices to the underlying borrowers,

SageCrest also sent a notice to ACG-II, Fine Art Finance, ACG Finance and their counsel.  The

November 26, 2008 notice informed Defendants that SageCrest was exercising its contractual

rights to service, administer and manage the Assigned Loans and that Defendants should not

interfere with those loans.  (*See* PX 239.)

113.    Despite their obligations under the So-Ordered Settlement Stipulation, Peck

contacted Crawford by e-mail and told that underlying borrower not to pay SageCrest because

SageCrest is in bankruptcy.  (*See* PX 29.)

114.    Crawford has since not made any payments to SageCrest in breach of his loan

agreement with SageCrest.

115.    Peck continued to contact those underlying borrowers during the course of these actions. (*See, e.g.,* PX 9; 13; 29; 55; 164.)  Those repeated communications adversely affected SageCrest's relationships with the underlying borrowers and SageCrest's ability to collect.

116.    Contrary to a representation by H&H on behalf of Defendants that the underlying borrowers would hold payments until the Blocked Account was established, SageCrest learned on April 23, 2009 that Art Capital Inc., one of the Peck-controlled Entities and an entity with no interest in the Assigned Loans or the Assigned Collateral, received over $913,000 from the underlying borrowers after May 19, 2008.

117.    Art Capital Inc. and CM Russell also received numerous other payments that should have turned over to Plaintiff, including the payments relating to the sale of the Gill Furniture Lot, the $220,000 in proceeds from the Hearst settlement, the $300,000 payment from the Barquet Group for the Rivera.

118.    The So-Ordered Settlement Stipulation requires those funds to be deposited into the Blocked Account but the funds were not because, as discussed above, Defendants failed to open the Blocked Account.  Because Defendants failed to open the Blocked Account, Defendants were entrusted with funds that belong to SageCrest and those funds should have been immediately wire transferred to SageCrest because SageCrest is the owner of the Assigned Loans until SageCrest receives the Balance, all Additional Interest, and any collection costs it is entitled to recover.

119.    SageCrest repeatedly demanded that Defendants wire all of the above-described funds that they have received from the underlying borrowers, but Defendants refused to do so.[7]

---

[7]    As part of the 2011 settlement discussions, Defendants released $250,000 from escrow relating to the Rivera.  Accordingly, Defendants are still retaining $50,000 from the

120.     Peck, the Peck-controlled Entities, and their counsel did their best to hide these payments and facts from SageCrest and, as alleged below, went so far as to (a) make false and misleading statements to SageCrest both before and after these action was commenced, (b) sign and file an affidavit, under oath, containing false statements, (c) proffer false testimony during hearings held on February 11 and 13, 2009, (d) violate an Order of this Court that prohibited Defendants from removing any funds from an account, and (e) make two motions to stay the actions to attempt to prevent SageCrest from discovering these facts. (See, e.g., PX 132, 134, 136.)

121.     For example, Defendants represented that:

- the Assigned Collateral was in secured locations;

- none of the Assigned Collateral has been moved by ACG II;

- any and all payments received by Defendants are in a segregated account; and

- the outstanding principal balance of each of the Assigned Loans was the exact same amount as was identified in Exhibit K to the So-Ordered Settlement Stipulation.

(See PX 134.)

122.     Those representations were false.  For example, Rembrandt Buggati's *Deux Grands Leopards* had been sold on November 3, 2008 and, therefore, was not at the Barquet Group's offices.  (See PX 6-8.)  The release of the Rivera and the sale of Rembrandt Buggati's *Deux Grands Leopards* reduced the Barquet Group's principal balance to $5,200,000 and, thus, was $800,000 less than the balance set forth in Exhibit K.  Further, the number of pieces of collateral for the Crawford Assigned Loan had been reduced from 98 pieces to 23 pieces.  (See

---

Rivera, the proceeds from the sale of the Gill Furniture Lot, and the $220,000 settlement payment from Hearst.

PX 134.)  However, SageCrest was never informed of any sales and, to date, has never been provided with any details regarding those sales.  Further, the payments relating to the Assigned Loans and Assigned Loan Collateral were more than reported.  (*Compare* PX 236 *with* PX 134.) Finally, the payments were not in a segregated account; rather, they were initially paid into an Art Capital Inc. account that was used to pay operating expenses.  (*See* PX 3.)

123.    Unbeknownst to SageCrest until after November 26, 2008, the due diligence materials provided by Defendants (including, but not limited to, Fine Art Finance and Art Capital Inc.) contained false information, and the representations and warranties provided by Fine Art Finance were false.

124.    Defendants released the Rivera in exchange for a $300,000 principal payment from Barquet Group and the Barquet Group had sold numerous pieces of art prior to the parties entering into the So-Ordered Settlement Stipulation.  (*See, e.g.,* PX 16, 18, 680.)  The funds for the Rivera were received by Art Capital Inc., an entity with no interest in the Barquet Group loan.  (*See* PX 3.)

125.    Defendants knew that the representations and warranties in the So-Ordered Settlement Stipulation and Exhibit K thereto were false.

126.    Moreover, on November 21, 2008 — two days after SageCrest sent the Default Notice — Art Capital Inc. received $500,000 from Barquet Group in connection with the sale of a piece of the Assigned Collateral, namely, Rembrandt Bugatti's *Deux Grands Leopards*.

127.    In a letter agreement, dated November 21, 2008, between ACG-I and Galleria Ramis Barquet, on ACG-I letterhead c/o Art Capital LLC, Defendants represented to Galleria Ramis Barquet that they would release and terminate security interests in the *Deux Grands*

*Leopards* in exchange for a principal paydown of $500,000 to Art Capital Inc.  Peck signed that agreement as President of ACG-I.

128.    However, the loan to Galleria Ramis Barquet was not owned by ACG-I, but rather ACG Finance.  Further, Defendants knew they had no security interests in any of the pieces of Assigned Collateral, let alone the *Deux Grands Leopards*, because all of the security interests and liens were assigned to SageCrest in the So-Ordered Settlement Stipulation and the Collateral Assignment.

129.    Equally troubling was that the *Deux Grands Leopards* was sold for $1,150,000 plus a buyer's premium.  Defendants allowed Barquet Group to keep approximately $650,000 of the proceeds, despite the fact that ACG-II defaulted two days earlier.

## VI.    Defendants Are Alter Egos

130.    On November 20, 2012, in a separate action filed against the Defendants (among others) in the United States District Court for the Southern District of New York, the Honorable Katharine B. Forrest held, after a two-day bench trial, that Defendants are alter egos of each another (the "*Hilton Head* Opinion").  (*See* PX 468.)

131.    In *Hilton Head*, the primary cause of action was against Art Capital Inc. for breach of fiduciary duty to its shareholders.  Each of the Defendants were named defendants in the *Hilton Head* action.

132.    Judge Forrest held that "[a]s to recovery, Peck – in his personal capacity – and the defendant companies are all liable.  The Peck companies became or always were (it matters not which) a corporate melting pot – a stew of different companies, controlled and dominated by one man, none of which respected the formal differences between their operations that would have entitled Peck or his companies to take best advantage of the insulations of corporate form."  (PX 468 at 4-5.)

133.    The evidence is this case is even more compelling than the evidence in *Hilton Head.* All of the corporate entities are ultimately owned, controlled and dominated by Peck.

134.    As discussed above, Peck is the President and sole officer of the entities.  All of the entities share the same office, phone and fax numbers, and the Website to market and advertise their business.  Art Capital Inc. does not charge the other Defendants for use of its mark.

135.    Defendants cannot distinguish between the various companies.  Ferdousi Islam, an employee of "Art Capital Group," could not identify her employer nor could she distinguish between the companies.  Defendants routinely issue bills directing payment to Art Capital Inc. for loans that were made by ACG-II, Fine Art Finance, and ACG Finance, even though Art Capital Inc. was the lender or the servicer.  (*See, e.g.,* PX 51; 56.)

136.    It is also common for entities that have no relationship with a loan to enter into agreements relating to such loan.  For example, as discussed above, ACG-I had no relationship with the Barquet Group loan in November 2009, yet ACG-I agreed to release liens in exchange for a payment to Art Capital Inc.  Similar, ACG Galleries had no involvement in the loan to Hearst.  Yet, ACG Galleries apparently sold the Hearst Collateral and the proceeds were remitted to Art Capital Inc.  There are no documents authorizing ACG Galleries to sell the Hearst Collateral, nor is there any evidence of any agreement between ACG-II and ACG Galleries relating to the Hearst Collateral.

137.    Many of the Defendants do not have bank accounts.  It is apparent that Defendants used Art Capital Inc. and C.M. Russell's bank accounts to receive funds relating to the Assigned Loans and the 2-Year Note.  (*See* PX 3; 417.)

138.    Defendants produced only three documents in this case where corporate activity was consented to or was authorized by a resolution.  (*See* PX 607; 608; 615.)  There are no minutes of meetings or any other consents, authorizations, or resolutions for any other activities.

139.    Defendants' financial statements and tax returns also show that the sole purpose of the corporate structure was to enrich Peck.

## VII.    Defendants Lose Their Malpractice Claim Relating To The So-Ordered Settlement Stipulation And The Arranger's Fees Claim Is Not Permitted In The Barquet Group Bankruptcy Case

140.    Hahn & Hessen, LLP served as counsel for the Prior ACG Litigation Defendants. (PX 1; 21; 241; 598; 599.)

141.    Apparently, the Prior ACG Litigation Defendants (and other entities controlled by Peck) failed to pay hundreds of thousands of dollars owed to Hahn & Hessen.  Hahn & Hessen commenced an action to recover those fees, and the defendants therein (which include all of Defendants herein) asserted a malpractice counterclaim arising out of the So-Ordered Settlement Stipulation.  In particular, the defendants in the Hahn & Hessen action alleged that the firm committed malpractice because Plaintiff commenced these actions and the Hahn & Hessen defendants contended that sole remedy for any nonpayment by ACG-II to Plaintiff was for Plaintiff to collect on the underlying collateral.  Apparently, discovery was taken and Hahn & Hessen ultimately moved for summary judgment.  In November 2013, the court granted summary judgment to Hahn & Hessen and held that the collateral was not the sole recourse for Plaintiff because, among other reasons, Plaintiff never agreed to such and the So-Ordered Settlement Stipulation provides otherwise.  (PX 598.)  The NY Supreme Court also held that ACG Finance and Fine Art Finance are not entitled to any arranger's fees or commissions relating to the Assigned Loans because they lost interest in such fees or commissions when

ACG-II failed to pay the Balance and the Additional Interest.  The NY Supreme Court subsequently entered a judgment dismissing the malpractice counterclaim.  (PX 599.)

## PROPOSED CONCLUSIONS OF LAW

## I.   Plaintiff's Claims

1.   Because this case arises out of the So-Ordered Settlement Stipulation, and the So-Ordered Settlement Stipulation is governed by the laws of the State of New York, New York law applies to Plaintiff's claims.  (PX 1 at ¶ 35); *Doe No. 1 v. Knights of Columbus,* 930 F. Supp. 2d 337, 370 (D. Conn. 2013).

A.   Breach of the So-Ordered Settlement Stipulation

2.   Stipulations of settlement are essentially contracts that are interpreted according to general principles of contract law.  *See Rexnord Holdings, Inc. v. Biderman*, 21 F.3d 522, 525 (2d Cir. 1994); *Sharp v. Stavisky,* 221 A.D.2d 216, 217, 633 N.Y.S.2d 488, 489 (1st Dep't 1995).

3.   Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages. *See Rexnord Holdings,* 21 F.3d at 525.

4.   Failure to make a payment under a settlement stipulation constitutes a material breach of a contract.  *See Gucci Am., Inc. v. Sample Sale Wholesalers, Ltd.*, 39 A.D.3d 271, 272, 835 N.Y.S.2d 26, 27 (1st Dep't 2007); *see also McKenzie v. Vintage Hallmark, PLC*, 302 A.D.2d 503, 504, 755 N.Y.S.2d 288, 289 (2d Dep't 2003).

5.   It is undisputed that Defendants executed the So-Ordered Settlement Stipulation, thereby agreeing to all of the terms therein.  (PX 1.)

6.   ACG-II was obligated to wire transfer $6.7 million plus Additional Interest on November 19, 2008. (PX 1, at ¶ 4(d).)  Defendants have admitted that ACG-II did not do so. (PX 588, ¶¶ 89-91.)  Pursuant to the So-Ordered Settlement Stipulation, SageCrest sent the

Notice of Default to ACG-II, Fine Art Finance and ACG Finance, which notice gave them five (5) business days to cure the payment default.  (PX 45.)  Defendants did not cure the default on or before November 26, 2008.  (PX 588, ¶¶ 89-91.)  Thus, ACG-II has breached its obligation to pay SageCrest and has thus caused SageCrest to suffer damages in excess of $6.7 million.  *See Gucci Am., Inc.*, 39 A.D.3d at 272 (failure to make a payment under a settlement stipulation constitutes a material breach of contract).  As a result of Plaintiff mitigation efforts, that amount has been reduced to $2,663,407.10 as of March 31, 2014.  (PX 631.)

7.     To establish a *prima facie* entitlement recover on a promissory note, a plaintiff must show "the existence of a promissory note, executed by the defendant, containing an unequivocal and unconditional obligation to repay, and the failure by the defendant to pay in accordance with the note's terms." *Ocean View Realty Co. v. Ziss*, 90 A.D.3d 872, 873 (2d Dep't 2011); *see also* N.Y. U.C.C. § 3–104; *Quadrant Management Inc. v. Hecker*, 102 A.D.3d 410, 410 (1st Dep't 2013); *Mulholland v. GMZ Associates, Ltd.*, No. 02 CV 8678(MP), 2004 WL 489062, at *1 (S.D.N.Y. Mar. 11, 2004).

8.     Here, the 2-Year Note is a valid, enforceable, negotiable instrument.  The 2-Year Note was executed by Peck as President of ACG-II and unambiguously states that ACG-II "unconditionally promises to pay to the order of" Plaintiff the fixed amount of $4,425,000 "on May 19, 2010," and contains no conditions for payment.  *See Ocean View Realty Co.*, 90 A.D.3d at 873.  ACG-II has admitted that it failed to pay.  (PX 466, at ¶¶ 30, 55, 58.)

9.     Accordingly, Plaintiff is entitled to judgment against ACG-II on the amount owed on the 2-Year Note, which is $3,710,154.20.

## Peck Personal Guarantee

10.     "The interpretation of a contract of suretyship is governed by the standards which govern interpretation of contracts in general." *Gen. Phoenix Corp. v. Cabot*, 300 N.Y. 87, 90

(1949).  "Whether a surety is a guarantor of payment or a guarantor of collection depends upon the intention of the parties as expressed in the surety contract."  *Id.*  Under a guarantee of collection, the guarantor binds himself when efforts to collect against the third party debtor have failed.  *Id.*  A plaintiff is entitled to judgment on a guaranty where the plaintiff submits proof of an underlying credit agreement, a personal guaranty bearing the signature of the defendant guarantor, and the failure of that defendant guarantor to make payment in accordance with the credit agreement and the guaranty.  *See, e.g., N. Fork Bank Corp. v. Graphic Forms Assocs., Inc.*, 36 A.D.3d 676, 676 (2d Dep't 2007); *JPMorgan Chase Bank v. Gamut-Mitchell, Inc.*, 27 A.D.3d 622, 622-23 (2d Dep't 2006).

11.     Peck guaranteed payment of $1,000,000 if the 2-Year Note was not fully paid. (PX 1 at Ex. Q.)  The conditions to enforcement of the Peck Personal Guarantee require SageCrest to use best efforts to (1) repossess or foreclose upon the Other Art Loans Collateral and the IPFP Collateral; (2) enforce judgments against Hearst; (3) enforce the American Furniture Judgment, if any amounts remain thereunder; and (4) to liquidate the IPFP Collateral. (PX 1 at Ex. Q § 2(b).)

12.     All of the conditions to enforcement of the Peck Personal Guarantee have been met and/or should be excused.  Peck testified that he sold all of the Hearst Collateral and Gill Furniture Lot.  Peck further testified that there is no market for the Bailey Collateral and Socolof Collateral and that his prior attempts to sell such collateral have failed, thus admitting that the pieces have no value.  As for the IPFP Collateral, all but three of those pieces have been sold. Plaintiff has tried to sell two of those pieces and found that there is little, if any, market for those pieces.  The other piece, Anne Redpath's *Still Life*, is still in Defendants' possession.

13.     Moreover, ACG-II failed to deliver the appraisals that were required to be delivered pursuant to the Peck Personal Guarantee.  (PX 1 at Ex. Q.)  ACG-II's failure to do so excuses Plaintiff's performance of any obligations to liquidate the collateral.  Thus Plaintiff is entitled to collect $1 million from Peck pursuant to the Peck Personal Guarantee.

**Alter Ego Liability**

14.     Courts consider the following factors in determining whether to pierce the corporate veil:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms-length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*William Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1990).  There is substantial evidence to support each of the elements of alter ego liability, and thus Defendants are all liable on the alter ego claims.

15.     Defendants wholly failed to adhere to formalities of corporate governance, and have produced no by-laws, no corporate or board meeting minutes, and admitted that many, if not all, of these corporate formalities were simply never undertaken, let alone recorded. Defendants had years to locate and produce these records, and received multiple requests to do so.  Defendants' failure to adhere to corporate formalities weighs in support of piercing the veil. *William Passalacqua Builders*, 933 F.2d at 139.

16.     Defendants were also undercapitalized, with Art Capital Inc. and Art Capital LLC both operating at a net loss of $1,108,888 and $44,911, respectively, as of December 31, 2011. Since "Defendants Fine Art Finance, LLC, ACG Credit Company, LLC, ACG Finance Company, LLC, [and] ACG Credit Company II, LLC . . . are wholly owned subsidiaries" of Art Capital LLC, and "do not have financials separate from" Art Capital LLC, all of the Defendants were undercapitalized as of December 31, 2011.  (*See* PX 484 at ACGII 0100227.)  It is a well-recognized principle that "[c]arrying on a business without substantial capital and leaving the corporation without substantial assets to meet its debts can justify piercing the corporate veil." *Directors Guild of America, Inc. v. Garrison Productions, Inc.*, 733 F. Supp. 755, 762 (S.D.N.Y. 1990); *see also William Passalacqua Builders,* 933 F.2d at 139-40 (2d Cir. 1991).

17.     Peck has used corporate funds to pay his own personal expenses, another factor weighing in favor of finding alter ego liability.  *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461, 472 (S.D.N.Y. 2005) (piercing the veil was appropriate where corporate funds were diverted for personal purposes and where corporation was significantly undercapitalized, regardless of the fact that the corporation conducted legitimate business); *In re Flutie New York Corp.*, 310 B.R. 31, 59-61 (Bankr. S.D.N.Y. 2004) (reaching debtor's personal assets where his company paid for personal expenses, including his apartment rent, telephone bill, electric utility bill, automobile lease, and parking garage fees).

18.     Peck is the sole member of Art Capital LLC, and Art Capital LLC is the sole member of ACG-I, ACG-II, Fine Art Finance, and ACG Finance.  Peck is also the sole shareholder of Art Capital Inc.  In addition, Peck serves as President of each of the Peck-controlled Entities, and is wholly unable to distinguish the role and/or function of any of the entities.  There are no employees of any of the corporate Defendants other than Art Capital Inc., and there are no officers or directors of any of the corporate Defendants other than Peck.  This

evidence demonstrates both (i) an "overlap in ownership, officers, directors, and personnel," and (ii) that Peck exercises complete control and dominion over the corporate Defendants *William Passalacqua Builders*, 933 F.2d at 139.

19.     The Peck-controlled Entities have shared and continue to share the same office, telephone number, employees, bank accounts, and website. *D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 198 (2d Cir. 2005) (imposing alter ego liability where two entities shared "common use of marketing materials, e-mail addresses, and telephone numbers.").

20.     Defendants' dealings with each other were not arms-length.  Rather, "agreements" purportedly entered into both to govern the relationship between two or more of the Peck-controlled Entities and with third parties were signed on all sides by Peck, including (i) the Management Services Agreement by and among Art Capital Group, LLC, ACG Credit Company, LLC, Art Capital Group, Inc., and Fine Art Finance (the last three collectively referred to in the agreement as "ACG Entities"); and (ii) the Operating Agreement of Fine Art Finance, LLC and Art Capital Group, LLC. (PX 1; 476; 480.)  *William Passalacqua Builders*, 933 F.2d at 139.

21.     Furthermore, the corporate Defendants have transferred millions of dollars by, between, and among each other since 2005, have intermingled assets, and have admitted that they operate collectively as one "firm."  Certain of the corporate Defendants were even receiving and/or transferring funds to other Defendants during periods of self-described dormancy, which is further evidence of an alter ego relationship.  *See NYK Cool A.B. v.  Pac. Int'l Servs., Inc. et al.*, No. 12 Civ. 5754(LAK)(AJP), 2013 WL 1274561, *9-*10 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 2014 WL 1408542 (2d Cir. April 14, 2014) (corporate veil was pierced where defendant entity transferred funds to sister companies that were effectively dormant and had no employees).

22.     Thus, the evidence demonstrates that Defendants (i) failed to adhere to corporate formalities; (ii) were inadequately capitalized; (iii) used corporate funds for personal purposes; (iv) overlap in ownership, officers, directors and personnel; (v) share a common office space, address, telephone number, and website; (vi) are subject to the whim and control of Peck; (vii) did not deal with each other at arms-length; (viii) were not treated as independent profit centers; (ix) consistently intermingled assets and assumed responsibility for each other's debts; and (x) treated the collateral and payments from underlying borrowers as property of all of the entities, regardless of the true owner.  Accordingly, as each element weighs in favor of imposing alter ego liability, the corporate Defendants' veil should be pierced to hold each, as well as Peck, individually liable for Plaintiff's claims. *William Passalacqua Builders*, 933 F.2d at 139.

**Conversion**

23.     Conversion is "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in property." *Moses v. Martin*, 360 F. Supp. 2d 533, 541-42 (S.D.N.Y. 2004); *Five O'clock Club, Inc. v. Savino*, 36 Misc.3d 1220(A), *5, 959 N.Y.S.2d 88 (N.Y. Sup. Ct. July 16, 2012) (granting summary judgment on conversion claim where defendant exercised dominion over funds belonging to plaintiff and noting that "[w]hen funds are provided for a particular purpose, the use of those funds for an unauthorized purpose constitutes conversion.").

24.     Here, ACG-II, Fine Art Finance and ACG Finance failed to establish the Blocked Account and failed to direct the underlying borrowers to make payments into the Blocked Account in violation of the terms of the So-Ordered Settlement Stipulation.  (PX 37.)  Since the Blocked Account was not established, Defendants including, but not limited to, Art Capital Inc. received over $2 million that they were entrusted with and should have immediately wire

transferred to SageCrest.  By failing to turnover those funds to SageCrest, Defendants exercised

unauthorized dominion over the funds in contravention of SageCrest's superior ownership rights.

25.     Additionally, the So-Ordered Settlement Stipulation requires Defendants to notify

SageCrest of any movement of the collateral.  (*See, e.g.,* PX 1 at § 14(d).)  Defendants (i)

secretly sold the Schnabel on December 17, 2008 in violation of their obligations under the IPFP

Agreement to notify SC II of any sale of the IPFP Collateral; (ii) secretly transferred the Hearst

Collateral from ACG-II to another entity owned and controlled by Peck – ACG Galleries –

which entity then sold the Hearst Collateral for only $500,000 (PX 2; 473); and (iii) sold the Gill

Furniture Lot without turning the proceeds over to SageCrest.  While Defendants have since

remitted to Plaintiff $575,000, representing the proceeds of the sales of the Schnabel and the

2004 Hearst Loan Collateral, Defendants have yet to turn over the proceeds of any other

collateral that has been sold.

26.     Defendants' unauthorized and intentional retention of funds belonging to

SageCrest, entrusted to Defendants by SageCrest solely based on their promise to establish a

Blocked Account, and movement and sale of the Assigned Collateral without requisite notice to

or authorization by SageCrest, interferes with SageCrest's superior ownership interest and

constitutes wrongful conversion of such funds and property.  *Moses*, 360 F. Supp. 2d at 541-42;

*Five O'clock Club*, 36 Misc.3d 1220(A), *5, 959 N.Y.S.2d 88.

**Civil Contempt**

27.     A party can sustain a claim of civil contempt if a lawful judicial order expressing

an unequivocal mandate was in effect and was disobeyed.  *See McCain v. Dinkins*, 84 N.Y.2d

216, 226, 616 N.Y.S.2d 335, 341 (1994); *see also* CPLR § 5104; Judiciary Law § 753(A)(3).

The party to be held in contempt must have had knowledge of the order, although it is not

necessary that the order actually have been served upon the party.  *See McCain*, 84 N.Y.2d at

226, 616 N.Y.S.2d at 341. In addition, prejudice to the rights of a party to the litigation must be demonstrated. *Id.* at 226, 616 N.Y.S.2d at 341; *see also* Judiciary Law § 753(A). "In determining whether to grant an application to punish for civil contempt pursuant to Judiciary Law § 753, the court need not find willful or intentional conduct on the part of the contemnor. Nor is the court required to find that the contemnor benefited from his act of disobedience." *Campanella v. Campanella*, 152 A.D.2d 190, 194, 548 N.Y.S.2d 279, 281 (2d Dep't 1989).

28.     A court-ordered settlement stipulation constitutes a clear and unequivocal mandate of the court. *See City Wide Sewer & Drain Service Corp. v. Carusone*, 39 A.D.3d 687, 688, 834 N.Y.S.2d 283, 284 (2d Dep't 2007) (settlement stipulation placed on the record in open court that was negotiated between represented parties as part of an underlying breach-of-contract action was an enforceable unequivocal order of the court).

29.     Defendants were aware of the So-Ordered Settlement Stipulation because it contains a provision stating such. Peck was actively involved in the negotiation of that agreement as evidenced by his communications with H&H. Defendants failed to pay the Balance, the 2-Year Note, and failed to comply with numerous other requirements of the So-Ordered Settlement Stipulation. These breaches constitute violations of a court order. As a result, Defendants are in contempt and Plaintiff is entitled to recover its damages as well as attorneys' fees. *City Wide Sewer*, 39 A.D.3d at 688, 834 N.Y.S.2d at 284; *McCain*, 84 N.Y.2d at 226, 616 N.Y.S.2d at 341.

**Fraud**

30.     A cause of action based on fraud requires an allegation that a plaintiff "reasonably relied upon a misrepresentation knowingly and intentionally made to them, and suffered resultant damages." *Gordon v. Oster*, 36 A.D.3d 525, (2007). "To state a legally cognizable claim of

fraudulent misrepresentation, the complaint must allege that the defendant made a material

misrepresentation of fact; that the misrepresentation was made intentionally in order to defraud

or mislead the plaintiff; that the plaintiff reasonably relied on the misrepresentation; and that the

plaintiff suffered damage as a result of its reliance on the defendant's misrepresentation." *P.T.*

*Bank Central Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 376, 754 N.Y.S.2d 245, 250 (1st

Dep't 2003) (citation omitted).   In addition, a fraudulent concealment claim requires "an

allegation that the defendant had a duty to disclose material information and that it failed to do

so." *Id.* at 376, 754 N.Y.S.2d at 250 (citation omitted).

31.     SageCrest has more than adequately alleged a claim of fraud based on

Defendants' multiple misrepresentations and concealments regarding the location and sale of the

Assigned Collateral and payments relating to the Assigned Loans.  For example, during the

February 11, 2009 hearing in the Supreme Court of the State of New York, New York County,

Peck admitted that Defendants made misrepresentations regarding the locations of the Assigned

Collateral.  When Peck was originally asked whether any of the Assigned Collateral was

transferred to an underlying borrower, Peck answered:  "I wouldn't remember exactly, but I

don't think so."  In fact, a document on "Art Capital Group" letterhead shows that Defendants

released the piece by Diego Rivera on April 9, 2008. (PX 16.)  Peck then admitted that the

representation contained in the Assigned Collateral Warehouse Waiver Agreement that the piece

by Diego Rivera was located at Defendants' offices was inaccurate.  Rembrandt Buggati's *Deux*

*Grands Leopards* was sold on November 3, 2008 and, therefore, was not at the Barquet Group's

offices.  The number of pieces of collateral for the Crawford Assigned Loan was reduced from

98 pieces to 23 pieces. (*See* PX 6-8; 134.)  However, SageCrest was never informed of any sales

and, to date, has never been provided with any details regarding those sales.  These

misrepresentations caused Plaintiff to be deprived of the value of collateral that could have been liquidated. Accordingly, Plaintiff has been damaged by Defendants' fraud.

**Fraudulent Inducement**

32.     "[T]he essential elements required to adequately plead a cause of action for fraudulent inducement are:  that the defendant made a false representation of a material fact, that the defendant made such misrepresentation knowingly (i.e., with scienter), that the misrepresentation made was justifiably relied upon by the plaintiff, and that some injury or damage resulted to the plaintiff." *B & F Product Development, Inc. v. Fasst Products LLC*, 22 Misc.3d 1107(A), 2009 WL 81145, at *4 (Sup. Ct. Kings Cnty. Jan. 13, 2009) (citations omitted); *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 528 (2d Dep't 2001) ("a misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action" for fraudulent inducement).

33.     Here, ACG Finance and Fine Art Finance represented that the principal balance due and owing from the Barquet Group was $6 million as of April 30, 2008.  That was false because Barquet Group made a $300,000 principal payment in April 2008.

34.     Fine Art Finance and Art Capital Inc. were in a special position vis-à-vis the Assigned Loans and those entities knew that those representations and warranties in the So-Ordered Settlement Stipulation and the due diligence materials contained false information. (PX 1 at § 4; 587 at 18, 68-72.)  SageCrest did not know that the information and representations were false and SageCrest relied on those misrepresentations and SageCrest has been damaged as a result.  (PX 587, at 18.)  Thus, Fine Art Finance and Art Capital Inc. defrauded SageCrest by knowingly providing false information and making fraudulent representations and warranties to SageCrest regarding the value of the Assigned Loans and the Assigned Collateral. (*See* PX 4; 25; 100; 114-14; 118; 121; 825-96.)

**Turnover (UCC)**

35.     Once a debtor defaults, a secured party can enforce its rights under Article 9 of the Uniform Commercial Code ("UCC"), the parties' agreement, and applicable laws.  Section 9-601(a)(i) of the UCC provides that, following a default, a secured party may reduce its claim to judgment, foreclose or otherwise enforce the claim or the security interest by any available judicial procedure.  These rights are cumulative and may be exercised simultaneously.  *See* N.Y. U.C.C. § 9-601(c); *see also* 12 Weinstein, Korn & Miller, NEW YORK CIVIL PRACTICE, ¶ 6001.02, p. 60-5 (2001 ed.) (plaintiff may utilize more than one provisional remedy if it is necessary to protect its interests) (*citing Rockford, Rock Island & St. Louis R.R. Co. v. Boody*, 56 N.Y. 456 (1874)).

36.     Section 9-609(a) of the UCC provides that after a default by a debtor, the secured party "may take possession of the collateral."  *See* N.Y. U.C.C. Law § 9-609(a);  *see also Bank of India v. Weg & Myers, P.C.*, 257 A.D.2d 183, 191 (1st Dep't 1999) (holding that a secured party's right to possession of collateral upon default may be asserted against a third party in possession, and that party in possession may not refuse the secured party's request to turn over the collateral); *SK Global America, Inc. v. Roberts*, 6 A.D.3d 179, 180 (1st Dep't 2004) (affirming the right of secured parties to enforce the obligations of a defaulting account debtor against third parties).

37.     Separately, Section 7102 of the New York Civil Practice Law and Rules ("CPLR") permits a court to order the sheriff to seize a chattel and by breaking open, entering and searching for the chattel if a plaintiff submits an affidavit stating:  (1) that the plaintiff is entitled to possession; (2) that the chattel is wrongfully held by the defendant; (3) whether an action to recover the chattel has been commenced, the defendants served, whether the defendants are in default, and, if the defendants have appeared, where papers may be served upon them; (4)

the value of each chattel or class of chattels or the aggregate value of the chattels; (5) the location of the chattel and facts sufficient to establish probable cause to believe the chattel is located at that place; and (6) that no defense to the claim is known to the plaintiff. *See* CPLR § 7102(c).  If the court finds that the facts are as stated in the affidavit and the plaintiff delivers an undertaking, then the court may grant the order of seizure. *See* CPLR § 7102(d).

38.     Thus, the plaintiff must establish a superior possessory right in order to recover chattels under Article 71 of the CPLR. *See Christie's Inc. v. Davis*, 247 F. Supp. 2d 414, 419 (S.D.N.Y. 2002); *see also Bendat v. Premier Broad. Grp., Inc.*, 175 A.D.2d 536, 538, 572 N.Y.S.2d 796, 798 (3d Dep't 1991).  Stated differently, a replevin action is concerned with which party has the right to possession and not with who has title. *See Wilk Enterprises, Inc. v. J.I.B. Realty Corp.*, 72 Misc. 2d 507, 510, 339 N.Y.S.2d 75, 79 (N.Y. City Civ. Ct. Dec. 15, 1972).

39.     As described herein, ACG-II has defaulted on its obligations to SageCrest and, thus, SageCrest is entitled to turnover of the funds and property to fully protect SageCrest's secured party rights under the 2-Year Note.

**Attorneys' Fees**

40.     SageCrest is further entitled to its attorneys' fees and costs expended in connection with prosecuting this action based on Defendants' civil contempt and fraud.

41.     A defrauded party is entitled to recover "the sum necessary for restoration to the position occupied before the commission of the fraud." *Winkler v. Allvend Industries, Inc.*, 186 A.D.2d 732, 733, 588 N.Y.S.2d 885, 886 (2d Dep't 1992) (holding that the defrauded party is entitled to recover attorneys' fees when the defendant's fraudulent conduct necessarily caused the defrauded party to commence the action).

42.     Attorneys' fees are also recoverable by the complainant under Judiciary Law
Section 773 as items of costs and expenses in proving contempt. *See Jamie v. Jamie*, 19 A.D.3d
330, 330, 798 N.Y.S.2d 36, 37 (1st Dep't 2005); *Guiliano v. Carlisle*, 236 A.D.2d 364, 365, 653
N.Y.S.2d 635, 637 (2d Dep't 1997).

43.     Here, Defendants are in contempt of the So-Ordered Settlement Stipulation.
Moreover, Fine Art Finance and Art Capital Inc. fraudulently induced SageCrest to enter into the
So-Ordered Settlement Stipulation. Finally, Defendants have defrauded SageCrest since the So-
Ordered Settlement Stipulation was executed. These actions necessitated the commencement of
this action and, therefore, SageCrest is entitled to recover its attorneys' fees.

44.     Furthermore, the reasonableness and necessity of SageCrest's attorneys' fees for
the period beginning August 17, 2008, ending February 10, 2012, for the firms Zeisler & Zeisler,
P.C.; Kelley Drye & Warren LLP; and Sheppard, Mullin, Richter & Hampton LLP, have already
been litigated and awarded in the related bankruptcy proceeding, No. 08-50754, in the United
States Bankruptcy Court for the District of Connecticut. Defendants were notice parties to the
bankruptcy, and did not object to any of the fee applications filed by the three law firms. As
Defendants had an opportunity to litigate the reasonableness and necessity of the attorneys' fees,
they are barred under the doctrine of collateral estoppel from doing so in the instant action. *See
D.A. Elia Constr. Corp. v. Damon Morey LLP*, No. 11-CV-637-A, 2013 U.S. Dist. LEXIS
45931, *28 (W.D.N.Y. Mar. 29, 2013) (precluding challenge to attorneys' fees where previous
fee applications were approved on an interim and final basis by the bankruptcy court, even in
light of previous objections, as plaintiff had "numerous opportunities to challenge the award of
attorney fees" before the bankruptcy court and plaintiff's "vendetta" against defendants has
"burdened the docket" of the court "long enough."); *In re All American Semiconductor, Inc.*, 427

B.R. 559, 571 (Bankr. S.D. Fla. 2010) (denying challenge to reasonableness and appropriateness of fees based on collateral estoppel and *res judicata* where fee applications were approved through previous bankruptcy court order, despite previous objections).

45.     The attorneys' fees SageCrest has incurred since February 10, 2012, have similarly been necessary and reasonable.  Accordingly, SageCrest should be awarded its attorneys' fees and costs incurred during the course of this litigation.

## II.     DEFENDANTS' COUNTERCLAIMS

### A.     Counterclaims Alleging Breach of the So-Ordered Settlement

Alleged Breach Based On Participation Interests

46.     Defendants allege breach of Section 33 of the So-Ordered Settlement Stipulation based on SageCrest granting participation interests in the Assigned Loans.  Again, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.  *See Rexnord Holdings,* 21 F.3d at 526.

47.     There is clearly no such claim and this is a made-up claim.

48.     SageCrest entered into two separate agreements granting participation interests to offshore entities in 2006, well before the execution of the So-Ordered Settlement Stipulation. (PX 592-95.)  These agreements explicitly provide that the participation interests are not an assignment of the assets, as SageCrest must hold legal title to the assets in its own name.  (PX 592-93.)  Moreover, SageCrest retained the right to control the assets and the participants had no ability to control the assets.  Defendants therefore cannot demonstrate a breach of the So-Ordered Settlement Stipulation by SageCrest based on the participation interests  to sustain their counterclaim.

49.     Moreover, even if the granting of participation interests in 2006 was a violation of the So-Ordered Settlement Stipulation, Defendants cannot establish the necessary element of

harm because all of the assets were transferred and assigned to the SageCrest Liquidating Trust, for which Plaintiff serves as the Trustee.  Accordingly, if Defendants paid their obligations to Plaintiff, Plaintiff could return any remaining interests to Defendants.

Article 9 of the UCC Does Not Apply to the Assigned Loans

50.    Article 9 of the UCC applies to security agreements, namely agreements that create or provide for a security interest.  N.Y. U.C.C. §§ 9-102, 9-109.

51.    Here, Article 9 of the UCC does not apply because SageCrest owned the Assigned Loans as of May 19, 2008, when the Collateral Assignment was executed.  Accordingly, SageCrest did not need to foreclose after ACG-II's default in November 2008.  Therefore, the obligations contained in Article 9, such as to dispose of the collateral in a commercially reasonable manner, are inapplicable to the Assigned Loans and Assigned Collateral.  This is consistent with the Collateral Assignment, which provides:

> It is expressly understood and agreed, however, that [Plaintiff] shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any other action to collect or enforce the payment of any amount which may have been assigned to [Plaintiff] or to which [Plaintiff] may be entitled hereunder at any time or times.

(PX 1 at Ex. L thereto.)

52.    An assignment of rights or interests by one party to another effectively deprives the assignor of any right to sue based on those rights or interests.  *See Amusement Indus., Inc. v. Stern,* No. 07 Civ. 11586 (LAK)(GWG), 2011 WL 6811018, at *4 (S.D.N.Y. Dec. 28, 2011) (granting motion to dismiss counterclaims where defendants assigned any "right" or "interest" they had in payments made pursuant to the contract and thereby "plainly [lack] standing to initiate a law suit for return of those payments.").

53.     Defendants lack any interest in the Assigned Loans and thereby do not have standing to assert challenges based upon the UCC.  In order to secure ACG-II's payment obligation of $6.7 million plus the Additional Interest, Fine Art Finance and ACG Finance assigned the underlying loan documents for the Assigned Loans to SageCrest and, equally as important, assigned their security interests in the Assigned Collateral to SageCrest.  The assignment of the loan documents and the security interests to Plaintiff, together with the clear and unambiguous language of the Collateral Assignment, make clear that Defendants have no right to assert a commercially reasonable claim.  In particular, the Collateral Assignment provides:

> if Assignee does not receive the Balance plus any Additional Interest and any Assigned Loans Costs in available funds on or before the expiration of the Grace Period and after five (5) business days written notice to Borrower and Assignor, then Assignor **shall have no interest** in the Assigned Loans unless and until all such amounts are paid to Assignee at which time this Collateral Assignment shall expire and be null and void.

(PX 1 at Ex. L thereto (emphasis added).)

54.     Because ACG-II defaulted in its payment obligation of $6.7 million plus the Additional Interest on November 19, 2008, and failed to cure that default by November 26, 2008, neither Fine Art Finance nor ACG Finance have any interest in the Assigned Loans or the Assigned Collateral.  (PX 588, ¶¶ 89-91.)

55.     Article 9 of the New York UCC states that "a secured party having possession of collateral or control [over it] ... shall apply money or funds received from the collateral to reduce the secured obligation.... Every aspect of a disposition of collateral, including the method, manner, time, and place, and other terms must be commercially reasonable." N.Y. U.C.C. §§ 9-207(c)(2), 9610(b).

56.     Even assuming *arguendo* that UCC Article 9 applies to the Assigned Loans (which Plaintiff does not concede), it is well established that a secured creditor is entitled to

pursue a money judgment for the amount owed and, simultaneously attempt to collect on the collateral, so long as any amounts collected on the collateral are deducted from the total amount owed. *See* N.Y. U.C.C. § 9-601(a)(1) ("A secured party may reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure."); N.Y. U.C.C. § 9-601(c) ("The rights under subsections (a) and (b) are cumulative and may be exercised simultaneously.") (emphasis added). "A secured creditor owes no duty to anyone to foreclose its lien on a borrower's assets after a default." *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 548 (S.D.N.Y. 2007).

57.     Thus, a secured creditor is not required to liquidate collateral to reduce the debt secured by that collateral before proceeding on the guaranty or note at issue, particularly where the collateral was not in the creditor's possession. *See Chem. Bank v. Kaufman*, 142 A.D.2d 526, 527 (1st Dep't 1988). In fact, "secured parties are permitted to retain collateral while awaiting payment on loan obligations." *Sotheby's Fin. Servs., Inc. v. Baran*, 2003 WL 21756126, at *8 (S.D.N.Y. July 29, 2003); *see also McGrath v. Carnegie Trust Co.*, 221 N.Y. 92, 95 (1917) (Cardozo, J.) (stating that "[a] creditor may not be required to surrender any part of his collateral till payment has been made in full"); *Reich v. Bowery Sav. Bank*, 183 A.D.2d 884, 885-86 (2d Dep't 1992) (holding that bank was entitled to hold collateral from personal loan even after personal loan was paid because corporate loan was in default).

58.     Further, Defendants are precluded based on collateral estoppel from arguing that collecting on the collateral was Plaintiff's sole recourse in the event of default.

59.     Collateral estoppel precludes a party from relitigating an issue if (i) it "is identical to an issue which was raised" in an earlier action, (ii) the issue was "necessarily decided and material in the first action," and (iii) "the plaintiff had a full and fair opportunity to litigate the

issue in the earlier action." *See Lafleur v. Whitman*, 300 F.3d 256, 271 (2d Cir. 2002) (barring

petitioner's litigation of the same issue and emphasizing that the "full and fair opportunity"

prong of collateral estoppel does not require the same parties, as "the fact that a party has not had

his day in court on an issue as against a particular litigant" is not decisive) (internal citations and

quotations omitted). Further, the pendency of an appeal or the possibility of an appeal does not

prevent the use of the prior judgment as the basis of collateral estoppel. *See DiSorbo v. Hoy*, 343

F.3d 172, 183 (2d Cir. 2003) ("the mere pendency of an appeal does not prevent the use of the

challenged judgment as the basis of collaterally estopping a party to that judgment in a second

proceeding.").

  60. Defendants already litigated the issue of whether the collateral for the Assigned

Loans and the 2-Year Note was the sole recourse for Plaintiff in *Hahn & Hessen LLP v. Peck, et

al.*, Index No. 603122/2008 (N.Y. Sup. Ct. N.Y. Cnty. Nov. 25, 2013) (the "*Hahn & Hessen*

Opinion") and thereby collateral estoppel precludes Defendants from advancing that same

argument here. The *Hahn & Hessen* Opinion is a previous decision and order, rendered in state

court and officially entered on November 29, 2013, that ruled on issues related to this lawsuit.

The *Hahn & Hessen* Opinion further unambiguously sets forth Justice Jaffe's findings that the

collateral was not the sole recourse for Plaintiff because, among other reasons, the So-Ordered

Settlement Stipulation explicitly provides otherwise. The *Hahn & Hessen* Opinion is relevant, as

it directly opines on the issue of whether the collateral is the sole recourse for the Plaintiff, the

very same issue raised in Defendants' Memorandum supporting their Motion to Dismiss here,

and holds that Defendants' arguments on that issue necessarily fail.

  61. The *Hahn & Hessen* court heard and subsequently rejected the Defendants'

argument that the collateral was Plaintiff's sole recourse under the So-Ordered Stipulation. The

*Hahn & Hessen* court further held that the facts demonstrated that Plaintiff never agreed to accept a sole recourse provision and that Defendants were aware of that fact, despite their contentions, when granting summary judgment for the law firm on the malpractice claim. The resolution of this issue was necessary and material to the decision on the merits of the Defendants' malpractice claim against the firm, just as it is necessary to the resolution of Plaintiff's claims here. Lastly, the *Hahn & Hessen* court rendered the summary judgment decision for the law firm following discovery. The issue was therefore fully litigated. The fact that the *Hahn & Hessen* matter is still pending is neither dispositive nor helpful to Defendants' arguments, as the pendency of an appeal does not diminish the preclusive effect of a previous decision under New York law. *See DiSorbo*, 343 F.3d at 183. Accordingly, collateral estoppel bars relitigation of this issue.

62.     Thus SageCrest was under no obligation to liquidate the collateral, whether or not the collateral was in its possession.

<u>Arranger's Fees</u>

63.     Defendants assert that they are entitled a "secured first out" right to any commissions, fees or expenses, or arranger's fees (collectively "Arranger's Fees") from the sale of any of the Assigned Collateral. Defendants assert Plaintiff has breached the So-Ordered Settlement Stipulation by failing to pay them Arranger's Fees. As previously noted, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages. *See Rexnord Holdings,* 21 F.3d at 526.

64.     As an initial matter, nothing in the So-Ordered Settlement Stipulation obligates Plaintiff to pay Arranger's Fees. To the contrary, if Arranger's Fees are recoverable, they can only be recovered from the underlying borrowers. There is no grant of any security interest to relating to the Arranger's Fees.

65.     More damaging to Defendants' claim is the fact that ACG Finance and Fine Art Finance assigned the arranger's agreements to Plaintiff. (*See* PX 43.)  Accordingly, Plaintiff is the only party that might be entitled to Arranger's Fees relating to the Assigned Collateral.

66.     Further, ACG Finance and Fine Art Finance lost any rights to Arranger's Fees when ACG-II failed to pay the Balance and Additional Interest on November 19, 2008 and cure that default.  The Collateral Assignment clearly and unequivocally states that "if Assignee does not receive the Balance plus any Additional Interest and any Assigned Loans Costs in available funds or before the expiration of the Grace Period and after five (5) business days written notice to Borrower and Assignor, then Assignor shall have no interest in the Assigned Loans unless and until all such amounts are paid to Assignee." (PX 1, Ex. L.)  It is undisputed that Defendants did not pay the Balance and Additional Interest at any time, let alone after the expiration of the Grace Period or within five days after receipt of the Notice of Default.  Thus Defendants cannot sustain their counterclaim for Arranger's Fees.

67.     Furthermore, Defendants' entitlement to Arranger's Fees has already been considered and rejected in *In re Barquet Group*,  477 B.R. 454 (Bankr. S.D.N.Y. 2012), *aff'd*, *ACG Credit Company, LLC v. Barquet Group, Inc.*, 486 B.R. 68 (S.D.N.Y. 2012).  Defendants ACG Finance, Fine Art Finance, and ACG-I filed a Proof of Claim in the Barquet bankruptcy proceeding alleging a secured claim of $3,075,000 based on Arranger's Fees arising out of the Barquet Loan, which was assigned to SageCrest pursuant to the Collateral Assignment.  This claim was expunged and disallowed by the Bankruptcy Court in *In re Barquet Group, Inc. See id.*  The order was affirmed by the District Court, which held that the Bankruptcy Court "correctly found that Claimants did not have a meritorious defense to the Claim Objection in light of the undisputed fact that, pursuant to the [So-Ordered] Settlement Stipulation, they had

assigned all of their claims against Barquet Group and ACG Finance's lien to SageCrest." *ACG Credit Co., LLC*, 486 B.R. at 73.

68.     As the Supreme Court noted in *Katchen v. Landy*, 382 U.S. 323, 334 (1966), "a creditor who offers a proof of claim and demands its allowance is bound by what is judicially determined, and if his claim is rejected, its validity may not be relitigated in another proceeding on the claim." 382 U.S. 323, 334 (1966); *see also EDP Med. Computer Sys., Inc. v. U.S.*, 480 F.3d 621, 625 (2d Cir. 2007) (internal quotations and citations omitted) (barring plaintiff from seeking refund of tax liability paid by the bankruptcy trustee where the bankruptcy court issued an order allowing an uncontested proof of claim); *In re Nicholas*, 457 B.R. 202, 218 (Bankr. E.D.N.Y. 2011) (court held that relitigation of a party's dismissed proof of claim in a separate action was barred by the doctrines of res judicata and collateral estoppel).

69.     Accordingly, since Defendants have previously asserted a claim to Arranger's Fees under the Barquet Loan, and such claim was denied, Defendants are barred from asserting any such claim to Arranger's Fees under the Barquet Loan in the instant action. *See Katchen*, 382 U.S. at 334; *EDP Med. Computer Sys., Inc.*, 480 F.3d at 625; *In re Nicholas*, 457 B.R. at 218.

70.     Defendants assert a claim against Plaintiff for tortious interference with their Arranger's Fees. Under New York law, the elements for tortious interference with contract are: (1) the existence of a valid contract between plaintiff and a third-party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom. *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006); *see also William Kaufman Org., Ltd. v. Graham & James LLP*, 269 A.D.2d 171, 173, 703 N.Y.S.2d

439, 442 (1st Dep't 2000) (same).  Here, Defendants were not entitled to Arranger's Fees by

virtue of their failure to pay the Balance and Additional Interest.  Therefore, since they were not

entitled to the Arranger's Fees, Defendants cannot show damages resulting from any alleged

interference with their ability to collect Arranger's Fees, nor can they show that any interference

with such Arranger's Fees was unjustified.  Accordingly, Defendants' claim for tortious

interference necessarily fails.

Claims Relating to Plaintiff's Fraudulent Inducement Claims

71.     Defendants' counterclaim relating to the fraud claims brought by Plaintiff fail.

Plaintiff's fraudulent inducement claim relating to the Assigned Loans is against two parties, Art

Capital Inc. and Fine Art Finance – two entities that were not released in the So-Ordered

Settlement Stipulation.  (PX 1 at § 20.)  Defendants previously moved to dismiss that claim, but

that motion was denied.  (PX 589.)  In Plaintiff's original complaint, it asserted a fraud claim

against other parties.  Defendants did not, however, comply with the requisite rules before filing

a motion to dismiss that claim.  As noted in Plaintiff's opposition motion, Plaintiff was in the

process of amending the complaint and revising the fraudulent inducement claim to be limited to

parties that were not released.  Indeed the Complaint was immediately so amended.

Accordingly, Defendants suffered little, if any damage and had they complied with the Court

rules, would have suffered no damages.  This pretextual claim is baseless.

**Counterclaim for Contempt**

72.     Defendants assert a claim for contempt based on SageCrest's supposed breach of

the So-Ordered Settlement Stipulation.  Again, a claim for civil contempt requires the showing

that a lawful judicial order expressing an unequivocal mandate was in effect and was disobeyed.

*See McCain*, 84 N.Y.2d at 226, 616 N.Y.S.2d at 341; *see also* CPLR § 5104; Judiciary Law

§ 753(A)(3).

73.     As discussed in detail above, Defendants cannot establish any breach by SageCrest.  Therefore, as Defendants cannot establish an essential element of their civil contempt claim, their claim fails.

Dated:  June 11, 2014

PLAINTIFF JOHN D. HUBER, as Trustee of the SageCrest Liquidating Trust

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By: /s/Robert S. Friedman_____
     Robert S. Friedman (admitted *pro hac vice*)
     Mark E. McGrath (ct28814)
30 Rockefeller Plaza
New York, New York 10112
Telephone:  (212) 653-8700

- and -

ZEISLER & ZEISLER, P.C.
James Berman (ct06027)
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Telephone: (203) 368-4234